## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MABVAX THERAPEUTICS HOLDINGS, INC., *et al.*,[1] | ) ) ) | Case No. 19- |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO SECTIONS 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e)
AND 507 OF THE BANKRUPTCY CODE (I) AUTHORIZING DEBTORS TO (A)
OBTAIN POST-PETITION SECURED FINANCING FROM BIONTECH RESEARCH
AND DEVELOPMENT, INC.; (B) UTILIZE CASH COLLATERAL; AND
(C) PAY CERTAIN RELATED FEES AND CHARGES; AND
(II) SCHEDULING A FINAL HEARING**

MabVax Therapeutics Holdings, Inc. ("**MabVax Holdings**") and MabVax Therapeutics, Inc. ("**MabVax**" and together with MabVax Holdings, the "**Debtors**"), file this motion (the "**Motion**")[2] for the entry of an emergency interim financing order (the "**Interim DIP Order**"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**") (a) authorizing the Debtors, to obtain post-petition financing (the "**DIP Financing**"); (b) granting first priority priming liens and superpriority claims with respect to such post-petition financing; (c) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of this Interim DIP Order; (d) prescribing the form and manner of notice and setting the time for the final hearing on this Motion (the "**Final Hearing**"); and (e) granting related relief.

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) MabVax Therapeutics Holdings, Inc. (7903) and (ii) MabVax Therapeutics, Inc. (1765). The Debtors' mailing address is 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order.

The Debtors have filed this Motion on an emergency basis because they require immediate access to liquidity to fund ordinary course working capital needs and chapter 11 administrative expenses and to effectuate the sale of the Debtors' assets.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1(b) and 4001-2.

## BACKGROUND

4.      On the date hereof (the "**Petition Date**"), the Debtors each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing these

bankruptcy cases (together, the "**Chapter 11 Cases**").  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No trustee, examiner, or creditors' committee has been appointed in the Chapter 11 Cases.

6.      MabVax, a wholly owned subsidiary of MabVax Holdings, is a non-operating company that holds certain patents and other property that the Debtors are seeking to sell in these Chapter 11 Cases.

7.      MabVax Holdings is a biotechnology company specializing in clinical-stage immuno-oncology drug development with a fully human antibody discovery platform focused on the clinical development of products to address unmet medical needs in the treatment of cancer and pancreatitis.

8.      The Debtors' prepetition capital structure and the events leading up to the commencement of this case are set forth in Declaration of J. David Hansen in Support of Debtors Chapter 11 Petitions and First Day Motions (the "**Hansen Declaration**") filed concurrently herewith and fully incorporated by reference.

**I.      Pre-Petition Obligations**

9.      As of the Petition Date, the Debtors' aggregate funded and matured secured debt obligations were approximately $3,000,000, plus accrued expenses (subject to the Debtors' verification).  This amount is owed to the Debtors' sole pre-petition secured lender: Oxford Finance LLC (the "**Pre-Petition Lender**" or "**Oxford**").

10.     On January 15, 2016, the Debtors and the Pre-Petition Lender entered into that certain Loan and Security Agreement (as amended, the "**Loan Agreement**").  The Pre-Petition

Loan Agreement provides for two equal tranches of $5,000,000 each. The first tranche of $5,000,000 (the "**Term A Loan**") was funded on January 15, 2016.  The option to fund the second tranche of $5,000,000 was exercisable by the Debtors upon achieving certain milestones.  The option was not exercised and expired on September 30, 2016.  The interest rate for the Term A Loans is set on a monthly basis at the index rate plus 11.29%, where the index rate is the greater of the 30-day LIBOR rate or 0.21%.  Interest is due on the first day of each month, in arrears, calculated based on a 360-day year.  The Term A Loan was interest only for the first year after funding, and the principal amount of the loan is amortized in equal principal payments, plus period interest, over 36 months.  A facility fee of 1.0% or $100,000 was due at closing of the transaction and was paid by the Debtors on January 15, 2016.

11.     The Loan Agreement thereafter was amended three times.

- First Amendment (March 31, 2017) (extended payment due date by 2 months);

- Second Amendment (July 3, 2018) (approved sale of certain assets, payment of fees and extended maturity date, in exchange for lien on intellectual property); and

- Third Amendment (January 1, 2019) (provides for a payment schedule based on arrears).

12.     To secure repayment of the Term A Loan, the Debtors granted the Pre-Petition Lender a first lien upon and security interest in, *inter alia,* goods, accounts receivable, inventory, equipment, deposit accounts, general intangibles (excluding intellectual property), and investment property (the "**Oxford Security Agreement**").  The Debtors also entered into a Deposit Account Control Agreement with the Pre-Petition Lender.  In the Second Amendment to the Loan Agreement, MabVax Holdings granted the Pre-Petition Lender a security interest in intellectual property in exchange for the Pre-Petition Lender's consent to the Debtors entering into an asset purchase and license agreement with Boehringer Ingelheim International GmbH

("**Boehringer Ingelheim**"),[3] by entering into a separate Intellectual Property Security Agreement between the Debtor and the Pre-Petition Lender.

13.     As of the Petition Date, the amount due and owing, including principal and non-default interest, under the Loan Agreement is $3,000,000, plus accrued expenses (subject to the Debtors' verification).

14.     On February 28, 2019, the Debtors entered into an unsecured promissory note with BioNTech AG ("**BioNTech**")[4] for $258,000 (the "**Pre-Petition Unsecured Loan**").  The Pre-Petition Unsecured Loan was funded on March 11, 2019 and was fully used to provide necessary liquidity to bridge the Debtors to the filing date for these Chapter 11 Cases.

## II.     The Debtors' Liquidity Crisis

15.     Like other clinical-stage biotechnology companies, MabVax Holdings cannot earn product revenue until it (or its collaborative partners) complete clinical trials, obtain regulatory approval, and successfully commercialize one or more of its products.  Consequently, it relies on outside financing, and the sale and licensing of certain intellectual property to fund its operations.  The Debtors have not yet brought any products to market and consequently have incurred net losses since inception.

16.     As detailed in the Hansen Declaration, MabVax learned the SEC brought fraud claims against certain investors for misconduct involving their investment in and trading of MabVax stock.  MabVax considers itself a victim of the activities of these investors.  The SEC has never brought or threatened any claims against MabVax.  MabVax Holdings is now the target of two derivative investor lawsuits.  Further, MabVax Holdings was deregistered from the

---

[3] Boehringer Ingelheim is Europe's largest privately held biopharmaceutical company pioneering the development of individualized therapies for cancer and other diseases.
[4] BioNTech is a researched-based pharmaceutical biotech company that develops tailored treatments for cancer and other diseases with high unmet medical need through its disruptive research platforms. Its affiliate, BioNTech Research and Development, Inc., is the Stalking Horse Bidder and the proposed DIP Lender.

NASDAQ exchange, primarily as a result of the "pump and dump" scheme, temporarily invalidating the number of shares of common stock outstanding and votes on stockholder matters. As a result of the "pump and dump" scheme, the Pre-Petition Lender alleged an event of default under the Loan Agreement. MabVax Holdings also had to incur substantial legal fees in connection with the SEC investigation and to obtain declaratory relief in the Delaware Court of Chancery in order to rectify uncertainty regarding whether shares of its common stock were validly issued upon conversion of preferred stock from June 30, 2014 to February 12, 2018.

### III.    The Debtors' Efforts to Generate Liquidity

17.    As detailed in the Hansen Declaration, the Debtors attempted to generate sufficient liquidity through equity issuances, asset sales, licensing certain intellectual property and reducing their workforce. However, these efforts did not generate the liquidity needed to continue operating the Debtors as a going concern absent further financing.

***Efforts by Northland Securities to Raise Capital for MabVax Holdings***

18.    With the discoveries made at Cold Spring Harbor Laboratories demonstrating that its lead antibody product, already being tested in clinical trials at several sites, could have a positive impact on the treatment of pancreatitis, MabVax Holdings engaged Northland Securities ("**Northland**") on October 4, 2018 to raise up to $20 million to support a Phase 2 clinical program. Northland is a mid-sized investment banking firm with significant experience in raising capital for biopharmaceutical firms. With Northland's input, MabVax Holdings created new non-confidential and confidential marketing materials for an outreach program targeted at institutional investors who regularly invest in early stage companies. After three months of activity, Northland reported to MabVax Holdings that while they could get investors interested in the science, the fact that MabVax Holdings was involved in an SEC investigation and still had

the investors charged by the SEC for stock manipulation and fraud as substantial shareholders, it was unlikely they would be successful.  MabVax Holdings agreed to terminate the engagement as of January 4, 2019.

### *Discussions with Oxford about Additional Funding*

19.     MabVax Holdings asked Oxford to provide bridge financing on multiple occasions since Oxford first alleged an event of default under the Loan Agreement in mid-2018.  Although Oxford was not willing to provide any additional funding to the Debtors, it agreed to reasonably cooperate with MabVax Holdings in connection with a bankruptcy sale of MabVax Holding's assets.  Toward that end, Oxford has agreed to subordinate its senior first lien security interest and lien position to liens and security interests securing the DIP Financing; provided, however, that (i) such priming DIP Financing is provided by the proposed DIP Lender; (ii) the *maximum* amount of such DIP Loan shall in no event exceed $500,000; and (iii) the proceeds of the DIP Loan shall be used consistent with the Budget (as defined below).

20.     The Debtors face a severe liquidity crisis arising from the accrued legal and clinical development fees, limited access to funds through equity offerings, the alleged default under their secured loan and the inability to either sell the entire company or license or sell significant assets of the company.  In the Debtors' business judgment, the best means to maximize value for their stakeholders is to sell their assets in a section 363 sale.

### IV.     Pre-Petition Marketing

21.     Beginning in September 2018, the Debtors retained Greenhill & Company ("**Greenhill**") to act as financial advisor to market the Debtors' assets.

22.     Greenhill contacted and sent introductory marketing materials to fifty-nine (59) different parties that Greenhill and the Debtors determined were potential candidates for a

transaction.  Of those fifty-nine (59) parties, nineteen (19) executed non-disclosure agreements (the "**Greenhill Interested Parties**").  Three parties moved forward to negotiate terms sheets. Ultimately, two parties submitted offers for specific assets.  However, for reasons outside their control, the Debtors were not able to consummate a deal for a sale of substantially all of their assets.

23.     Given the Debtors increasingly difficult financial condition, the Debtors, in December of 2018, again made an attempt to sell substantially all of the company's assets by retaining another highly experienced investment bank, Objective Capital Partners, LLC ("**Objective Capital**").

24.     Objective Capital contacted and sent marketing materials to fifty-five (55) different parties that Objective Capital and the Debtors determined were potential candidates for a transaction, including re-soliciting several potential candidates that were approached by Greenhill.  Several of the prospective buyers expressed interest and held high level meetings with management.  Of those expressing interest, seven (7) executed non-disclosure agreements (the "**Interested Parties**").  The Interested Parties that executed non-disclosure agreements were then given the opportunity to gain access to a data room containing confidential information related to the Debtors and to participate in management meetings, either in person or telephonically, with Objective Capital and the Debtors' management team.  One of these parties submitted a letter of intent.

25.     The Debtors' CEO directly initiated strategic discussions and presentations with at least three possible buyers.   All three of these parties engaged in due diligence and executed letters of intent in the management-led marketing process.  The Stalking Horse Bidder (as defined below) and two other bidders thereafter engaged in a competitive bidding process that

improved offers from an initial offer of $1 million to the current $3.7 million offer from the Stalking Horse Bidder (as defined below).

**V.**     **The Stalking Horse Offer and the DIP**

26.     At the conclusion of the sales process, the board of directors of the Debtors determined that the offer (as amended, supplemented or otherwise modified, the "**Stalking Horse Offer**") that BioNTech Research and Development, Inc. or its designee (the "**Stalking Horse Bidder**") submitted was the highest and best offer.  The Stalking Horse Offer is for substantially all assets of the Debtors (but does not include certain accounts receivable and avoidance and other litigation claims), as further described in the sale motion filed contemporaneously herewith.

27.     The Stalking Horse Offer also involved the issuance of a pre-petition unsecured loan in the amount of $258,000, as well as funding of up to $500,000 of post-petition financing by the Stalking Horse Bidder, as a post-petition lender (in such capacity, the "**DIP Lender**") to cover the operating and administrative expenses associated with preserving the Debtors' operations and running the chapter 11 sales process set forth in the proposed Bidding Procedures.

28.     The Stalking Horse Offer will provide substantial value to the Debtors and their estates.

29.     As contemplated by the Stalking Horse Offer, this Motion seeks approval of the DIP Facility to fund ordinary course working capital needs and chapter 11 administrative expenses through the consummation of the 363 sales process.

30.     The DIP Facility represents the best source of financing available to the Debtors under the circumstances, and was negotiated at arm's length with both the Pre-Petition Lender

and the DIP Lender, resulting in terms that the Debtors submit are reasonable and appropriate to meet the Debtors' financing needs during the Chapter 11 Cases.

31.    The Debtors have not been able to obtain an alternative financing commitment on terms better than those proposed by the DIP Lender, or, indeed, on any other terms.  While the DIP Facility contemplates a priming of the Pre-Petition Lender's security interests, the Pre-Petition Lender has consented to such priming in the context of the global resolution of this case.

32.    Specifically, the DIP Facility provides:

    a.  for a term loan of up to a maximum of $500,000 (the "**Stated Principal Amount**"), secured by a first priority priming lien on any and all pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, except certain limited excluded assets; and

    b.  borrowings and disbursements to be made in two draws pursuant to the terms of the Budget attached hereto as **Exhibit D** (as may be modified from time to time with the consent of the DIP Lender in its sole discretion, but without need for further Court order, the "**Budget**"), but under no circumstance shall borrowings and disbursements be for a principal amount in excess of the Stated Principal Amount.

## **TERMS AND CONDITIONS OF THE DIP FACILITY**

33.    The following chart contains a summary of the essential terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.[5]

| Rule Citation | Summary of Material Terms |
|---|---|
| **Borrowers** | MabVax Therapeutics Holdings, Inc. and MabVax Therapeutics, Inc. |

---

[5]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined therein shall have the meanings ascribed to them in the Interim DIP Order or the DIP Loan Agreement, as applicable.

| Rule Citation | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | *See* Interim DIP Order, Preamble; Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement ("<u>DIP Loan Agreement</u>") (attached hereto as **Exhibit B**), Preamble. |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | BioNTech Research and Development, Inc.<br><br>*See* Interim DIP Order at preamble; DIP Loan Agreement, Preamble. |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The DIP Facility shall include an Interim Loan and a Final Loan to be advanced and made available to the Debtors in the aggregate maximum principal amount of up to $500,000.<br><br>*See* Interim DIP Order, ¶ 1; DIP Loan Agreement, Definitions and § 2.1. |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local 4001-2(a)(ii) | Except with respect to the payment of the Carve-Out (as defined herein), the DIP Lender's agreement to provide the DIP Financing in accordance with the DIP Documents shall immediately and automatically terminate (except as the DIP Lender may otherwise agree in writing in its reasonable discretion), upon the earliest to occur of any of the following: (i) the date which is the earliest of (a) the date that is three (3) months from the date of the first Loan under this DIP Loan Agreement, (b) the Acquisition Closing, (c) the first Business Day following entry by the Court of an order approving an Alternative Transaction (an "<u>Alternative Transaction Order</u>"), (d) the effective date as of which the Acquisition Agreement terminates in accordance with its terms (so long as such termination is not due to a breach thereof by the DIP Lender), (e) the earlier of the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Court, and (f) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of the DIP Agreement and the other Loan Documents, including <u>Section 7</u> thereof.  One of the other Loan Documents is the Security Agreement attached hereto as **Exhibit C**.<br><br>*See* DIP Loan Agreement, Definitions and §§ 2.1, 2.1(b)(ii), 2.3 and 2.4(a)(i). |
| **Use of Post-Petition Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | Unless otherwise agreed to by the DIP Lender, the Debtors shall use the proceeds of the DIP Facility solely to pay the Debtors' reasonable and documented expenses in accordance with the terms of the Budget and any applicable Variance Report(s), as reviewed and approved by the DIP Lender.<br><br>*See* DIP Loan Agreement, Definitions, § 5.2.<br><br>The DIP Loan Agreement provides that the DIP Lender is entitled to reimbursement of its legal fees and expenses. |

| Rule Citation | Summary of Material Terms |
|---|---|
| | DIP Loan Agreement § 8.5(a).<br><br>As part of the consideration offered in connection with its proposed purchase of the Debtors' assets, the DIP Lender waived its contractual and legal rights to be reimbursed for its legal fees.<br><br>*See* Interim DIP Order, ¶ 5. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | It is presently expected that the Pre-Petition Lender will have an interest in approximately $31,347.00 of pre-petition cash collateral of the Debtors as of the Petition Date, which interest will be primed by the liens securing the DIP Facility. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | 8% per annum, provided the DIP Facility is not in default; 10% per annum upon default.<br><br>*See* DIP Loan Agreement, § 2.5(a). |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001- 2(a)(ii) | The obligation of the DIP Lender to make advances is subject to customary borrowing conditions and certain plan milestones, including: (a) an order approving bidding procedures on or before April 12, 2019, and (b) approving the sale by May 15, 2019.<br><br>*See* DIP Loan Agreement, §§ 4.1, 4.2 and 5.5. |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Budget mutually agreed upon by the Debtors and the DIP Lender, in an amount not more than $500,000, as may be modified from time to time with the consent of the DIP Lender in its sole discretion, but without need for further Court order, and not to exceed, in any event, the Stated Principal Amount.<br><br>Pursuant to the approved Budget, the Debtors will be authorized to borrow up to (i) $200,000 on an interim basis; and (ii) up to $500,000 (inclusive of amounts previously borrowed) on a final basis through May 31, 2019.<br><br>*See* Budget attached to the DIP Loan Agreement; Interim DIP Order, ¶ 2. |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Standard or ordinary reporting requirements including, without limitation, Budget related information; providing copies of, or access to, cash flows, cash balance reports or any other financial reports as reasonably requested by the DIP Lender. |

| Rule Citation | Summary of Material Terms |
|---|---|
| Local Rule 4001- 2(a)(ii) | *See* DIP Loan Agreement, § 5.4. |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001- 2(a)(ii) | Notwithstanding the then applicable Budget, the Debtors may exceed the budgeted amount for any line item during any weekly budget period by no more than 10% in the aggregate or per line item, not to exceed the Stated Principal Amount.<br><br>*See* DIP Loan Agreement, § 5.2. |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001- 2(a)(ii) | The Debtors shall obtain orders from the Court in a form reasonably acceptable to the DIP Lender (a) approving bidding procedures on or before April 12, 2019 and (b) approving the sale on or before May 15, 2019.<br><br>*See* DIP Loan Agreement, § 5.5. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001- 2(a)(i)(D) and (G), 4001- 2(a)(ii) | DIP Liens:<br><br>Subject and subordinate to the Carve-Out in all respects, all of the DIP Facility Obligations shall be (i) a superpriority administrative claim pursuant to section 364(c)(1) of Bankruptcy Code, having priority over any and all administrative expenses including, without limitation, administrative expenses or claims of the kind specified in sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 365, 503, 506, 507, 546, 552, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment; (ii) valid and perfected security interests and liens, senior to all other creditors of the estates of the Debtors, pursuant to section 364(c)(2) of the Bankruptcy Code, in and upon all now existing and hereafter acquired personal and real property and fixtures of the Debtors and their bankruptcy estates, and the proceeds thereof, of whatever kind or nature, whether acquired prior to or subsequent to the Petition Date (other than the Avoidance Actions), that is not subject to an existing properly perfected and unavoidable lien; (iii) valid and perfected junior security interests and liens in and upon all now existing and hereafter acquired personal and real property and fixtures of the Debtors and their bankruptcy estates, and the proceeds thereof, of whatever kind or nature, whether acquired prior to or subsequent to the Petition Date that is subject to an existing properly perfected and unavoidable Permitted Lien pursuant to section 364(c)(3) of the Bankruptcy Code; and (iv) valid and perfected first priority priming security interests and liens in and upon all now existing and hereafter acquired personal and real property and fixtures of the Debtors and their bankruptcy estates, and the proceeds thereof, of whatever kind or nature, whether acquired prior to or subsequent to the Petition Date that is subject to an existing properly perfected and unavoidable Primed Lien pursuant to section 364(d)(1) of the Bankruptcy Code.<br><br>The DIP Facility Liens shall be junior only to (i) the Permitted Liens in the case of Liens granted under section 364(c)(3) of the Bankruptcy Code and (ii) the Carve-Out. |

| Rule Citation | Summary of Material Terms |
|---|---|
| | *See* Interim DIP Order, ¶ 3; DIP Loan Agreement, § 2.9. |
| **Repayment and Prepayment** | The DIP Facility Superpriority Claims shall be allowed in full and paid from the proceeds of the sale (or at the DIP Lender's option, credit bid at the auction).<br><br>Draws against the DIP Facility can be prepaid in any amount.<br><br>*See* DIP Loan Agreement ¶¶ 2.4(b) and 2.4(c)(ii). |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(f) | The liens and claims of the DIP Lender and the Pre-Petition Lender shall be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"): (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code; and (ii) unpaid fees, costs, disbursements, charges and expenses incurred at any time before the date of conversion of the Case to a case under Chapter 7 of the Bankruptcy Code (the "Carve-Out Trigger Date") by firms retained by the Debtors whose retention is approved by the Court pursuant to sections 327, 328, 330 or 331 of the Bankruptcy Code ("Carve-Out Expenses"), to the extent such Carve-Out Expenses are allowed by the Court at any time before the Carve-Out Trigger Date not to exceed the amount expressly set forth in the Budget.<br><br>*See* DIP Loan Agreement, §§ 1.1, 2.9(a), 6.12(a)-(b). |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001- 2(a)(ii) | <u>Events of Default</u>.<br><br>Usual and customary for financings of this type, including, without limitation, non-payment of principal and interest, defaults under affirmative and negative covenants and breaches of representations and warranties.  Failure to achieve the case milestones set forth in the Interim DIP Order and DIP Loan Agreement (discussed above) would constitute an Event of Default thereunder.  Additionally, certain actions, if taken, or pleadings, if filed, would constitute an Event of Default.<br><br>*See* DIP Loan Agreement, § 7.1.<br><br><u>Remedies</u>.<br><br>Upon the occurrence of an Event of Default, the DIP Lender may (i) declare the Commitment of the DIP Lender to make the Loans terminated, whereupon the Commitment shall be terminated, (ii) declare the unpaid principal amount of all outstanding Loans, all interest accrued thereon, and all other amounts owed or payable under any DIP Loan Document to be immediately due and payable, and (iii) exercise all rights and remedies available to it under the DIP Loan Documents. Without limiting the foregoing, immediately upon the earlier of entry of an Alternative Transaction Order or any termination of the Acquisition Agreement, the |

| Rule Citation | Summary of Material Terms |
|---|---|
| | Commitment shall terminate.  After the occurrence of an Event of Default, subject only to the delivery by the DIP Lender of three (3) Business Days' prior written notice to the Debtors (with a copy to counsel for the Debtors, counsel for the Creditors' Committee, the UST and the Court) of its intent to exercise any rights or remedies under this Agreement or any other DIP Loan Document, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order by the Court and the DIP Lender shall be entitled to exercise all such rights and remedies, including against the Collateral.<br><br>*See* DIP Loan Agreement, § 7.1. |
| **Waiver / Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay shall be modified to the extent necessary to permit the DIP Lender to exercise its remedies in accordance with the terms of the Interim DIP Order and DIP Loan Documents, including subject to any notice requirements set forth therein.<br><br>*See* Interim DIP Order ¶ 10. |
| **Waiver / Modification of Applicability of Non-bankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Liens shall be effective and perfected upon the date the Interim DIP Order is entered and without the necessity of the execution, recordation of filings by the Debtors or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of or over any DIP Collateral.<br><br>*See* Interim DIP Order, ¶ 6. |
| **Releases**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | None. |
| **506(c) Waiver**<br><br>Local Rule 4001-2(a)(i)(D) | 506(c) waiver to DIP Lender.<br><br>*See* Interim DIP Order, ¶ 4. |
| **Disparate Treatment of Professionals in Carve-Out**<br><br>Local Rule 4001- | The Carve-Out provides for payment of the fees and expenses of counsel to the Debtors.  There is no funding and not a carve-out for counsel to a Creditors' Committee.<br><br>*See* Budget; DIP Loan Agreement Definitions. |

| Rule Citation | Summary of Material Terms |
|---|---|
| 2(a)(i)(F) | |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(l)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(D) | None.<br><br>*See* Interim DIP Order, ¶ 3. |
| **Credit Bid Rights**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001- 2(a)(ii) | DIP Lender (and all other secured creditors) are given credit bid rights in the proposed bidding procedures. |

## **RELIEF REQUESTED**

34.     The Debtors seek entry of the Interim DIP Order and, where applicable, the Final

DIP Order:

   a.   authorizing the Debtors to enter into the secured DIP Facility, which shall include loans to be advanced and made available to the Debtors, up to a maximum of $500,000 (subject to the terms of the DIP Loan Documents), with up to $200,000 to be available upon entry of the Interim DIP Order and satisfaction of other conditions to borrowing;

   b.   ordering that, subject to the Carve-Out, in all respects, all obligations of the Debtors to the DIP Lender under the DIP Documents shall be:

      i.   entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code;

      ii.   secured, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, by a perfected first priority lien on all of the pre- and post-petition property of the Debtors whether existing on the Petition Date or thereafter acquired (excluding avoidance actions); and

      iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a perfected junior lien on all of the property of the Debtors that is subject to a Permitted Lien.

    c. modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order or the Final DIP Order, as applicable;

    d. scheduling the Final Hearing to consider entry of the Final DIP Order, and approving the form of notice with respect to the Final Hearing; and

    e. granting related relief.

### THE DEBTORS HAVE AN IMMEDIATE NEED FOR CASH

35.    The Debtors propose to use the proceeds of the DIP Facility to, among other things, pay employee wages, employee benefits, certain other operational expenses and to fund administration of these Chapter 11 Cases in order to effectuate a 363 sales process, all as set forth in the Budget. Without access to the DIP Facility and Cash Collateral to satisfy these obligations, the Debtors will have insufficient funds to continue to pay wages for their employees and administer the Chapter 11 Cases. Thus, the Debtors' access to the DIP Facility and Cash Collateral will facilitate their efforts to maximize value of the Debtors' estates for their creditors through the closing a 363 sale.

### ALTERNATIVE SOURCES OF FINANCING ARE NOT READILY AVAILABLE

36.    In light of their extensive prepetition efforts to restructure or sell their businesses and the fact that their assets are subject to the liens of the Prepetition Lender, the Debtors do not believe that alternative sources of financing are readily available. In addition, the Debtors do not believe it would be prudent, or even possible, to administer the Chapter 11 Cases on a "cash collateral" basis. Without access to the DIP Facility, the Debtors have limited cash on hand, and do not expect to be able to generate sufficient levels of cash flow through operation of the Debtors' business to cover cash needs and the projected costs of the Chapter 11 Cases. In

addition, even if the Debtors could secure an alternative source of financing, consummating such financing would allow the Stalking Horse Bidder to terminate the Stalking Horse Offer, thereby causing a loss of the substantial consideration offered to the Debtors' estates thereunder.  This result would cause a severe hardship to the Debtors and their stakeholders.

37.     In sum, the Debtors believe that, given the realities of the current circumstances, the proposed DIP Facility represents the best (and likely only) option available to address the Debtors' immediate liquidity needs.  It is the product of extensive arm's length negotiations with the DIP Lender and is an essential component of running the proposed 363 sale process.

## **BASIS FOR RELIEF**

**A.      The Debtors Should Be Authorized to Obtain DIP Financing Through the DIP Facility**

**i.      Entering Into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment**

38.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and use Cash Collateral.   Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.   Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc*., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a [trustee] in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

39.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a trustee's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the trustee's authority under the [Bankruptcy] Code").

40.     Furthermore, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the estate and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986). The Court may also appropriately take into consideration non-economic benefits to an estate offered by a proposed post-petition facility. For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtor and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

41.    The Debtors' determination to move forward with the DIP Facility is an exercise of the Debtors' sound business judgment following an arm's length process and careful evaluation of alternatives.  Specifically, the Debtors require post-petition financing to fund the Debtors' working capital needs and the administrative expenses of the chapter 11 process.  The terms of the DIP Facility are advantageous to the Debtors.  Further, the DIP Facility funds the Chapter 11 Cases as contemplated under the Stalking Horse Offer.  Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Lender in good faith, at arm's length, and with the assistance of its advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.

### ii. The Debtors Should Be Authorized to Obtain DIP Financing on a Secured and Superpriority Basis

42.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code.  The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

43.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

　　a.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

　　b.  the credit transaction is necessary to preserve the assets of the estate; and

> c. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

44.    Based on current loan market conditions, after consultation with its advisors, the Debtors determined that post-petition financing on an unsecured basis would be unobtainable. Without post-petition financing, the Debtors will not be able to preserve and maximize the value of the Debtors' estates.  Absent sufficient financing to operate the business during the Chapter 11 Cases, the value of the Debtors' estates would be substantially impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility are fair, reasonable, and adequate, all as more fully set forth below.

45.    In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving the DIP Facility Superpriority Claims in favor of the DIP Lender is reasonable and appropriate.

46.    The security interests and liens requested herein are appropriate under sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code because, among other things: (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in the property of the Debtors' estate, or (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and priming liens granted requested herein.  The Pre-Petition Lender has consented to

the Debtors' grant of a first lien and security interests in its collateral that primes its pre-petition liens to the extent of $500,000.

### iii.  No Comparable Alternative to the DIP Facility Is Reasonably Available

47.     In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor need not seek credit from every available source, but needs only to demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *See In re Snowshoe Co*., 789 F.2d 1085, 1088 (4th Cir. 1986) ("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is available"); s*ee also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor's estate, "it would be unrealistic and unnecessary to require the trustee to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).  Generally, a debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time of the essence' nature of this type of financing." *In Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).  *See also In re Sky Valley, Inc.*, 100 B.R. at 112-13 (exhaustive search not required where the business suffered from financial stress, had little or no unencumbered property, and primary property was subject to numerous liens, and thus debtors' approach of only four lenders was sufficient under such circumstances).

48.     The Debtors do not believe that alternative sources of financing are reasonably available.  Thus, the Debtors have determined that the DIP Facility provides the best option under the circumstances to both fund the Chapter 11 Cases and bridge the gap until the closing of

a section 363 sale.  Therefore, the Debtors submit that the requirements of section 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

### B.    The DIP Lender Should Be Deemed a Good-Faith Lender under Section 364(e)

49.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor's estate, and its right in any lien securing those loans, even if the authority of the trustee to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

50.    As explained herein, the DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed post-petition financing, and of arm's length, good-faith negotiations between the Debtors and the DIP Lender.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility other than as described herein.  Accordingly, the Court should find that the DIP Lender is a good-faith lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**C.    The Automatic Stay Should Be Modified on a Limited Basis**

51.    The Debtors request that the automatic stay imposed by section 362 of the Bankruptcy Code be modified to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order or the Final DIP Order, as applicable.  Among other things, the proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified, to the extent necessary, to permit the DIP Lender to exercise certain remedies if an Event of Default occurs and is continuing.

52.    Similar stay modifications are commonplace and standard features of post-petition financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.  *See, e.g., In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order*); In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.,* No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

**D.    Failure to Obtain the Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm**

53.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

54.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors from and after entry of the Interim DIP Order until the Final Hearing to receive advances contemplated by the DIP Facility.  The Debtors require these advances prior to the Final Hearing and entry of the Final DIP Order to be able to operate the Debtors' business and pay administrative expenses.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

55.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

56.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

57.     The Debtors will provide notice of this Motion via e-mail, facsimile, telephone, and/or hand delivery to:  (a) the U.S. Trustee for Region 3; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Pre-Petition Lender; (d) counsel to the proposed DIP Lender; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; and (g) the Food and Drug Administration.

58.    Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim DIP Order, and notice of the Final Hearing, by first class mail upon the parties referenced in the foregoing section above.  The Debtors respectfully submit that such notice is sufficient and requests that this Court find that no further notice of the Final Hearing and Final DIP Order is required.

**WHEREFORE**, the Debtors respectfully request entry of the Interim DIP Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein, and granting such other relief as is just and proper.

Dated: March 21, 2019
      Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

By: *<u>/s/ Frederick B. Rosner</u>*
Frederick B. Rosner (DE 3995)
Scott J. Leonhardt (DE 4885)
Jason A. Gibson (DE 6091)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
Email:  rosner@teamrosner.com
       leonhardt@teamrosner.com
       gibson@teamrosner.com

*Proposed Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MABVAX THERAPEUTICS HOLDINGS, INC., *et al.*,[1] | ) | Case No. 19- |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **Re: D.I. ___** |

**INTERIM ORDER (A) AUTHORIZING
AND APPROVING DEBTOR-IN-POSSESSION
FINANCING AND GRANTING FIRST PRIORITY AND PRIMING
SECURITY INTERESTS AND A SUPERPRIORITY ADMINISTRATIVE
CLAIM IN CONNECTION THEREWITH, (B) APPROVING THE TERMS
AND CONDITIONS OF THAT CERTAIN SENIOR SECURED SUPERPRIORITY
PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND RELATED
DOCUMENTS, (C) MODIFYING THE AUTOMATIC STAY TO THE EXTENT
NECESSARY TO ENTER INTO THE DEBTOR-IN-POSSESSION FINANCING AND
EFFECTUATE THE TERMS THEREOF AND (D) SCHEDULING A FINAL HEARING**

Upon consideration of the Motion (the "Motion") filed by MabVax Therapeutics Holdings,

Inc. and MabVax Therapeutics, Inc. (each a "Debtor" and collectively, "Debtors"), seeking, inter

alia, (a) authority pursuant to sections 105 and 364(c)(1), (c)(2), (c)(3) and (d)(1) of title 11 of the

United States Code ("Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure and Local Rules 2002-1 and 4001-2, for the Debtors to obtain post-petition

loans, advances and other credit accommodations from BioNTech Research and Development,

Inc. ("BioNTech" or, in its capacity as lender, "Lender") under that certain Senior Secured

Superpriority Priming Debtor-in-Possession Credit Agreement by and between the Lender and the

Debtors, substantially in the form attached as **Exhibit B** to the Motion ("DIP Credit Agreement")

and that certain Security Agreement between the Lender and the Debtors, attached to the Motion

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) MabVax Therapeutics Holdings, Inc. (7903) and (ii) MabVax Therapeutics, Inc. (1765). The Debtors' mailing address is 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121.

as **Exhibit C** ("DIP Security Agreement," and together with the DIP Credit Agreement and any other documents required to be executed in connection therewith, collectively, "DIP Loan Documents"), pursuant to which the Lender will be granted, subject in each case to the Carve-Out, (i) a superpriority administrative claim pursuant to 11 U.S.C. § 364(c)(1); (ii) first priority security interests in and liens upon substantially all unencumbered property of the Debtors' estates pursuant to 11 U.S.C. § 364(c)(2); (iii) junior security interests in and liens upon property of the Debtors' estates that is subject to an unavoidable lien pursuant to 11 U.S.C. § 364(c)(3) and (iv) first priority priming security interests in and liens upon property of the Debtors' estates that is subject to a prepetition unavoidable lien pursuant to 11 U.S.C. § 364 (d)(1); (b) approval of the terms and conditions of the DIP Loan Documents;[2] and (c) modification of the automatic stay solely to the extent necessary to enter into the proposed financing and effectuate the terms thereof; this Court having conducted a hearing on the Motion on March 22, 2019; and the Lender and Debtors having agreed and stipulated as follows, which stipulations this Court hereby approves and adopts:[3]

A.      Filing of Petitions.   On March 21, 2019 ("Petition Date"), the Debtors filed voluntary chapter 11 petitions under the Bankruptcy Code thereby commencing the above-captioned bankruptcy cases ("Chapter 11 Case").   Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are authorized to operate their business as debtors in possession.

B.      Jurisdiction: Core Proceeding.   Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (O).   This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C.

---

[2]      Unless otherwise defined herein, capitalized terms shall have the meanings ascribed thereto in the DIP Credit Agreement.

[3]      Each of the following findings by the Court will be deemed a finding of fact if and to the full extent that it makes and contains factual findings and a conclusion of law if and to the full extent that it makes and contains legal conclusions.

§§ 157 and 1334.  Venue is proper in this District.

C.    <u>Need for Funding</u>.  The relief sought in the Motion is necessary and in the best interests of the Debtors, their estates and creditors.  Without the proposed financing, the Debtors do not have the funds necessary to pay the costs and expenses in connection with (a) the Debtors' administration of this Chapter 11 Case, including, without limitation, payment of the fees and expenses of estate professionals, (b) consummation of the transfer and sale of the Debtors' assets in order to maximize recoveries for the Debtors' creditors, (c) payments required to be made under the Acquisition Agreement, and (d) management and preservation of the Debtors' assets.  The Debtors have requested that Lender make loans and advances to Debtors in order to provide funds to pay such costs and expenses. The Lender is willing to make post-petition loans and advances and provide such other credit accommodations pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code and the holder of the Primed Liens has consented to the priming of its liens pursuant to the terms of the DIP Loan Documents.  Among other things, entry of this Interim Order ("Order") will preserve and maintain the assets of the Debtors' estates, will avoid harm to, and is in the best interests of, the Debtors, their creditors, and their estates.

D.    <u>Validity of Primed Liens</u>.  The Debtors admit and stipulate that the Liens and security interests of the holder of the Primed Liens constitute valid, binding, enforceable and perfected liens and security interest and are not subject to avoidance, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated to the DIP Facility Liens and the Carve-Out in accordance with the provisions of this Order); <u>provided</u>, <u>however</u>, the Debtors do not stipulate to, and expressly reserve the right to review, investigate and object to, the validity, enforceability and/or perfection, of any security interest or lien that is or may be asserted by Oxford Finance, LLC or any third

party against any commercial tort claims including, without limitation, the settlement fees and/or fines described in Schedule 2.02(c) to the Asset Purchase Agreement. The Debtors further reserve their right to investigate and, if appropriate, object to the amount of the claim of any party (except the claims of the DIP Lender for funds advanced under the DIP Facility) including, without limitation, the claim (or any component thereof) of the holder of the Primed Liens. Subject to the Challenge Period (defined below), each stipulation, admission and agreement contained in this Order shall also be binding upon all other parties in interest, including, without limitation, an Official Committee of Unsecured Creditors ("Creditors' Committee"), if any, under all circumstances and for all purposes.

E.     Unavailability of Alternative Financing.   The Debtors are unable to procure unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(b) of the Bankruptcy Code.

F.     Notice.   The Debtors have provided due and sufficient notice of the Motion and the relief requested to (i) the United States Trustee, (ii) all creditors known to the Debtors who may have liens against the Debtors' assets, (iii) any applicable taxing authority, (iv) counsel for the official committee of unsecured creditors ("Committee") (if such committee has been appointed), (v) the twenty (20) largest unsecured creditors of the Debtors on a consolidated basis, and (vi) all other creditors and parties in interest requesting notice under Bankruptcy Rule 2002(i).

G.     Business Judgment and Good Faith under Section 364(e) of the Bankruptcy Code. The terms of the DIP Credit Agreement, the other DIP Loan Documents and this Order have been negotiated in good faith and at arms-length within the meaning of section 364(e) of the Bankruptcy Code, are in the best interests of the Debtors, their creditors and the estates, are fair and equitable under the circumstances, and are enforceable pursuant to their terms.  The terms of the DIP Credit

Agreement are (i) fair and reasonable and are well within the range of market terms for debtor-in-possession financing; (ii) reflect prudent exercise of business judgment by the Debtors, consistent with their fiduciary duties; (iii) constitute reasonably equivalent value and fair consideration; and (iv) are essential and appropriate for the continued operation and management of the Debtors' business and the preservation of their assets and properties.  This Order is subject to, and Lender is entitled to the benefits of, the provisions of section 364(e) of the Bankruptcy Code.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      <u>Authorization to Incur Indebtedness and Enter Into DIP Loan Documents</u>.  The Motion is hereby granted and approved as set forth herein on an interim basis.  Pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Debtors are hereby authorized and empowered to borrow up to the amount of $200,000.00 from the Lender, pursuant to the terms of this Order and the terms and conditions set forth in the DIP Credit Agreement and the other DIP Loan Documents.  The Debtors are authorized and directed to execute, deliver, perform and comply with the terms and covenants of the DIP Loan Documents and this Order.  The terms and conditions of the DIP Loan Documents are ratified and approved, and, together with this Order, shall be sufficient and conclusive evidence of the borrowing arrangements between the Debtors and Lender and of the terms and conditions of the DIP Loan Documents, for all purposes.

2.      <u>Use of Advances Made Under this Order and the DIP Credit Agreement</u>.  The Debtors are hereby authorized to use the proceeds of the Interim Loan advanced, and other credit accommodations provided, by Lender under the DIP Credit Agreement to pay the Debtors' reasonable and documented expenses actually incurred in accordance with the terms of the Budget in the form attached to the Motion as **Exhibit D** and any applicable Variance Report(s), as reviewed and approved by the Lender.

3.    <u>Grant of Liens and Superpriority Administrative Claim</u>.  Effective on and after the

date of this Order, to secure the prompt payment and performance of any and all Obligations,

Liens, liabilities and indebtedness ("<u>DIP Facility Obligations</u>") of the Debtors to Lender of

whatever kind or nature or description arising under the DIP Credit Agreement or other DIP Loan

Documents, Lender shall have and is hereby granted, in each case subject to the Carve-Out: (i) a

superpriority administrative claim pursuant to section 364(c)(1) of Bankruptcy Code, having

priority over any and all administrative expenses including, without limitation, administrative

expenses or claims of the kind specified in sections 105, 326, 327, 328, 330, 331, 361, 362, 363,

365, 503, 506, 507, 546, 552, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such

expenses or claims may become secured by a judgment lien or other consensual or non-consensual

lien, levy or attachment; (ii) valid and perfected security interests and liens, senior to all other

creditors of the estates of the Debtors, pursuant to section 364(c)(2) of the Bankruptcy Code, in

and upon all now existing and hereafter acquired personal and real property and fixtures of the

Debtors and their bankruptcy estates, and the proceeds thereof, of whatever kind or nature, whether

acquired prior to or subsequent to the Petition Date (other than the Avoidance Actions), that is not

subject to an existing properly perfected and unavoidable lien; (iii) valid and perfected junior

security interests and liens in and upon all now existing and hereafter acquired personal and real

property and fixtures of the Debtors and their bankruptcy estates, and the proceeds thereof, of

whatever kind or nature, whether acquired prior to or subsequent to the Petition Date that is subject

to an existing properly perfected and unavoidable Permitted Lien pursuant to section 364(c)(3) of

the Bankruptcy Code; and (iv) valid and perfected first priority priming security interests and liens

in and upon all now existing and hereafter acquired personal and real property and fixtures of the

Debtors and their bankruptcy estates, and the proceeds thereof, of whatever kind or nature, whether

acquired prior to or subsequent to the Petition Date that is subject to an existing properly perfected and unavoidable Primed Lien pursuant to section 364(d)(1) of the Bankruptcy Code (collectively, clauses (i), (ii), (iii) and (iv) referred to as the "DIP Facility Superpriority Claims" and "DIP Facility Liens"). The DIP Facility Liens referred to in clause (iv) of the preceding sentence above shall include all funds held in any account of the Debtors and all cash deposited therein or credited thereto from time to time, including any account covered by a Deposit Account Control Agreement entered into by Oxford and the Debtors. For the avoidance of doubt, the DIP Facility Superpriority Claims and the DIP Facility Liens shall be junior only to (i) the Permitted Liens in the case of Liens granted under section 364(c)(3) of the Bankruptcy Code and (ii) the Carve-Out.

4.      <u>No Surcharge of Collateral</u>.  No costs or expenses of administration which have been or may be incurred by the Debtors or any creditor of a Debtor in connection with the Debtors' bankruptcy case, whether proceeding under chapter 11 or chapter 7 of the Bankruptcy Code, are or will be prior to or on a parity with the DIP Facility Superpriority Claims and DIP Facility Liens; and no such costs or expenses shall be imposed or charged against the Lender or the Collateral pursuant to section 506(c) of the Bankruptcy Code.

5.      <u>Fees and Expenses of the Lender</u>.  The Lender waives its contractual and legal rights to the reimbursement of (a) all reasonable and documented out-of-pocket costs and expenses incurred by the Lender in connection with the investigation, development, preparation, negotiation, execution, interpretation or administration of, any modification of any term of or termination of, any DIP Loan Document, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including the attorneys' fees of the Lender and (b) all costs and expenses incurred in connection with (i) the creation, perfection and maintenance of the perfection of the Lender's DIP Facility Liens upon the

Collateral, including Lien search, filing and recording fees, (ii) the enforcement or preservation of any right or remedy under any DIP Loan Document, any Secured Obligation, with respect to the Collateral or any other related right or remedy or any attempt to inspect, verify, protect, insure, collect, sell, liquidate or otherwise dispose of any Collateral or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to any Debtor, DIP Loan Document, Secured Obligation or the transactions contemplated by the Acquisition Agreement (collectively "Fees and Expenses").  <u>Provided</u>, <u>however</u>, for the avoidance of doubt, the foregoing shall not impair the Lender's rights to any bid protections approved by this Court in connection with serving as a stalking horse bidder.

6.    <u>Automatic Perfection</u>.  With respect to the debt incurred by Debtors under the DIP Credit Agreement, this Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all of the security interests in and liens upon the property of the estates of Debtors granted to Lender as set forth herein, without the necessity of filing, recording or serving any financing statements, or other documents which may otherwise be required under federal or state law in any jurisdiction or the taking of any other action, including, without limitation, taking possession of or exercising control over any Collateral, to validate or perfect the security interests and liens granted to Lender in this Order and the DIP Loan Documents.  If Lender shall, in its discretion, elect for any reason to file any such financing statements or other documents with respect to such security interests and liens, the Debtors are authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon Lender's reasonable request and the filing, recording or service (as the case may be) of such financing statements or similar documents shall be deemed to have been made at the time of and on the Petition Date.

Lender may, in its discretion, file a certified copy of this Order in any filing or recording office in any county or other jurisdiction in which a Debtor has real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Order.

7. <u>Preservation of Pre-Petition Liens</u>.  Notwithstanding anything to the contrary contained herein, any pre-petition secured lender's unavoidable liens and security interests in and against any assets of the Debtors shall continue in full force and effect to the extent existing on the date of the entry of this Order, subject to all rights and defenses of the Debtors, their estates and the Committee with respect thereto, and shall be and are unaffected by the DIP Credit Agreement and this Order; <u>provided</u>, <u>however</u>, that the Primed Liens shall be primed by and subject to the first priority security interests and liens of the Lender under the DIP Credit Agreement.  The property that is encumbered by any lien or security interest that is avoided shall become subject to Lender's first priority lien; the Debtors and their estates waiving the benefits of section 551 of the Bankruptcy Code.

8. <u>Further Acts by Debtor</u>.  Debtors are hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements (in addition to the DIP Loan Documents) as Lender may reasonably require and as evidence of and for the protection of the Obligations and the Collateral or which may be otherwise deemed necessary by Lender to effectuate the terms and conditions of this Order and the DIP Loan Documents.

9. <u>No Control of the Debtors</u>.  In negotiating and consummating the transactions authorized by this Order and the DIP Loan Documents, in determining to make the Interim Loan under the DIP Credit Agreement, or in exercising any rights or remedies as and when permitted

pursuant to this Order, or the DIP Loan Documents, Lender shall not be deemed to be in control of the operations of the Debtors for any purpose, including to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).  Furthermore, nothing in this Order or the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon Lender of any liability for any claims arising from the post-petition activities of the Debtors.

10.    <u>Limited Modification of Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified solely to implement the DIP Loan Documents and to the extent necessary to permit Lender to exercise, upon the occurrence and during the continuance of any Event of Default, any or all rights and remedies provided for in the DIP Loan Documents; <u>provided</u>, <u>however</u>, that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the Lender shall be required to give three Business Days' written notice to the Debtors, their bankruptcy counsel, counsel to the Official Committee of Unsecured Creditors (if a committee is appointed) and the U.S. Trustee.  Notwithstanding the occurrence of an Event of Default or the Maturity Date, all of the rights, remedies, benefits, and protections provided to the Lender under the DIP Loan Documents and this Order shall survive the Maturity Date.

11.    <u>Access to the Debtors</u>.  Without limiting the rights of access and information afforded the Lender under the DIP Loan Documents, the Debtors shall permit representatives, agents and/or employees of the Lender to have reasonable access to its knowledgeable personnel, premises and records during normal business hours (without unreasonable interference with the

proper operation of the Debtors' business) and shall cooperate, consult with, and provide to such representatives, agents and/or employees all such non-privileged information as they may reasonably request.

12.    <u>Insurance Policies</u>.  Upon entry of this Order, the Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the Collateral. The Debtors are authorized and directed to take any action necessary to have the Lender added as an additional insured and loss payee on each insurance policy.

13.    <u>Survival of Provisions</u>.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered dismissing the Chapter 11 Case, converting Debtors' Chapter 11 case to a Chapter 7 case, or any order which may be entered confirming or consummating any Chapter 11 plan, and the terms and provisions of this Order as well as the priorities in payment, liens, and security interests granted pursuant to this Order and the DIP Credit Agreement shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Order until all Obligations are indefeasibly satisfied and discharged; <u>provided</u>, <u>that</u>, at such time, all obligations and duties of the Lender to provide any loans and advances under this Order or the DIP Credit Agreement shall terminate immediately upon the earlier of the date of any Event of Default, the Maturity Date or the date that the Plan of Reorganization becomes effective unless Lender has given its express prior written consent thereto.  For the avoidance of doubt, such consent shall not be implied from any other action, inaction or acquiescence by Lender.

14.    <u>Resolution of Any Conflicting Terms</u>.  To the extent the terms and conditions of the DIP Loan Documents are in conflict with the terms and conditions of this Order, the terms and

conditions of this Order shall control.

15.      <u>Order Binding on Successors</u>.  The provisions of this Order shall be binding upon and inure to the benefit of the Lender, the Debtors, and their respective successors and assigns (including any trustee or other estate representative appointed or elected as a representative of the Debtors' estates, whether the bankruptcy case is a proceeding under chapter 11 or chapter 7 of the Bankruptcy Code, or of any estate in any successor case).  Except as otherwise explicitly set forth in this Order, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Order or the DIP Credit Agreement.

16.      <u>Effect of Debtors' Stipulations on Third Parties</u>.

(i)      <u>Binding on Debtors</u>.  Except as otherwise limited by this Order, the Debtors' stipulations, admissions, and agreements contained in this Order, including, without limitation, in Paragraph D of this Order, shall be binding upon the Debtors in all circumstances and for all purposes.

(ii)     <u>Binding on Third Parties</u>.  The Debtors' stipulations, admissions, and agreements contained in this Order, including, without limitation, in Paragraph D of this Order, shall be binding upon their estates and all other parties-in-interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases including the Creditors' Committee and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtors, in all circumstances and for all purposes, unless the criteria under subparagraphs 16(ii)(a), (b), and (c) below are satisfied.

a. <u>Challenge Period</u>.  Such committee or any other party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so, a "Challenge Party"), in each case, with requisite standing granted by the Court (which motion for such standing may be filed concurrently with the adversary proceeding or contested matter), has timely filed an adversary proceeding or contested matter by no later than a date that is, consistent with Local Rule 4001-2(a)(i)(B), (x) 75 days after entry of this Order for all parties in interest other than the Creditors' Committee, and 60 days after appointment of the Creditors' Committee for such Creditors' Committee; and (y) any such later date as has been ordered by the Court for good cause shown upon a motion filed and served within any applicable period of time set forth in this Paragraph 16 (the "Challenge Period"); <u>provided</u>, <u>however</u>, that if the Creditors' Committee files a motion seeking standing on or prior to 60 days after its appointment, the Challenge Period for the Creditors' Committee shall be tolled through the date that is three (3) Business Days after this Court enters a ruling on such motion solely with respect to any challenge specifically identified in such motion (including any proposed complaint or pleading attached thereto); <u>provided</u>, <u>further</u>, that if these Chapter 11 Cases convert to chapter 7 cases, or if a chapter 11 trustee is appointed, prior to the end of the Challenge Period, any chapter 7 or chapter 11 trustee shall have the benefit of any remaining portion of the Challenge Period.

b. <u>Challenge Proceeding</u>.  Such adversary proceeding or contested matter (A) objects to or challenges the amount, validity, perfection, enforceability, priority

or extent of the Primed Liens, or any portion thereof, or (B) otherwise asserts or prosecutes any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "Challenge Proceeding") against the holder of the Primed Liens, or its subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "Representative" and, collectively, the "Representatives") in connection with matters related to the Primed Liens.

c.   Final Non-Appealable Order.  A final non-appealable order is entered in favor of the plaintiff in any such Challenge Proceeding; provided that any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred; and provided further, that nothing contained herein shall preclude or otherwise limit the rights of the Creditors' Committee or any party to seek to intervene, or to appear and be heard under 11 U.S.C. § 1109(b).

17.   Subsequent Reversal.  If any or all of the provisions of this Order or the DIP Credit Agreement are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of the Lender: (i) such modification, vacatur, amendment, or stay shall not affect the validity of any Obligation to the Lender that is or was incurred prior to

the effective date of such modification, vacatur, amendment, or stay (the "Modification Date"), or the DIP Facility Superpriority Claims and DIP Facility Liens authorized or created by this Order and the DIP Loan Documents; (ii) the Obligations that were incurred by the Debtors prior to the Modification Date shall be governed in all respects by the original provisions of this Order and the DIP Loan Documents, and (iii) the validity of any Obligations and the DIP Facility Superpriority Claims and DIP Facility Liens is and shall be protected by sections 364(e) of the Bankruptcy Code.

18.     <u>Final Hearing</u>.  The final hearing to consider entry of the Final Order and approval of the Final Loan on a final basis is scheduled for _____, 2019 at __:__ _.m. (ET) before the honorable _____, United States Bankruptcy Judge, Courtroom _, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.

19.     <u>Notice of Final Hearing</u>.  Within three (3) Business Days of the date of entry of this Order, the Debtors shall serve, by United States mail, first-class postage prepaid, a copy of the Motion and this Order upon all parties required under section 4001(c) of the Bankruptcy Rules and Local Bankruptcy Rule 4001-4.

20.     <u>Objection Deadline</u>.  Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the clerk of the Court and served upon (a) counsel to the Debtors, (b) the U.S. Trustee, (c) counsel to the Committee, if any, and (d) counsel to the Lender, so that such objections are filed with the Court and received by said parties on or before 4:00 p.m. (ET) on _____, 2019 with respect to entry of the Final Order.

21.     <u>Order Effective Immediately</u>.  This Order shall be effective immediately upon entry by the Court, and any stay of the effectiveness of this Order is hereby waived.  This Court has and

will retain jurisdiction to enforce any terms of, and resolve any issues and disputes raised with

respect to, this Order.

Dated:  March __, 2019
         Wilmington, Delaware

_____
United States Bankruptcy Judge

# EXHIBIT B

## SENIOR SECURED SUPERPRIORITY PRIMING
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of March [22], 2019, is made by and between MABVAX THERAPEUTICS HOLDINGS, INC., a Delaware corporation ("Holdings"), MABVAX THERAPEUTICS, INC., a Delaware Corporation ("Mabvax", and together with Holdings, each a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code and each individually a "Borrower" and together "Borrowers"), and BIONTECH RESEARCH AND DEVELOPMENT, INC., a Delaware corporation, as lender (together with its successors and assigns, "Lender").

## PRELIMINARY STATEMENTS

1.      The Borrowers filed voluntary petitions with the Bankruptcy Court on March 21, 2019 (the date of such filing being referred to herein as the "Petition Date") initiating the Case and are continuing in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  The Bankruptcy Court entered the Interim Order on March [22], 2019, allowing the Borrowers to enter into this Agreement.

2.      The Borrowers have requested that the Lender provide a term loan facility to the Borrowers in an aggregate principal amount not to exceed the Commitment (as defined herein).

3.      The proceeds of the Loans (as defined herein) will be used solely in the manner set forth in Section 5.2 hereof.

4.      To provide security for the repayment of all obligations of the Borrowers hereunder and under the other Loan Documents (as defined herein), the Borrowers will provide to the Lender the following (all as more fully described herein), subject in each case to the Carve-Out (as defined herein):

(a)      pursuant to Section 364(c)(1) of the Bankruptcy Code and the Order, as applicable, a Superpriority Claim in the Case having priority over any administrative claims of any entity, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 365, 503, 506, 507, 546, 552, 726, 1113, 1114 or any other provisions of the Bankruptcy Code,

(b)      pursuant to Section 364(c)(2) of the Bankruptcy Code and the Order, a perfected first priority Lien on all unencumbered property and assets of the Borrowers of any kind (other than Avoidance Actions and the proceeds therefrom),

(c)      pursuant to Section 364(c)(3) of the Bankruptcy Code and the Order, a perfected junior Lien on the property of the Borrower subject to a Lien (other than the Primed Liens) ("Permitted Liens"), and

(d)      pursuant to Section 364(d)(1) of the Bankruptcy Code and the Order, a perfected first priority senior priming Lien on all of the "Collateral" (as defined in the Oxford Loan Agreement) (collectively, the "Primed Liens").

The parties hereto hereby agree as follows:

## SECTION 1. DEFINITIONS

1.1     <u>Defined Terms.</u> As used in this Agreement (including the recitals hereof), the terms listed in this <u>Section 1.1</u> shall have the respective meanings set forth in this <u>Section 1.1</u>.

"<u>Acquisition Agreement</u>": the Asset Purchase Agreement, dated as of March 20, 2019, by and among the Lender and the Borrowers relating to the acquisition by the Lender of substantially all of the assets of the Borrowers' Business and the other transactions contemplated thereby, attached as <u>Exhibit C</u> to this Agreement.

"<u>Acquisition Closing</u>": the "Closing" (as defined in the Acquisition Agreement) of the Contemplated Transactions.

"<u>Affiliate</u>": with respect to any Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"<u>Agreement</u>": as defined in the preamble hereto.

"<u>Alternative Transaction</u>": any plan, agreement or arrangement, other than the Acquisition Agreement, or agreement to support or propose to the Bankruptcy Court any plan, agreement or arrangement, other than the Acquisition Agreement, the effect and/or results of which involve the recapitalization or acquisition of either Borrower or substantially all of the assets of the Borrowers by any Person other than the Lender.

"<u>Alternative Transaction Order</u>": as defined in this <u>Section 1.1</u> in the definition of "Maturity Date."

"<u>Anti-Corruption Laws</u>": as defined in <u>Section 3.10(c)</u>.

"<u>Applicable Rate</u>": eight percent (8%) per annum.

"<u>Assignee</u>": as defined in <u>Section 8.7</u>.

"<u>Avoidance Actions</u>": claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>": Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>": the United States Bankruptcy Court (or, as applicable, the District Court) for the District of Delaware.

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Budget": the initial budget of the Borrowers in the form attached as Exhibit D to this Agreement and any subsequent budget approved by the Lender in its sole discretion.

"Budget Period": each weekly period set forth in the Budget.

"Business": the business of developing therapeutic antibodies and CAR-Ts.

"Business Day": any day except Saturday, Sunday or any other day on which commercial banks located in the State of New York, USA are authorized or required by law to be closed for business.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including member interests, partnership interests and joint venture interests, and any and all warrants, rights or options to purchase (or convertible into, or exchangeable for) any of the foregoing.

"Carve-Out": collectively: the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and  (ii) Carve-Out Expenses, to the extent such Carve-Out Expenses are allowed by the Bankruptcy Court at any time before the Carve-Out Trigger Date, not to exceed the amount expressly set forth in the Budget.

"Carve-Out Expenses": unpaid fees, costs, disbursements, charges and expenses incurred at any time before the Carve-Out Trigger Date by persons or firms retained by the Borrowers whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, 330 or 331 of the Bankruptcy Code.

"Carve-Out Trigger Date": the date of conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

"Case": the case or cases of a Borrower or the Borrowers to be filed (or, currently pending, as the case may be) under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Cash Collateral": "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code, or any successor provision.

"<u>Code</u>": the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>": all of the "Collateral" referred to in the Order or the other Security Documents and all of the other property and assets that are or are intended under the terms of the Order or the other Security Documents to be subject to Liens in favor of the Lender.

"<u>Commitment</u>": the obligation of the Lender to make an Interim Loan and a Final Loan to the Borrowers in an aggregate principal amount at any time outstanding of up to $500,000.00, as such amount may be reduced from time to time in accordance with the terms of this Agreement.[1]

"<u>Commonly Controlled Entity</u>": an entity, whether or not incorporated, that is under common control with a Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes a Borrower and that is treated as a single employer under Section 414 of the Code or the regulations thereunder.

"<u>Contemplated Transactions</u>": all of the transactions among the Borrowers and the Lender contemplated by the Acquisition Agreement.

"<u>Contractual Obligation</u>": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"<u>Creditors' Committee</u>": any official committee of unsecured creditors appointed in the Case.

"<u>Debtor Relief Laws</u>": the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Default</u>": any of the events specified in <u>Section 7</u>, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"<u>Disposition</u>" or "<u>Dispose</u>": (a) the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property of a Borrower or any of its Subsidiaries (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any Capital Stock owned by a Borrower or any of its Subsidiaries, or any notes or accounts receivable or any rights and claims associated therewith, and (b) the issuance of Capital Stock by a Borrower or any of its Subsidiaries to any Person (in the case of any such Subsidiary, other than a Borrower or any of its Subsidiaries).

"<u>Dollars</u>" and "<u>$</u>": dollars in lawful currency of the United States.

"<u>Effective Date</u>": as defined in Section 4.1(a).

---

[1]    NTD: Amount of Interim Loan TBD and will be set forth in the Interim Order.

"Environmental Laws": the Legal Requirements relating to pollution or protection of public or employee health or safety or the environment, including laws relating to (i) emissions, discharges, releases or threatened releases of Hazardous Materials, into the environment (including ambient air, indoor air, surface water, ground water, land surface or subsurface strata), (ii) the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport or handling of Hazardous Materials, and (iii) underground and above ground storage tanks containing Hazardous Materials, and related piping, and emissions, discharges, releases or threatened releases therefrom.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default": any of the events specified in Section 7, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Facility": the Commitment and the Loans made hereunder.

"FCPA": as defined in Section 3.10(c).

"Final Loan": a loan made pursuant to the Final Order.

"Final Order": the final order of the Bankruptcy Court with respect to this Agreement, substantially in the form of the Interim Order attached hereto, with any necessary changes required by the Bankruptcy Court, the Federal Rules of Bankruptcy Procedure or the Local Rules of the Bankruptcy Court, as necessary and as approved by the Lender.

"First Day Orders": as defined in Section 4.1(d).

"GAAP": generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Approval": any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"Governmental Authority": any federal, state, municipal, county or regional government or governmental or regulatory authority, domestic or foreign, and includes any department, commission, bureau, board, administrative agency or regulatory body of any of the foregoing or any non-governmental regulatory body that provides standards for certification.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor

{00025294. }                                    5

or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrowers in good faith.

"Hazardous Material": any pollutant, contaminant or toxic or hazardous substance, constituent, material or waste regulated under Environmental Laws, including petroleum, crude oil or any fraction thereof or any petroleum product, but does not include nominal quantities of any chemical used in the ordinary course of business as office or cleaning supplies.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Interim Loan": a Loan made pursuant to the Interim Order.

"Interim Order": the interim order of the Bankruptcy Court with respect to this Agreement, substantially in the form of Exhibit B hereto, as the same may be amended, modified or supplemented from time to time with the express written consent of the Lender.

"Investment": as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock or debt of

another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this <u>Section 1.1</u> in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit of, or all of a substantial part of the business being conducted by, such Person.

"<u>Legal Requirement</u>": any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"<u>Lender</u>": as defined in the preamble hereto.

"<u>Lien</u>": means any lien, pledge, mortgage, deed of trust, hypothecation, interest, security interest, claim, lease, charge, option, right of first refusal, levy, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, tax (including foreign, federal, state and local tax), order of any Governmental Authority, encumbrance or any other restriction or limitation whatsoever of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, perfected or unperfected, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"<u>Loan(s)</u>": an extension of credit by the Lender to the Borrowers pursuant to <u>Section 2.1</u>.

"<u>Loan Documents</u>": this Agreement, the Security Documents, the Note, and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation and any amendment, waiver, supplement or other modification to any of the foregoing.

"<u>Material Adverse Effect</u>": any fact, circumstance, event, effect, development, occurrence or change that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on (a) the assets, liabilities, business, properties, financial condition or results of operations of the Business, taken as a whole, provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) the commencement of the Bankruptcy Case, (ii) the announcement of this Agreement or the transactions contemplated hereby in accordance with the terms hereof, (iii) the sale process of the Business to the extent in accordance with the terms of the Acquisition Agreement or related order entered by the Bankruptcy Court, (b) the ability of either or both of the Borrowers to timely consummate the Contemplated Transactions or to perform its respective obligations under the Loan Documents, (c) the validity of, enforceability of the material rights or remedies of, or benefits available to the Lender under the Loan Documents, or (d) the validity and perfection of the Lender's Liens on a material portion of the Collateral.

"Maturity Date": the date which is the earliest of (a) the date that is three (3) months from the date of the first Loan under this Agreement, (b) the Acquisition Closing, (c) the first Business Day following entry by the Bankruptcy Court of an order approving an Alternative Transaction (an "Alternative Transaction Order"), (d) the effective date as of which the Acquisition Agreement terminates in accordance with its terms (so long as such termination is not due to a breach thereof by the Lender), (e) the earlier of the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, and (f) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents, including Section 7 hereof.

"Multiemployer Plan": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds": with respect to any Disposition by a Borrower or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of the Borrower or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Agreement), (ii) reasonable expenses related thereto incurred by the Borrower or such Subsidiary in connection therewith (including, without limitation, attorneys' fees and accountants' fees), (iii) transfer taxes paid to any taxing authorities by the Borrower or such Subsidiary in connection therewith, and (iv) income and franchise taxes to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case, to the extent, but only to the extent, that the amounts so deducted are (x) actually paid or required to be paid (and reserved for such purpose) to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of the Borrower or any of its Subsidiaries and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"Non-Excluded Taxes": as defined in Section 2.7.

"Notice of Borrowing": a notice of a borrowing substantially in the form of Exhibit A.

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans) the Loans, and all other obligations and liabilities of the Borrowers to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses, or otherwise.

"OFAC": as defined in Section 3.10(a).

"Order": collectively, the Interim Order and the Final Order.

"Ordinary Course of Business" or "in the Ordinary Course": the conduct of the Business in substantially the same manner as the Business was operated on the date of this Agreement.

"Other Taxes": any and all present or future stamp or documentary taxes or any other excise taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Oxford Loan Agreement": the Loan and Security Agreement dated as of January 15, 2016, by and among the Borrowers and Oxford Finance LLC, as collateral agent and lender, as it may have been amended, supplemented or modified prior to the Petition Date.

"Patriot Act": the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 10756, signed into law October 26, 2001.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Liens": as defined in the preliminary statements hereto.

"Permitted Uses" as defined in Section 5.2.

"Person": means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization or Governmental Authority or other entity of whatever nature.

"Petition Date": as defined in the preliminary statements hereto.

"Plan": at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity (i) is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, (ii) is a sponsor, (iii) is obligated to contribute thereto, or (iv) otherwise has any liability with respect thereto.

"Plan of Reorganization": a plan or plans of reorganization with respect to the Case.

"Primed Liens": as defined in the preliminary statements hereto.

"Properties": the facilities and properties owned, leased or operated by the Borrower.

"Reorganization": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under of PBGC Reg. § 4043.

"Requirement of Law": as to any Person, the Bylaws and Certificate of Incorporation or other organizational or governing documents of such Person, and any Legal Requirement, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer": the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Borrower or any of the other individuals designated in writing to the Lender by an existing Responsible Officer of a Borrower as an authorized signatory of any certificate or other document to be delivered hereunder.

"Sale Hearing": a sale hearing conducted by the Bankruptcy Court to consider the approval of the Contemplated Transactions.

"Sale Milestones": the following milestones with respect to the Contemplated Transactions, in each case, in a manner satisfactory to the Lender in its sole and absolute discretion:[2]

(a)        the Petition Date shall have occurred no later than one Business Day after the date of the Acquisition Agreement;

(b)        the Borrowers shall file a motion in form and substance satisfactory to the Lender in its sole and absolute discretion seeking approval of procedures for an auction (the "Auction") with respect to the sale contemplated by the Acquisition Agreement (the "Bidding Procedures Motion") on the Petition Date;

(c)        a hearing of the Bankruptcy Court to approve the Bidding Procedures Motion shall be held and entry of the Bidding Procedures Order (as such term is defined in the Acquisition Agreement) shall occur not later than [20 days] after the Petition Date;

(d)        the deadline for submission of qualified bids for the Auction shall occur not later than [20 days] after entry of the Bidding Procedures Order (the "Bid Deadline");

(e)        the Auction shall be held not later than [3 days] after the Bid Deadline; and

(f)        a hearing of the Bankruptcy Court to approve the successful bid in the Auction shall be held not later than [9 days] after the Auction, or if there are no Qualified Bidders (as defined in the Bidding Procedures Order), no later than [9 days] following the Bid Deadline.

"Sanctions: as defined in Section 3.10(a).

"Sanctioned County: as defined in Section 3.10(a).

"SDN List": as defined in Section 3.10(a).

---

[2]        NTD: To be conformed to bidding procedures motion.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Obligations": as defined in the Security Agreement.

"Securities Act": the Securities Act of 1933, as amended from time to time and any successor statute.

"Security Agreement": that certain Security Agreement dated of even date herewith by the Borrowers to and for the benefit of Lender, as it may be amended, supplemented or otherwise modified from time to time.

"Security Documents": the collective reference to the Security Agreement, the Order, any guaranty, and all other security documents hereafter delivered to the Lender granting a Lien on any property of any Person to secure the Obligations.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Subsidiary": when used with reference to an entity, any corporation, a majority of the outstanding voting securities of which are owned directly or indirectly by such entity or any partnership, joint venture or other enterprise in which any entity has, directly or indirectly, a majority equity interest.

"Superpriority Claim": a claim under Section 364(c)(1) of the Bankruptcy Code against the Borrowers in the Case which is an administrative expense claim having priority over any or all administrative expenses, including, without limitation, administrative expenses of the kind specified in Sections 503(b), 506(c) or 507(b) of the Bankruptcy Code.

"Uniform Commercial Code" or "UCC": the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in the State of Delaware or any other applicable jurisdiction.

"United States": the United States of America.

"UST": the Office of the United States Trustee.

"Variance Report": a budget variance report/reconciliation, certified by a Responsible Officer, in a form acceptable to the Lender, setting forth the actual cash receipts and disbursements of the Borrowers (i) for the Budget Period ending immediately prior to the Variance Report Date and (ii) on a cumulative basis, for the period commencing on the Petition Date and ending on the Friday immediately preceding such Variance Report Date (the "Cumulative Period"), in each case on (A) a line-item basis as of the end of the Budget Period and the Cumulative Period, respectively, and (B) in aggregate as of the end of the Budget Period and the Cumulative Period, respectively, the variance in dollar amounts of the actual disbursements for each Budget Period and the Cumulative Period, respectively, from those budgeted amounts for the corresponding Budget Period and the Cumulative Period, respectively, reflected in the Budget and the variance of the actual cash receipts for the Budget Period from those budgeted amounts for the corresponding

Budget Period and the Cumulative Period, respectively, reflected in the Budget; <u>provided</u> <u>that</u> no line-item or aggregate variance shall be greater than ten percent (10%) from those budgeted amounts for the corresponding Budget Period and the Cumulative Period, respectively, reflected in the Budget; and <u>provided</u> <u>further</u> <u>that</u> the Budget and any variance therefrom shall not exceed the Commitment.

"<u>Variance Report Date</u>": each Tuesday of each calendar week, commencing with the first Tuesday following the Petition Date.

1.2     <u>Other Definitional Provisions</u>.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the meanings set forth herein when such terms are used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

**SECTION 2. AMOUNT AND TERMS OF COMMITMENT**

2.1     <u>Commitment</u>.

(a)     Subject to the terms and conditions and relying upon the representations and warranties set forth herein and in the Order, the Lender agrees to make Loans to the Borrowers at in an aggregate principal amount of Loans at any time outstanding not to exceed the amount of the Commitment. The Borrowers may draw only two Loans under the Commitment that shall be (i) an Interim Loan pursuant to the Interim Order and (ii) a Final Loan pursuant to the Final Order. The Commitment in respect of the Interim Loan shall terminate automatically immediately upon the making of the Interim Loan and the Commitment in respect of the Final Loan shall terminate automatically immediately upon the making of the Final Loan.

(b)      Notwithstanding the foregoing:

(i)      The aggregate principal amount of Loans outstanding at any time to the Borrowers shall not exceed the Commitment in effect at such time.

(ii)      The Commitment shall automatically and permanently be reduced to zero on the Maturity Date. Within the limits set forth herein, the Borrowers may borrow, prepay and repay Loans, on or after the Effective Date and prior to the Maturity Date, subject to the terms, provisions and limitations set forth herein; provided, however, that amounts repaid or prepaid may not be reborrowed.

2.2      Making the Loans.

(a)      The Borrowers shall give the Lender prior telephonic notice (immediately confirmed in writing by e-mail, in substantially the form of Exhibit A hereto (a "Notice of Borrowing")), not later than 12:00 noon (California time) on the date which is seven (7) Business Days prior to the date of the proposed Loan (or such shorter period as the Lender is willing to accommodate from time to time, but in no event later than 12:00 noon (California time) on the borrowing date of the proposed Loan). Such Notice of Borrowing shall be irrevocable and shall specify (i) the aggregate principal amount of the proposed Loan and line-item amounts for each of the proposed uses of the proposed Loan, (ii) the use(s) of the proposed Loan, in reasonable detail (which use(s) must be Permitted Uses) and (iii) the proposed borrowing date, which must be a Business Day. The Lender may act without liability upon the basis of written, electronic, telecopied, or telephonic notice believed by the Lender in good faith to be from the Borrowers (or from any Responsible Officer thereof designated in writing purportedly from the Borrowers to the Lender). The Borrowers hereby waive the right to dispute the Lender's record of the terms of any such telephonic Notice of Borrowing. The Lender shall be entitled to rely conclusively on any Responsible Officer's authority to request a Loan on behalf of the Borrowers until the Lender receives written notice to the contrary. The Lender shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b)      Each Loan shall be made in a minimum amount of $100,000.

2.3      Repayment of the Loans. The Loans shall mature on the Maturity Date and shall be indefeasibly repaid in full in immediately available funds (subject to Sections 2.08 and 7.11(d) of the Acquisition Agreement) on the Maturity Date. Unless otherwise provided under this Agreement, all payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 noon (California time) on the due date thereof to the Lender at the office of the Lender specified in Section 8.2 (or such other office as may be specified from time to time by the Lender by written notice to the Borrowers), in Dollars and in immediately available funds. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

2.4      Reduction of Commitment; Prepayments.

(a)       Termination; Reduction of Commitment.

(i)       The Commitment shall terminate on the Maturity Date.

(ii)       The Borrowers may, without premium or penalty, reduce the Commitment to an amount (which may be zero) not less than the sum of (A) the aggregate unpaid principal amount of all Loans then outstanding and (B) the aggregate principal amount of all Loans not yet made as to which a Notice of Borrowing has been given by the Borrower under Section 2.2. Each such reduction (1) shall be in an amount which is an integral multiple of $100,000 (unless the Commitment in effect immediately prior to such reduction is less than $100,000), (2) shall be made by providing not less than five (5) Business Days' prior written notice to the Lender and (3) shall be irrevocable.

(iii)       Once reduced, the Commitment may not be increased.

(b)       Optional Prepayment. The Borrowers may at any time and from time to time prepay the principal of any Loan, in whole or in part without penalty or premium.

(c)       Mandatory Prepayment.

(i)       If at any time the aggregate principal amount of all Loans exceeds the Commitment, the Borrowers shall immediately prepay the Loans to the full extent of any such excess.

(ii)       Immediately upon any Disposition by a Borrower or any of its Subsidiaries, the Borrower shall prepay the outstanding principal amount of the Loans in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition. Nothing contained in this subsection (ii) shall permit a Borrower or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 6.5.

2.5       Interest Rates and Payment Dates. Each Loan shall bear interest at a rate per annum equal to the Applicable Rate. All computations of interest shall be made on the basis of a 360- day year and actual days elapsed.

(a)       (i) On or prior to the Maturity Date, if any Event of Default shall occur, the Loans (whether or not overdue) shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2%, (ii) after the Maturity Date, the Loans shall bear interest at a rate per annum equal to the rate then applicable to the Loans under the Facility plus 2% and (iii) if all or a portion of any interest payable on any Loan or any other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to the Loans under the Facility plus 2%, in each case, with respect to clauses (i), (ii) and (iii) above, from the date of such nonpayment until such amount is indefeasibly paid in full in immediately available funds (as well after as before judgment).

(b)       Interest shall accrue and be payable on the Maturity Date, provided that interest accruing pursuant to paragraph (a) of this Section shall be payable from time to time on demand.

2.6      [Reserved].

2.7      Taxes.

(a)      All payments made by the Borrowers under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding: (i) taxes imposed on or measured by net income and franchise taxes (imposed in lieu of net income taxes) imposed on the Lender as a result of (x) such Lender being organized under the laws of, or having its principal office located in, the jurisdiction imposing such tax or (y) such Lender having a present or former connection between the Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (ii) U.S. withholding taxes imposed on any amount payable to a Lender pursuant to a law in effect on the date such Lender becomes a party to this Agreement, (iii) taxes that are attributable to the Lender's failure to comply with the requirements of Section 2.7(d) of this Agreement, and (iv) taxes that are attributable to the gross negligence of Lender. If any taxes that are not described in clauses (i) through (iv) of the prior sentence (such taxes, the "Non-Excluded Taxes") or Other Taxes are required to be deducted or withheld from any amounts payable to the Lender hereunder, the amounts so payable to the Lender shall by way of additional interest be increased to the extent necessary to pay to the Lender (after payment of all Non-Excluded Taxes and Other Taxes) a sum equal to the amount such Lender would have received had no such deduction of withholding been required.

(b)      In addition, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrowers, as promptly as possible thereafter the Borrowers shall send to the Lender for its own account a certified copy of an original official receipt received by the Borrowers showing payment thereof. If the Borrowers fail to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fail to remit to the Lender the required receipts or other required documentary evidence, the Borrowers shall indemnify the Lender for any incremental taxes, interest or penalties that may become payable by the Lender as a result of any such failure.

(d)      Each Lender that is organized under the laws of: (i) the United States shall execute and deliver to the Borrowers two completed copies of IRS form W-9 on or prior to the Effective Date and (ii) the laws of a jurisdiction other than the United States shall execute and deliver to the Borrowers two completed copies of IRS form W-8ECI, W-8BEN, or W-8IMY (and any supporting documentation requested by the Borrowers), as applicable, or other applicable form, certificate or document prescribed by the United States IRS certifying as to such Lender's entitlement to exemption from U.S. withholding taxes on or prior to becoming a Lender under this Agreement. Specifically, a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder"

of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E.

(e)     The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.8     <u>Evidence of Indebtedness</u>. The Lender shall maintain an account or accounts evidencing the Obligations of the Borrowers to the Lender resulting from each Loan made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder. The entries made in such accounts, to the extent permitted by applicable law, shall be prima facie evidence of the existence and amounts of the obligations recorded therein, absent manifest error; provided, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement and the other Loan Documents.

2.9     <u>Priority and Liens</u>.

(a)     <u>Superpriority Claims and Liens</u>. The Borrowers hereby covenant, represent and warrant that, upon entry of the Order, the Obligations of the Borrowers to the Lender under the Loan Documents, subject in each case to the Carve-Out:

(i)     pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim of the Lender;

(ii)     pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all tangible and intangible property of the Borrowers that is not subject to Permitted Liens (other than Avoidance Actions and the proceeds therefrom);

(iii)     pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible and intangible property of the Borrowers that is subject to Permitted Liens; and

(i)     pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected first priority senior priming Lien upon all tangible and intangible property of the Borrowers that is subject to Primed Liens, all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens of the Lender.

(b)     <u>Set-Off</u>. Subject to <u>Section 7</u> hereof, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirements and without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final, other than payroll, trust, withholding and tax accounts) at any time held by, or on behalf of, Lender, and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrowers against any and all of the obligations of the Borrowers under the Loan Documents, whether or not such obligations are then

due. The Lender shall notify the Borrowers of such setoff and application, <u>provided that</u> the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Lender under this <u>Section 2.9(b)</u> are in addition to other rights and remedies which it may have on the Maturity Date or upon the occurrence and during the continuance of any Event of Default under the Loan Documents or the Order.

(c)      <u>Discharge</u>. Each Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (and each Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the Order, and described in <u>Section 2.9(a)</u> and the Liens granted to the Lender pursuant to the Order, and the Security Documents shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

2.10    <u>Security</u>. Upon entry of the Order, as security for the prompt payment and performance of all Secured Obligations of the Borrowers, each Borrower has granted, in accordance with the provisions hereof, the Security Documents applicable to such Borrower and the Order, to the Lender a security interest in all of its right, title and interest in and to all of the Collateral.

## SECTION 3. REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement and to make the Loans, each Borrower hereby represents and warrants to the Lender that:

3.1    <u>Continued Compliance with the Acquisition Agreement</u>. Each of the representations and warranties made by the Borrower in or pursuant to the Acquisition Agreement, each of which is expressly incorporated and made applicable to the transactions under the Loan Documents herein by reference, is true and correct in all respects (in the case of any representation or warranty that is subject to a materiality or Material Adverse Effect qualifier) or in all material respects (in the case of any representation or warranty that is not subject to a materiality or Material Adverse Effect qualifier) as if made on the date hereof. The Borrower has performed and complied with all of its obligations and agreements under the Acquisition Agreement in all respects (in the case of any representation or warranty that is subject to a materiality or Material Adverse Effect qualifier) or in all material respects (in the case of any representation or warranty that is not subject to a materiality or Material Adverse Effect qualifier).

3.2    <u>No Legal Bar</u>. Subject to the entry of the Order (which shall have occurred prior to the making of any Loan), the execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any Contractual Obligation of the Borrower and will not result in, or require, the creation or imposition of any Lien on any of its properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents).

3.3    <u>No Default</u>. The Borrower is not in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to result in a Material Adverse Effect.

3.4     Federal Regulations. No portion of any Loan is to be used for the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the FRB 12 C.F.R. Parts 221 and 224.

3.5     Investment Company Act; Other Regulations. The Borrower is not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. The Borrower is not subject to regulation under any Requirement of Law that limits its ability to incur Indebtedness.

3.6     Accuracy of Information, etc. No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.

3.7     Financial Statements; No Material Adverse Effect. There is no fact known to the Borrower that could reasonably be expected to result in a Material Adverse Effect that has not been expressly disclosed in the Acquisition Agreement, in this Agreement, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

3.8     Secured Superpriority Obligations. On and after the Effective Date and the entry of the Order, the Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, Section 2.9 of this Agreement and the Order. From and after entry of the Order, the Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, rescinded or stayed without the prior written consent of the Lender.

3.9     Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices.

(a)     The Borrower is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations ("Sanctions") as administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") and the U.S. State Department. The Borrower is not (i) a Person on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List"), (ii) a person who is otherwise the target of U.S. economic sanctions laws such that a U.S. person cannot deal or otherwise engage in business transactions with such person, (iii) a Person organized or resident in a country or territory subject to comprehensive Sanctions (a "Sanctioned Country"), or (iv) owned or controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a government of a Sanctioned Country such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited by U.S. law.

(b)     The Borrower is in compliance in all material respects with all laws related to terrorism or money laundering including: (i) all applicable requirements of the Currency and Foreign Transactions Reporting Act of 1970 (31 U.S.C. 5311 et. seq., (the Bank Secrecy Act)), as amended by Title III of the USA Patriot Act, (ii) the Trading with the Enemy Act, (iii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (66 Fed. Reg. 49079), any other enabling legislation, executive order or regulations issued pursuant or relating thereto and (iv) other applicable federal or state laws relating to "know your customer" or anti-money laundering rules and regulations.

(c)     The Borrower is in compliance in all material respects with all applicable anti-corruption laws, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA") and the U.K. Bribery Act 2010 ("Anti-Corruption Laws").

## SECTION 4. CONDITIONS PRECEDENT

4.1     Conditions to Effective Date. This Agreement shall become effective as of the Business Day (the "Effective Date") when each of the following conditions precedent shall have been satisfied or waived in a manner satisfactory to the Lender in its sole and absolute discretion:

(a)     The Lender shall have received each of the following, each of which shall be originals or telecopies (followed promptly by originals), each dated on or prior to the Effective Date (or, in the case of certificates of governmental officials, a recent date before the Effective Date) each in form and substance satisfactory to the Lender and in such number of copies as may be requested by the Lender:

(i)      duly executed counterparts of this Agreement;

(ii)     the Security Agreement, duly executed by the Borrowers;

(iii)    such duly executed certificates of resolutions or consents, incumbency certificates and/or other duly executed certificates of Responsible Officers of each Borrower as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents;

(iv)    such documents and duly executed certifications as the Lender may reasonably require to evidence that each Borrower is duly organized or formed, and that each Borrower is validly existing and in good standing in the jurisdiction where it is formed;

(v)     a certificate signed by a Responsible Officer of each Borrower certifying, as of the Effective Date, that since the Petition Date there has been no change, event, circumstance or development that, individually or in the aggregate, has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.

(b)     All Governmental Approvals and all third party consents and approvals necessary in connection with the transactions contemplated hereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Lender) and shall remain in effect; all applicable governmental filings shall have been made and all applicable

waiting periods in connection with the transactions contemplated hereby shall have expired without, in either case, any action being taken by any Governmental Authority, and no law or regulation shall be applicable in the reasonable judgment of the Lender that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated hereby.

(c)    The Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender.

(d)    All of the "first day motions" and related orders submitted on or about the date of the commencement of the Case shall be in form and substance reasonably satisfactory to the Lender and, as entered, shall not deviate from the form thereof approved by the Lender in any material respect which is adverse to the interests of the Lender (such orders hereinafter being referred to as "First Day Orders"; it being understood and agreed that notwithstanding anything herein to the contrary, the relief sought in all such First Day Orders approved by the Lender shall be permitted herein and the consent of the Lender to such relief therein shall be deemed to have been obtained).

(e)    The Sale Motion (as defined in the Acquisition Agreement) and the related exhibits (including the Sale Order, as defined in the Acquisition Agreement) shall be in form and substance acceptable to the Lender in its sole discretion.

(f)    The Lender shall have received, at least one Business Day prior to the Effective Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(g)    Each of the representations and warranties made by the Borrowers in or pursuant to the Loan Documents shall be true and correct in all respects (subject to any qualification provided therein) or in all material respects (in the case of any representation or warranty not otherwise qualified) on and as of such date as if made on and as of such date.

(h)    No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(i)    All proceedings in connection with the making of such Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Lender, and the Lender shall have received all such agreements, instruments, approvals, opinions, and other documents, each in form and substance satisfactory to the Lender, as the Lender may reasonably request.

4.2    Conditions Precedent to All Loans. The obligation of the Lender to make any Loan on or after the Effective Date is subject to the fulfillment of each of the following conditions precedent:

(a)    The Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender.

(b)     Each of the representations and warranties made by the Borrowers in or pursuant to the Loan Documents shall be true and correct in all respects (subject to any qualification provided therein) or in all material respects (in the case of any representation or warranty not otherwise qualified) on and as of such date as if made on and as of such date.

(c)     No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(d)     The Lender shall have received a Notice of Borrowing pursuant to Section 2.2 hereof.

## SECTION 5. AFFIRMATIVE COVENANTS

Each Borrower hereby agrees that, so long as the Commitment remains in effect or any Loan or Obligations or other amounts are owing to the Lender hereunder or under the other Loan Documents, such Borrower shall:

5.1     Further Assurances. At any time or from time to time upon the request of the Lender, at the expense of the Borrower, promptly execute, acknowledge and deliver such additional instruments, certificates or documents, and do all such other acts and things as the Lender may reasonably request for purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, of providing for payment of the Obligations in accordance with the terms of this Agreement, the Notes and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lender with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by the Borrower which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower shall execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Lender may be required to obtain from the Borrower for such governmental consent, approval, recording, qualification or authorization (to the extent the Borrower is permitted by applicable law to do so). The Borrower shall fully preserve or cause to be fully preserved the Liens granted by the Security Documents.

5.2     Use Of Proceeds. Use the proceeds of the Loans to pay the Borrower's reasonable and documented expenses in accordance with the terms of the Budget and any applicable Variance Report(s), as reviewed and approved by the Lender (collectively, the "Permitted Uses").

5.3     Preservation Of Existence; Business, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business; (c) preserve or renew all of its material registered patents, trademarks, trade names and service marks; and (d) maintain and operate its business in substantially the manner in which it is presently conducted and operated, and in compliance with all covenants of the Borrower set forth in the Acquisition Agreement.

5.4     Financial Information; Default Notices. Deliver to the Lender, in form satisfactory to the Lender:

(a)     as soon as reasonably practicable after request by the Lender, such consolidated balance sheets of the Borrower and its Subsidiaries, related consolidated statements of income or operations, shareholders' equity, and cash flows, cash balance reports or any other financial reports as reasonably requested by the Lender; and

(b)     promptly (and in any event within two Business Days) provide written notice to the Lender of the occurrence of any Default or Event of Default, describing the nature of such Default or Event of Default and any remedial actions being taken with respect thereto.

5.5     Sale Milestones. The Borrower and its Subsidiaries shall comply with and achieve the Sale Milestones.

## SECTION 6. NEGATIVE COVENANTS

Each Borrower hereby agrees that, so long as the Commitment remains in effect or any Loan or other Obligations or other amounts are owing to the Lender hereunder or under any other Loan Document, such Borrower shall not, directly or indirectly:

6.1     Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than the following:

(a)     Liens pursuant to any Loan Document and the Order;

(b)     Permitted Liens;

(c)     Liens existing on the date hereof and listed on Schedule 6.1; and

(d)     pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA.

6.2     Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness under the Loan Documents; and

(b)     Indebtedness outstanding on the date hereof and listed on Schedule 6.2.

6.3     Investments. Make or hold any Investments, except:

(a)     Investments held by the Borrower in the form of cash or cash equivalents;

(b)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(c)     Investments existing on the date hereof and listed on <u>Schedule 6.3</u>.

6.4     <u>Fundamental Changes</u>. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, other than the Contemplated Transactions.

6.5     <u>Dispositions</u>. Make any Disposition or enter into any agreement to make any Disposition, except:

(a)     Dispositions of obsolete or worn out property or property no longer used or useful in the Business of the Borrower, whether now or hereafter owned or leased, in the Ordinary Course of Business of such Person;

(b)     Dispositions of inventory in the Ordinary Course of Business;

(c)     Dispositions of equipment, software or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property; and

(d)     the marketing for sale and the sale of the assets of the Business in accordance with the Acquisition Agreement, the Bidding Procedures Order, and the transactions contemplated thereby.

6.6     <u>Change In Nature Of Business</u>. Engage in any line of business different from the Business.

6.7     <u>Transactions With Affiliates</u>. Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the Ordinary Course of Business, other than on fair and reasonable terms substantially as favorable to the Borrower as would be obtainable by the Borrower at the time in a comparable arm's length transaction with a Person other than an Affiliate; <u>provided that</u> the foregoing restriction shall not apply to transactions, arrangements, fees reimbursements and indemnities specifically and expressly permitted between or among such parties under this Agreement.

6.8     <u>Accounting Changes</u>. Make any change in (i) accounting policies or reporting practices in a manner that could materially affect the results of computation of any financial ratio or data for a given reporting period, except (x) as required by generally accepted accounting principles, (y) as required for compliance with the Sarbanes-Oxley Act or (z) as pre-approved by the Lender, or (ii) its fiscal year.

6.9     <u>Partnerships, Etc</u>. Become a general partner in any general or limited partnership or joint venture.

6.10    <u>Speculative Transactions</u>. Engage in any transaction involving any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement (including caps and collars with respect to interest rates, currency exchange rates or commodity prices) or futures contracts for speculative purposes or any similar speculative transactions, which are, in any case, inconsistent with prior practice and not otherwise made in the Ordinary Course of Business.

6.11    <u>Formation Of Subsidiaries</u>. Organize or invest in any new Subsidiary.

6.12    <u>Administrative Priority; Lien Priority; Payment</u>.

(a)     At any time, suffer to exist a priority for any administrative expense, secured claim or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever), including without limitation any administrative expense of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) 726 or 1114 of the Bankruptcy Code equal or superior to the priority of the Lender in respect of the Obligations, except for the Carve-Out.

(b)     At any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Lender in respect of the Collateral, except for Permitted Liens and the Carve-Out.

(c)     Prior to the date on which the Obligations have been paid in full in cash, pay any administrative expense claims except (i) Obligations due and payable hereunder, (ii) other administrative expense and professional claims incurred in the ordinary course of the business of the Borrower or the Case and (iii) the Carve-Out.

6.13    <u>OFAC; USA Patriot Act; Anti-Corruption Laws</u>. Permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in <u>Section 3.10</u>. The Borrower will not use the proceeds of any Loan, directly or, knowingly, indirectly, for any payments to any Person, including any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, or otherwise take any action, directly or, knowingly, indirectly, that would result in a violation of any Anti-Corruption Laws. Furthermore, the Borrower will not, directly or indirectly, use the proceeds of any Loan, or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person participating in the transaction of any Sanctions.

## SECTION 7. EVENTS OF DEFAULT

7.1     <u>Events of Default</u>. If any of the following events shall occur and be continuing:

(a)     the Borrowers shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrowers shall fail to pay any interest on any Loan or any other amount payable hereunder or under any other Loan Document, within one Business Day after any such interest or other amount becomes due in accordance with the terms hereof, or any Borrower shall use the proceeds of any Loan for purposes other than as described in the corresponding Notice of Borrowing; or

(b)     any representation or warranty made or deemed made by any Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any respect (subject to any qualification provided therein) or in any material respect (in the case of any representation or warranty not otherwise qualified) on or as of the date made or deemed made; or

(c)     any Borrower fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 2.9</u> or <u>2.10</u>, <u>Section 5</u> or <u>Section 6</u>; or

(d)     any Borrower shall Default in the observance or performance of any other provision contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such Default shall continue unremedied for a period of three (3) Business Days after notice to the Borrower from the Lender; or

(e)     (i) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) any Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Lender is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Lender, reasonably be expected to result in a Material Adverse Effect; or

(f)     one or more judgments or decrees shall be entered against any Borrower involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $50,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within five (5) Business Days from the entry thereof; or

(g)     any of the Security Documents shall cease, for any reason, to be in full force and effect, or any Borrower or any Affiliate of any Borrower shall file a proceeding or take any

other action to revoke or invalidate the Security Documents without the express written consent of the Lender, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(h)    an order (which has not been stayed) with respect to the Case shall be entered by the Bankruptcy Court appointing, or any Borrower shall file an application for an order with respect to the Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(i)    an order with respect to the Case shall be entered by the Bankruptcy Court converting the Case to a Chapter 7 case or any Borrower shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Lender; or

(j)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of any Borrower which has a value in excess of $50,000 in the aggregate or permits any third party to commence or continue any litigation against any Borrower involving a potential liability not covered by insurance in excess of $50,000 in the aggregate; or

(k)    an order shall be entered by any court, tribunal, or governmental authority or agency, or any Borrower shall apply for authority, to revoke, reverse, stay, modify, supplement or amend the Order without the express prior written consent of the Lender; or

(l)    an order with respect to the Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (i) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Borrower equal or superior to the priority of the Lender in respect of the Obligations, except for allowed administrative expenses to the extent set forth in the Order, or (ii) to grant or permit the grant of a Lien on the Collateral, other than a Permitted Lien or any Lien in favor of the Lender; or

(m)    any Borrower shall make any payment of principal or interest or otherwise on account of any prepetition Indebtedness or trade payable (excluding payments effected by a setoff of obligations as permitted by Section 553 of the Bankruptcy Code) in excess of $1,000 without the express prior written consent of the Lender and the approval of the Bankruptcy Court other than as provided for in any First Day Orders; or

(n)    any Borrower shall file a motion in the Case (i) to use Cash Collateral of the Lender under Section 363(c) of the Bankruptcy Code without the express prior written consent of the Lender (it being understood and agreed that the Lender consents to the proposed use of Cash Collateral on the terms and conditions set forth in the form of Order attached hereto), (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (iii) to take any other action or actions materially

adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or the Lender's interest (as lender under the Loan Documents) in any of the Collateral; or

(o)    an order shall be entered by the Bankruptcy Court dismissing the Case which does not contain a provision for termination of the Commitment, and payment in full in cash of all Obligations of any Borrower hereunder and under the other Loan Documents upon entry thereof;

(p)    any Borrower shall fail to comply with the Order in any respect;

(q)    the Acquisition Agreement shall have terminated in accordance with its terms (other than as a result of a breach by the Lender); or

(r)    by not later than the first Business Day following entry by the Bankruptcy Court of an Alternative Transaction Order, the Borrowers shall fail to indefeasibly pay in full to Lender all Obligations, including, without limitation, the outstanding principal, interest, and other obligations of the Borrowers under this Agreement;

then, upon the occurrence of an Event of Default, the Lender may (i) declare the Commitment of the Lender to make the Loans terminated, whereupon the Commitment shall be terminated, (ii) declare the unpaid principal amount of all outstanding Loans, all interest accrued thereon, and all other amounts owed or payable under any Loan Document to be immediately due and payable, and (iii) exercise all rights and remedies available to it under the Loan Documents.  Without limiting the foregoing, immediately upon the earlier of entry of an Alternative Transaction Order or any termination of the Acquisition Agreement, the Commitment shall terminate.  After the occurrence of an Event of Default, subject only to the delivery by the Lender of three (3) Business Days' prior written notice to the Borrowers (with a copy to counsel for the Borrowers, counsel for the Creditors' Committee, the UST and the Bankruptcy Court) of its intent to exercise any rights or remedies under this Agreement or any other Loan Document, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order by the Bankruptcy Court and the Lender shall be entitled to exercise all such rights and remedies, including against the Collateral.

Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrowers. Notwithstanding the foregoing, any Event of Default under clause (m) above may be cured through the return to the Borrower, within five days following notice from the Lender of such Event of Default, of all sums paid which constitute or caused an Event of Default under clause (m) above. Upon the return of all such sums, the Borrower shall provide notice thereof to the Lender, along with such other evidence the Lender may reasonably require to confirm that such payment has been made to the Borrower, and upon delivery of such items such Event of Default shall then be cured and cease to be in effect or continuing.

7.2    <u>Application of Proceeds</u>. If an Event of Default shall have occurred and be continuing, the Lender may at any time apply (a) all payments received by the Lender under the Loan Documents, whether from any Borrower or otherwise and (b) all or any part of proceeds

constituting Collateral received by the Lender, in payment of the Obligations in the following order:

(a)     *first,* to the payment of all costs and expenses of such sale, collection or other realization, all other expenses, liabilities and advances made or incurred by the Lender in connection therewith, and all amounts for which the Lender is entitled to compensation, reimbursement and indemnification under any Loan Document and all advances made by the Lender thereunder for the account of any Borrower, and to the payment of all costs and expenses paid or incurred by the Lender in connection with the Loan Documents, all in accordance with Section 8.5 and the other terms of this Agreement and the Loan Documents;

(b)     *second,* thereafter, to the payment of all other Obligations; and

(c)     *third,* thereafter, to the payment to or upon the order of the Borrowers or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## SECTION 8. MISCELLANEOUS

8.1     <u>Amendments and Waivers</u>. No amendment, supplement, modification or waiver of any of the provisions of this Agreement or any other Loan Document shall be deemed to be made unless the same shall be in writing signed on behalf of the Borrowers and the Lender and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Any such waiver and any such amendment, supplement or modification shall be binding upon the Borrowers, the Lender and all future holders of the Loans. In the case of any waiver, each of the Borrowers and the Lender shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

8.2     <u>Notices</u>. Any and all notices, requests, instructions and other communications required or permitted to be given under this Agreement after the date of this Agreement by any party hereto to any other party may be delivered personally or by nationally recognized overnight courier service or sent by mail or (except in the case of payments) by facsimile transmission or electronic mail, at the respective addresses or transmission numbers set forth below and is deemed delivered (a) in the case of personal delivery, facsimile transmission or electronic mail, when received; (b) in the case of mail, upon the earlier of actual receipt or five (5) Business Days after deposit in the United States Postal Service, first class certified or registered mail, postage prepaid, return receipt requested; and (c) in the case of an overnight courier service, one (1) Business Day after delivery to such courier service with and instructions for overnight delivery. The parties may change their respective addresses and transmission numbers by written notice to all other parties, sent as provided in this Section. All communications must be in writing and addressed as follows:

Borrowers:          Mabvax Therapeutics Holdings, Inc.; Mabvax Therapeutics, Inc.

[115335 Sorrento Valley Road
Suite 400
San Diego, CA 92121


                        ]

With a copy to:

[




                        ]

Lender:

BioNTech Research and Development, Inc.
[ ]
E-mail: james.ryan@biontech.de
[Attention: James Ryan, Vice President IP & Legal]

With a copy to:

Covington & Burling LLP
265 Strand
London WC2R 1BH, United Kingdom
E-mail: kwiggert@cov.com
Attention: Kristian Wiggert

and

Covington & Burling LLP
The New York Times Building
620 Eighth Ave
New York, NY 10018, USA
E-mail: dcoffino@cov.com, mbeeler@cov.com
Attention: Dianne Coffino and Martin Beeler

provided that any notice, request or demand to or upon the Lender shall not be effective until received. Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Lender.

      8.3    No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or

the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.4     Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

8.5     Payment of Fees and Expenses; and Indemnification.

(a)     Any action taken by any Borrower under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Lender, shall be at the expense of such Borrower, and the Lender shall not be required under any Loan Document to reimburse any Borrower therefor except as expressly provided therein. In addition, each Borrower agrees to pay or reimburse the Lender upon demand for (a) all reasonable and documented out-of-pocket costs and expenses incurred by the Lender (including the reasonable fees and expenses of counsel to the Lender) in connection with the investigation, development, preparation, negotiation, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including the attorneys' fees of the Lender and (b) all costs and expenses (including the fees and expenses of counsel to the Lender) incurred in connection with (i) the creation, perfection and maintenance of the perfection of the Lender's Liens upon the Collateral, including Lien search, filing and recording fees, (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Secured Obligation, with respect to the Collateral or any other related right or remedy or any attempt to inspect, verify, protect, insure, collect, sell, liquidate or otherwise dispose of any Collateral or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to any Borrower, Loan Document, Secured Obligation or the transactions contemplated by the Acquisition Agreement.

(b)     Borrower shall pay, indemnify, and hold the Lender, and the officers, directors, trustees, employees, agents, advisors and Affiliates of the Lender and its officers, directors, employees, affiliates, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the enforcement of this Agreement, the other Loan Documents and any such other documents (regardless of whether any Indemnitee is a party hereto and regardless of whether any such matter is initiated by a third party, a Borrower or any other Person), including any of the foregoing relating to the use of proceeds of the Loan or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Borrower or any of the Properties and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Borrower under any Loan Document (all the foregoing in this clause (b), collectively, the "Indemnified Liabilities"), provided, that the Borrowers shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent

jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, each Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this <u>Section 8.5</u> shall be payable not later than 10 days after written demand therefor. Statements payable by any Borrower pursuant to this <u>Section 8.5</u> shall be submitted to the address of such Borrower set forth in <u>Section 8.2</u>, or to such other Person or address as may be hereafter designated by such Borrower in a written notice to the Lender. The agreements in this <u>Section 8.5</u> shall survive repayment of the Loan and all other amounts payable hereunder.

8.6     <u>Payments Set Aside</u>. To the extent that any payment by or on behalf of the Borrowers is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, or otherwise avoided and recovered by any Borrower, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and any Lien corresponding thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

8.7     <u>Successors and Assigns; Assignments</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder (x) without the prior written consent of the Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) or (y) to any Person that is not a "United States person" as defined in Section 7701(a)(30) of the Code and (ii) the Lender may assign to one or more assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement with notice to the Borrowers. The Borrowers shall maintain a register containing the name and address of each Lender and Assignee under this Agreement and its interest in the Loans and the amounts of the Obligations of the Borrowers owing to such Person.

8.8     <u>Set-off</u>. In addition to any rights and remedies of the Lender provided by applicable Legal Requirements and/or the Acquisition Agreement, the Lender and its Affiliates shall have the right, without prior notice to the Borrowers, any such notice being expressly waived by the Borrowers to the extent permitted by applicable Legal Requirements, upon any amount becoming due and payable by the Borrowers hereunder (whether at the Maturity Date or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in each case, whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by, or on behalf of, the Lender or any Affiliate of the Lender to or for the credit or the account of the Borrowers, as the case may be. The Lender agrees promptly to notify the Borrowers after any such setoff and application made by the Lender or any Affiliate, <u>provided that</u> the failure to give such notice shall not affect the validity of such setoff and application.

8.9     <u>Conflicts Between this Agreement and the Order</u>. To the extent any term or provision of this Agreement conflicts or is inconsistent with any term of the Order, the terms of the Order shall control and govern.

8.10    <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with each Borrower and the Lender.

8.11    <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Legal Requirements, then (a) this Agreement is to be construed and enforced as if such illegal, invalid or unenforceable provision were not a part hereof; (b) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such illegal, invalid or unenforceable provision or by its severance from this Agreement; and (c) there will be added automatically as a part of this Agreement a provision mutually agreed to which is similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and enforceable.

8.12    <u>Integration</u>. This Agreement and the other Loan Documents represent the entire agreement of the Borrowers and the Lender with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

8.13    <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

8.14    <u>Submission To Jurisdiction; Waivers</u>.

(a)     <u>SUBMISSION TO JURISDICTION</u>. EACH BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER ANY MATTER OR IF IT HAS JURISDICTION BUT DOES NOT EXERCISE SUCH JURISDICTION FOR ANY REASON, THEN TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY

COURT, ANY SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS IN THE COURTS OF ANY JURISDICTION.

(b)    WAIVER OF VENUE. EACH BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY IN ANY NEW YORK STATE OR FEDERAL COURT. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    SERVICE OF PROCESS. EACH BORROWER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

8.15    Acknowledgements. Each Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    the Lender does not have a fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lender, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Borrower and the Lender.

8.16    Releases of Liens. At such time as the Loans and the other Obligations under the Loan Documents shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, the Collateral shall be released from the Liens created by the Security Documents and the Order, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Lender and the Borrowers under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

8.17    <u>WAIVERS OF JURY TRIAL</u>. EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

8.18    <u>Regulatory</u>. Each Borrower will, and will cause each of its Subsidiaries to, provide, to the extent commercially reasonable or required by any Requirement of Law, such information and take such actions as are reasonably requested by the Lender to assist the Lender in maintaining compliance with applicable Legal Requirements.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Borrowers and the Lender have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

**BORROWERS**:

**MABVAX THERAPEUTICS HOLDINGS, INC.,**
a Delaware corporation


By:_____
Name:
Title:


**MABVAX THERAPEUTICS, INC.,**
a Delaware corporation


By:_____
Name:
Title:

**LENDER**:

**BIONTECH RESEARCH AND DEVELOPMENT, INC.,**
a Delaware corporation


By:_____
Name:
Title:

**Schedule 6.1**

Liens

## **Schedule 6.2**

Indebtedness

**<u>Schedule 6.3</u>**

Investments

## **EXHIBIT A**

Notice of Borrowing

[_____], 2019

BioNTech Research and Development, Inc., as the
Lender party to the Credit Agreement referred to below
[



]

With a copy to:

Covington & Burling LLP
265 Strand
London WC2R 1BH, United Kingdom
E-mail: kwiggert@cov.com
Attention: Kristian Wiggert

Covington & Burling LLP
The New York Times Building
620 Eighth Ave
New York, NY 10018, USA
E-mail: dcoffino@cov.com, mbeeler@cov.com
Attention: Dianne Coffino and Martin Beeler

Ladies and Gentlemen:

The undersigned, Mabvax Therapeutics Holdings, Inc. and Mabvax Therapeutics, Inc., each a Delaware Corporation, a debtor and a debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code ("Borrowers"), refer to the Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of _____, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the capitalized terms defined therein being used herein as therein defined), between the Borrowers and BioNTech Research and Development, Inc., as lender ("Lender"), and hereby give you notice, irrevocably, pursuant to Section 2.2 of the Credit Agreement, that the undersigned hereby requests a borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such borrowing of the requested Loan (the "Proposed Loan") as required by Section 2.2 of the Credit Agreement:

1. The Business Day of the Proposed Loan is: [                    ], 20[  ]

2. The aggregate amount of the Proposed Loan is: $

3. The proceeds of the Proposed Loan are to be used for:

[Describe with specificity the uses of the Proposed Loan (which uses must be Permitted Uses) on a per expenditure basis with a dollar amount corresponding to each expenditure.]

4.   The proceeds of the Loan are to be disbursed to the following account:

Bank: [_____]

Account No.: [_____]

The Borrowers hereby certify that:

(A) each of the representations and warranties made by the Borrowers in or pursuant to the Loan Documents is true and correct on and as of the date hereof as if made on and as of the date hereof; and

(B) no Default or Event of Default has occurred and is continuing on the date hereof or after giving effect to the Loan requested to be made on the date specified above.

Very truly yours,

Mabvax Therapeutics Holdings, Inc.

By: _____
Name:
Title:



Mabvax Therapeutics, Inc.

By: _____
Name:
Title:

# **EXHIBIT B**

Interim Order

# **EXHIBIT C**

Acquisition Agreement

## Exhibit D

Budget

# EXHIBIT C

# SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (this "Agreement") dated _____ __, 2019 is made by and between MABVAX THERAPEUTICS HOLDINGS, INC., a Delaware corporation ("Holdings"), MABVAX THERAPEUTICS, INC., a Delaware Corporation ("Mabvax", and together with Holdings, each a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code and each individually a "Grantor" and together "Grantors"), and BIONTECH RESEARCH AND DEVELOPMENT, INC., a Delaware corporation, as lender (together with its successors and assigns, "Lender").

## PRELIMINARY STATEMENTS

(1)     The Grantors and the Lender have entered into a Superpriority Debtor-in-Possession Credit Agreement dated of even date herewith (as it may hereafter be amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized terms not otherwise defined herein shall have the meanings set forth in the Credit Agreement), pursuant to which the Lender will make the Loans available to the Grantors.

(2)     It is a condition precedent to the Loans that the Grantors shall have executed and delivered this Agreement.

NOW, THEREFORE, in consideration of the premises and in order to induce the Lender to make the Loans under the Credit Agreement, each Grantor hereby agrees with the Lender as follows:

1.     <u>Grant of Security</u>.  Subject only to the Permitted Liens and the Carve-Out, each Grantor hereby grants to the Lender a security interest in such Grantor's right, title and interest in and to all assets and property interests of the Grantor, including, without limitation, the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Grantor, wherever located, by whomsoever held or controlled and whether now or hereafter existing or arising, and the proceeds thereof, as security for the Secured Obligations (as defined below) (collectively, the "Collateral"):

(a)     all equipment (any and all such property being the "Equipment");

(b)     all inventory (any and all such property being the "Inventory");

(c)     all accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), commercial tort claims identified on <u>Schedule V</u> hereto, documents, instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights, general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, commercial tort claims, documents, instruments, deposit accounts, letter-of-credit rights, general intangibles and

other obligations, to the extent not referred to in clause (d), (e), or (f) below, being the "<u>Receivables</u>", and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "<u>Related Contracts</u>");

(d)      the following (the "<u>Security Collateral</u>"):

(i)      the shares of Capital Stock (the "<u>Initial Pledged Interests</u>") set forth opposite the Grantor's name on and as otherwise described in <u>Schedule I</u> hereto and issued by the Persons named therein and the certificates, if any, representing the Initial Pledged Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Initial Pledged Interests and all subscription warrants, rights or options issued thereon or with respect thereto;

(ii)      all other shares of stock and other Capital Stock from time to time acquired by or owned by the Grantor in any manner (such shares and other Capital Stock, together with the Initial Pledged Interests, being the "<u>Pledged Interests</u>"), and the certificates, if any, representing such additional shares or other Capital Stock, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other Capital Stock and all subscription warrants, rights or options issued thereon or with respect thereto;

(iii)      all indebtedness from time to time owed to the Grantor (such indebtedness being the "<u>Pledged Debt</u>") and the instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness; and

(iv)      all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C) securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all subscription warrants, rights or options issued thereon or with respect thereto;

(e)      the following (collectively, the "<u>Account Collateral</u>"):

(i)      the deposit accounts as described in <u>Schedule II</u> hereto (the "<u>Deposit Accounts</u>") and all funds and financial assets from time to time credited thereto (including, without limitation, all cash equivalents), all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such funds and financial assets, and all certificates and instruments, if any, from time to time representing or evidencing the Deposit Accounts;

(ii)      all promissory notes, certificates of deposit, deposit accounts,

checks and other instruments from time to time delivered to or otherwise possessed by the Lender for or on behalf of the Grantor, including, without limitation, those delivered or possessed in substitution for or in addition to any or all of the then existing Account Collateral; and

        (iii)     all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral;

        (f)     the following (collectively, the "Intellectual Property Collateral"):

        (i)     all patents, patent applications and inventions claimed or disclosed therein and all improvements thereto ("Patents");

        (ii)     all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable law), together, in each case, with the goodwill symbolized thereby ("Trademarks");

        (iii)     all copyrights, including, without limitation, copyrights in Computer Software (as hereinafter defined), Internet web sites and the content thereof, whether registered or unregistered ("Copyrights");

        (iv)     all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing ("Computer Software");

        (v)     all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, "Trade Secrets"), and all other intellectual, industrial and intangible property of any type;

        (vi)     all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for registration set forth in Schedule III hereto (as such Schedule III may be supplemented from time to time by any Intellectual Property Security Agreement executed by the Grantor and the Lender from time to time), together with, as applicable, all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

        (vii)     all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto

throughout the world and all other rights of any kind whatsoever of the Grantor accruing thereunder or pertaining thereto;

(viii)    all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Grantor, now or hereafter, is a party or a beneficiary ("IP Agreements"); and

(ix)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(g)    all books and records (including, without limitation, all data, formula, programs, licenses relating thereto, customer lists, credit files, printouts and other computer output materials and records) of the Grantor pertaining to any of the Collateral;

(h)    all general intangibles, including, without limitation, payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, including intellectual property licenses, infringement claims, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, and interests in a partnership or limited liability company which do not constitute a security under Article 8 of the UCC;

(i)    the commercial tort claims specified on Schedule V hereto; and

(j)    all proceeds (in whatever form received, existing or arising) of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (i) of this Section 1 and this clause (j)) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, (B) tort claims, including, without limitation, all commercial tort claims and (C) cash;

provided, however, that notwithstanding anything to the contrary contained in clause (f) above, Intellectual Property Collateral shall not include intellectual property in relation to which any applicable law, regulation, agreement with a domain name registrar, or other contractual arrangement, prohibits the creation of a security interest therein or would otherwise invalidate the Grantor's right, title or interest therein (but proceeds and receivables thereof shall not be deemed excluded from the Collateral regardless of such prohibition).

2.    Security for Obligations.  This Agreement secures the payment of all Obligations of the Grantors now or hereafter existing under the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise

(all such Obligations being the "<u>Secured Obligations</u>").

3. <u>Grantors Remain Liable</u>.  Anything herein to the contrary notwithstanding, (a) each Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Lender of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral and (c) the Lender shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement or any other Loan Document, nor shall the Lender be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

4. <u>Delivery and Control of Security Collateral</u>.

(a) If any certificates or instruments represent or evidence Security Collateral, all such certificates or instruments shall, upon request of the Lender, be delivered to and held by or on behalf of the Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender. If an Event of Default shall have occurred and be continuing, the Lender shall have the right (i) at any time to exchange certificates or instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations and (ii) at any time in its discretion and without notice to the Grantor, to transfer to or to register in the name of the Lender or any of its nominees any or all of the Security Collateral, subject only to the revocable rights specified in <u>Section 10(a)</u>.

(b) With respect to any Security Collateral in which any Grantor has any right, title or interest and that constitutes an uncertificated security, upon reasonable request from the Lender, such Grantor will use commercially reasonable efforts to cause the issuer thereof, either (i) to register the Lender as the registered owner of such security or (ii) to agree in an authenticated record with the Grantor and the Lender that such issuer will comply with instructions with respect to such security originated by the Lender without further consent of the Grantor, such authenticated record to be in form and substance reasonably satisfactory to the Lender. With respect to any Security Collateral in which any Grantor has any right, title or interest and that is not an uncertificated security, upon the request of the Lender upon the occurrence and during the continuance of an Event of Default, such Grantor will notify each issuer of Pledged Interests pledged by the Grantor that such Pledged Interests is subject to the security interest granted hereunder.

(c) With respect to any Security Collateral in which any Grantor has any right, title or interest and that constitutes a security entitlement in which the Lender is not the entitlement holder, upon reasonable request from the Lender, such Grantor will use commercially reasonable efforts to cause the securities intermediary with respect to such security entitlement either (i) to identify in its records the Lender as the entitlement holder of such security entitlement against such securities intermediary or (ii) to agree in an authenticated record with the Grantor and the Lender that such securities intermediary will comply with

entitlement orders (that is, notifications communicated to such securities intermediary directing transfer or redemption of the financial asset to which the Grantor has a security entitlement) originated by the Lender without further consent of the Grantor, such authenticated record to be in form and substance reasonably satisfactory to the Lender.

(d)     Upon the request of the Lender upon the occurrence and during the continuance of an Event of Default and without further order from the Bankruptcy Court, but subject to the Order, each Grantor will notify each such issuer of Pledged Debt that such Pledged Debt pledged by such Grantor is subject to the security interest granted hereunder.

(e)     Without the prior written consent of the Lender, any Grantor shall not vote to enable or take any other action to cause any issuer of any Pledged Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Interests to be treated as securities for purposes of the UCC unless such Grantor shall promptly notify the Lender in writing of any such proposed election or action and shall take all steps necessary or advisable to establish the Lender's "control" on the date such Pledged Interests are treated as securities for purposes of the UCC.

5.     <u>Superpriority Claim and Liens</u>.  So long as the Loans or any other Obligation (other than indemnification Obligations for which no claims have been made) of any Grantor under any Loan Document shall remain unpaid or unsatisfied or the Lender shall have any Commitment under the Credit Agreement, each Grantor hereby covenants, represents and warrants that, upon entry of the Order, the Obligations and the obligations of such Grantor under the Loan Documents shall be secured by the Liens and claims to the extent and with the priorities, validity and enforceability provided in the Order and Sections 2.9 and 2.10 of the Credit Agreement.

6.     <u>Representations and Warranties</u>.   Each Grantor represents and warrants as follows:

(a)     The Grantor's exact legal name, as defined in Section 9-503(a) of the UCC, is correctly set forth in <u>Schedule IV</u> hereto. The Grantor is located (within the meaning of Section 9-307 of the UCC) and has its chief executive office and the office in which it maintains the copies of each Related Contract to which the Grantor is a party and all originals of all chattel paper that evidence Receivables of the Grantor, in the state or jurisdiction set forth in <u>Schedule IV</u> hereto. The information set forth in <u>Schedule IV</u> hereto with respect to the Grantor is true and accurate in all respects. The Grantor has not within the last year changed its name, location, chief executive office, place where it maintains its agreements, type of organization, jurisdiction of organization or organizational identification number from those set forth in <u>Schedule IV</u> hereto.

(b)     Subject to the Permitted Liens, the Grantor is the legal and beneficial owner of its Collateral free and clear of any Lien, claim, option, or right of others, other than Liens permitted or disclosed under the Credit Agreement and the Order. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral or listing the Grantor or any trade name of the Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the Lender relating to the Loan Documents or as otherwise permitted or disclosed under the Credit Agreement, hereunder and the Order.

{00025293. }                                          6

(c)     The Initial Pledged Interests pledged by the Grantor constitute the percentage of the issued and outstanding Capital Stock of the issuers thereof indicated on Schedule I hereto.  The Initial Pledged Interests have not been pledged to any Person other than the Lender.

(d)     As of the Effective Date, the Grantor has no deposit accounts, other than the Account Collateral listed on Schedule II hereto, as such Schedule II may be amended from time to time upon the reasonable request of the Lender.  No Person other than the Grantor is in control of the Account Collateral.

(e)     All filings and other actions (other than (A) actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-105 and 9-107 of the UCC and Section 16 of Uniform Electronic Transactions Act and (B) actions necessary to perfect the Lender's security interest with respect to Collateral evidenced by a certificate of ownership) necessary to perfect, to the extent that perfection can be accomplished by such filings or other actions, the security interest in the Collateral of the Grantor created under this Agreement in addition to entry of the Order have been (or contemporaneously herewith will be) duly made or taken if requested by the Lender and, upon the entry by the Bankruptcy Court of the Order, are (or, upon filing or taking of such other actions, will be) in full force and effect, and upon the entry by the Bankruptcy Court of the Order and without in any way diminishing or limiting the effect of the Order, this Agreement creates in favor of the Lender a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral of the Grantor, to the extent that perfection can be accomplished by such filings or actions or entry of the Order, subject to Permitted Liens and Liens permitted under the Order, securing the payment of the Secured Obligations. Notwithstanding the foregoing, nothing in this Agreement shall require the Grantor to make any filings or take any actions to record or perfect the security interest in any Intellectual Property Collateral outside the United States.

(f)     Upon the entry of the Order, no further authorization or approval or other action by, and no further notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Grantor of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Grantor, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority nature of such security interest, subject to the Permitted Liens and Liens permitted under the Order), or (iii) the exercise by the Lender of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement and the Order, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(g)     Upon the entry of the Order, the Grantor has the corporate power and authority and the legal right to execute and deliver, to perform its obligations under, and to grant the Lien on the Collateral pursuant to, this Agreement and has taken all necessary corporate actions to authorize its execution, delivery and performance of, and grant of the Lien on the Collateral pursuant to, this Agreement.

(h)     Upon the entry of the Order, the Grantor is duly authorized to execute and deliver this Agreement to the Lender, and this Agreement constitutes the legal, valid and binding

obligation of the Grantor, enforceable against the Grantor in accordance with its terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law).

       7.      <u>Further Assurances</u>.

       (a)      Each Grantor agrees that from time to time, upon the Lender's request and at the expense of such Grantor, the Grantor will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Lender may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Grantor hereunder or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor will promptly with respect to Collateral: (i) if an Event of Default shall have occurred and be continuing or if requested by the Lender, and without further order of the Bankruptcy Court, mark conspicuously each document included in Inventory, each chattel paper included in Receivables, each Related Contract and, at the request of the Lender, each of its records pertaining to such Collateral with a legend, in form and substance satisfactory to the Lender, indicating that such document, chattel paper, Related Contract or Collateral is subject to the security interest granted hereby; (ii) if any such Collateral shall be evidenced by a promissory note or other instrument or chattel paper individually or in the aggregate in an amount in excess of $50,000, at the reasonable request of the Lender, deliver and pledge to the Lender hereunder such note or instrument or chattel paper duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Lender; (iii) execute or authenticate and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Lender may reasonably request, in order to perfect and preserve the security interest granted or purported to be granted by the Grantor hereunder; (iv) at the reasonable request of the Lender, deliver and pledge to the Lender certificates representing Security Collateral that constitutes certificated securities, accompanied by undated stock or bond powers executed in blank; (v) at the reasonable request of the Lender, take all action necessary to ensure that the Lender has control of Collateral consisting of deposit accounts, electronic chattel paper, investment property, letter-of-credit rights and transferable records as provided in Sections 9-104, 9-105, 9-106 and 9-107 of the UCC and in Section 16 of Uniform Electronic Transactions Act; (vi) at the reasonable request of the Lender, take all action to ensure that the Lender's security interest is noted on any certificate of ownership related to any Collateral evidenced by a certificate of ownership; (vii) at the reasonable request of the Lender, cause the Lender to be the beneficiary under all letters of credit that constitute Pledged Collateral, with the exclusive right to make all draws under such letters of credit, and with all rights of a transferee under Section 5-114(e) of the UCC; and (viii) at the reasonable request of the Lender, deliver to the Lender evidence that all other action that the Lender may reasonably deem necessary in order to perfect and protect the security interest created by the Grantor under this Agreement has been taken.

       (b)      Each Grantor hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal

property (or words of similar effect) of such Grantor, in each case without the signature of the Grantor, and regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement or the Order. A photocopy or other reproduction of the Order or this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. Each Grantor ratifies its authorization for the Lender to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c)        Each Grantor will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail and similar in nature and scope to other statements and schedules required under or constituting a part of this Agreement.

(d)        Without limiting anything in this Agreement, each Grantor agrees to (i) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization; (ii) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its Business; (iii) preserve or renew all of its material registered patents, trademarks, trade names and service marks; and (iv) maintain and operate its Business in substantially the manner in which it is presently conducted and operated, and in compliance with all covenants of such Grantor set forth in the Acquisition Agreement.

8.        Post-Closing Changes; Collections on Receivables and Related Contracts.

(a)        No Grantor will change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 6(a) of this Agreement without first giving at least 15 days' prior written notice to the Lender and taking all action reasonably required by the Lender, in addition to the Order, for the purpose of perfecting or protecting the security interest granted by this Agreement. Each Grantor will hold and preserve its records relating to the Collateral, including, without limitation, the Related Contracts. If any Grantor does not have an organizational identification number and later obtains one, it will forthwith notify the Lender of such organizational identification number.

(b)        Except as otherwise provided in this subsection (b), each Grantor will continue to have the right to collect, at its own expense, all amounts due or to become due to such Grantor under the Receivables and Related Contracts. In connection with such collections, such Grantor may take (and, during an Event of Default at the Lender's direction, will take) such action as the Grantor or, during an Event of Default, the Lender may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; provided, however, that the Lender shall have the right at any time, upon the occurrence and during the continuance of an Event of Default and upon written notice to the Grantor of its intention to do so, to notify each person obligated under any Receivables and Related Contracts (each, an "Obligor") of the assignment of such Receivables and Related Contracts to the Lender and to direct such Obligors to make payment of all amounts due or to become due to the Grantor thereunder directly to the Lender and, upon such notification and at the reasonable expense of the Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the

amount or payment thereof, in the same manner and to the same extent as the Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth set forth in Section 9-607 of the UCC. After receipt by such Grantor of the notice from the Lender referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Grantor in respect of the Receivables and Related Contracts of the Grantor shall be received in trust for the benefit of the Lender hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement) to be applied as provided in Section 15(b) and (ii) the Grantor will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof, or allow any credit or discount thereon. No Grantor will permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

9.     Intellectual Property Collateral.

(a)     Each Grantor shall take all steps which it or the Lender deems reasonable and appropriate under the circumstances to preserve and protect each item of its material Intellectual Property Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks.

(b)     Each Grantor shall execute and deliver to the Lender, upon the Lender's request, an Agreement in form and substance satisfactory to the Lender in its sole and absolute discretion (an "Intellectual Property Security Agreement"), which Intellectual Property Security Agreement the Lender may record with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or any other U.S. governmental authorities necessary to perfect the security interest hereunder for all Copyrights, Trademarks and Patents of such Grantor, in the form attached hereto as Annex I.

(c)     Each Grantor agrees that should it obtain an ownership interest in any item of the type set forth in Section 1(f) that is not on the date hereof a part of the Intellectual Property Collateral ("After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual Property Collateral subject to the terms and conditions of this Agreement with respect thereto. Within ten days of acquiring After-Acquired Intellectual Property, such Grantor shall give prompt written notice to the Lender identifying the After-Acquired Intellectual Property acquired, and the Grantor shall execute and deliver to the Lender with such written notice, or otherwise authenticate, an agreement, in form and substance satisfactory to the Lender in its sole and absolute discretion an Intellectual Property Security Agreement covering the registered or applied for After-Acquired Intellectual Property, which Intellectual Property Security Agreement the Lender may record with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or any other U.S. governmental authorities necessary to perfect the security interest hereunder in such registered or applied for After-Acquired Intellectual Property.

10.     Voting Rights; Dividends; Etc.

(a)      So long as no Event of Default shall have occurred and be continuing:

(i)      Each Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Security Collateral of such Grantor or any part thereof for any purpose;

(ii)      Each Grantor shall be entitled to receive and retain any and all dividends, interest and other distributions paid in respect of the Security Collateral of such Grantor if and to the extent that the payment thereof is not otherwise prohibited by the terms of the Loan Documents or the Acquisition Agreement; provided, however, that any and all (A) dividends, interest and other distributions paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Security Collateral, (B) dividends and other distributions paid or payable in cash in respect of any Security Collateral of the Grantor in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and (C) cash paid, payable or otherwise distributed in respect of principal of, or in redemption of, or in exchange for, any Security Collateral of the Grantor, shall be, and shall be forthwith delivered to the Lender to hold as, Security Collateral and shall, if received by the Grantor, be received in trust for the benefit of the Lender, be segregated from the other property or funds of the Grantor and be forthwith delivered to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

(iii)      The Lender will execute and deliver (or cause to be executed and delivered) to each Grantor all such instruments as such Grantor may reasonably request for the purpose of enabling the Grantor to exercise the voting and other rights that it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends or interest payments that it is authorized to receive and retain pursuant to paragraph (ii) above.

(b)      Upon the occurrence and during the continuance of an Event of Default and without further order from the Bankruptcy Court, but subject to the Order and the Permitted Liens:

(i)      All rights of each Grantor (A) to exercise or refrain from exercising the voting and other consensual rights that it would otherwise be entitled to exercise pursuant to Section 10(a)(i) shall, upon notice to such Grantor by the Lender, cease and (B) to receive the dividends, interest and other distributions that it would otherwise be authorized to receive and retain pursuant to Section 10(a)(ii) shall automatically cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to exercise or refrain from exercising such voting and other consensual rights and to receive and hold as Security Collateral such dividends, interest and other distributions.

(ii)      All dividends, interest and other distributions that are received by any Grantor contrary to the provisions of paragraph (i) of this Section 10(b) shall be received in trust for the benefit of the Lender, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

11.     <u>Transfers and Other Liens; Additional Shares</u>.

(a)     Each Grantor agrees that it will not (i) sell, assign or otherwise dispose of, or grant any Lien with respect to, any of the Collateral, other than sales, assignments and other dispositions of Collateral, and options relating to Collateral, permitted under the terms of the Credit Agreement or expressly permitted by the Order, or (ii) create or suffer to exist any Lien upon or with respect to any of the Collateral of such Grantor except for the pledge, assignment and security interest created under this Agreement and Liens permitted under Section 6.1 of the Credit Agreement or expressly permitted by the Order.

(b)     Each Grantor agrees that it will (i) cause each issuer of the Pledged Interests pledged by such Grantor not to issue any Capital Stock or other securities in addition to or in substitution for the Pledged Interests issued by such issuer, except to such Grantor, and (ii) pledge hereunder, immediately upon its acquisition (directly or indirectly) thereof, any and all additional Capital Stock or other securities and concurrently deliver possession of all certificates representing such Capital Stock to the Lender.

12.     <u>Lender Appointed Attorney-in-Fact</u>.  Subject to the Order, each Grantor hereby irrevocably appoints the Lender such Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of an Event of Default, in the Lender's discretion, to take any action and to execute any instrument that the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)     to obtain and adjust insurance claims with respect to the Collateral,

(b)     to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(c)     to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) or (b) above, and

(d)     to file any claims or take any action or institute any proceedings that the Lender may deem necessary for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral.

13.     <u>Lender May Perform</u>.  If any Grantor fails to perform any agreement contained herein, the Lender may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable under <u>Section 15</u>.

14.     <u>The Lender's Duties</u>.  The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, or as to the taking of any necessary

steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.  The Lender shall not have any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Loan Documents and the relationship between each Grantor and the Lender in connection herewith or therewith is solely that of debtor and creditor.

15.    <u>Remedies</u>.  If any Event of Default shall have occurred and be continuing, subject to the Order and without further order of or application to the Bankruptcy Court but subject to the Permitted Liens:

(a)    The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place and time to be designated by the Lender that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable; (iii) occupy any premises owned or leased by such Grantor where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to the Grantor in respect of such occupation; and (iv) exercise any and all rights and remedies of such Grantor under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)    Any cash held by or on behalf or under the control of the Lender and all cash proceeds received by or on behalf or under the control of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Lender pursuant to <u>Section 15</u>) in whole or in part by the Lender against, all or any part of the Secured Obligations, as set forth in Section 7.2 of the Credit Agreement. Any surplus of such cash or cash proceeds held by or on behalf or under the control of the Lender and remaining after the indefeasible payment in full of

{00025293. }                                    13

all of the Secured Obligations shall be paid over to the applicable Grantor or to whomsoever may be lawfully entitled to receive such surplus.

(c)     All payments received by any Grantor in respect of the Collateral shall be received in trust for the benefit of the Lender, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement).

(d)     The Lender may at any time or from time to time, charge, set-off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account. The Lender agrees to notify the applicable Grantor promptly after any such charge or set-off; provided that failure to give such notice shall not affect the validity of such charge or set-off.

(e)     In the event of any sale or other disposition of any of the Intellectual Property Collateral of any Grantor, the goodwill symbolized by any Trademarks subject to such sale or other disposition shall be included therein, and such Grantor shall supply to the Lender or its designee the Grantor's know-how and expertise relating to such Intellectual Property Collateral, and documents relating to any Intellectual Property Collateral subject to such sale or other disposition, and the Grantor's customer lists and other records and documents relating to such Intellectual Property Collateral and to the manufacture, distribution, advertising and sale of products and services of the Grantor that relate to such Intellectual Property Collateral.

(f)     If the Lender shall determine to exercise its right to sell all or any of the Security Collateral pursuant to this <u>Section 15</u>, each Grantor agrees that, upon request of the Lender, such Grantor will, at its own expense, do or cause to be done all such other acts and things as may be necessary to make such sale of such Security Collateral or any part thereof valid and binding and in compliance with applicable law.

(g)     The Lender is authorized, in connection with any sale of the Security Collateral pursuant to this <u>Section 15</u>, to deliver or otherwise disclose to any prospective purchaser of the Security Collateral any information in its possession relating to such Security Collateral.

(h)     At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, the Lender may credit or cash bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by applicable law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any Secured Obligation to the Lender from such Grantor as a credit against the purchase price, and the Lender may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Lender shall be free to carry out such sale pursuant to such agreement and such Grantor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Lender shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full.

(i)     In the event and to the extent that the provisions of this <u>Section 15</u> conflict with what is set forth in the Order, the Order shall govern.

16.     <u>Indemnity and Expenses</u>.

(a)     **EACH GRANTOR AGREES TO INDEMNIFY, DEFEND AND SAVE THE LENDER AND EACH OF ITS AFFILIATES AND ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SUB-AGENTS AND ADVISORS (EACH, AN "INDEMNIFIED PARTY") FROM, AND HOLD HARMLESS EACH INDEMNIFIED PARTY AGAINST, AND SHALL PAY ON DEMAND, ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF COUNSEL FOR ANY INDEMNIFIED PARTY) INCURRED BY OR ASSERTED AGAINST ANY INDEMNIFIED PARTY, IN EACH CASE ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ENFORCEMENT OF THIS AGREEMENT), EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

(b)     To the extent that any Grantor is required to reimburse the Lender's expenses pursuant to Section 8.5 of the Credit Agreement, the Grantors will upon demand jointly and severally pay to the Lender the amount of any and all reasonable documented out-of-pocket expenses, including, without limitation, the reasonable and documented out-of-pocket fees and expenses of its counsel and of any experts and agents, that the Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral of any Grantor, (iii) the exercise or enforcement of any of the rights of the Lender or (iv) the failure by any Grantor to perform or observe any of the provisions hereof.

17.     <u>Amendments; Waivers; Etc.</u>   No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender and, with respect to any amendment, such Grantor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, that this Agreement may be amended without the consent of any Grantor for the purpose of adding any other Person as a "Grantor" hereunder. No failure on the part of the Lender to exercise, and no delay in exercising any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

18.     <u>Notices, Etc.</u>   All notices, requests and demands to or upon the Lender or any Grantor hereunder shall be effected in the manner provided for in Section 8.2 of the Credit Agreement.

19.     <u>Continuing Security Interest; Assignments under the Credit Agreement</u>.   This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full

force and effect until such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, (b) be binding upon each Grantor, its successors and assigns and (c) inure, together with the rights and remedies of the Lender hereunder and its respective successors and permitted assigns. Without limiting the generality of the foregoing clause (c), the Lender may assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement (including, without limitation, all or any portion of the Commitment, the Loans owing to it and the Note, if any, held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Lender herein or otherwise, in each case as provided in Section 8.7 of the Credit Agreement.

20.    <u>Release; Termination</u>.  At such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the applicable Grantor. Upon any such termination, the Lender will, at the applicable Grantor's expense, promptly execute and deliver to such Grantor such documents as the Grantor shall reasonably request to evidence such termination.

21.    <u>Execution in Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

22.    <u>Governing Law</u>.  This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, and to the extent applicable, the Bankruptcy Code.

23.    <u>Certain Defined Terms</u>.  Unless otherwise defined in this Agreement or in the Credit Agreement, terms defined in Article 8 or 9 of the UCC (as defined below) and/or in the Federal Book Entry Regulations (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9 and/or the Federal Book Entry Regulations. "<u>UCC</u>" means the Uniform Commercial Code as in effect, from time to time, in the State of New York. The term "<u>Federal Book Entry Regulations</u>" means (a) the federal regulations contained in Subpart B ("<u>Treasury/Reserve Automated Debt Entry System (TRADES)</u>") governing book-entry securities consisting of U.S. Treasury bills, notes and bonds and Subpart D ("<u>Additional Provisions</u>") of 31 C.F.R. Part 357, 31 C.F.R. § 357.2, § 357.10 through § 357.15 and § 357.40 through § 357.45 and (b) to the extent substantially similar to the federal regulations referred to in clause (a) above (as in effect from time to time), the federal regulations governing other book-entry securities.

24.    <u>Certain Matters of Construction</u>.  Words in the singular shall include the plural and words in the plural shall include the singular. References to Grantor shall mean, each Person comprising same, jointly and severally.

*[Signature Page Follows]*

{00025293. }                                              16

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS**:

**MABVAX THERAPEUTICS HOLDINGS, INC.,**
a Delaware corporation


By:_____
Name:
Title:


**MABVAX THERAPEUTICS, INC.,**
a Delaware corporation


By:_____
Name:
Title:

**LENDER**:

**BIONTECH RESEARCH AND DEVELOPMENT, INC.,**
a Delaware corporation


By:_____
Name:
Title:


**[Signature Page to Superpriority Debtor-In-Possession Security Agreement]**

**<u>Schedules to Follow</u>**

# EXHIBIT D

**MONTHLY CASH PROJECTION (000's)**

3/15/2019

| | Pre-Petition | | Post-Petition | | | | | | | | | | Total Pre-petition | Total Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week ending** | 11-Mar | 15-Mar | Filing Date | 22-Mar | 29-Mar | 5-Apr | 12-Apr | 19-Apr | 26-Apr | 3-May | 10-May | 17-May | | |
| Beginning cash balance (beginning of week) | 4,423 | 40,728 | 31,347 | 28,672 | 168,672 | 97,807 | 333,507 | 319,810 | 261,310 | 199,946 | 134,546 | 168,046 | | |
| Cash Receipts | | | | | | | | | | | | | | |
| Sale of equipment | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Returned deposit from Imaging endpoints | - | - | - | - | - | - | 65,000 | - | - | - | - | - | - | 65,000 |
| Receive rent deposit refund | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sale of Telik assets/Deposit | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Refund of Delaware tax payment, net | - | - | - | - | - | - | - | - | - | - | 35,000 | - | - | 35,000 |
| Promissory note pre-petition | 258,000 | - | - | - | - | - | - | - | - | - | - | - | 258,000 | - |
| DIP financing | - | - | - | 200,000 | - | 300,000 | - | - | - | - | - | - | - | 500,000 |
| **Total cash receipts** | 258,000 | - | - | 200,000 | - | 300,000 | 65,000 | - | - | - | 35,000 | - | 258,000 | 600,000 |
| Minimum required expenses | | | | | | | | | | | | | | |
| Payroll | 105,157 | - | - | 56,000 | - | 56,000 | - | 56,000 | - | 56,000 | - | 56,000 | 105,157 | 280,000 |
| Employee Benefits/HR | 6,398 | - | - | - | 6,398 | - | - | - | 6,398 | - | - | - | 6,398 | 12,796 |
| Contractors  (Professional fees incl IT support) | 5,136 | 1,250 | - | 1,000 | - | 1,000 | - | 1,000 | - | 1,000 | - | - | 6,386 | 4,000 |
| Office supplies, record storage | 1,373 | - | - | - | 2,700 | - | - | - | 2,700 | - | - | - | 1,373 | 5,400 |
| Business insurance (paid up by end of April) | 7,125 | - | - | - | 1,301 | - | - | - | - | - | - | - | 7,125 | 1,301 |
| Other insurance | 802 | - | - | - | 4,025 | - | - | - | 4,025 | - | - | - | 802 | 8,050 |
| Office rent | - | - | - | - | 46,000 | - | - | - | 46,000 | - | - | - | - | 92,000 |
| Utilities - gas and electrical | 3,272 | - | - | - | 3,300 | - | - | - | 3,300 | - | - | - | 3,272 | 6,600 |
| Unilities - Cox, internet | 2,044 | - | - | - | 2,050 | - | - | - | 2,050 | - | - | - | 2,044 | 4,100 |
| 366 Adequate Assurance Reserve | - | - | 2,675 | - | - | - | - | - | - | - | - | - | - | 2,675 |
| Copier Service | 346 | - | - | - | 350 | - | - | - | 350 | - | - | - | 346 | 700 |
| Equipment lease - ThermoFisher | 5,788 | - | - | 1,867 | - | - | - | 1,867 | - | - | - | - | 5,788 | 3,734 |
| Facilities cleaning, maint. and security | 3,525 | - | - | 1,775 | - | - | - | 1,775 | - | - | - | - | 3,525 | 3,550 |
| Debtor counsel fees | 75,000 | - | - | - | - | - | 75,000 | - | - | - | - | 75,000 | 75,000 | 150,000 |
| US Trustee and court fees | - | 3,434 | - | - | - | - | - | - | - | - | - | 37,000 | 3,434 | 37,000 |
| Auditors, tax consultants and state min tax fees | - | - | - | - | 3,500 | 1,600 | - | - | - | - | - | - | - | 5,100 |
| Stockholder records monthly fees, SEC  filings | 2,698 | - | - | 3,000 | 1,200 | - | - | - | 1,200 | - | - | - | 2,698 | 5,400 |
| Biomaterials removal (Advanced Chemical Transport) | 198 | - | - | - | 99 | - | - | - | 99 | - | - | - | 198 | 198 |
| FDA maintenance and advisory Fees | - | 1,000 | - | - | - | - | - | - | - | - | - | - | 1,000 | - |
| Credit Cards | 2,833 | - | - | 2,000 | - | - | 1,500 | - | - | 1,500 | - | - | 2,833 | 5,000 |
| Press releases & website - PR Newswire | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Objective Capital | | | | | | | | | | | | | | |
| Vantage Point ($10K already recorded in Dec.) | | | | | | | | | | | | | | |
| Accounting software license fees (Oracle Netsuite) | - | 3,697 | - | - | - | - | 3,697 | - | - | - | - | - | 3,697 | 3,697 |
| Misc: Taxes, etc | | | | | | | | | | | | | | |
| **Minimum before debt** | 221,695 | 9,381 | 2,675 | 60,000 | 70,865 | 64,300 | 78,697 | 58,500 | 61,364 | 65,400 | 1,500 | 168,000 | 231,076 | 631,301 |
| Oxford -principal | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Oxford - interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Minimum plus debt** | 221,695 | 9,381 | 2,675 | 60,000 | 70,865 | 64,300 | 78,697 | 58,500 | 61,364 | 65,400 | 1,500 | 168,000 | 231,076 | 631,301 |
| **Cash availability for programs** | 40,728 | 31,347 | 28,672 | 168,672 | 97,807 | 333,507 | 319,810 | 261,310 | 199,946 | 134,546 | 168,046 | 46 | | |