# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MABVAX THERAPEUTICS HOLDINGS, INC., *et al.*,[1] | Case No. 19- |
|  | Joint Administration Requested |
| Debtors. |  |

## DECLARATION OF J. DAVID HANSEN IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS[2]

I, J. David Hansen, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the President, Chairman of the Board, Chief Executive Officer, and one of the four founders of MabVax Therapeutics Holdings, Inc. ("MabVax Holdings"), and one of three directors of MabVax Therapeutics, Inc. ("MabVax" and together with MabVax Holdings, the "Debtors" or, as appropriate, the "Company").

2.     I have over forty-three (43) years of experience in the pharmaceutical and biotechnology industry.  I co-founded and held senior management roles in both Debtors as well as other small to mid-sized public companies.  My senior level experience includes executive management, finance and accounting, corporate development, sales and marketing.  I have developed expertise in the therapeutic areas of immunology, oncology, and infectious disease.

3.     On this date (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) MabVax Therapeutics Holdings, Inc. (7903) and (ii) MabVax Therapeutics, Inc. (1765). The Debtors' mailing address is 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121.

[2] Capitalized terms not defined in this section have the meanings given them in the applicable First Day Motion.

"Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing the above-captioned chapter 11 cases (together, the "Chapter 11 Cases").

4.      In my capacity as the Debtors' Chief Executive Officer, I am deeply familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtors.  I submit this declaration (the "First Day Declaration") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases, and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and (ii) relief, in the form of motions and applications, that the Debtors have requested of the Court on the Petition Date (the "First Day Motions").

5.      Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge, my discussions with other members of Debtors' senior management, my substantial pre-petition interactions with Greenhill Advisors and Objective Capital (defined *infra*) whom I used extensively over an 18-month period to assist me in marketing the company and/or the company assets, my review of relevant documents, and my opinion based upon my experience and knowledge of Debtors' operations and financial condition.   Unless otherwise indicated, the financial information contained herein is unaudited.

6.      This First Day Declaration is intended to provide a summary overview of the Debtors and these Chapter 11 Cases.  Part I of this First Day Declaration provides an overview of the Debtors' business and corporate history.  Part II provides a description of the Debtors' capital structure.  Part III provides a discussion of the events leading to the commencement of these Chapter 11 Cases.  Part IV provides a discussion of the Debtors' prepetition efforts to generate the liquidity needed to sustain their operations.  Part V provides a discussion of the pre-petition efforts

to market the Debtors' assets.  Part VI sets forth relevant facts in support of the Debtors' First Day Motions.

7.      If I were called to testify, I would testify competently to the facts set forth in this First Day Declaration and I am authorized to submit this First Day Declaration on behalf of the Debtors.

## PART I

## The Debtors' Formation, Its Locations, Its Subsidiary and Its Current Business

8.      The Debtors are both Delaware corporations headquartered in San Diego, California.

9.      MabVax Holdings is the parent company.  It was originally incorporated in 1988 under the name "Terrapin Diagnostics, Inc." in the state of Delaware, subsequently renamed "Telik, Inc." in 1998, and thereafter renamed "MabVax Therapeutics Holdings, Inc." in September 2014 as a result of its merger with MabVax on July 8, 2014.

10.      On July 8, 2014, Debtor MabVax, a private company I co-founded in 2006, merged with Tacoma Acquisition Corp., a subsidiary of MabVax Holdings in what is typically referred to as a reverse merger into a public company.  Upon consummation of the merger, MabVax survived as a wholly owned subsidiary of MabVax Holdings.  MabVax is a non-operating company that holds certain patents and other property the Debtors are seeking to sell along with the assets of MabVax Holdings.

11.      MabVax Holdings is a clinical-stage biotechnology company focused on the development of antibody-based products to address unmet medical needs in the treatment of cancer and pancreatitis.  MabVax has discovered a pipeline of human monoclonal antibody products

based on the protective immune responses generated by patients who have been vaccinated against targeted cancers with our proprietary vaccines.

12.     MabVax's lead development program is centered on its HuMab-5B1 antibody, which is fully human and discovered from the immune response of cancer patients vaccinated with an antigen-specific vaccine during a Phase I trial at Memorial Sloan Kettering Cancer Center.  The antigen the antibody targets is expressed on more than 90% of pancreatic cancers, and expressed in significant percentages on small cell lung cancer, stomach, colon and other cancers, making the antibody potentially broadly applicable to many types of cancers.  Debtor MabVax Holdings has multiple antibody candidates, discovered utilizing the same methodologies that are in preclinical development.

13.     MabVax Holdings was founded in San Diego more than a decade ago by leading pharmaceutical researchers, clinicians, and entrepreneurs, including the head of the Laboratory of Tumor Vaccinology at the renowned Memorial Sloan Kettering Cancer Center in New York. Since then, the MabVax Holdings' team has brought its multiple promising therapies into clinical trials and collaborated with others here and abroad—including Memorial Sloan Kettering Cancer Center—in the fight to find effective treatments for these diseases.  Along the way, MabVax Holdings matured from a local start-up financed by myself and one of the founders and a New York based venture capital fund into a public company with its stock traded on the OTCQB stock market, and shortly thereafter, on the Nasdaq Stock Market (NASDAQ), before being delisted by the NASDAQ.

14.     In September 2015, MabVax Holdings entered into a lease agreement with AGP Sorrento Business Complex, L.P. (the "Lease") for a lease of approximately 14,971 rentable square feet of office and research facilities located at 11535 Sorrento Valley Road, San Diego, California

92121 to serve as the Company's corporate offices and laboratories. After tenant improvements were completed in early February 2016, MabVax Holdings moved into the space. Monthly rent commenced upon occupancy at $2.38 per square foot, totaling $35,631 per month in 2016, and has increased each year at the rate of 3% a year to where in February 2019 the rent increased to approximately $48,181 per month starting in February 2019, and will continue to escalate at an annual rate of 3% a year over the six-year term of the lease until its termination date in February 2022. In December 2018 San Diego Inspire Holdings, LLC took assignment of the Lease and became the new landlord. In February 2019, a second amendment to the Lease reduced the security deposit by $46,783 to $37,653.53. The Debtors are currently in default of the rent payment.

15.     MabVax Holdings' six remaining regular employees all work in the Debtors' leased space. Payroll and related benefits for the MabVax Holdings' employees is handled by Paychex, Inc. ("Paychex").

16.     The three remaining senior executives played essential roles in the creation of the research and discovery initiatives of MabVax Holdings as well as initiated and managed the clinical trials for the development stage assets of interest to buyers. This team has cultivated and maintained key relationships with clinical investigators and internationally recognized thought leaders in the treatment of cancer.

**Key Product Lines**

17.     The Debtors' lead development product, MVT-5873, is a fully human IgG1 monoclonal antibody (mAb) that targets sialyl Lewis A (sLea), an epitope that is significantly overexpressed on multiple solid tumor cancers. MVT-5873 is currently in Phase 1 clinical trials as a therapeutic agent for patients with advanced pancreatic cancer and other sLea positive tumors.

The Debtors also have a immunoPET diagnostic imaging agent, designated MVT-2163, in a Phase 1 clinical trial to aid in the diagnosis and surgical staging of patients with pancreatic cancer. The Debtors have a third radioimmunotherapy product, designated MVT-1075 also in early Phase 1 clinical testing. MVT-1075 is an antibody based product intended to provide targeted radiotherapy for late stage pancreatitis patients.

## PART II

**The Debtors' Prepetition Capital Structure**

18.    As of the Petition Date, the Debtors' aggregate funded and matured secured debt obligations were approximately $3,000,000, plus accrued expenses, subject to the Debtors' verification. This amount is owed to the Debtors' sole pre-petition secured lender, Oxford Finance LLC (the "Pre-Petition Lender").

19.    On January 2016, the Debtors and the Pre-Petition Lender entered into that certain Loan and Security Agreement (as amended, the "Pre-Petition Loan Agreement"). The Pre-Petition Loan Agreement provides for two equal tranches of $5,000,000. The first tranche of $5,000,000 (the "Term A Loan") was funded on January 15, 2016. The option to fund the second tranche of $5,000,000 was exercisable by the Debtors upon achieving certain milestones. The option was not exercised and expired on September 30, 2016. The interest rate for the Term A Loans is set on a monthly basis at the index rate plus 11.29%, where the index rate is the greater of the 30-day LIBOR rate or 0.21%. Interest is due on the first day of each month, in arrears, calculated based on a 360-day year. The Term A Loan was interest only for the first year after funding, and the principal amount of the loan is amortized in equal principal payments, plus period interest, over 36 months. A facility fee of 1.0% or $100,000 was due at closing of the transaction and was paid by the Debtors on January 15, 2016.

20.     The Loan Agreement thereafter was amended three times.

- First Amendment (March 31, 2017) (extended payment due date by 2 months);

- Second Amendment (July 3, 2018) (approved sale of certain assets, payment of fees and extended maturity date, in exchange for lien on intellectual property); and

- Third Amendment (January 1, 2019) (provides for a payment schedule based on arrears).

21.     To secure repayment of the Term A Loan, the Debtors granted the Pre-Petition Lender a first lien upon and security interest in, *inter alia,* goods, accounts receivable, inventory, equipment, deposit accounts, general intangibles (excluding intellectual property), and investment property (the "Oxford Security Agreement").   The Debtors also entered into a Deposit Account Control Agreement with the Pre-Petition Lender.   In the Second Amendment to the Loan Agreement, MabVax Holdings granted the Pre-Petition Lender a security interest in intellectual property in exchange for the Pre-Petition Lender's consent to the Debtors entering into an asset purchase and license agreement with Boehringer Ingelheim International GmbH ("Boehringer Ingelheim"),[2] by entering into a separate Intellectual Property Security Agreement between the Debtor and the Pre-Petition Lender (the "IP Security Agreement," and with the Oxford Security Agreement, the "Pre-Petition Security Agreement" and the collateral described by each, the "Pre-Petition Collateral").

22.     On February 28, 2019, the Debtors entered into an unsecured promissory note with BioNTech AG ("BioNTech")[3] for $258,000 (the "Pre-Petition Unsecured Loan").   The Pre-

---

[2] Boehringer Ingelheim is Europe's largest privately held biopharmaceutical company pioneering the development of individualized therapies for cancer and other diseases.

[3] BioNTech is a researched-based pharmaceutical biotech company that develops tailored treatments for cancer and other diseases with high unmet medical need through its disruptive research platforms. Its affiliate, BioNTech Research and Development, Inc., is the Stalking Horse Bidder and the proposed DIP Lender.

Petition Unsecured Loan was funded on March 11, 2019 and was fully used to provide necessary liquidity to bridge the Debtors to the filing date for these Chapter 11 Cases.

## PART III

## Events Leading to the Filing of the Chapter 11 Cases

23.     Like other clinical-stage biotechnology companies, MabVax Holdings cannot earn product revenue until it (or its collaborative partners) complete clinical trials, obtain regulatory approval, and successfully commercialize one or more of its products.  Consequently, it relies on outside financing, and sales and licensing of certain intellectual property to fund its operations. The Debtors have not yet brought any products to market and consequently have incurred net losses since inception.

24.     MabVax Holdings learned the SEC brought fraud claims against certain investors for misconduct involving their investment in and trading of MabVax stock.  MabVax considers itself a victim of the activities of these investors.  The SEC has never brought or threatened any claims against MabVax.

### *The SEC Action*

25.     On January 26, 2018, MabVax Holdings received notice from the SEC of an investigation into potential violations of securities laws involving MabVax Holdings and certain of its stockholders.  As MabVax Holdings publicly disclosed, the subject matter of the SEC Investigation includes (i) the circumstances under which certain stockholders invested in MabVax Holdings and whether they have acted as an undisclosed group under Section 13(d)(3) of the Exchange Act in connection with their investment; (ii) the manner in which those stockholders may have sought to control or influence MabVax Holdings and its leadership since their respective investments (and the extent to which those efforts to control or influence have been successful);

and (iii) MabVax Holdings' prior disclosures regarding the control of it and the beneficial ownership of its common and preferred stock included in its registration statements filed in 2017 and 2018 and in its Exchange Act reports.

26.      On September 7, 2018, the SEC filed a complaint (the "SEC Complaint") in the U.S. District Court for the Southern District of New York against certain investors, *SEC v. Honig, et al.*, No. 1:18-cv-01875 (S.D.N.Y. 2018).  The complaint was amended and expanded in the First Amended Complaint filed March 8, 2019.  In the SEC Complaint, the SEC alleges a variety of misconduct with respect to the investors' transactions.  The SEC alleges that some of the investors manipulated the price of MabVax Holdings' securities by writing, or causing to be written, false or misleading promotional articles, and a variety of other manipulative trading practices.  The SEC further alleges that some of the investor defendants filed false reports of their beneficial ownership or failed to file reports of their beneficial ownership when required to do so.  The SEC claims that, by engaging in this and the other alleged actions in MabVax Holdings, the investor defendants and other defendants violated the anti-fraud and many other provisions of the Exchange Act, the Securities Act and SEC Rules promulgated thereunder.  The SEC Complaint does not assert any claims against the Debtors or any of their directors or officers, nor otherwise allege that they were culpable participants in the misconduct allegedly undertaken by the investor defendants.  The Debtors have cooperated with the SEC in connection with the SEC Action, and consider themselves victims.  However, the Debtors incurred substantial legal fees in connection with the investigation.

***Securities Litigation: Class Action and Derivative Complaints In re MabVax Therapeutics Securities Litigation*, Case No. 18-cv-1160-BAS-NLS.**

27.      On June 4, 2018, and August 3, 2018, purported stockholders of MabVax Holdings filed two securities class action complaints against it and certain of its current officers in the United

States District Court for the Southern District of California.  On September 6, 2018, the Court consolidated the cases and appointed lead plaintiffs.  On October 10, 2018, lead plaintiffs (and two additional plaintiffs) filed a consolidated complaint, which alleged that certain investors in Debtor MabVax Holdings, with the cooperation of Debtor MabVax Holdings and its management engaged in a pump-and-dump scheme at the expense of other MabVax Holdings' investors.  On November 13, 2018, the plaintiffs voluntarily dismissed the consolidated action without prejudice.

**_Liesman v. Hansen et al._, Case No. 18-cv-2237-BAS-MSB and _Jackson v. Hansen et al._, Case No. 18-cv-2302-BAS-MSB.**

28.    On September 26, 2018, and October 4, 2018, purported stockholders of MabVax Holdings filed two derivative complaints in the United States District Court for the Southern District of California.  The lawsuits arise out of the same underlying facts as _In re MabVax Therapeutics Securities Litigation_ but the complaint in _Liesman_ asserts a state law breach of fiduciary duty claim against certain of the Debtor MabVax Holdings' current and former directors and officers, and the complaint in _Jackson_ asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement and waste of corporate assets.  The plaintiffs seek, on behalf of Debtor MabVax Holdings, damages, fees, costs, and equitable relief.  On January 23, 2019, the Court consolidated the actions.  On February 22, 2019, the plaintiffs filed a joint motion for appointment of lead counsel.

**_The Debtors Incurred Substantial Legal Fees to Obtain Declaratory Relief Regarding Whether Shares Were Validly Issued_**

29.    The most immediate consequence of the SEC investigation and the disclosures by SEC to Debtor MabVax Holdings' SEC counsel is the inability to file accurate financial statements as reported on Form 8-K on May 21, 2018.  Historically, Debtor MabVax Holdings has calculated and reported beneficial ownership in reliance upon the accuracy of the beneficial ownership reporting of its stockholders, including reports filed on Schedules 13D and 13G and information

provided directly by these stockholders. MabVax Holdings has similarly relied on the accuracy of stockholder-reported beneficial ownership when effecting conversions of shares of preferred stock. The SEC Investigation and the Debtors review of the matters under investigation (including information learned recently) raised questions about the accuracy of those reports by those holders, including their past disclaimers of having not acted as a group with respect to their investment in MabVax Holdings.  If certain stockholders have indeed acted as a group, their respective beneficial ownership interests should have been aggregated and reported in the aggregate in MabVax Holdings' prior beneficial ownership disclosures.   If their holdings should have been so aggregated, then, due to the provisions of MabVax Holdings' organizational documents regarding the conversion limitations applicable to certain holders of MabVax Holdings' preferred stock, shares of its common stock may have been issued in violation of its organizational documents.  If shares of its common stock were issued in violation of its organizational documents, then the number of shares of its outstanding common stock previously reported in its financial statements, registration statements and Exchange Act Reports may be inaccurate.  Further, figures reported and included in its financial statements, registration statements and Exchange Act Reports in reliance on the number of its outstanding shares of common stock, including, but not limited to, its loss per share figures, may also be inaccurate.

30.     Due to the uncertainty regarding the valid issuance of certain shares common stock as a result of the Alleged Bad Actors' (defined *infra*) alleged fraudulent activities, and until such time as MabVax Holdings could obtain the ratification of the Delaware Court of Chancery, on May 20, 2018, MabVax Holdings' Board of Directors, upon the recommendation of management, concluded MabVax Holdings prior annual and interim period financial statements for the years 2014, 2015, 2016 and 2017 included in their Reports on Form 10-K and Form 10-Q for such years,

and MabVax Holdings' registration statements filed during the years 2014, 2015, 2016, 2017 and 2018 with respect to the number of shares of common stock outstanding, and the weighted average number of shares used in calculating earnings per share and related per share figures should not be relied upon.  Accordingly, on May 20, 2018, the Debtors' then-engaged independent registered public accounting firm, CohnReznick LLP, withdrew their audit reports included in MabVax Holdings' Annual Reports on Form 10-K for the years 2014, 2015, 2016 and 2017.  Given the cloud of uncertainty over the number of shares outstanding and allegations brought by the SEC against the Alleged Bad Actors, MabVax Holdings was unable to raise capital to continue clinical development of its programs.

31.    On July 27, 2018, MabVax Holdings filed a *Verified Petition for Relief Under 8 Del. C. § 205* (the "Delaware Petition") in the Court of Chancery of the State of Delaware (the "Delaware Chancery Court") captioned *In re: MabVax Therapeutics Holdings, Inc.*  The Delaware Petition sought a declaration that shares of common stock were validly issued upon conversion of preferred stock and that all stockholder resolutions be ratified.

32.    On September 20, 2018, the Delaware Chancery Court entered an order granting the Delaware Petition validating (i) issuances of common stock upon conversions of MabVax Holdings' preferred stock occurring between June 30, 2014 and February 12, 2018, and (ii) stockholder approval of corporate actions presented to MabVax Holdings' stockholders from June 30, 2014 to February 12, 2018.  And, on October 15, 2018, MabVax Holdings' auditor re-instated their audit report and MabVax Holdings filed an amended annual report for 2017 and two quarterly reports, bringing the company's filings current with the SEC.

33.     While MabVax Holdings was not charged by the SEC and also prevailed in the class action litigation, the legal fees were substantial and a further drain on MabVax Holdings' limited liquidity.

***Alleged Bad Actors' Pump and Dump Scheme***

34.     A group of MabVax Holdings' outside investors and vendors, (collectively, the "Alleged Bad Actors"), allegedly acquired control of MabVax Holdings through fraudulent and deceptive means, concealing from the Company the extent of their inter-relationships—both with each other, and with other collaborators.  The Alleged Bad Actors were able to obtain a consent right ("Consent Right"), pursuant to which MabVax Holdings was required to obtain Alleged Bad Actors' permission before it could raise any additional money (such as equity or debt financing). This Consent Right allowed the Alleged Bad Actors to block, for any reason or no reason at all, financing MabVax Holdings desperately needed to continue its work.  Through the Consent Right, the Alleged Bad Actors were able to impose any manner of conditions when allowing MabVax Holdings to conduct additional financing.

35.     Once in control of the Company, Alleged Bad Actors required, as a condition to their financing the Company, that the Company hire a number of vendors who, unbeknownst to the Company, were collaborating with the Alleged Bad Actors on their pump and dump scheme. Critically, for example, the Company was required to hire multiple investor relations vendors, at great expense to the Company.  In hindsight, it appears the Company was required to unknowingly finance through those vendors some fraudulently bullish "research" reports that facilitated the pump-and-dump scheme described below.  Also, critically, MabVax was compelled to retain Alleged Bad Actors' favored counsel, Harvey Kesner, Esq. ("Kesner") of Sichenzia Ross Ference LLP ("Sichenzia"), as counsel for securities reporting matters.  By allegedly providing the

Company with false legal advice, Sichenzia/Kesner concealed that the Alleged Bad Actors were acting as an illicit control group.

36.     The Alleged Bad Actors' intention in gaining control of MabVax was to profiteer through illegal "pump and dump" schemes with MabVax Holdings' stock, which have been publicly exposed by the SEC Action.  The Alleged Bad Actors' did so by, among other things, writing or having written fraudulent promotional articles about the Company that were intended to drive up MabVax Holdings' stock price.  Then—acting pursuant to their illicit agreement to acquire, hold, vote and/or dispose of their MabVax Holdings shares in concert—the Alleged Bad Actors sold their shares of MabVax Holdings into the market.

37.     Additionally, the Alleged Bad Actors fraudulently induced the MabVax Holdings to issue millions of shares of stock—worth over $30 million—to Alleged Bad Actors and their affiliates.  One way in which the Alleged Bad Actors did this was through shares of preferred stock many Alleged Bad Actors held.  Each share of preferred stock, upon the request of the investor holding that share, was to be converted by the Company into shares of common stock.  This preferred stock was also subject to "beneficial ownership blockers" that forbade the conversion of preferred shares into common stock if, as a result, the converting shareholder would beneficially own more than a certain percentage of MabVax Holdings (most often, 4.99%).  The Alleged Bad Actors and their affiliates misrepresented their beneficial ownership of MabVax Holdings when seeking conversions of preferred stock, leading MabVax Holdings to issue at least $22 million in common stock to which Alleged Bad Actors and their affiliates were not entitled to.  MabVax Holdings was also required to issue "inducement shares" to the Alleged Bad Actors and their affiliates, equal to roughly $9.6 million.

***Litigation by MabVax Against the Law Firm and Alleged Bad Actors***

38.     On September 10, 2018, MabVax Holdings filed an action in the Superior Court for the State of California, County of San Diego, styled *MabVax Therapeutics Holdings, Inc. v. Sichenzia Ross Ference LLP, et al.*

39.     MabVax Holdings has prepared, but not yet filed, a complaint against certain investors, asserting, among others, claims of market manipulation.

### NASDAQ Delisting

40.     As a consequence of uncertainty regarding the valid issuance of certain shares of common stock, on May 21, 2018, MabVax Holdings notified the Listing Qualifications Department of the Nasdaq Stock Market that it would not be filing its Form 10-Q, as required for continued listing on the Nasdaq Capital Market per Nasdaq listing rule 5250(c)(1). MabVax Holdings received notice from the Listing Qualifications Department of The Nasdaq Stock Market LLC indicating that it was not in compliance with Nasdaq Listing Rule 5250(c)(1) (the "Rule"), which requires the timely filing of periodic reports with the U.S. Securities and Exchange Commission.

41.     In accordance with the Nasdaq Listing Rules, MabVax Holdings was provided a period of 60 days from the date of the notice to either file the Form 10-Q or to submit a plan to regain compliance with the Rule for the Staff's review. If a plan was submitted and accepted, MabVax Holdings could be granted up to 180 days from the Form 10-Q's due date, or until November 12, 2018, to regain compliance.

42.     On June 29, 2018, MabVax Holdings' board of directors voted not to submit a plan to the Listing Qualifications Department of The Nasdaq Stock Market to regain compliance with Nasdaq Listing Rule 5250(c)(1) regarding filing its Form 10-Q with the SEC for the period ended March 31, 2018.  As a result of MabVax Holdings' decision not to submit a plan to regain compliance with Nasdaq's filing requirement, which decision was announced by MabVax

Holdings' in a press release on July 2, 2018, the Listing Qualifications Staff of The Nasdaq Stock Market LLC notified MabVax Holdings of its determination to delist the Company's securities from Nasdaq. The Staff indicated that the determination was based upon MabVax Holdings' non-compliance with the filing requirement as well as its non-compliance with the $2.5 million stockholders' equity requirement for continued listing on The Nasdaq Capital Market and, as a result, on July 2, 2018, MabVax Holdings received a letter from the Staff that the trading of the its common stock would be suspended on Nasdaq at the open of business on Wednesday, July 11, 2018.  On July 11, 2018, MabVax Holdings common stock began trading on the OTC Pink, continuing under the symbol MBVX.

43.    Delisting the common stock effectively results in the common stock being designated a "penny stock" that broker-dealers cannot recommend.  Additionally, subsequent transfers of the shares of common stock by U.S. holders may not be exempt from state securities laws.  Under such circumstances, the common stock is substantially less attractive to prospective purchasers.

44.    As a result of the various matters of the SEC's investigation and lawsuit against the Alleged Bad Actors and delisting from the NASDAQ Stock Market, MabVax Holdings has been unable to generate funds through additional equity issuances.

### PART IV

### Prepetition Efforts to Create Liquidity

45.    As detailed below, pre-petition, the Debtors attempted to address their liquidity issues by selling company stock and assets, licensing intellectual property and reducing their workforce.

### *Prepetition Equity Raises*

46.    Between February 2 and February 10, 2018, MabVax Holdings entered into separate purchase agreements with investors pursuant to which it sold (i) shares of their common stock, (ii) shares of their convertible preferred stock, and (iii) warrants to purchase shares of common stock (the "February 2018 Private Placements").  The net proceeds of the February 2018 Private Placements were $2,700,000 after transaction costs of $50,000.

47.    From April 30 to May 2, 2018, MabVax Holdings entered into separate purchase agreements with investors pursuant to which it agreed to sell shares of its common stock and convertible preferred stock (the "May 2018 Private Placements").  The May 2018 Private Placements closed on May 15, 2018, with the MabVax Holdings receiving gross proceeds totaling $830,000.

*Prepetition Sales*

48.    On July 6, 2018, the Debtors entered into the Asset Purchase Agreement with Boehringer Ingelheim, pursuant to which Boehringer Ingelheim purchased all the Debtors' assets relating to a specific human antibody research and development program to identify and characterize antibodies that bind to an undisclosed glycan antigen. The transaction closed on July 6, 2018 (the "Boehringer Sale").

49.    Pursuant to the Boehringer Sale, MabVax Holdings received $4 million with the right to receive an additional $7 million upon the achievement by Boehringer Ingelheim of various specified milestone events, plus further earn-out payments through the later of the expiration of the last to expire valid claim of the licensed program patent covering a Boehringer Ingelheim product, or ten (10) years from the date of first commercial sale of such Boehringer Ingelheim product on a country-by-country and product-by-product basis (the "Boehringer Sale Receivable").

50.     On June 27, 2018, MabVax Holdings entered into a Sublicense Agreement granting Y-mAbs Therapeutics, Inc. ("Y-mAbs"), a publicly held clinical stage biopharmaceutical company, an exclusive sublicense for a bi-valent ganglioside-based vaccine intended to treat neuroblastoma, a rare pediatric cancer (the "Y-mAbs Sublicense").   Upon entering into the Y-mAbs Sublicense, MabVax Holdings received a non-refundable upfront payment of $700,000 and will receive an additional $600,000 upon the one-year anniversary of entering into the agreement, provided Y-mAbs has not terminated the agreement 90 days prior to the one-year anniversary (the "Y-mAbs Second Payment").   If Y-mAbs successfully develops and receives FDA approval for the neuroblastoma vaccine, it will be required to file a Priority Review Voucher with the FDA. The FDA may then grant that Priority Review Voucher.  By way of background, Priority Review Vouchers entitle an applicant to expedited regulatory review of a new product.  This can be extremely valuable in the biotechnology industry and rights to the Vouchers are sold for substantial fees of $50 million or more. If a Priority Review Voucher is granted to Y-mAbs and subsequently sold, MabVax Holdings is entitled to 20% of the net sale proceeds (the "Y-mAbs Sales Receivable"). Y-mAbs has until March 27, 2019 to declare whether to move forward with the development program and pay $600,000 to MabVax Holdings.

51.     The Alleged Bad Actor Recoveries, Boehringer Sale Receivable, Y-mAbs Second Payment and Y-mAbs Sales Receivable are not included in the bid submitted by BioNTech (in that capacity, the "Stalking Horse Bidder") discussed below.

***Reduction in Workface***

52.     To reduce expenses, starting in mid-2017, MabVax Holdings reduced its employees from twenty-five (25) to the current six (6).  MabVax Holdings retains its physical assets of

facilities and laboratory materials but terminated most of its research and development human resources staff.

*Prepetition Note*

53.     As noted above, on February 28, 2019, the Debtors also entered into an unsecured promissory note with the BioNTech AG for $258,000 (the "Pre-Petition Unsecured Loan") to provide the liquidity needed to commence these Chapter 11 Cases.  The Pre-Petition Unsecured Loan funded on March 11, 2019.  The Debtors used the proceeds of the Pre-Petition Unsecured Loan to, among other things, retain bankruptcy counsel to prosecute the case and the sale process.

54.     Notwithstanding the efforts above, without the proposed DIP Loan, the Debtors do not have sufficient liquidity to continue operating as a going concern beyond the petition date.

## PART V

## Exploration of Restructuring Alternatives and Marketing and Sales Efforts

55.     Given the accrued  legal and clinical development fees, limited access to funds through equity offerings, the alleged default with their secured lender, and the multiple failed attempts authorized by the board of directors in using investment bankers to assist in either selling the entire Company or licensing or selling significant assets of the Company in the past, the Debtors were  facing a severe liquidity crisis, and in their business judgment, the best means to maximize value for their stakeholders was to sell their assets in a section 363 sale.

56.     Beginning in September 2017 and ending in February 2018, the Debtors upon direction and approval by the board of directors retained Greenhill & Company ("Greenhill")[4] in connection with a Potential Transaction (as defined below).[5]

57.     Greenhill contacted and sent introductory marketing materials to fifty-nine (59) different parties that Greenhill and the Debtors determined were potential candidates for a transaction.  Of those fifty-nine (59) parties, nineteen (19) executed non-disclosure agreements (the "Greenhill Interested Parties").  The Greenhill Interested Parties that executed non-disclosure agreements then were given the opportunity to gain access to confidential information related to the Debtors and to participate in management meetings, either in person or telephonically, with Greenhill and the Debtors' management team.  During the course of this process, the Greenhill Interested Parties were invited to submit letters of intent to license or purchase any or all of the assets of Debtors.  Three parties moved forward to negotiate terms sheets.  Ultimately, two parties submitted offers for specific assets.  However, the Debtors were not able to consummate a deal.

---

[4] To summarize, Greenhill was retained to render the following professional services: (i) assisting the Company in preparing an offering memorandum describing the Company, its operations, and historical and projected financial condition; (ii) identifying and contacting selected potential acquirers or partners; (iii) arranging for potential acquirers or partners to conduct business investigations; (iv) evaluating and recommending potential financial and strategic alternatives with respect to one or more potential Transactions; (v) advising the Company as to the timing, structure and pricing of any potential Transaction; (vi) assisting the Company in negotiating the financial terms of any potential Transaction; (vii) if appropriate, rendering, in accordance with Greenhill's customary practice, an opinion to the Board of Directors of the Company (or committee thereof, if applicable) as to the fairness, from a financial point of view, to the Company or, if applicable, holders of the Company's common stock of the consideration to be received by the Company or such holders (or the exchange ratio provided for) in connection with a proposed Transaction involving a change of control of the Company, (viii) providing such other financial advisory and investment banking services as are customary for similar transactions and mutually agreed upon by the Company and Greenhill.

[5] To summarize, a Potential Transaction meant the direct or indirect sale, transfer, licensing or other disposition of all or a significant portion of the equity interests, assets or business of the Company or any other business combination or extraordinary corporate transaction involving the Company or its assets, whether in one or a series of transactions, including, without limitation, by way of a negotiated sale, licensing, merger, reverse merger or consolidation, spin-off, split-off or other extraordinary dividend of cash, securities or other assets, reorganization, recapitalization, refinancing or restructuring, tender or exchange offer, leveraged buyout, minority investment or partnership, strategic relationship, collaborative venture, divestiture, or otherwise.

58.     Given the Debtors increasingly difficult financial condition, the Debtors in December of 2018, again made an attempt to sell substantially all of the Company's assets by retaining another highly experienced investment bank, Objective Capital Partners, LLC ("Objective Capital").  Objective Capital was retained to provide the following professional services: (i) select, contact and screen a targeted group of suitable acquirers;  (ii) solicit indications of interest from interested acquirers (including execution of non-disclosure agreements); (iii) assist MabVax Holdings in evaluating and comparing formal offers to acquire the MabVax Holdings; (iv) prepare marketing documents as needed; (v) collaboratively work with MabVax Holdings in negotiating the most favorable price and terms with potential acquirers; (vi) lead the due diligence process; (vii) review the business terms of legal documents prepared in connection with a transaction; (viii) together with MabVax Holdings' legal counsel, negotiate a mutually agreeable transaction agreement that achieves the MabVax Holdings' and its shareholders' objectives; and (ix) assist in resolving differences that often arise during the closing process and otherwise assist in closing a sale of the MabVax Holdings.

59.     The marketing process conducted by Objective Capital included the development, in conjunction with Debtors' management team, of a marketing presentation to provide to potential candidates for a transaction.  After familiarizing itself with the business, operations and financial condition of the Debtors, Objective Capital prepared the presentation.  Based on Objective Capital's relationship within and deep knowledge of the biotechnology industry, Objective Capital then assisted the Debtors in identifying and evaluating candidates for a potential transaction. Thereafter, Objective Capital coordinated with the Debtors to prepare and implement a marketing plan, and to distribute a management presentation to all interested parties.  Although Objective Capital did not repeat Greenhill's marketing efforts, it did market many of the same entities

Greenhill did.  Objective Capital held weekly (and sometimes twice a week, or more) meetings and conference calls with the Debtors since the beginning of their engagement throughout the four month process.

60.    Objective Capital contacted and sent marketing materials to fifty-five (55) different parties that Objective Capital and the Debtors determined were potential candidates for a transaction including re-soliciting several potential candidates that were approached by Greenhill. Several of the prospective buyers expressed interest and held high level meetings with management.  Of those expressing interest, seven (7) executed non-disclosure agreements (the "Objective Capital Interested Parties").  The Objective Capital Interested Parties that executed non-disclosure agreements were given the opportunity to gain access to a data room containing confidential information related to the Debtors and to participate in management meetings, either in person or telephonically, with Objective Capital and the Debtors' management team.  One party submitted a letter of intent.

61.    On behalf of the Debtors, in addition to the efforts made by Objective Capital, I also directly initiated strategic discussions and presentations with at least three of the four possible buyers.  All three of these parties engaged in due diligence and letters of intent were received from all three parties in that management lead marketing process.  BioNTech and two other bidders thereafter engaged in a competitive bidding process that improved offers from an initial offer of $1 million to the current offer of $3.7 million in total consideration made by BioNTech.

62.    Of the four letters of intent submitted during the process, I was advised by Objective Capital that the BioNTech proposal represents the highest, best and most viable offer received by the Debtors.  BioNTech Research and Development, Inc. signed an Asset Purchase Agreement ("APA") on March 20, 2019 (in that capacity, the "Stalking Horse Bidder") setting forth a

proposed disposition of substantially all of the Debtors' assets.  Contemporaneously herewith, the Debtors are filing a sale motion that details the terms of the proposed sale to the Stalking Horse Bidder.

**Efforts to Secure DIP Financing for the Chapter 11 Cases**

*Efforts by Northland Securities to Raise Capital for MabVax*

63.    MabVax engaged in significant efforts to raise additional capital to operate the business.  With the discoveries made at Cold Spring Harbor Laboratories demonstrating that its lead antibody product, already in the clinic, could have a positive impact on the treatment of pancreatitis, MabVax engaged Northland Securities on October 4, 2018 to raise up to $20 million to support a Phase 2 clinical program.  Northland is a mid-sized investment banking firm with significant experience in raising capital for biopharmaceutical firms.  With Northland's input, MabVax created new non-confidential and confidential marketing materials for an outreach program targeted at institutional investors who regularly invest in early stage companies.  After three months of activity, Northland reported to MabVax that while they could get investors interested in the science, the fact that MabVax was involved in an SEC investigation and still had the investors charged by the SEC for stock manipulation and fraud as substantial shareholders, it was unlikely they would be successful and agreed to terminate the engagement as of January 4, 2019.

*Discussions with Oxford about Additional Funding*

64.    MabVax directly asked Oxford for bridge financing on multiple occasions since Oxford first alleged an event of default in mid-2018.  Although Oxford made it known that it was not willing to provide any additional monies to the Debtors, it would reasonably cooperate with MabVax in connection with a bankruptcy sale of MabVax's assets.  Toward that end, and in

connection with third party financing, Oxford agreed to subordinate its senior first security interest and lien position on substantially all of the Debtors' assets and intellectual property; provided, however, it will only agree to such limited priming to BioNTech Research and Development, Inc., an affiliate of BioNTech AG, as proposed DIP Lender (in such capacity, the "DIP Lender") and, provided, further, that the *maximum* amount of such DIP Facility shall in no event exceed the amount of $500,000 to be used consistent with a budget it has reviewed and approved that is necessary and appropriate to fund the continued operations of the Debtors pending a sale that must close on or before May 16, 2019.

65.     Based on the foregoing, the Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by the Stalking Horse Bidder under the DIP Facility.

## PART VI

### Summary of First Day Motions

66.     To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filing, the Debtors have filed the motions (the "First Day Motions") described below.

67.     I have reviewed each of the First Day Motions.  The First Day Motions were prepared with my input and assistance or the input and assistance of employees working under my supervision and proposed bankruptcy counsel.  I believe the information contained in the First Day Motions is accurate and correct.  As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to Debtors' reorganization efforts.

A.    **Debtors' Application for Joint Administration**

68.    The Debtors request the entry of an order directing that their bankruptcy cases be jointly administered for procedural purposes only under the caption of the case filed by MabVax Therapeutics Holdings, Inc.

69.    The Debtors believe that it would be more efficient and less costly for these cases to be jointly administered, particularly given the limited liquidity available to the Debtors.  The Debtors anticipate a certain level of activity during these cases and believe that most hearings and contested matters will apply to the Debtors' cases equally. The Debtors will be selling assets that belong to their respective estates.

70.    Consequently, joint administration of these cases will promote the economical and efficient administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases.

B.    **Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; (II) Deeming Utility Companies Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utility Motion")**

71.    In the normal conduct of their business, the Debtors have relationships with two (2) utility companies (together, the "Utility Companies") for the provision of electric and gas, telephone and internet services (the "Utility Services").

72.    Continued and uninterrupted Utility Service is vital to the Debtors' ability to sustain their operations during these Chapter 11 Cases.  Because of the nature of the Debtors' operations, termination or interruption of the Utility Services would dramatically impair the Debtors' ability to conduct business and cause considerable damage and inconvenience to the Debtors', their employees and the sales process.

73.     To ensure the continued provision of Utility Services to the Debtors, the Debtors seek entry of an order prohibiting the Utility Companies from altering, refusing, or discontinuing services to, or discriminating against the Debtors on account of prepetition invoices, determining that Utility Companies are adequately assured of future payment, and establishing procedures for determining adequate assurance of payment.  The Debtors propose to establish a segregated account into which Debtors will deposit the sum of approximately $2,470, which is equal to approximately half a month of Utility Services calculated on a historical basis and, additionally, have proposed determination procedures to address any request made by Utility Companies for additional adequate assurance.

74.     For the foregoing reasons, the Debtors submit, that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**C.     Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363, 1107 and 1108 Authorizing: (a) Continued Maintenance of Existing Bank Accounts, (b) Continued Use of Existing Business Forms and (c) Waiver of Section 345(b) Deposit and Investment Requirements and Certain United States Trustee Guidelines (the "<u>Bank Account Motion</u>")**

75.     The Debtors maintain two bank accounts with Pacific Premier Bank (the "<u>Bank</u>"): (a) a Checking Account and (b) a Money Market Account (together, the "<u>Bank Accounts</u>").  The Bank is located at 17901 Von Karman Ave, Suite 1200, Irvine, California, 92614.

76.     The Checking Account is used for all the Debtors' payable transactions and disbursements including employee payroll.  The Money Market Account is used to receive money transfers such as wires.

77.     The Debtors need to maintain their Bank Accounts in order to maintain normal business operations, collections and disbursements in the ordinary course.  Accordingly, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, the Debtors seek

authority to continue to use and maintain their Bank Accounts, including as controlled accounts for purposes of the proposed DIP Loan.

**D.    Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Pre-Petition Taxes and (II) Authorizing the Banks to Honor and Process the Payment of Such Amounts (the "Taxes Motion")**

78.    In the ordinary course of business, the Debtors incur or collect and remit a variety of taxes, including, without limitation, (i) franchise taxes; (ii) business taxes; (iii) income taxes; (iv) property taxes; and (v) certain other miscellaneous taxes (collectively, the "Taxes"), to various federal, state, local and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states.  The Debtors also incur fees for business licenses and permits and various other fees and assessments (collectively, the "Fees," and together with the Taxes, the "Taxes and Fees") in connection with the operation of their business. The Debtors remit the Taxes and Fees in accordance with applicable regulations and laws.

79.    The Debtors estimate that, as of the Petition Date, the total amount of pre-petition Taxes and Fees currently owed does not exceed approximately $10,000 in the aggregate. The Taxes and Fees are comprised entirely of current tax obligations and are not in respect of "catch-up" payments.

80.    By the Taxes Motion, the Debtors seek authority, but not the direction, to pay certain Taxes and Fees owing on account of periods prior to the Petition Date, subject to a $10,000 cap, plus any Taxes and Fees subsequently determined upon audit, or otherwise to be owed for periods prior to the Petition Date.

81.    The Debtors further seek an order authorizing, but not directing, Pacific Premier Bank and all other applicable financial institutions to honor and process checks and electronic transfer requests related thereto.

**E.     Motion for Interim and Final Orders Pursuant to Sections 105(a), 363(b), 363(c), 507(a), 541(b)(7), 541(d), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing the Debtors to (A) Pay Certain Prepetition Severance, Variable Commissions, Wages, Compensation, and Employee Benefits, (B) Continue Payment of Severance, Variable Commissions, Wages, Compensation, and Employee Benefits in the Ordinary Course of Business and (C) Continue Payment of Employment, Unemployment, Social Security and Other Taxes Incident to the Employee Obligations; and (II) Authorizing and Directing the Debtors' Third-Party Payroll Administrator and Debtors' Bank to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing (the "<u>Wages Motion</u>")**

82.     As of the Petition Date, Debtors' workforce is comprised of six (6) regular employees (the "<u>Employees</u>").

83.     By the Wages Motion, the Debtors seek authority, but not direction to, among other things, in accordance with the Budget to: (a) pay certain pre-petition claims for paid time off, wages, commissions and salaries to their current employees; (b) continue withholding from Employee Salaries and Wages, the Employee's share of costs for certain benefit programs and tax obligations and remitting such withholdings to the appropriate benefit provider or taxing authority, along with any obligations owed directly by the Debtors to such benefit provider and taxing authority, and pay any accrued but unpaid amount; (c) continue to use Paychex as the Debtors' payroll administration and to pay the pre-petition amount owed to Paychex in the approximate amount of $150; (d) reimburse Employees for prepetition expenses incurred on behalf of the Debtors, if any (and there likely are none or a *de minimis* amount); (e) continue the Debtors' Corporate Credit Cards to permit the use the Debtors' Credit Card for legitimate business  expenses and to pay all pre-petition amounts owed on such Credit Card; and (f) pay any amounts due and owing under Employee Benefit Programs in a pre-petition amount (as defined in the Wages Motion) (collectively, "<u>Employee Obligations</u>"); and an order authorizing the Debtors' third-party payroll administrator, Paychex, and Bank to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing.

84.     Prior to the Petition Date, and before the $258,000 received from BioNTech AG, the Company was not able to fund payroll and related obligations, and missed one payroll period, that it subsequently funded.  I believe that any further delay in paying pre-petition Employee Obligations will adversely impact the Debtors' relationship with their Employees and irreparably impair the Employees' morale, dedication, confidence and cooperation in with the chapter 11 process. At this early stage in the case, the Debtors simply cannot risk the substantial damage to their business that would inevitably result from a decline in the Employees' morale and cooperation attributable to the Debtors' failure to honor their pre-petition Employee Obligations.

**F.      Motion for Entry of an Order Authorizing the Debtors to Continue and Renew Its General Business Insurance Policies and Honor All Obligations and Financing Agreement in Respect Thereof (the "<u>Insurance Motion</u>")**

85.     In the ordinary course of their business, the Debtors maintain the following types of insurance:  (a) Auto; (b) Cargo; (c) Directors & Officers, (d) Crime, (e) Fiduciary Liability; (f) Employment Practices Liability; (g) Products Liability, (h) Umbrella, (i) Cyber, (i) Workers Compensation and (j) Property Package (collectively, (a)–(j) referred to as the "<u>Insurance Policies</u>").  The Insurance Policies are essential to the preservation of the Debtors' business, and assets, and in many cases coverage is required by various laws and contracts that govern the Debtors' business conduct.

86.     The Debtors seek the entry of an order authorizing them to maintain, continue and renew the Insurance Policies and to honor all of their obligations under and in connection with the Insurance Policies and the Financing Agreements on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date.[3]  This would include

---

[3] Nothing in the Insurance Motion should be construed as an assumption of any executory contract or unexpired lease between the Debtors and any other party, nor should it be construed as a rejection of any executory contract or unexpired lease with any creditor.  The Debtors reserve the right to contest the amount claimed to be due by any person or entity.

(a) continuing make payments under the Financing Agreements, (b) renewing or obtaining new insurance policies as needed in the ordinary course of business and (c) paying all prepetition amounts arising under the Insurance Policies (including commissions to the Debtors' insurance broker) in an amount not to exceed $9,164.83 in the aggregate.

**G.    Motion of Debtors for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of the Bankruptcy Code (I) Authorizing Debtors to (A) Obtain Post-Petition Secured Financing from BioNTech Research and Development, Inc.; (B) Utilize Cash Collateral; and (C) Pay Certain Related Fees and Charges; (II) Granting Adequate Protection to the Pre-Petition Lender; and (III) Scheduling A Final Hearing (the "<u>DIP Financing Motion</u>")**

87.     The Debtors immediately need to obtain post-petition financing in order to pay their employees and continue their business operations.  Without access to debtor in possession financing, the Debtors have limited cash on hand, and do not expect to be able to generate sufficient levels of cash flow through operation of the Debtors' business to cover cash needs and the projected costs of these Chapter 11 Cases through a sale date.

88.     The Debtors, their advisors and Objective Capital examined a variety of options for resolving their liquidity issues without resorting to a chapter 11 filing.  The Debtors explored raising equity and capital.  Despite these efforts, no feasible alternatives to chapter 11 were available, the Debtors' liquidity position continued to deteriorate and their Pre-Petition Lender declared an event of default.

89.     Recognizing the need to access cash, in advance of these chapter 11 filings, the Debtors engaged in good faith, arms-length negotiations with the Pre-Petition Lender and also solicited proposed post-petition financing from other sources.

90.     Pursuant to the APA, the Stalking Horse Bidder is willing to provide the DIP Facility to the Debtors.  The Stalking Horse Bidder previously provided the Prepetition Unsecured Loan to bridge the Debtor to the filing date of these Chapter 11 Cases.

91.     The Stalking Horse Bidder as DIP Lender has agreed to provide the DIP Facility to cover the costs associated with preserving the Debtors' operations and running a chapter 11 process through the closing of a sale in accordance with the Bidding Procedures.  The maximum amount that may be borrowed under the DIP Loan is $500,000; $200,000 will be available on an interim basis and up to but not exceeding $500,000 (inclusive of amounts funded on an interim basis) will be available on a final basis potentially through May 16, 2019 consistent with the Budget (as defined in the DIP Motion).  Provided the DIP Loan does not exceed $500,000 and the funds are expended consistent with the Budget, the Pre-Petition Lender has consented to the priming of its senior lien up to $500,000 to allow for a section 363 sales process.

92.     As more fully set forth in the DIP Financing Motion, absent an Event of Default (as defined in the DIP Motion), the DIP Facility provides for an 8% interest rate and no facility or commitment fee.  The DIP Facility provides for the reimbursement of the DIP Lender's expenses (including its legal fees and expenses), but the DIP Lender has agreed to waive reimbursement of such fees and expenses as additional consideration for the purchase of the Assets. The DIP Facility contains important milestones including, approving the Bidding Procedures on or before April 14, 2019 and approving the Sale by May 16, 2019.

93.     The DIP Facility represents the best (and only) source of financing available to the Debtors under the circumstances, and was negotiated at arm's length with both the Pre-Petition Lender and the DIP Lender, resulting in terms that the Debtors submit are reasonable and appropriate to meet the Debtors' financing needs during these Chapter 11 Cases.

94.     I am advised by Objective Capital that it does not believe that the Debtors can obtain financing to fund and preserve their assets on terms more favorable than those offered by the DIP Lender under the DIP Facility and that the Debtors are (and have been) unable to obtain

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  I also believe that the Debtors are unlikely to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by the Stalking Horse Bidder under the DIP Facility.

95.    Accordingly, the relief requested in the DIP Financing Motion is in the best interest of the Debtors' estates, creditors, and other parties in interest, and the Debtors request approval thereof.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

96.     In furtherance of the Debtors' reorganization efforts, I respectfully request that the

orders granting the relief requested in the First Day Motions be entered.


Dated: March 20, 2019

_/s/_

J. David Hansen
Chief Executive Officer
MabVax Therapeutics Holdings, Inc.
MabVax Therapeutics, Inc.