## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MABVAX THERAPEUTICS HOLDINGS, INC., *et al.*,[1] | ) Case No. 19-10603 (CSS) |
|  | ) |
| Debtors. | ) Joint Administration Requested |
|  | ) |

**MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION WITH RESPECT TO
SALE OF ASSETS FOR (I) AN ORDER (A) ESTABLISHING BIDDING
PROCEDURES INCLUDING, WITHOUT LIMITATION, BREAK-UP FEE
PROVISIONS AND OTHER BID PROTECTIONS, (B) APPROVING FORM OF
ASSET PURCHASE AGREEMENT, (C) APPROVING FORM AND MANNER OF
NOTICE OF SALE AND TREATMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES AND (D) SCHEDULING SALE HEARING DATE TO
CONSIDER FINAL APPROVAL OF SALE AND ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (II) AN ORDER
APPROVING (A) THE SALE, FREE AND CLEAR OF LIENS, CLAIMS AND
ENCUMBRANCES AND (B) TREATMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (III) RELATED RELIEF**

MabVax Therapeutics Holdings, Inc. ("MabVax Holdings") and MabVax Therapeutics,

Inc. ("MabVax" and together with MabVax Holdings, the "Debtors") file this motion in

connection with the sale of substantially all of the Debtors' assets (collectively, the "Purchased

Assets"). The Debtors move for entry of an order pursuant to sections 105(a), 363, 365, 503 and

507 of the Bankruptcy Code (defined below), Rules 2002, 6004, 6006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 6004-1(i) of

the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) MabVax Therapeutics Holdings, Inc. (7903) and (ii) MabVax Therapeutics, Inc. (1765). The Debtors' mailing address is 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121.

of Delaware (the "<u>Local Rules</u>") for entry of an order substantially in the form attached hereto as **Exhibit A** (the "<u>Bidding Procedures Order</u>") (a) establishing bidding procedures in the form attached as **Exhibit 1** to the Bidding Procedures Order (the "<u>Bidding Procedures</u>") in connection with the sale of the Purchased Assets (the "<u>Sale</u>"), including, without limitation, approving the terms and conditions for payment of a break-up fee and expense reimbursement (together, the "<u>Bidder Protections</u>") to BioNTech Research and Development, Inc. or its designee (the "<u>Stalking Horse Bidder</u>"), (b) approving the asset purchase agreement substantially in the form attached as **Exhibit B** (the "<u>Asset Purchase Agreement</u>" or "<u>Stalking Horse APA</u>"), (c) approving the form and manner of notices in connection with the Sale and treatment of executory contracts and unexpired leases and (d) scheduling a hearing (the "<u>Sale Hearing</u>") to consider approval of the Sale and assumption and assignment of the Assumed Contracts (defined below); (ii) for entry of an order substantially in the form attached hereto as **Exhibit C** (the "<u>Sale Order</u>") approving (a) the Sale of the Purchased Assets, free and clear of all liens, claims, encumbrances and other interests (collectively, the "<u>Interests</u>"), pursuant to the Asset Purchase Agreement, to the Stalking Horse Bidder or to another qualified bidder submitting a higher or otherwise better offer (the "<u>Successful Bidder</u>") in accordance with the Bidding Procedures and (b) assumption and assignment of certain executory contracts and unexpired leases, free and clear of the Interests, to the Stalking Horse Bidder (or other Successful Bidder); and (iii) granting such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors rely on the Declaration of J. David Hansen, Chief Executive Officer and President of each of the Debtors, in Support of First Day Pleadings (the "<u>Hansen Declaration</u>"), filed contemporaneously with this Motion, and respectfully state as follows:

## Jurisdiction

1.      On March 21, 2019 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the bankruptcy code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  No creditors' committee has yet been appointed in the Chapter 11 Cases by the United States Trustee.  The Debtors are continuing in possession of their respective properties and are operating their respective businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      The statutory predicates for the relief sought herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and Local Rule 6004-1.

## Background

A.      The Debtors' Businesses.

4.      The Debtors are both Delaware corporations headquartered in San Diego, California.

5.      MabVax Holdings is a public company that originally was incorporated in 1988 under the name "Terrapin Diagnostics, Inc." in the state of Delaware and subsequently renamed "Telik, Inc." in 1998, and thereafter renamed MabVax Therapeutics Holdings, Inc. in September 2014.  On July 8, 2014, MabVax Therapeutics, Inc. consummated a reverse-merger with MabVax Therapeutics Holdings, Inc., pursuant to which MabVax Therapeutics Holdings'

subsidiary Tacoma Acquisition Corp. merged with and into MabVax Therapeutics, Inc. which survived as a wholly-owned subsidiary of MabVax Therapeutics Holdings, Inc.

6.      Debtor MabVax is a wholly owned subsidiary of Debtor MabVax Holdings.  It is a non-operating company that holds certain patents and other property the Debtors are seeking to sell.

7.      Debtor MabVax Holdings is a biotechnology company.  Specifically, it is a clinical-stage immuno-oncology drug development company with a fully human antibody discovery platform focused on the clinical development of products to address unmet medical needs in the treatment of cancer and pancreatitis.

B.      Pre-Petition Secured Obligations.

8.      As of the Petition Date, the Debtors aggregate funded and matured secured debt obligations were approximately $3,000,000, plus accrued expenses (subject to the Debtors' verification).   This amount is owed to the Debtors' sole pre-petition secured lender: Oxford Finance LLC (the "Pre-Petition Lender" or "Oxford").

C.      Economic Performance and Other Challenges.

9.      Like other clinical-stage biotechnology companies, the Debtors cannot earn product revenue until they (or their collaborative partners) complete clinical trials, obtain regulatory approval, and successfully commercialize one or more of its products.  As a result, the Debtors have incurred, and will likely continue to incur, substantial operating losses.

10.      The Debtors are dependent on financing (either through loans or equity raises), licensing intellectual property and assets sales to generate the liquidity required to continue the research and development necessary to bring their products into the marketplace.

11.     As detailed in the Hansen Declaration, MabVax Holdings learned the SEC brought fraud claims against certain investors for misconduct involving their investment in and trading of MabVax Holdings stock.  MabVax Holdings considers itself a victim of the activities of these investors.  The SEC has never brought or threatened any claims against MabVax Holdings.  MabVax Holdings is now the target of two derivative investor lawsuits.  Further, MabVax Holdings was deregistered from the NASDAQ exchange, primarily as a result of the "pump and dump" scheme, temporarily invalidating the number of shares of common stock outstanding and votes on stockholder matters.  As a result of the "pump and dump" scheme, the Pre-Petition Lender alleged an event of default under the Loan Agreement.  MabVax Holdings also had to incur substantial legal fees in connection with the SEC investigation and to obtain declaratory relief in the Delaware Court of Chancery in order to rectify uncertainty regarding whether shares of its common stock were validly issued upon conversion of preferred stock from June 30, 2014 to February 12, 2018

12.     Given the accrued legal fees, limited access to funds through equity offerings, and the alleged default with their secured lender, the Debtors are facing a severe liquidity crisis.  In their business judgment, the best means to maximize value for their stakeholders is to sell their assets in a section 363 sale.   As detailed in the Hansen Declaration, the Debtors attempted to generate sufficient liquidity through equity issuances, asset sales, licensing certain intellectual property and reducing their workfoce.  However, these efforts did not generate the liquidity needed to continue operating the Debtors as a going concern absent further financing.

D.     The Debtors' Pre-Petition Efforts to Raise Capital
       Pre-Petition Marketing Efforts.

13.     Beginning in September 2017, the Debtors retained Greenhill & Company ("Greenhill") to market their assets.   Greenhill contacted and sent material materials

to fifty-nine (59) different companies that Greenhill and the Debtors determined were potential candidates for a transaction. Of those fifty-nine (59) parties, nineteen (19) executed non-disclosure agreements (the "Greenhill Interested Parties"). The Greenhill Interested Parties that executed non-disclosure agreements then were given the opportunity to gain access to confidential information related to the Debtors and to participate in management meetings, either in person or telephonically, with Greenhill and the Debtors' management team. During the course of this process, the Greenhill Interested Parties were invited to submit letters of intent to license or purchase any or all of the assets of Debtors. Three parties moved forward to negotiate terms sheets. Ultimately, two parties submitted offers for specific assets. However, for reasons beyond the Debtors' control, the parties were not able to consummate a transaction for a sale of substantially all of the Debtors' assets.

14.     Given the Debtors increasingly difficult financial condition, the Debtors in December of 2018, again made an attempt to sell substantially all of the Company's assets by retaining another highly experienced investment bank, Objective Capital Partners, LLC.

15.     The marketing process conducted by Objective Capital included the development, in conjunction with Debtors' management team, of a marketing presentation to provide to potential candidates for a transaction. After familiarizing itself with the business, operations and financial condition of the Debtors, Objective Capital prepared the presentation. Based on Objective Capital's relationship within and deep knowledge of the biotechnology industry, Objective Capital then assisted the Debtors in identifying and evaluating candidates for a potential transaction. Thereafter, Objective Capital coordinated with the Debtors to prepare and implement a marketing plan, and to distribute a management presentation to all interested parties. Objective Capital held weekly (and sometimes twice a week, or more) meetings and

conference calls with the Debtors since the beginning of their engagement throughout the four month process.

16.     Objective Capital contacted and sent marketing materials to fifty-five (55) different parties that Objective Capital and the Debtors determined were potential candidates for a transaction including re-soliciting several potential candidates that were approached by Greenhill.  Several of the prospective buyers expressed interest and held high level meetings with management.  Of those expressing interest, seven (7) executed non-disclosure agreements (the "Objective Capital Interested Parties").  The Objective Capital Interested Parties that executed non-disclosure agreements were given the opportunity to gain access to a data room containing confidential information related to the Debtors and to participate in management meetings, either in person or telephonically, with Objective Capital and the Debtors' management team.  Four parties submitted letters of intent.

17.     Of the four letters of intent submitted during the process, the Stalking Horse Bidder's proposal represents the highest, best and most viable offer received by the Debtors.

E.     Prepetition Bridge Loan with Stalking Horse Bidder

18.     Pre-petition, the Stalking Horse Bidder made a loan to the Debtors for $258,000 (the "Pre-petition Unsecured Loan") to provide the liquidity needed to commence these Chapter 11 Cases.  The Pre-Petition Unsecured Loan funded on March 11, 2019. The Debtors used the proceeds of the Pre-Petition Unsecured Loan to, among other things, retain bankruptcy counsel to prosecute the case and the sale process.

F.     Need for Relief.

19.     Given the foregoing factors, the Debtors have determined that chapter 11 affords them the best possible tools to preserve and realize upon the going-concern value.

20.     In consultation with their professionals and after careful examination by the Debtors' Board of Directors, the Debtors have determined that chapter 11, combined with an expeditious sale through an auction process, is the best and most efficient way to maximize a return for the Debtors, their estates, and all parties-in-interest.

G.     The Purchased Assets.

21.     The Purchased Assets consist of substantially all the assets of the Debtors (together, the "Sellers") including, but not limited to, all intellectual property, furniture, fixtures, equipment, devises, inventory, finished goods, raw materials, work in progress, packaging, supplies, intangible property, permits and licenses (to the extent assignable), prepaid expenses, IT systems, and further including the Assumed Contracts, but excluding certain assets of Sellers as set forth in the Asset Purchase Agreement (the "Excluded Assets").[2]  The Excluded Assets include, *inter alia,* certain receivables in connection with the asset purchase and license agreement entered into with Boehringer Ingelheim International GmbH, the sublicense agreement entered into with Y-mAbs Therapeutics, Inc. and agreements with Memorial Sloan Kettering relating to the trivalent vaccine) (collectively, the "Retained Receivables"), avoidance actions, commercial tort claims, and certain litigation claims (including, without limitation, any claims for recovery the Debtors may have in connection with ongoing or future proceedings against certain of Debtors' investors, the Debtors' former SEC counsel and the SEC investigation) (collectively, the "Retained Litigation Claims").

---

[2] The description of the Purchased Assets contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

F.      The Stalking Horse Bidder and the DIP Loan.

22.     The Stalking Horse Bidder is a Delaware corporation.  The Stalking Horse Bidder is an affiliate of BioNTech SE.  The Stalking Horse Bidder is **not** an insider of the Debtors.

23.     Contemporaneously with the filing of this Motion, the Debtors have also filed a motion (the "DIP Motion") seeking to enter into the short-term financing arrangement proposed by the Stalking Horse Bidder (the "DIP Loan").  The DIP Loan is essentially a bridge loan to finance the Debtors through a 363 sales process.  The maximum amount that can be drawn on the DIP Loan is $500,000.  Oxford has agreed to the terms of the DIP Loan as set forth in the DIP Motion.

24.     The DIP Loan ensures that the Debtors will have sufficient liquidity to complete the Sale of the Purchased Assets while safeguarding the going-concern value of the Debtors between the Petition Date and the closing of the Sale.  As a result of the DIP Loan, the Debtors will be afforded the necessary working capital to continue to operate and administer the Chapter 11 Cases prior to receiving the proceeds from the Sale.

**Relief Requested**

25.     By this Motion, the Debtors seek entry of orders (i) (a) approving the Bidding Procedures in connection with the Sale of the Purchased Assets, including, without limitation, approving the terms and conditions of the Bidder Protections, (b) approving the form of Asset Purchase Agreement, (c) approving the form and manner of notices of and treatment of executory contracts and unexpired leases in connection with the Sale and (d) scheduling the Sale Hearing to consider approval of the Sale and assumption and assignment of the Assumed Contracts; (ii) approving (a) the Sale of the Purchased Assets, free and clear of the Interests, pursuant to the Asset Purchase Agreement, to the Stalking Horse Bidder (or other Successful Bidder) in accordance with the Bidding Procedures and (b) assumption of the Assumed

Contracts, and assignment to the Stalking Horse Bidder (or other Successful Bidder); and

(iii) granting such other and further relief as the Court deems just and proper.

A.     The Bidding Procedures.

26.     The Debtors seek approval of the Bidding Procedures attached as **Exhibit 1** to the

Bidding Procedures Order.

27.     Pursuant to Local Rule 6004-1(c)(i), the following is a summary of certain key

provisions of the proposed Bidding Procedures:[3]

> (a)     Provisions Regarding Qualification of Bidders.   To participate in the bidding process and to receive access to due diligence ("Diligence Materials"), a party must submit to the Debtors (i) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction on a timely basis for the Purchased Assets (a "Sale Transaction").   A party who qualifies for access to Diligence Materials shall be an "Interested Bidder."
>
> (b)     Provisions Governing Qualified Bids.
>
>> (i)     Deadlines.   The proposed deadline for submitting bids by a Qualified Bidder is May 2, 2019, at 5:00 p.m. (prevailing Eastern time) (the "Bid Deadline").
>>
>> (ii)    Form of Bid.
>>
>>> (1)     Executed Transaction Documents.   A competing Bid must be based on the Stalking Horse APA and must include a binding, executed offer, signed by an authorized representative of such Bidder, pursuant to which the competing Bidder proposes to effectuate a Sale Transaction, which must be on substantially the
>>>
>>> same terms as those contained in the Stalking Horse APA. A competing Bid also must include a copy of a redline

---

[3] The description of the Bidding Procedures contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Bidding Procedures, the Bidding Procedures shall control.  Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures.

reflecting all of the changes to the Stalking Horse APA requested by the Bidder ("Redline APA").

(iii)   Required Deposits.  A competing Bid must be accompanied by a cash deposit ("Good Faith Deposit"), which will be deposited into a segregated account established by the Debtors, such that such Good Faith Deposit is actually received by the Bid Deadline in an amount equal to $370,000 (ten percent (10%) of the Stalking Horse Bid).

(iv)   Other Conditions.

(1)     To be considered a Qualified Bid such competing Bid must have a value that the Debtors determine in their reasonable business judgment is  $4,235,000 or greater, which includes (i) the Purchase Price provided for in the Stalking Horse APA, ($3,700,000), (ii) the Stalking-Horse Bidder Fee ($185,000.00), (iii) the Expense Reimbursement ($250,000.00) and (iv) the minimum overbid ($100,000).

(2)     Designation of Assigned Contracts and Leases:  A competing Bid must identify with particularity each and every executory contract and unexpired lease with respect to which the Bidder seeks assignment from the Debtors, and whether any cure costs will be assumed by the Bidder; provided, however, the Bidder's Asset Purchase Agreement may contain provisions allowing for the removal or addition of assumed executory contracts and unexpired leases on substantially the same terms as provided for in the Asset Purchase Agreement.

(3)     Designation of Assumed Liabilities.  A competing Bid must identify with particularity any and all liabilities that the Bidder proposes to assume, and, if limited in amount, set forth the maximum amount to be assumed provided, however, the Bidder's Asset Purchase Agreement may contain provisions allowing for the removal or additional of assumed liabilities on substantially the same terms as provided for in the Asset Purchase Agreement.

(4)     Corporate Authority:  A competing Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Sale Transaction.

(5)      <u>Disclosure of Identity of Bidder</u>:  A competing Bid must fully disclose the identity of and contact information for each entity that will be bidding for or purchasing the Purchased Assets, including any equity holders, in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such competing Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A competing Bid must also fully disclose any connections or agreements with the Debtors, or any other known, potential or prospective Bidder, Interested Bidder or Qualified Bidder, and/or any officer, director or equity holder of the Debtors.

(6)      <u>Evidence of Financing Sources</u>.  A Bid must contain written evidence satisfactory to Sellers that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction, and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, <u>inter</u> <u>alia</u>, the following: (A) contact names and numbers for verification of financing sources; (B) evidence of the competing Bidder's internal resources and/or proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid as needed to close the Sale Transaction; and (C) any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such competing Bidder has the ability to close the Sale Transaction and provide the Replacement DIP Facility.

(7)      <u>No Contingencies</u>:  A competing Bid may <u>not</u> be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of unperformed due diligence.

(8)      <u>Irrevocable</u>.   A competing Bid must be irrevocable until five (5) business days after the Sale Hearing, <u>provided</u> that if such Bid is accepted as the Successful Bid or the

Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, in accordance with the terms and conditions of the Bidding Procedures.

(9)    <u>Compliance with Diligence Requests</u>:  A competing Bidder submitting a Bid must have promptly complied with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors.

(10)    <u>Confidentiality Agreement</u>:    To the extent not already executed, the competing Bid must include an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors and the Stalking Horse Bidder.

(11)    <u>Termination Fees</u>:  Other than with respect to the Stalking Horse Bidder, the competing Bid must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the competing Bid, the Bidder waives the right to any such fee and the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid.

(12)    <u>Closing Date</u>:  The competing Bid must include a commitment to close a sale of the Purchased Assets by the Closing Date set forth in the Stalking Horse APA.

(13)    <u>Bid Deadline</u>:  The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline: (1) the Debtors, c/o The Rosner Law Group, 824 N. Market Street, Suite 810, Wilmington, DE 19801, Attn: Frederick B. Rosner (rosner@teamrosner.com) and Jason Gibson (gibson@teamrosner.com); and (2) counsel to Secured Creditor, Greenberg Traurig LLP, One International Place, Suite 2000, Boston, MA  02110, Attn: J. Gregory Milmoe.

(c)    <u>Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder</u>.

(i)    <u>No-Shop or No-Solicitation Provisions</u>.  There are no "No-Shop" or "No-Solicitation" provisions in the Stalking Horse APA.

(ii)    <u>Break-Up Fees and Expense Reimbursement</u>.  Subject to approval of the Bankruptcy Court, a break-up fee in an amount equal to $185,000, and expense reimbursement in an amount up to

$250,000 shall be payable to the Stalking Horse Bidder upon the closing of the sale of the Purchased Assets to a competing bidder. The expense reimbursement shall also be payable to the Stalking Horse Bidder in the event that the Asset Purchase Agreement terminates without a Closing (other than due to a sale to a competing bidder) for reasons not attributable to the Stalking Horse Bidder.

(iii)     Bidding Increments.    Initial bid must be an amount at least $4,235,000 ($100,000.00 more than the combined amount of (i) the Purchase Price provided for in the Stalking Horse APA, $3,700,000.00, (ii) the Stalking-Horse Bidder Fee, $185,000.00, and (iii) the Expense Reimbursement, $250,000.00).

(iv)     Treatment of Break-Up/Topping Fees and Expense Reimbursement at Auction.  The Stalking Horse Bidder shall be entitled to a credit equal to its break-up fee and expense reimbursement when bidding at the auction.  The Stalking Horse Bidder shall continue to be entitled to a break-up fee and expense reimbursement upon submitting a higher or otherwise better bid than its initial bid.

(d)     Modification of Bidding Procedures.  The proposed Bidding Procedures provide that the Debtors shall have the right to adopt modifications to certain of the rules set forth in the Bidding Procedures that will better promote the goals of the Bidding Procedures and that are not materially inconsistent with the Bidding Procedures or of any Bankruptcy Court order or the Stalking Horse APA, the Bankruptcy Code, or the Bankruptcy Rules, and shall be disclosed to each Qualified Bidder.

(e)     Closing with Alternative Backup Bidders.  Subject to the right of the Stalking Horse Bidder under the Stalking Horse APA to elect whether to serve as Backup Bidder, the Backup Bidder shall be required to keep its Bid open and irrevocable until the later of: (i) the closing of the transaction with the Successful Bidder; or (ii) 30 days after the Sale Hearing.  The Stalking Horse Bidder will be deemed to be the Backup Bidder only in accordance with the terms of the Stalking Horse APA and with the prior written consent of the Stalking Horse Bidder, exercisable in its sole and absolute discretion.

28.    The Debtors have attempted to include in the Bidding Procedures each of the elements of Local Rule 6004-1(c)(ii). To the extent that circumstances prevented the inclusion of a required element (such as the inability to specify the Auction location as a result of not

knowing the size of the forum required until the deadline for submission of Bids), the Debtors hereby respectfully request that, pursuant to the Local Rules, those requirements be waived.

B.    <u>The Bidder Protections</u>.

29.    The Stalking Horse Bidder and its professionals have expended, and likely will continue to expend, considerable time and energy pursuing the purchase of the Purchased Assets and the assumption and assignment of the Assumed Contracts, and have engaged in lengthy, good-faith negotiations and have forgone other potential investment opportunities.  The Asset Purchase Agreement is the culmination of these efforts.

30.    In recognition of this expenditure of time, energy, resources and lost opportunities, the Debtors have agreed, subject to this Court's approval, that, in the event upon the closing of the Sale of the Purchased Assets to a competing bidder other than the Stalking Horse Bidder, the Debtors will pay to the Stalking Horse Bidder a break-up fee in an amount equal to $185,000 (the "<u>Break-Up Fee</u>" or "<u>Stalking Horse Bidder Fee</u>"), roughly 5% of the Purchase Price, and an expense reimbursement in an amount up to $250,000 (the "<u>Expense Reimbursement</u>").

31.    The Break-Up Fee is also in consideration for, *inter alia*: (i) the $258,000 Pre-Petition Unsecured Loan; (ii) the Stalking Horse Bidder, in its capacity as a DIP Lender, is waiving its rights to legal fees incurred in connection with the debtor-in-possession financing; and (iii) the fees the Stalking Horse Bidder incurred in connection the due diligence efforts before being able to make the Stalking Horse Offer.

32.    The Debtors have agreed further that, subject to this Court's approval, the Expense Reimbursement shall also be payable to the Stalking Horse Bidder in the event that the

Asset Purchase Agreement terminates without a Closing (other than due to a sale to a competing bidder) for reasons not attributable to the Stalking Horse Bidder.

33.     The Debtors will select the Qualified Bid that they determine to be the highest or best Qualified Bid ("Baseline Bid") to serve as the starting point at the Auction.  Selection of the Baseline Bid shall take into account all relevant considerations, including, without limitation: (i) payment of the Stalking-Horse Bidder Fee ($185,000.00), (ii) payment of the Expense Reimbursement ($250,000.00), (iii) the financial condition of the applicable Qualified Bidder, (iv) the assumption of any liabilities by the Qualified Bidder under the applicable Asset Purchase Agreement, and (v) the certainty of closing.  The Debtors will provide notice of the selected Baseline Bid to all Qualified Bidders (including the Stalking Horse Bidder) and the Pre-Petition Lender at least one day before the Auction.

34.     During the Auction (assuming one is held), bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $100,000 higher than the most recent prevailing bid.

35.     The Debtors searched for an alternative stalking horse that would also be willing to provide financing but were unable to find such a bidder other than the Stalking Horse Bidder. The Debtors respectfully submit that the bidding protections, when considered alongside the DIP Loan and the Pre-petition Unsecured Loan, are reasonable.

C.     Credit Bidding.

36.     In connection with the Sale of the Purchased Assets, the Debtors' secured creditors may seek to credit bid some or all of their claims for their respective collateral (a "Credit Bid"), and the Stalking Horse Bidder will credit bid the DIP Loan.  In the event there is an auction, the Stalking Horse Bidder's bids will include the value of the Expense

Reimbursement and Breakup Fee, <u>provided</u>, however, for the avoidance of doubt, the Successful Bid cannot provide for less cash consideration than the Stalking Horse Offer.  The Debtors seek the Court's allowance of credit bidding in connection with any Sale to the full extent of Bankruptcy Code section 363(k).

D.    <u>The Asset Purchase Agreement</u>.

37.    After extensive arm's-length, good-faith negotiations among the parties and their respective advisors, Sellers and the Stalking Horse Bidder executed the Stalking Horse Asset Purchase Agreement, pursuant to which they have agreed, among other things, on the following:[4]

(a)    <u>Purchase Price</u>.  The Purchase Price will consist of (i) $2,300,000.00, (ii) Assumed Cure Costs (up to an aggregate amount of $1,400,000.00) (the "<u>Cash Amount</u>"), plus (B) the Assumed Liabilities.  At Closing, Buyer shall pay to the Sellers the Cash Amount.

(b)    <u>Excluded Assets</u>.  The following are not part of the Purchased Assets (the "<u>Excluded Assets</u>"): all (i) Excluded Contracts; (ii) the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Sellers; (iii) any rights to pursue avoidance claims and causes of action under Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code; (iv) commercial tort claims; (v) the assets, properties and rights specifically set forth on Section 2.02(c) of the Disclosure Schedules (including, without limitation the Retained Receivables and Retained Litigation Claims); and (vi) the rights which accrue or will accrue to Sellers under the Asset Purchase Agreement and the Ancillary Documents.

(c)    <u>Assumed Liabilities</u>.  Buyer shall assume the following (collectively, the "<u>Assumed Liabilities</u>"): (i) all Liabilities from the ownership or operation of the Purchased Assets by Buyer solely to the extent such liabilities arise after Closing; and (ii) all Liabilities in respect of the Assignment Contracts but solely to the extent that such Liabilities thereunder arise after the Closing Date, were incurred in the ordinary course of business and do not related to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers on or prior to the Closing.

---

[4] The description of the Asset Purchase Agreement contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

(d)     Excluded Liabilities.   Buyer shall not assume certain liabilities
(collectively, the "Excluded Liabilities") as set forth in Section 2.04 of the
Asset Purchase Agreement.

(e)     Representations and Warranties.  Usual and customary for transactions of
this nature. Representations and warranties shall not survive the closing.

(f)     Sale Free and Clear.  The transactions contemplated by the Asset Purchase
Agreement will be completed pursuant to section 363 of the Bankruptcy
Code and an order of the Bankruptcy Court in a form satisfactory to Buyer
approving the Asset Purchase Agreement (the "Sale Order"), which shall
include (i) findings of fact and conclusions of law that Buyer acquires the
Purchased Assets free and clear of all liens, claims, interests and
encumbrances of all kind against Sellers or the Purchased Assets whether
known or unknown and a release of Buyer from any successor liability,
(ii) provisions enjoining creditors and others from bringing claims against
Buyer arising prior to the Closing, and (iii) findings that Buyer is not a
successor-in-interest of the Debtors for any purpose and that Buyer acted
in good faith and negotiated at arms' length in connection with the Asset
Purchase Agreement.

(g)     Conduct of Business.  The Asset Purchase Agreement contains covenants
customary for transactions of this nature including, but not limited to,
covenants by Seller to operate the Business in the ordinary course
consistent with past practice and in accordance with Sellers' Budget
previously agreed to by Buyer (attached hereto as **Exhibit D**, the
"Budget"), preserve intact its business organization and maintain its
customary relationships with creditors, licensors, suppliers and customers
of the Business and maintain all material Licenses and Permits, subject to
any of Seller's obligations as debtors or debtors-in-possession under the
Bankruptcy Code.

(h)     Financing.   In connection with the commencement of the Chapter 11
Cases, Sellers and the Debtors will negotiate and seek Bankruptcy Court
approval of a senior secured, super-priority priming debtor-in-possession
financing with the Stalking Horse Bidder.

(i)     Closing Conditions.  Section 8 of the Asset Purchase Agreement contains
certain closing conditions.

(j)     Employees.  Buyer shall be entitled to review information about Sellers'
employees to the extent permitted by applicable Law.  Buyer, at its sole
discretion, may offer employment to the Employees subject to appropriate
background checks and, if necessary, negotiation of employment
agreements. Seller shall remain liable to for all Employee claims.  Certain
key executives entering into employment agreements with the Stalking

Horse Bidder, in a form reasonably acceptable to the Stalking Horse Bidder, is a condition precedent to closing.

(k)  <u>Termination</u>.  The Stalking Horse Bidder may terminate the Asset Purchase Agreement on April 12, 2019 if the Bankruptcy Court has not approved the Bidding Procedures and by May 15, 2019, if the Bankruptcy Court has not approved the Asset Purchase Agreement and entered the Sale Order.  The Stalking Horse Bidder shall be entitled to the Expense Reimbursement if the Agreement is terminated for any reason not attributable to the Stalking Horse Bidder (except for regulatory delays), and the Stalking Horse Fee if the Debtors sell their assets in a competing transactions.

E.  <u>Form and Manner of Notice of Sale and Treatment of Executory Contracts and Unexpired Leases</u>.

38.  Upon entry of an order approving the Bidding Procedures, the Debtors propose to give notice of the Bidding Procedures, the date and time of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing, by sending a notice (the "<u>Sale Hearing Notice</u>"), substantially in the form attached to the Bidding Procedures Order as **<u>Exhibit 3</u>** to the following parties:  (i) the United States Trustee; (ii) counsel to Secured Creditor, Greenberg Traurig LLP, One International Place, Suite 2000, Boston, MA  02110, Attn: J. Gregory Milmoe; (iii) counsel to the Stalking Horse Bidder, Covington & Burling LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Dianne F. Coffino; (iv) counsel to any official committee of unsecured creditors, and counsel to any other official committees appointed pursuant to section 1102 of the Bankruptcy Code; (v) the Internal Revenue Service and all known state and local taxing authorities or recording offices to which the Sellers are subject; (vi) the Securities and Exchange Commission; (vii) the Office of the United States Attorney for the District of Delaware; (viii) all known creditors of the Debtors, and their counsel if known; (ix) all parties that have filed requests for notice in the Chapter 11 Cases, and their counsel if known; (x) all parties (other than Debtors) to relevant contracts or leases (including Assumed Contracts), and their counsel, if known; (xi) any entities previously solicited to acquire, or

known to have an interest in acquiring, the Purchased Assets; (xii) any person or entity known to have asserted a lien or interest in all or any portion of the Purchased Assets, and their counsel if known; (xiii) all employees affected by the relief requested herein, and their counsel if known; and (xiv) the Federal Drug Administration.

39.     The Debtors further seek authority, effective upon the Closing, to assume and assign to the Successful Bidder (or the Back-Up Bidder, as the case may be), pursuant to sections 363 and 365 of the Bankruptcy Code, the Assumed Contracts.

40.     The Debtors propose to send a notice substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Notice of Potential Assumption and Assignment of Contracts") to each known counterparty to an executory contract or unexpired lease (each, a "Contract") that the Successful Bidder (or the Back-Up Bidder, as the case may be) may elect to assume and have the Sellers assume and assign to it at Closing (each, a "Counterparty") and its counsel if known, at the last known address available to the Debtors, by first-class mail.  Such notice identifies a Contract by (i) the name and date of the Contract (if available), (ii) the non-debtor party to the Contract, and (iii) the address of such Counterparty for notice purposes.  Such document shall also (i) set forth the amount determined by the Debtors to be necessary to be paid to the Counterparty to cure any existing defaults under the executory contract or unexpired lease pursuant to section 365(b) of the Bankruptcy Code in the event that such executory contract or unexpired lease is designated (the "Cure Amount"), and (ii) delineate a procedure for transferring to the Successful Bidder (or the Back-Up Bidder, as the case may be) the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Contract.

41.     The Sale Hearing Notice shall be filed and sent, such that it provides 21 days' notice of the Sale Hearing as required pursuant to Bankruptcy Rule 2002(a)(2).

42.     The Successful Bidder (or the Back-Up Bidder, as the case may be) shall have until Closing to designate which of the Contracts it wishes to assume and have the Sellers assume and assign to Buyer at Closing (the "Assumed Contracts") (such date being referred to herein as the "Contract Designation Date").  Provided, however, each contract counterparty will be given a Notice of Potential Assumption and Assignment and at least ten (10) days to object to the assumption and assignment of their contract and the proposed cure amount. In all cases, appropriate additions and deletions to Section 2.01(b) of the Sellers' Disclosure Schedule (and corresponding additions and deletions to Section 2.02(c) of the Sellers' Disclosure Schedule) shall be made to reflect such elections made by the Successful Bidder (or the Back-Up Bidder, as the case may be), and within two business days following the Closing the Debtors shall file on the Court's docket Section 2.02(c) of the Sellers' Disclosure Schedule identifying the Assumed Contracts.  Further, the Debtors cannot agree to pay any Cure Costs without the prior consent of Oxford.

43.     Section 2.05(d) of the Asset Purchase Agreement addresses procedures for potential assumption and assignment of Contracts related to the Business not disclosed on Section 2.01(b) of the Sellers' Disclosure Schedule.  Section 2.06(b) of the Asset Purchase Agreement provides that in the case of licenses, certificates, approvals, authorizations, leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Sellers shall, subject to any approval of the Bankruptcy Court that may be required, use commercially reasonable efforts to obtain such consent.

44.     The proposed Sale Hearing Notice and the proposed Notice of Potential Assumption and Assignment of Contracts each specify, among other things, that objections to entry of the Sale Order as requested in this Motion and/or objections relating to a proposed Cure Amount shall be set forth in writing and specify with particularity the grounds for such objections or other statements of position, and shall be filed and served by the objection deadline set forth in the Bidding Procedures Order, on (i) counsel to the Debtors, The Rosner Law Group LLC, 824 N. Market Street, Suite 810, Attn:  Frederick B. Rosner; (ii) counsel to the Stalking Horse Bidder, Covington & Burling LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Dianne F. Coffino; (iii) counsel to Prepetition Secured Creditor, Greenberg Traurig LLP, One International Place, Suite 2000, Boston, MA  02110, Attn: J. Gregory Milmoe; (iv) the U.S. Trustee; and (v) counsel to any official committee of unsecured creditors, and counsel to any other official committees appointed pursuant to section 1102 of the Bankruptcy Code.  The Debtors request that failure to file and serve such objections by the objection deadline set forth in the Bidding Procedures Order in accordance with the foregoing procedures shall be deemed a waiver of such objection and the objecting party shall be forever barred from asserting such objections.

45.     Section 2.05(b) of the Asset Purchase Agreement provides that Cure Costs up to $1,400,000.00 shall be paid by the Debtors with designated proceeds from the Purchase Price. The Debtors cannot agree to pay any Cure Costs without the prior consent of Oxford.

F.     <u>The Sale Hearing</u>.

46.     The Debtors intend to present the Successful Bid for approval by the Bankruptcy Court at the Sale Hearing.  The Debtors' presentation of a particular Bid to the Bankruptcy Court for approval does not constitute acceptance of the Bid.

47.     Pursuant to Rule 6004-1(b)(iv) of the Local Rules, the Debtors are required to highlight certain provisions of this Motion relating to approval of the Sale.  The following is a list of items required to be highlighted pursuant to Local Rule 6004-1(b)(iv):

(a)     <u>Sale to Insider</u>.  The Stalking Horse Bidder is **<u>not</u>** an insider of the Debtors.

(b)     <u>Agreements with Management</u>.  The Debtors understand that the Stalking Horse Bidder has discussed the opportunity for and future employment of certain of the Debtors' management and key employees, but no terms of potential employment have been discussed or presented.  Key executives entering into employment agreements with the Stalking Horse Bidder, in a form reasonably acceptable to the Stalking Horse Bidder, is a condition precedent to closing under the Asset Purchase Agreement. The Debtors are unaware of any formal agreements in that regard.  Nonetheless the Debtors believe that the proposed Bidding Procedures provide for an open and fair sale process.  Indeed none of the Debtors' management personnel that conducted the negotiations with the Stalking Horse Bidder on behalf of the Sellers are the subject of any agreements with the Stalking Horse Bidder, formal or informal, with regard to compensation and future employment.

(c)     <u>Releases</u>.  The Motion seeks a release of the Stalking Horse Bidder from any successor liability, an injunction against creditors and others from bringing claims against the Stalking Horse Bidder arising prior to the Closing.

(d)     <u>Private Sale/No Competitive Bidding</u>.  If no Qualified Bids are received other than from the Stalking Horse Bidder, no Auction will occur and the Debtors will seek approval of the Sale to the Stalking Horse Bidder without an Auction.

(e)     <u>Closing Deadlines</u>.  The Stalking Horse Bidder may terminate the Asset Purchase Agreement on April 12, 2019, if the Bankruptcy Court has not entered an order approving the Bidding Procedures, and on May 15, 2019 if the Bankruptcy Court has not approved the Asset Purchase Agreement and entered the Sale Order <u>See</u> Section 9.01 of the proposed Asset Purchase Agreement. The Outside Closing Date for closing the transactions contemplated by the proposed Asset Purchase Agreement is May 16, 2019.

(f)     <u>Good-Faith Deposit and Conditions for Forfeiture</u>.  Upon approval of the Bidding Procedures, the Stalking Horse Bidder will provide a good faith deposit of $370,000.  Each other Bid must be accompanied by a

deposit in the form of cash or a certified bank check payable to the order of MabVax Holdings in the amount of $370,000. If the Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, Sellers shall be entitled to retain the portion of the deposit that relates to 10% of the total amount of the Bid as part of its damages resulting from the breach or failure to perform by such Bidder.

(g)     <u>Interim Arrangements with Proposed Buyer</u>. The Debtors are seeking approval for the Stalking Horse Bidder to provide debtor-in-possession financing to the Debtors. Oxford has consented, provided that the total amount of the DIP Loan does not exceed $500,000. Pre-Petition, the Stalking Horse Bidder loaned the Debtors $258,000, on an unsecured basis, pursuant to a Promissory Note.

(h)     <u>Use of Proceeds</u>. The Stalking Horse Bidder's Bid provides for repayment of the DIP Loan (which may not exceed $500,000). Qualified Bids must be higher and/or better than the Stalking Horse Bidder's Bid, and thus the Successful Bid must repay the DIP Loan (as does the Stalking Horse Bid).

(i)     <u>Tax Exemption</u>. N/A

(j)     <u>Record Retention</u>. The Asset Purchase Agreement provides for continued access by the Debtors to the books and records of the Sellers following the Closing. <u>See</u> Section 7.07 of the proposed Asset Purchase Agreement.

(k)     <u>Sale or Release of Avoidance Actions</u>. The Debtors are not selling any rights to pursue avoidance claims and causes of action under Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code. <u>See</u> Schedule 2.02(c) of Asset Purchase Agreement.

(l)     <u>Requested Findings as to Successor Liability</u>. Yes. <u>See</u> paragraphs 10 and 19 of the proposed Sale Order.

(m)     <u>Sale Free and Clear of Possessory Leasehold Interests, Licenses or Other Rights</u>. N/A.

(n)     <u>Credit Bid</u>. The proposed Bidding Procedures allow for credit bidding. The Stalking Horse Bidder will credit bid the DIP Loan. The Stalking Horse Bidder also will get credit for the Break-Up Fee and Expense Reimbursement when comparing its bid to any competing bid.

(o)     <u>Relief from Bankruptcy Rule 6004(h)</u>. The Debtors seek such relief with respect to the proposed Bidding Procedures Order and the proposed Sale Order. <u>See</u> paragraph 22 of the proposed Bidding Procedures Order and paragraph 26 of the proposed Sale Order.

**Basis for Relief**

A.    The Bidding Procedures, Including the Break-Up Fee and
        Expense Reimbursement, Are Appropriate.

48.    A debtor may sell, after notice and a hearing, its assets outside the ordinary course

of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a

debtor must demonstrate that the "proffered purchase price is the highest and best offer" under

the circumstances of the case.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food

Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a

primary objective of the Code [is] to enhance the value of the estate at hand"); Official Comm.

Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659

(S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty

with respect to such sales is to obtain the highest price or greatest overall benefit possible for the

estate.") (quoting Cello Bay Co. v. Champion Intl Corn. (In re Atlanta Packaging Prods., Inc.),

99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

49.    The primary goal of any proposed sale is to maximize the value for the estate.

See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (explaining

fiduciary duty of debtor-in-possession to maximize estate's assets); Official Comm. of

Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003); Four B.

Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir.

1997) (goal of bankruptcy sales is to enhance the value of the estate).

50.    Bidding procedures should be approved when they benefit the estate by

maximizing the value of the assets.  In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998)

("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed

to maximize value for the estate").

51.     The use of bid protections such as these has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.  Historically, bankruptcy courts have approved bidding incentives similar to the bid protections solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").  See also In re Integrated Res., 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

52.     The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context.  In Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that, even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives such as the Stalking Horse Fee and Expense Reimbursement must provide benefit to a debtor's estate.  Id. at 533.

53.     The O'Brien opinion identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.  Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

54.     The Debtors respectfully submit that the Bidding Procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Debtors' assets and, therefore, should be approved by this Court.  The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a Bid, and which the Debtors believe is fair and reasonable in view of the assets to be sold.

55.     Further, the bid protections embodied in the Bidding Procedures, including the Stalking Horse Fee and Expense Reimbursement, were judged by the Debtors to be necessary to incentivize the Stalking Horse Bidder to submit its Bid.  The Debtors believe that in addition to the risks ordinarily associated with a competitive bidding process, the Stalking Horse Bidder in this case is taking additional risks by also agreeing to provide the DIP Loan (while waiving fees and expenses under the DIP Loan as a contribution of value to the estate) and the Pre-Petition Unsecured Loan. Accordingly, the Bidding Procedures and, in particular, the proposed Stalking Horse Fee and Expense Reimbursement, are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard.

56.     Moreover, the Stalking Horse Fee of $185,000 (which is approximately 5% of the $3.7 million Purchase Price) sought to be approved by this Motion is comparable to break-up fees approved in other chapter 11 cases in this Court.  See In re Nortel Networks Inc., Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 5.9%); In re Tallygenicom, L.P., Case No. 09-10266 (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); In re Archway Cookies LLC, Case No. 08-12323 (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3.8%); see also In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (Bankr. D. Del. February 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale, or up to 11.4%).

57.     Similarly, the "overbid" protection contained in the Bidding Procedures, requiring Bids to be at least $100,000 greater than the Bid of the Stalking Horse Bidder, plus the Stalking Horse Fee an Expense Reimbursement, is consistent with practice in this District.  This overbid increment is reasonable and appropriate under the circumstances, will enable the Debtors to maximize the value for the Purchased Assets and will not have a chilling effect on bidding.  Overbid increments such as the one proposed herein is consistent with other increments previously approved by this Court.  See Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 overbid increment); New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 20, 2007) (approving $250,000 overbid increment); Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006) (approving $250,000 overbid increment).

58.     Therefore, because the procedures and incentives included in the sale, including the proposed Stalking Horse Fee and Expense Reimbursement, are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Purchased Assets and thereby confer actual benefits upon the estates herein, and are within the range of incentives customarily approved by courts, such procedures should be approved in these Chapter 11 Cases.

B.     Credit Bidding Should Be Authorized.

59.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under section 363 of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured, as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of the their secured claims under § 363(k)").

60.     The Debtors respectfully submit that the provisions of the Bidding Procedures permitting the Debtors' secured creditors (including the Stalking Horse) to credit bid some or all of their claims (including the DIP Loan) for their respective collateral pursuant to section 363(k) of the Bankruptcy Code is appropriate and should be approved.

C.      <u>Sale of the Purchased Assets Is a Product of the Debtors' Reasonable Business Judgment</u>.

61.      Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

62.      Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  <u>See In re Abbotts Dairies of Pa.</u>, 788 F.2d 143 (3d Cir. 1986); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); <u>In re Stroud Ford, Inc.</u>, 164 B.R. 730, 732 (Bankr. M.D. Pa. 1993); <u>Titusville Country Club v. Pennbank (In re Titusville Country Club)</u>, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); <u>In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.</u>, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983); <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 391 (6th Cir. 1986); <u>In re Ionosphere Clubs, Inc.</u>, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); <u>In re Phoenix Steel Corp.</u>, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

63.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business;  (2) that accurate and reasonable notice has been provided to interested persons;  (3) that the trustee has obtained a fair and reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.

64.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim).

65.     The proposed Bidding Procedures meet the "sound business reason" test. First, sound business purposes justify the Sale.  The Debtors believe that a prompt sale of the Purchased Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the estate's assets for distribution to the estate and its creditors. The Debtors further believe that the net benefit to their creditors may be adversely affected absent an immediate sale, as a result of the ever-diminishing value of the assets.  See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").  The Debtors have limited liquidity (only that provided by the Stalking Horse under its Pre-Petition Unsecured

Loan and its proposed DIP Loan).  Absent a sale process in accordance with the Bidding Procedures, the Debtors' only option is conversion to a chapter 7 case which will result in significantly lower values for the Debtors' assets.

66.     The proposed Bidding Procedures also meet the other factors of the "sound business reason" test.  As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders.  Under the circumstances of this case, including the robust marketing of the Debtors' assets prior to the commencement of the Chapter 11 Cases, the Debtors submit that the notice period proposed satisfies the requirements of Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

67.     Finally, the proposed Bidding Procedures satisfy the good faith requirement of Abbotts Dairies.  The Debtors submit that the results of the Auction will be the product of good-faith, arm's-length negotiations with respect to the price and other terms of the sale of the Purchased Assets between the Debtors and highest or best bidder at the conclusion of the Auction.

68.     As set forth above, the Debtors have determined, in the exercise of their sound business judgment, that the sale of the Purchased Assets to the highest or best bidder at the Auction is appropriate and in the best interests of their estate and creditors.  The Sale of the Purchased Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed Bidding Procedures for Sale of the Purchased Assets to the highest or otherwise best bidder at the Auction and approve the Sale presented to the Court at the Sale Hearing.

D.      Sale Should be Free and Clear of Liens, Claims, Encumbrances and Other Interests.

        69.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to
sell and transfer the Purchased Assets to the Stalking Horse Bidder (or Successful Bidder) free
and clear of all Interests, with such Interests to attach to the proceeds of the Sale of the
Purchased Assets, subject to any rights and defenses of the Debtors and other parties in interest
with respect thereto.  Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free
> and clear of any interest in such property of an entity other than the estate,
> only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property free
> and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property is to be
> sold is greater than the aggregate value of all liens on such property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable proceeding,
> to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that
section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least
one of the requirements is met).

        70.     A sale free and clear of Interests is necessary to maximize the value of the
Purchased Assets.  A sale subject to Interests would result in a lower purchase price and be of
substantially less benefit to the Debtors' estates.  A sale free and clear of Interests is particularly
appropriate under the circumstances because any Interests in, to or against the Purchased Assets
that exists immediately prior to the closing of the Sale will attach to the Sale proceeds with the
same validity, priority, force and effect as it had at such time, subject to the rights and defenses

of the Debtors or any party in interest.  The Debtors submit that holders of Interests, if any, will

be adequately protected by the availability of the proceeds of the Sale to satisfy their Interests.

Thus, the proposed Sale satisfies section 363(f) of the Bankruptcy Code.  Moreover, any holder

of an Interest that receives notice of the Sale and which fails to object to the Sale of the

Purchased Assets free and clear of Interests should be deemed to consent to the Sale, thereby

complying with section 363(f)(2) of the Bankruptcy Code.

E.    The Successful Bidder Is Entitled to a Finding of No
      Successor Liability, and a Release and Injunction of Claims.

71.    Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes free from successor liability resulting from pre-existing claims.  See In re

TWA, 322 F.3d 283, 293 (3d Cir. 2003) (affirming bankruptcy court's authorization of sale of

debtor's assets to buyer free and clear of claims asserted against debtor); Ninth Ave. Remedial

Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (N.D. Ill. 1996) (explaining that a bankruptcy

court has the power to sell assets free and clear of any interest that could be brought against the

bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-

Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling claims to proceeds consistent

with sales free and clear under section 363(f) of the Bankruptcy Code); Rubinstein v. Alaska

Pac. Consortium (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982)

(transfer of property through a sale free and clear under section 363(f) was free and clear of

discrimination claims held by debtor's employees).

72.    The Debtors respectfully submit that the Sale Order should provide for a release

of the Stalking Horse Bidder (or the Successful Bidder) from any successor liability, enjoin

creditors and others from bringing claims against the Stalking Horse Bidder (or the Successful

Bidder) arising prior to the Closing, and find that the Stalking Horse Bidder (or the Successful

Bidder) is not a successor-in-interest of the Debtors for any purpose.

F.    Notice of the Proposed Sale Is Reasonable.

73.    The Debtors submit that the notice procedures herein comply fully with

Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the

Sale, the Bidding Procedures, the Auction, the Cure Costs and the Sale Hearing to the Debtors'

creditors and other parties in interest that are entitled to notice of the Sale, as well as to those

parties who have expressed an interest, or may express an interest, in bidding on the Purchased

Assets  As such, the Debtors respectfully request that the Bankruptcy Court approve the notice

procedures proposed above.

G.    The Assumption and Assignment of the Assumed Contracts Should be Authorized.

74.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the
> debtor only if –
>
>     (A) the trustee assumes such contract or lease in accordance with the
>     provisions of this section; and
>
>     (B) adequate assurance of future performance by the assignee of such
>     contract or lease is provided, whether or not there has been a default in
>     such contract or lease.

11 U.S.C. § 365(f)(2).  Under Bankruptcy Code section 365(a), a debtor, "subject to the court's

approval, may assume or reject any executory contract or unexpired lease of the debtor."  11

U.S.C. § 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for

assuming an executory contract of a debtor.  This subsection provides:

> (b)(1)    If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

75.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

76.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

77.    To the extent any defaults exist under any Assigned Contract, any such default will be cured promptly or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Bidder or Successful Bidder (or the Back-Up Bidder, as the case may be) and willingness and ability to perform under

the Assumed Contracts. The Sale Hearing will therefore provide the Bankruptcy Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or Successful Bidder (or the Back-Up Bidder, as the case may be) to provide adequate assurance of future performance under the Assumed Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code. The Bankruptcy Court should therefore authorize the Debtors to assume and assign the Assumed Contracts as set forth herein.

78.    Moreover, to assist in the assumption, assignment and sale of the Assumed Contracts, the Debtors request entry of an order providing that any anti-assignment provisions in the Assumed Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

79.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign leases and contracts despite assignment restrictions in the contract or lease.    11 U.S.C. § 365(f)(1). Section 365(f)(1), by operation of law, invalidates provisions that restrict, prohibit or condition assignment of an unexpired lease or executory contracts. See Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.), 190 B.R. 370 (B.A.P. 9th Cir. 1995). Section 365(f)(3) goes further and prohibits enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See In re Jamesway Corp., 201 B.R. 73, 77-78 (Bankr. S.D.N.Y 1996).

80.    Therefore, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment or sale of the Assumed Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 363(f) of the Bankruptcy Code.

H.    Waiver of Automatic Ten-Day Stay Under
      Bankruptcy Rules 6004(g) and 6006(d) Is Appropriate.

81.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  The Debtors request that any order approving the Purchase Agreement and the assumption and assignment of the Assumed Contracts be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

82.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, the leading treatise on bankruptcy suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006).  Additionally, Collier suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

83.    The Debtors respectfully submit that waiver of any applicable stays is appropriate under the circumstances to allow implementation of the Bidding Procedures immediately following entry of the Bidding Procedures Order, and to allow the Closing to proceed immediately following entry of the Sale Order.  The Debtors have limited postpetition financing

and each day that passes jeopardizes the Debtors' ability to consummate the Sale.  Absent such

relief, the Debtors bear risk of irreparable harm in the event that the Closing fails to occur due to

delays associated with such ten-day periods.

I.      The Stalking Horse Bidder (or the Successful Bidder) Is a Good-Faith
        Purchaser Pursuant to Section 363(m) of the Bankruptcy Code and the
        Sale Should Not Be Avoided Pursuant to Section 363(n) of the Bankruptcy Code.

84.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest

in  property  purchased  from  a  debtor  notwithstanding  that  the  sale  conducted  under

Section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The  reveral  or  modification  on  appeal  of  an  authorization  under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an entity
> that purchased . . . such property in good faith, whether or not such entity
> knew of the pendency of such appeal, unless such authorization and such
> sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon  which  third  parties  rely.'"    In re Chateaugay Corp., 1993 U.S. Dist. LEXIS 6130, *9

(S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 at 147).  See also

Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("section 363(m) . . . provides

that good faith transfers of property will not be affected by the reversal or modification on appeal

of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

85.     The Stalking Horse Bidder's Bid was  the  product of good-faith, arm's-length

negotiations.    Moreover,  the  selection  of  the  Successful  Bidder  pursuant  to  the  Bidding

Procedures will be the product of a good-faith competitive bidding process.  The Debtors intend

to seek a finding at the Sale Hearing that the Stalking Horse Bidder (or the Successful Bidder) is

a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

86.     Similarly, the Debtors intend to seek a finding at the Sale Hearing that the terms and conditions of the Asset Purchase Agreement and the Sale, including without limitation the consideration provided in respect thereof, are fair and reasonable and shall not be avoided under section 363(n) of the Bankruptcy Code, as a result of any improper or collusive bidding or otherwise.

J.      <u>No Severance or Paid Time Off for Transferred Employees</u>.

87.     Prior to the Closing, Sellers will provide notice to any employee of Sellers who is offered and accepts employment by the Stalking Horse Bidder at comparable compensation levels that such employee will not be entitled to severance and/or paid time off under Seller's practices.

88.     The Debtors hereby respectfully request that upon receipt of such notice, any employee of Sellers who is offered and accepts employment by the Stalking Horse Bidder at comparable compensation levels shall be deemed to waive any claim for severance and/or paid time off against the Debtors' estates.

### **Notice**

89.     The Debtors shall provide notice of this Motion by facsimile, email and/or overnight mail to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' 20 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (iii) counsel to Oxford, the Debtors' prepetition secured lender; (iv) counsel to Stalking Horse Bidder (who is also the Debtors proposed DIP Lender); (v) the Securities and Exchange Commission; (vi) the Office of the United States Attorney for the District of Delaware; (vii) any person or entity known to have asserted a lien or interest in all or any portion of the Purchased Assets, and their counsel if known; (viii) all taxing authorities or recording offices known to have an interest in the relief requested; and (ix) the Food and Drug Administration.

90.     In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

## No Prior Request

91.     No prior motion for the relief requested herein has been made to this or any other court.

## Conclusion

WHEREFORE, for the reasons set forth herein and in the Hansen Declaration, the

Debtors respectfully request entry of an order granting the relief request herein and such other

and further relief as the Court deems just and proper.

Dated:  March 21, 2019
        Wilmington, Delaware

                                           **THE ROSNER LAW GROUP LLC**

                                           */s/ Scott J. Leonhardt*
                                           Frederick B. Rosner (DE # 3995)
                                           Scott J. Leonhardt (DE # 4885)
                                           Jason A. Gibson (DE # 6091)
                                           824 Market Street, Suite 810
                                           Wilmington, DE 19801
                                           Tel.: (302) 777-1111
                                           Email: rosner@teamrosner.com
                                                    leonhardt@teamrosner.com
                                                    gibson@teamrosner.com

                                           *Proposed Counsel for the Debtors and Debtors in*
                                         *Possession*