# EXHIBIT B

**ASSET PURCHASE AGREEMENT**

among

**MABVAX THERAPEUTICS HOLDINGS, INC.,**

**MABVAX THERAPEUTICS, INC.**

and

**BIONTECH RESEARCH AND DEVELOPMENT, INC.**

dated as of

March 20, 2019

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................ 1

ARTICLE II PURCHASE AND SALE ............................................ 10

    Section 2.01 Purchase and Sale of Assets........................................ 10

    Section 2.02 Excluded Assets ......................................................... 12

    Section 2.03 Assumed Liabilities ................................................... 12

    Section 2.04 Excluded Liabilities ................................................... 13

    Section 2.05 Assignment of Contracts............................................ 14

    Section 2.06 Assignment of Assets................................................. 15

    Section 2.07 Further Conveyances and Assumptions...................... 16

    Section 2.08 Purchase Price ........................................................... 16

    Section 2.09 Purchase Price Deposit .............................................. 16

    Section 2.10 Allocation of Purchase Price...................................... 17

    Section 2.11 Certain Tax Matters ................................................... 18

ARTICLE III CLOSING ................................................................. 19

    Section 3.01 Closing ...................................................................... 19

    Section 3.02 Closing Deliverables ................................................. 19

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 21

    Section 4.01 Organization and Qualification of Sellers.................... 21

    Section 4.02 Authority of Sellers.................................................... 21

    Section 4.03 No Conflicts; Consents .............................................. 21

    Section 4.04 Title to Purchased Assets ........................................... 22

    Section 4.05 Assets Necessary to Business .................................... 23

    Section 4.06 Intellectual Property; IT Systems............................... 23

Section 4.07 Purchased Contracts ....................................................................... 25

Section 4.08 Real Property ................................................................................... 25

Section 4.09 Tangible Personal Property ............................................................. 27

Section 4.10 Inventory ......................................................................................... 27

Section 4.11 Compliance With Laws; Permits; Insurance ................................... 27

Section 4.12 Legal Proceedings; Governmental Orders ...................................... 28

Section 4.13 Environmental Matters .................................................................... 28

Section 4.14 Employees; Seller Plans ................................................................. 29

Section 4.15 Taxes ............................................................................................... 30

Section 4.16 Brokers ............................................................................................ 31

Section 4.17 No Other Representations and Warranties ....................................... 31

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 31

Section 5.01 Organization of Buyer ..................................................................... 31

Section 5.02 Authority of Buyer .......................................................................... 31

Section 5.03 No Conflicts; Consents ................................................................... 32

Section 5.04 Brokers ............................................................................................ 32

Section 5.05 Sufficiency of Funds ....................................................................... 32

Section 5.06 Legal Proceedings ........................................................................... 32

Section 5.07 Investigation by Buyer .................................................................... 32

ARTICLE VI BANKRUPTCY COURT MATTERS ................................................................ 33

Section 6.01 Competing Transactions .................................................................. 33

Section 6.02 Bankruptcy Court Filings ................................................................ 33

ARTICLE VII COVENANTS ................................................................................................... 35

Section 7.01 Conduct of Business Prior to the Closing ....................................... 35

Section 7.02 Access to Information ..................................................................... 36

Section 7.03 Notice of Certain Events ............................................................... 36

Section 7.04 Employees and Employee Benefits. ............................................. 37

Section 7.05 Confidentiality .............................................................................. 38

Section 7.06 Consents ........................................................................................ 38

Section 7.07 Books and Records ....................................................................... 38

Section 7.08 Public Announcements ................................................................. 38

Section 7.09 Further Assurances ....................................................................... 39

Section 7.10 Wrong Pockets .............................................................................. 39

Section 7.11 DIP Financing ............................................................................... 39

Section 7.12 No Successor Liability .................................................................. 40

ARTICLE VIII CONDITIONS TO CLOSING ............................................................ 40

Section 8.01 Conditions to Obligations of All Parties ..................................... 40

Section 8.02 Conditions to Obligations of Buyer ............................................ 41

Section 8.03 Conditions to Obligations of Sellers ........................................... 43

ARTICLE IX TERMINATION ....................................................................................... 44

Section 9.01 Termination ................................................................................... 44

Section 9.02 Effect of Termination ................................................................... 47

Section 9.03 Termination Fee; Expense Reimbursement ................................. 47

ARTICLE X MISCELLANEOUS .................................................................................. 49

Section 10.01 No Survival of Representations and Warranties ........................ 49

Section 10.02 Expenses ..................................................................................... 49

Section 10.03 Notices ........................................................................................ 49

Section 10.04 Interpretation .............................................................................. 50

Section 10.05 Headings ......................................................................................... 50

Section 10.06 Severability ..................................................................................... 50

Section 10.07 Entire Agreement ............................................................................ 51

Section 10.08 Successors and Assigns................................................................... 51

Section 10.09 No Third-party Beneficiaries ......................................................... 51

Section 10.10 Amendment and Modification; Waiver .......................................... 51

Section 10.11 Governing Law; Jurisdiction; Waiver of Jury Trial...................... 52

Section 10.12 Specific Performance ...................................................................... 52

Section 10.13 Counterparts ................................................................................... 52

Exhibit A    DIP Loan Agreement

Exhibit B    Bidding Procedures Order

Exhibit C    Bidding Procedures

Exhibit D    Sale Order

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of March 20, 2019, is entered into among MabVax Therapeutics Holdings, Inc. ("**MabVax Holdings**"), a Delaware corporation, MabVax Therapeutics, Inc. ("**MabVax Therapeutics**", together with MabMax Holdings, the "**Sellers**", and each being a "**Seller**"), a Delaware corporation and a wholly-owned subsidiary of MabVax Holdings, and BioNTech Research and Development, Inc. ("**Buyer**"), a Delaware corporation.

## RECITALS

WHEREAS, Sellers are engaged through an operational business unit in the business of developing therapeutic antibodies and CAR-Ts (the "**Business**");

WHEREAS, Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Sellers, substantially all the assets of the Business, subject to the terms and conditions set forth herein; and

WHEREAS, Sellers and Buyer anticipate effecting the sale of substantially all the assets of the Business through and as part of a case (the "**Bankruptcy Case**") filed under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Accounts Receivable**" has the meaning set forth in Section 2.01(h).

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.10.

"**Ancillary Documents**" means the DIP Loan Agreement, the Bill(s) of Sale, the Assignment and Assumption Agreement(s), Intellectual Property Assignment(s), Assignment and Assumption of Leases, and any other agreements, instruments and documents required to be delivered at the Closing.

"**Apportioned Taxes**" has the meaning set forth in Section 2.11(c).

"**Assigned Contracts**" has the meaning set forth in Section 2.01(b).

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 3.02(a)(ii).

"**Assignment and Assumption of Lease**" has the meaning set forth in Section 3.02(a)(iv).

"**Assumed Cure Costs**" means all Cure Costs up to an aggregate amount of $1,400,000.00.

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Auction**" means the auction contemplated by the Bidding Procedures Order.

"**Avoidance Action Claims**" means any claims or causes of action held by Sellers' bankruptcy estates under chapter 5 of the Bankruptcy Code.

"**Bankruptcy Case**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Backup Bidder**" means the party whose bid is determined to be the next highest bid after the bid of the Successful Bidder at the Auction.

"**Backup Bidder Outside Date**" has the meaning set forth in Section 9.02.

"**Bidding Procedures**" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, in the form of Exhibit C attached hereto subject to (a)

immaterial modifications or clarifications or (b) such other changes to which Buyer consents in writing.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving, among other things, the Bidding Procedures for conducting a sale and auction of the Purchased Assets, and authorizing Sellers' performance of their obligations under this Agreement, in the form of Exhibit B attached hereto with (a) immaterial modifications or clarifications or (b) such other changes to which Buyer consents in writing.

"**Bill of Sale**" has the meaning set forth in Section 3.02(a)(i).

"**Books and Records**" has the meaning set forth in Section 2.01(m).

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in the State of California, USA, or Mainz, Germany are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in Section 8.03(e).

"**Closing**" has the meaning set forth in Section 3.01.

"**Closing Date**" has the meaning set forth in Section 3.01.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competing Transaction**" has the meaning set forth in Section 6.01.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Cure Costs**" means monetary amounts that must be paid and obligations that otherwise must be satisfied under Sections 365(b)(l)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Assigned Contract, as agreed upon by the parties hereto or determined by the Bankruptcy Court pursuant to the procedures in the Bidding Procedures Order.

"**Cure Notice**" has the meaning set forth in Section 6.02(c).

"**DIP Loan Agreement**" means that certain Super-Priority Debtor-in-Possession Credit Agreement between Buyer as lender and Sellers as borrowers, attached hereto as Exhibit A.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Employee**" means an individual who is currently an employee, independent contractor or consultant of the Business or was an employee, independent contractor or consultant of the Business in the past four years.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Contracts**" has the meaning set forth in Section 2.02(a).

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Expense Reimbursement**" has the meaning set forth in Section 9.04(a).

"**Final Order**" means an order of the Bankruptcy Court or other court of competent jurisdiction (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial, request for stay, motion or petition for reconsideration, application or request for review, or other similar motion, application, notice or request (collectively, a "**Challenge**") has been timely filed, or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further Challenge thereon; (b) as to which the time for instituting or filing a Challenge shall have expired; and (c) as to which no stay is in effect.

"**FIRPTA Certificates**" has the meaning set forth in Section 8.02(n).

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally

occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Independent Accountant**" means an impartial nationally recognized firm of independent certified public accountants other than Sellers' accountants or Buyer's accountants.

"**Insurance Policies**" has the meaning set forth in Section 4.11(e).

"**Intellectual Property**" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("**Trademarks**"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**"); (d) internet domain names, whether or not Trademarks, all associated web addresses, URLs, websites and web pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein ("**Trade Secrets**"); (h) computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof ("**Software**"); and (i) all other intellectual or industrial property and proprietary rights.

"**Intellectual Property Agreements**" means all licenses (including, without limitation, all in-licenses and all out-licenses), sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to any Intellectual Property to which any Seller is a party, beneficiary or otherwise bound.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Sellers or held for use in the conduct of the Business as currently conducted or proposed to be conducted, including, without limitation, all Intellectual Property owned or held for use by Sellers relating to the HuMab-5B1 and Anti-GD2 antibodies or the Sialyl Lewis A and GD2 CAR-Ts, together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Sellers with respect to such Intellectual Property; and (ii) claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the date hereof, including all

rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof, but excluding any Intellectual Property licensed by Sellers pursuant to any Excluded Contracts.

"**Intellectual Property Assignment**" has the meaning set forth in Section 3.02(a)(iii).

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued Patents, registered Trademarks, domain names and Copyrights, and pending applications for any of the foregoing.

"**Inventory**" has the meaning set forth in Section 2.01(d).

"**IT Systems**" has the meaning set forth in Section 4.06(h).

"**Knowledge of Sellers or Sellers' Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of any Seller, after due inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in Section 4.10(b).

"**Leases**" has the meaning set forth in Section 4.10(b).

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Material Adverse Effect**" means any event, change, occurrence or state of facts that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on the assets, Liabilities, business, properties, financial condition or results of operations of the Business, taken as a whole, provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) changes in the U.S. or global economy or capital markets in general but that do not have a disproportionate effect on the Business relative to other businesses in the industry in which the Business operates, (ii) changes that affect generally the industry in which the Business operates but that do not have a disproportionate effect on the Business relative to other businesses in the industry in which the Business operates, (iii) changes after the Agreement Date in any applicable Law or GAAP,(iv) the commencement of the Bankruptcy Case, (v) the announcement of this Agreement or the transactions contemplated hereby

in accordance with the terms hereof, (vi) the sale process of the Business to the extent in accordance with the terms of the Bidding Procedures Order.

"**Necessary Consent**" has the meaning set forth in Section 2.06(b).

"**Outside Closing Date**" has the meaning set forth in Section 9.01(b)(ii).

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Encumbrances**" has the meaning set forth in Section 4.04.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Personal Property Leases**" has the meaning set forth in Section 4.09.

"**Petition Date**" has the meaning set forth in Section 6.02(a).

"**Post-Closing Tax Period**" has the meaning set forth in Section 2.11(c).

"**Pre-Closing Tax Period**" has the meaning set forth in Section 2.11(c).

"**Previously Omitted Contract**" has the meaning set forth in Section 2.05(d).

"**Previously Omitted Contract Designation**" has the meaning set forth in Section 2.05(d).

"**Previously Omitted Contract Notice**" has the meaning set forth in Section 2.05(d).

"**Purchase Price**" has the meaning set forth in Section 2.08.

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representatives**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Hearing**" means the hearing at which the Bankruptcy Court considers approval of the Sale Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

"**Sale Motion**" has the meaning set forth in Section 6.02(a).

"**Sale Order**" means an order entered by the Bankruptcy Court or other court of competent jurisdiction in the form of Exhibit D attached hereto, subject to (a) immaterial modifications or clarifications or (b) such other changes to which Buyer consents in writing.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificates**" has the meaning set forth in Section 8.02(k).

"**Seller Plan**" means each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off (PTO), medical, vision, dental, disability, welfare, Code Section 125 cafeteria, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by any Seller for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual, or under which any Seller or any of its ERISA Affiliates has or may have any Liability with respect to any Employee.

"**Successful Bidder**" means the prevailing party at the conclusion of the Auction.

"**Successor**" has the meaning set forth in Section 9.04(b).

"**Tangible Personal Property**" has the meaning set forth in Section 2.01(e).

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Termination Fee**" has the meaning set forth in Section 9.04(a).

"**Transfer Taxes**" has the meaning set forth in Section 2.11(b).

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

# ARTICLE II
# PURCHASE AND SALE

**Section 2.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, free and clear of any Encumbrances other than Permitted Encumbrances, all of Sellers' right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible, wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "**Purchased Assets**"), including, without limitation, the following:

(a)      all Intellectual Property Assets;

(b)      subject to Section 2.05, all Contracts, including Intellectual Property Agreements, which are set forth on Section 2.01(b) of the Disclosure Schedules, and in connection with which an order has been entered by the Bankruptcy Court (which may be the Sale Order), authorizing the assumption and assignment of such Contracts by Buyer (the "**Assigned Contracts**");

(c)      all Leased Real Property;

(d)      all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories related to the Business or any Purchased Asset ("**Inventory**");

(e)      all furniture, fixtures, equipment, devices, machinery, tools, vehicles, supplies and other tangible personal property related to the Business or any Purchased Asset, including, without limitation, the items listed in Section 2.01(e) of the Disclosure Schedules (the "**Tangible Personal Property**");

(f)      all Permits related to the Business which are held by Sellers and all of Sellers' pending applications for Permits related to the Business, including, without limitation, all Permits, Investigational New Drug applications and other applications for Permits related to the Business as currently conducted or to the ownership and use of the Purchased Assets;

(g)      the IT Systems, including, without limitation, the items listed in Section 2.01(g) of the Disclosure Schedules;

(h)      all accounts or notes receivable held by Sellers, and any security, claim, remedy or other right related to the Business or any Purchased Asset ("**Accounts Receivable**");

(i)      all rights to any Actions of any nature available to or being pursued by any Seller to the extent related to the Business, any Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise, other than the rights to Actions specifically set forth on Section 2.02(c) of the Disclosure Schedules;

(j)      all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees related to the Business or any Purchased Asset including, without limitation, any such item relating to the payment of Taxes and including, without limitation, the remaining security deposit of approximately $37,653.53 discussed in Section 2.01(j) of the Disclosure Schedules;

(k)      all of Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Asset;

(l)      all insurance benefits, including rights and proceeds, arising from or relating to the Business or any of the Purchased Assets or the Assumed Liabilities; provided, however, any insurance policies for D&O or other fiduciary coverage shall stay with Sellers until they expire by their terms in July 2019;

(m)      originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, personnel files, lists of current and prospective customers, vendors and suppliers, customer purchasing histories, price lists, distribution records, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence and filings related to any Investigational New Drugs and clinical trials with any Governmental Authority), rights of reference to any Drug Master Files, sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements,

marketing and promotional surveys, material and research and files relating to the Business or any Purchased Asset ("**Books and Records**"); and

      (n)     all goodwill associated with the Business or any Purchased Asset.

**Section 2.02    Excluded Assets.** Notwithstanding any provision of this Agreement to the contrary, nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers will retain all right, title and interest to, in and under the Excluded Assets. The term "**Excluded Assets**" means all assets, properties and rights of Sellers other than the Purchased Assets. Without limiting the generality of the foregoing, the Excluded Assets shall include the following assets:

      (a)     Contracts, including Intellectual Property Agreements, that are not Assigned Contracts (the "**Excluded Contracts**");

      (b)     the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Sellers;

      (c)     the assets, properties and rights specifically set forth on Section 2.02(c) of the Disclosure Schedules;

      (d)     Avoidance Action Claims;

      (e)     commercial tort claims; and

      (f)     the rights which accrue or will accrue to Sellers under this Agreement and the Ancillary Documents.

**Section 2.03    Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Sellers (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

      (a)     all Liabilities from the ownership or operation of the Purchased Assets by Buyer solely to the extent such Liabilities arise after the Closing;

      (b)     all Liabilities in respect of the Assigned Contracts but solely to the extent that such Liabilities thereunder arise after the Closing, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers on or prior to the Closing.

**Section 2.04   Excluded Liabilities.** Notwithstanding anything to the contrary set forth herein, Sellers expressly acknowledge and agree that Buyer will not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, including on the basis of any Law imposing successor liability, other than the Assumed Liabilities and the obligations of Buyer under this Agreement (all such Liabilities that Buyer is not assuming being referred to collectively as the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)     any Liabilities relating to or arising out of the Excluded Assets;

(b)     any Liabilities under the Excluded Contracts or any other Contracts, including Intellectual Property Agreements, (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Sellers of such Contracts prior to Closing;

(c)     all Liabilities with respect to the Purchased Assets and Assigned Contracts that arose or accrued on or prior to the Closing Date, other than Assumed Cure Costs;

(d)     any Liabilities of Sellers for any present or former employees, officers, directors, retirees, independent contractors or consultants of Sellers, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(e)     any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Sellers (including with respect to any breach of fiduciary obligations by same);

(f)     any Liabilities associated with debt, loans or credit facilities of Sellers and/or the Business owing to financial institutions;

(g)     any accounts payable of Sellers (i) which constitute intercompany payables owing to Affiliates of Sellers; (ii) which constitute debt, loans or credit facilities to financial institutions; or (iii) which did not arise in the ordinary course of business;

(h)     any Liabilities of the Business relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Sellers on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

{00025297. }                                    13

(i)     any Liability for (i) Taxes of Sellers (or any stockholder or Affiliate of Sellers) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Sellers; or (iii) any other Taxes of Sellers (or any stockholder or Affiliate of Sellers) of any kind or description (including any Liability for Taxes of Sellers (or any stockholder or Affiliate of Sellers) that become Liabilities of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(j)     any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date; and

(k)     any Liabilities arising out of, in respect of or in connection with the failure by Sellers or any of their Affiliates to comply with any Law or Governmental Order.

## Section 2.05    Assignment of Contracts

(a)     Section 2.01(b) of the Disclosure Schedules sets forth a list of all Contracts to which, to Sellers' Knowledge, a Seller is a party and which are to be included in the Assigned Contracts. Sellers shall make such deletions to Section 2.01(b) of the Disclosure Schedules as Buyer shall, in its sole discretion, request in writing. Any such deleted Contract shall be deemed to no longer be an Assigned Contract. Any Contract of Sellers that is not listed on Section 2.01(b) of the Disclosure Schedules shall not be considered an Assigned Contract and shall be deemed an Excluded Contract. Buyer and Sellers acknowledge and agree that there shall be  no  reduction in the Purchase Price if Buyer elects to delete any Contracts from Section 2.01(b) of the Disclosure Schedules.

(b)     Sellers shall take all actions required to assume and assign the Assigned Contracts to Buyer, including using commercially reasonable efforts to facilitate any negotiations with the counterparties to such Assigned Contracts and to obtain a finding under the Sale Order that the proposed assumption and assignment of the Assigned Contracts to Buyer satisfy all applicable requirements of Section 365 of the Bankruptcy Code. Notwithstanding the foregoing, Sellers shall not pay any Cure Costs without the consent of Oxford Finance LLC.

(c)     At the Closing, (i) Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) or the Assignment and Assumption of Lease(s), as applicable, assign to Buyer (the consideration for which  is included  in  the Purchase  Price) each of the Assigned Contracts that is capable of being assigned  under applicable Law and (ii) Buyer shall assume and discharge the Assumed Liabilities (if any)  under  the Assigned Contracts, pursuant to the Assignment and Assumption Agreement(s) or the Assignment and Assumption of Lease(s), as applicable.

(d)      If prior to or following Closing, it is discovered that a Contract should have been listed in Section 2.01(b) of the Disclosure Schedules but was not so listed (any such Contract, a "**Previously Omitted Contract**")*,* Sellers shall, promptly (but in no event later than two Business Days following the discovery thereof) notify Buyer in writing of such Previously Omitted Contract. Buyer shall deliver written notice to Sellers promptly thereafter, designating such  Previously Omitted Contract as   "Assumed" or "Excluded" (a "**Previously Omitted Contract Designation**"). A Previously Omitted Contract designated as "Excluded," or with respect to which Buyer fails to deliver a Previously Omitted Contract Designation, shall be an Excluded Contract. If Buyer designates a Previously Omitted Contract as "Assumed", Section 2.01(b) of the Disclosure Schedules shall be amended to include such Previously Omitted  Contract and Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of Sellers' intention to assign and Buyer's intention to assume such Previously Omitted Contract in accordance with this Agreement. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten Business Days to object, in writing to Sellers and Buyer, to the assumption of its Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before Bankruptcy Court to approve the assumption. If no objection is timely served on Sellers and Buyer, Sellers shall obtain an order of the Bankruptcy Court approving the assumption of the Previously Omitted Contract. Sellers and Buyer shall execute, acknowledge and deliver such other instruments and take commercially reasonable efforts as are reasonably practicable for Buyer to assume the rights and obligations under such Previously Omitted Contract.

### Section 2.06   Assignment of Assets

(a)      Buyer may, in its discretion by written notice to Sellers, designate any of the Purchased Assets as additional Excluded Assets, and any of the Excluded Assets as additional Purchased Assets, which notice shall set forth in reasonable detail the Purchased Assets or Excluded Assets so designated. Buyer and Sellers acknowledge and agree that there shall be no reduction in the Purchase Price if Buyer elects to designate any Purchased Assets (other than Assumed Contracts) as Excluded Assets and there shall be no increase in the Purchase Price if Buyer elects to designate any Excluded Assets (other than Excluded Contracts) as Purchased Assets. Notwithstanding any other provision hereof, the Liabilities of Sellers under or related to any Purchased Asset excluded under this paragraph will constitute Excluded Liabilities.

(b)      Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset (including any Assigned Contract) if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would reasonably likely to subject Buyer, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any

license or permit by, any third party thereto (each such action, a "**Necessary Consent**"), would constitute a breach, default or violation thereof or of any Law or in any way adversely affect the rights of Buyer thereunder or (ii) the Bankruptcy Court has not entered an order approving such assignment or transfer. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Sellers and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset (including any Assigned Contract) or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer as Buyer may reasonably request. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this section, be ineffective or would adversely affect the rights of Buyer to such Purchased Asset following the Closing, (x) Sellers and Buyer will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as soon as reasonably practicable, and (3) upon receipt of any applicable Necessary Consents, to transfer or assign the applicable Purchased Asset to Buyer, and (y) Sellers will, and will cause their respective Affiliates to, cooperate with Buyer in good faith without further consideration in any arrangement reasonably acceptable to Buyer and Sellers intended to provide Buyer with the benefit of any such Purchased Assets.

**Section 2.07   Further Conveyances and Assumptions.** From time to time following the Closing, Sellers and Buyer will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to each Seller and its Affiliates and their respective successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective the transactions contemplated herein; provided that nothing in this section will require Buyer or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

**Section 2.08   Purchase Price.** The aggregate purchase price for the Purchased Assets shall be  the aggregate of (i) $2,300,000.00 and (ii) Assumed Cure Costs (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities. The Purchase Price shall be paid as provided in Section 3.02(b)(i).

**Section 2.09   Purchase Price Deposit**. Promptly upon the entry of the Bidding Procedures Order by the Bankruptcy Court, Buyer shall deposit the sum of $370,000.00 (the "**Deposit Amount**") in a segregated bank account in the name of Sellers in accordance with the terms of the Bidding Procedures Order. The Deposit Amount will be released to Sellers or returned to Buyer as follows:

{00025297. }                                              16

(a)      if this Agreement is terminated by Sellers pursuant to Section 9.01(c)(i) then the Deposit Amount shall be released to Sellers (and such Deposit Amount will be deemed fully earned by Sellers as compensation and consideration for entering into this Agreement);

(b)      if this Agreement is terminated for any reason other than by Sellers pursuant to Section 9.01(c)(i) then the Deposit Amount shall be returned to Buyer within one (1) day following such termination; or

(c)      if the Closing occurs, the Deposit Amount shall be credited towards the Purchase Price payable by Buyer, and the Deposit Amount shall be released to Sellers upon the earlier to occur of (i) completion of Sellers' post-Closing obligations under this Agreement to Buyer's satisfaction or (ii) the one hundred and eightieth day following the Closing Date.

The Deposit Amount shall only constitute property of Sellers' bankruptcy estates in the event that the Deposit Amount is required to be released to Sellers in accordance with the terms of this Agreement. The obligation to return the Deposit Amount in accordance with the provisions of this Section 2.09 will (w) be binding upon and enforceable against the Sellers immediately upon the Bankruptcy Court's entering the Bidding Procedures Order, (x) not be terminable or dischargeable thereafter for any reason, (y) survive any subsequent conversion, dismissal or consolidation of the Bankruptcy Case, any plan of reorganization or liquidation in the Bankruptcy Case, and (z) survive the subsequent termination of this Agreement by any means. For the avoidance of doubt, the obligation to return the Deposit Amount, as and when required under this Agreement, is intended to be, and upon entry of the Bidding Procedures Order will be, binding upon (A) Sellers, (B) any successors or assigns of Sellers, (C) any trustee, examiner or other representative of Sellers' bankruptcy estates, (D) the reorganized Sellers and (E) any other entity vested or revested with any right, title or interest in or to Sellers, or any other Person claiming any rights in or control (direct or indirect) over Sellers (each of (A) through (E), a "**Successor**") as if such Successor were a Seller hereunder. The obligation to return the Deposit Amount, as and when required under this Agreement, may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

**Section 2.10   Allocation of Purchase Price.** Sellers and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including tax and financial accounting) as shown on the allocation schedule (the "**Allocation Schedule**"). A draft of the Allocation Schedule shall be prepared by Buyer and delivered to Sellers within ten days following the Closing Date. If Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Allocation Schedule, Sellers and Buyer shall negotiate in good faith to resolve such dispute; provided, however, that if Sellers and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within thirty days following the Closing Date, such dispute shall be resolved by an Independent Accountant. The fees and expenses of such accounting firm shall be borne equally by Sellers and Buyer. Buyer and Sellers shall file all Tax Returns (including amended

returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

### Section 2.11   Certain Tax Matters.

(a)     Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of tax Law. All such withheld amounts shall be treated as delivered to Sellers hereunder.

(b)     Any sales, use, gross-receipts, excise, value-added, property, transfer, or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (collectively "**Transfer Taxes**"), and that are not exempt under the Bankruptcy Code, shall be borne and timely paid by Sellers. Sellers shall, at their own expense, timely file any Tax Return or other document required to be filed with respect to such Transfer Taxes, and Buyer shall join in the execution of any such Tax Return if required by Law. If Buyer is required by Law to file any such Tax Return, Buyer shall notify Sellers of the amount of the Transfer Taxes shown to be due on such Tax Return and Sellers shall reimburse Buyer for one hundred percent of the amount of such Transfer Taxes by wire transfer of immediately available funds within ten days of receipt of such notice to an account or accounts designated by Buyer.

(c)     All real property, personal property and similar ad valorem Taxes, if any, levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Taxes**") shall be apportioned between Sellers and Buyer based on the number of days of such taxable period ending on and including the Closing Date (such portion of such taxable period, the "**Pre-Closing Tax Period**") and the number of days of such taxable period after the Closing Date (such portion of such taxable period, the "**Post-Closing Tax Period**"). Sellers shall be responsible for the proportionate amount of such Apportioned Taxes that is attributable to the Pre-Closing Tax Period and such amount shall be an Excluded Liability, and Buyer shall be responsible for the proportionate amount of such Apportioned Taxes that is attributable to the Post-Closing Tax Period and such amount shall be an Assumed Liability. Any Apportioned Taxes shall be timely paid, and all applicable Tax Returns shall be timely filed, as provided by applicable Law. The paying party (or parties, as applicable) shall be entitled to reimbursement from the non-paying party (or parties, as applicable) for the non-paying party's (or parties', as applicable) portion of the Apportioned Taxes in accordance with this section. Upon payment of any such Apportioned Taxes, the paying party (or parties, as applicable) shall present a statement to the non-paying party (or parties, as applicable) setting forth the amount of reimbursement to which the paying party (or parties, as applicable) is entitled under this section, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying party (or parties, as applicable) shall make such reimbursement by wire transfer in immediately

available funds within ten days of receipt of such statement to an account designated by the paying party (or parties, as applicable).

(d)    Buyer and Sellers agree to provide each other with such information and assistance as is reasonably necessary and is reasonably requested by the other party (or parties, as applicable), including access to records, Tax Returns and personnel, for the preparation and filing of any Tax Returns or for the defense of any tax claim or assessment, whether in connection with a tax proceeding or otherwise.

## ARTICLE III
## CLOSING

**Section 3.01    Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of The Rosner Law Group LLC located at 824 N. Market Street, Suite 810, Wilmington, DE 19801, USA, at 10:00 a.m. (Prevailing Eastern Time), on the first Business Day after all of the conditions to Closing set forth in ARTICLE VIII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other time, date or place as Sellers and Buyer may designate in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Sellers shall deliver to Buyer the following:

(i)    one or more duly executed bills of sale in form and substance satisfactory to Buyer (each being a "**Bill of Sale**"), transferring the tangible personal property included in the Purchased Assets to Buyer;

(ii)    one or more duly executed assignment and assumption agreements in form and substance satisfactory to Buyer (each being a "**Assignment and Assumption Agreement**"), effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)    one or more duly executed assignments in form and substance satisfactory to Buyer (each being a "**Intellectual Property Assignment**"), transferring all of Sellers' right, title and interest in and to the Intellectual Property Assets to Buyer;

(iv)    with respect to each Lease, a duly executed assignment and assumption of lease in form and substance satisfactory to Buyer (each being an "**Assignment and Assumption of Lease**");

(v)    one or more duly executed powers of attorney in form and substance satisfactory to Buyer;

(vi)    the Seller Closing Certificates;

(vii)    the FIRPTA Certificates;

(viii)    the certificates of the Secretary or Assistant Secretary of each Seller required by Section 8.02(l) and Section 8.02(m);

(ix)    a copy of the Sale Order as entered by the Bankruptcy Court; and

(x)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Sellers the following:

(i)    the Purchase Price less the Deposit Amount, less any amount outstanding under the DIP Loan Agreement, which shall be delivered by wire transfer of immediately available funds to the account identified in Schedule 3.02(b)(i);

(ii)    all Assignment and Assumption Agreements duly executed by Buyer;

(iii)    with respect to each Lease, an Assignment and Assumption of Lease duly executed by Buyer;

(iv)    the Buyer Closing Certificate;

(v)    the certificates of the Secretary or Assistant Secretary of Buyer required by Section 8.03(f) and Section 8.03(g); and

(vi)    such other documents or instruments as Sellers reasonably request and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Sellers represent and warrant to Buyer that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Qualification of Sellers.** Each Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and, subject to any limitations that may be imposed on such Seller as a result of filing a petition for relief under the Bankruptcy Code, has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. Section 4.01 of the Disclosure Schedules sets forth each jurisdiction in which each Seller is licensed or qualified to do business, and each Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary.

**Section 4.02   Authority of Sellers.** Subject to entry of the Bidding Procedures Order and Sale Order, as applicable, each Seller has the requisite corporate power and authority to enter into this Agreement and the Ancillary Documents to which such Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Seller of this Agreement and any Ancillary Document to which such Seller is a party, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate or similar action on the part of such Seller. This Agreement has been duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by Buyer and the entry of the Sale Order) this Agreement constitutes a legal, valid and binding obligation of each Seller enforceable against such Seller in accordance with its terms. When each Ancillary Document to which a Seller is or will be a party has been duly executed and delivered by such Seller (assuming due authorization, execution and delivery by each other party thereto and the entry of the Sale Order), such Ancillary Document will constitute a legal and binding obligation of such Seller enforceable against it in accordance with its terms.

**Section 4.03   No Conflicts; Consents.** Subject to the Sale Order having been entered, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of such Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Sellers, the Business or the Purchased Assets; (c) except as set out in Section 4.03 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the

acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which a Seller is a party or by which a Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any Seller in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except to the extent required if the Sale Order is not entered and except as set out in Section 4.03 of the Disclosure Schedules.

Section 4.04   **Title to Purchased Assets.** Subject to bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally and equitable principles of general applicability (whether considered in a proceeding at law or in equity), Sellers have good and valid title to, or in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets free and clear of all Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

(a)      liens for Taxes not yet due and payable;

(b)      mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the Business or the Purchased Assets;

(c)      easements, rights of way, zoning ordinances and other similar encumbrances affecting any Leased Real Property which are not, individually or in the aggregate, material to the Business or the Purchased Assets, and which do not prohibit or interfere with the current operation of any Leased Real Property;

(d)      liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business consistent with past practice which are not, individually or in the aggregate, material to the Business or the Purchased Assets;

(e)      Encumbrances created in favour of Buyer, including, without limitation, Encumbrances created in connection with the DIP Loan; or

(f)      such other Encumbrances as Buyer may approve in writing in its sole discretion.

At the Closing, Buyer will be vested with good and valid title to, or in the case of leased assets, good and valid leasehold interest in, such Purchased Assets, free and clear of all Encumbrances

and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

**Section 4.05   Assets Necessary to Business**. Subject to the exclusion of the Excluded Assets, the Purchased Assets constitute all of the assets, properties, licenses and Contracts necessary to conduct the Business in substantially the same manner as the Business has been conducted prior to the date hereof, subject to ordinary wear and tear.

**Section 4.06   Intellectual Property; IT Systems.**

(a)      Section 4.06(a) of the Disclosure Schedules contains a correct, current and complete list of: (i) all Intellectual Property Registrations, specifying as to each, as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered or filed; the patent, registration or application serial number; the issue, registration or filing date; and the current status; (ii) all unregistered Trademarks included in the Intellectual Property Assets; (iii) all proprietary Software included in the Intellectual Property Assets; and (iv) all other Intellectual Property that is used or held for use in the conduct of the Business as currently conducted or proposed to be conducted other than Intellectual Property licensed by Sellers pursuant to Excluded Contracts. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing. Sellers have provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all Intellectual Property Registrations.

(b)      Section 4.06(b) of the Disclosure Schedules contains a correct, current and complete list of all Intellectual Property Agreements necessary or useful for operating the Business as currently conducted, specifying for each the date, title and parties thereto. Sellers have provided Buyer with true and complete copies (or in the case of any oral agreements, a complete and correct written description) of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on Sellers in accordance with its terms and is in full force and effect. Neither any Seller nor any other party thereto is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal), any Intellectual Property Agreement.

(c)      Except as set forth in Section 4.06(c) of the Disclosure Schedules, Sellers are the exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owners of all right, title and interest in and to the Intellectual Property Assets, and have the valid and enforceable right to use all other Intellectual Property used or held for use in or necessary for the conduct of the Business as currently conducted or as proposed to be conducted, in each case, free and clear of Encumbrances other than

Permitted Encumbrances. Sellers have entered into binding, valid and enforceable written Contracts with each current and former employee and independent contractor who is or was involved in or has contributed to the invention, creation, or development of any Intellectual Property during the course of employment or engagement with any Seller whereby such employee or independent contractor (i) acknowledges such Seller's exclusive ownership of all Intellectual Property Assets invented, created or developed by such employee or independent contractor within the scope of his or her employment or engagement with such Seller; (ii) grants to such Seller a present, irrevocable assignment of any ownership interest such employee or independent contractor may have in or to such Intellectual Property; and (iii) irrevocably waives any right or interest, including any moral rights, regarding such Intellectual Property, to the extent permitted by applicable Law. Sellers have provided Buyer with true and complete copies of all such Contracts.

(d)     Neither the execution, delivery or performance of this Agreement, nor the consummation of the transactions contemplated hereunder, will result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own or use any Intellectual Property Assets or any Intellectual Property subject to any Intellectual Property Agreement.

(e)     All of the Intellectual Property Assets are valid and enforceable, and all Intellectual Property Registrations are subsisting and in full force and effect. The Sellers have taken all necessary steps to maintain and enforce the Intellectual Property Assets and to preserve the confidentiality of all Trade Secrets included in the Intellectual Property Assets, including by requiring all Persons having access thereto to execute binding, written non-disclosure agreements.

(f)     The conduct of the Business as currently and formerly conducted and as proposed to be conducted, including the use of the Intellectual Property Assets and the Intellectual Property licensed under the Intellectual Property Agreements in connection with the Business, and the products, processes, and services of the Business have not infringed, misappropriated, or otherwise violated and will not infringe, misappropriate, or otherwise violate the Intellectual Property or other rights of any Person. No Person has infringed, misappropriated, or otherwise violated any Intellectual Property Assets or the Intellectual Property licensed under the Intellectual Property Agreements.

(g)     There are no Actions (including any opposition, cancellation, revocation, review, or other proceeding) settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, or other violation of the Intellectual Property of any Person by any Seller in the conduct of the Business; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Intellectual Property Assets; or (iii) by any Seller or any other Person alleging any infringement, misappropriation, or violation by any Person of any Intellectual Property Assets. Sellers are not aware of any facts or circumstances that could reasonably be expected to give rise to any such Action. Sellers are not subject to any outstanding or

prospective Governmental Order (including any motion or petition therefor) that does or could reasonably be expected to restrict or impair the use of any Intellectual Property Assets.

(h)    The computer hardware, servers, networks, platforms, peripherals, data communication lines, and other information technology equipment and related systems, including any outsourced systems and processes, that are owned and/or used by Sellers in the Business (the "**IT Systems**") are reasonably sufficient for the immediate and anticipated needs of the Business. In the past eighteen months, there has been no unauthorized access, use, intrusion, or breach of security, or failure, breakdown, performance reduction, or other adverse event affecting any IT Systems, that has caused or could reasonably be expected to cause any: (i) substantial disruption of or interruption in or to the use of the IT Systems or the conduct of the Business; (ii) loss, destruction, damage, or harm of or to the Sellers or their operations, personnel, property, or other assets; or (iii) liability of any kind to the Sellers. The Sellers have taken all reasonable actions, consistent with applicable industry best practices, to protect the integrity and security of the IT Systems and the data and other information stored or processed thereon. The Sellers (i) maintain commercially reasonable backup and data recovery, disaster recovery, and business continuity plans, procedures, and facilities; (ii) act in compliance therewith; and (iii) test such plans and procedures on a regular basis, and such plans and procedures have been proven effective upon such testing.

**Section 4.07    Assigned Contracts.** Each Assigned Contract is in full force and effect and is a valid and binding obligation of the Seller party thereto and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally, (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (c) the obligations to pay Cure Costs hereunder. No Seller has received any written notice of the intention of any Person to terminate any Assigned Contract. To the Knowledge of Sellers, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any Assigned Contract or would cause the acceleration of any obligation of any Seller or the creation of an Encumbrance upon any Purchased Asset. Sellers have delivered or made available to Buyer copies of all of the Assigned Contracts, together with all amendments, modifications or supplements thereto.

**Section 4.08    Real Property.**

(a)    Neither Seller owns any real property, individually or collectively, in whole or in part.

(b)    Section 4.08(b) of the Disclosure Schedules sets forth each parcel of real property leased by Sellers and used in or necessary for the conduct of the Business as currently conducted (together with all rights, title and interest of Sellers in and to leasehold

improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "**Leased Real Property**"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Sellers hold any Leased Real Property (collectively, the "**Leases**"). Sellers have delivered to Buyer a true and complete copy of each Lease. With respect to each Lease:

(i)     such Lease is valid, binding, enforceable and in full force and effect, and Sellers enjoy peaceful and undisturbed possession of the Leased Real Property;

(ii)     Sellers are not in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and Sellers have paid all rent due and payable under such Lease;

(iii)     Sellers have not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by a Seller under any of the Leases and, to the Knowledge of Sellers, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)     Except as set out in Section 4.08(b) of the Disclosure Schedules, Sellers have not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)     Except as set out in Section 4.08(b) of the Disclosure Schedules, Sellers have not pledged, mortgaged or otherwise granted an Encumbrance, other than a Permitted Encumbrance, on their leasehold interest in any Leased Real Property.

(c)     The Leased Real Property is not subject to any use restriction, exception, reservation or limitation which in any material respect interferes with or impairs the present and continued use thereof in the Business as currently conducted. Neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty.

(d)     The Leased Real Property is sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to conduct the Business as currently conducted.

**Section 4.09   Tangible Personal Property.** Section 4.09 of the Disclosure Schedules sets forth all leases of personal property **("Personal Property Leases")** used in or related to the Business. Sellers have a valid and enforceable leasehold interest under each Personal Property Lease under which either of the Sellers is a lessee.

**Section 4.10   Inventory.** The Inventory consists of a material quality and quantity usable in the ordinary course of business consistent with past practice. Except as set forth in Section 4.10 of the Disclosure Schedules, all Inventory is owned by Sellers free and clear of all Encumbrances.

**Section 4.11   Compliance With Laws; Permits; Insurance.**

(a)      Sellers have complied, and are now complying, with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

(b)      All Permits required for Sellers to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have either been obtained by Sellers and are valid and in full force and effect or have been applied for by Sellers. All of the Sellers' applications for Permits related to the Business as currently conducted or to the ownership and use of the Purchased Assets (including, without limitation, any Investigational New Drug applications) have not lapsed or been rejected or suspended. All fees and charges with respect to such Permits and applications for Permits as of the date hereof have been paid in full. Section 4.11(b) of the Disclosure Schedules lists all current Permits issued to any Seller and all of Sellers' applications for Permits (including, without limitation, any Investigational New Drug applications) which are related to (i) the conduct of the Business as currently conducted or (ii) the ownership and use of the Purchased Assets. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse, rejection or limitation of any Permit or application for a Permit set forth in Section 4.11(b) of the Disclosure Schedules.

(c)      All clinical studies conducted by or on behalf of Sellers have been and are being conducted in accordance with the requirements of 21 CFR §Part 312. No investigator in the clinical studies conducted by or on behalf of Sellers has been debarred under Section 306 of the Food Drug and Cosmetic Act.

(d)      Except as set forth in Section 4.11(d) of the Disclosure Schedules, there have been no adverse events reported to Sellers in any of the clinical investigations conducted by or on behalf of Sellers in connection with the Business. All adverse events set forth in  Section 4.11(d) of the Disclosure Schedules have been properly reported to the Food and Drug Administration and any other relevant Governmental Authority.

(e)      Section 4.11(e) of the Disclosure Schedules sets forth (i) a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability,

real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by any Seller or its Affiliates and relating to the Business, the Purchased Assets or the Assumed Liabilities (collectively, the "**Insurance Policies**"); and (ii) with respect to the Business, the Purchased Assets or the Assumed Liabilities, a list of all pending claims and the claims history for Seller since MabVax Therapeutics completed a reverse merger into Telik, Inc. on July 8, 2014. Except as set forth on Section 4.11(e) of the Disclosure Schedules, there are no claims related to the Business, the Purchased Assets or the Assumed Liabilities pending under any of the Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Neither Sellers nor any of their Affiliates have received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of the Insurance Policies. All premiums due on the Insurance Policies have either been paid or, if not yet due, accrued. All the Insurance Policies (x) are in full force and effect and enforceable in accordance with their terms; (y) are provided by carriers who are financially solvent; and (z) have not been subject to any lapse in coverage. None of Sellers or any of their Affiliates is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any of the Insurance Policies. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Business and are sufficient for compliance with all applicable Laws and Contracts to which any Seller is a party or by which it is bound. True and complete copies of the Insurance Policies have been made available to Buyer.

**Section 4.12    Legal Proceedings; Governmental Orders.**

(a)    Except as set forth in Section 4.12(a) of the Disclosure Schedules, there are no Actions pending or, to Sellers' Knowledge, threatened against or by any Seller (i) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)    There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business.

**Section 4.13    Environmental Matters.**

(a)    The operations of Sellers with respect to the Business and the Purchased Assets are currently and have been in compliance with all Environmental Laws. Sellers have not received from any Person, with respect to the Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

{00025297. }                                28

(b)      Sellers have obtained and are in material compliance with all Environmental Permits necessary for the conduct of the Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by Seller through the Closing Date in accordance with Environmental Law, and Sellers are not aware of any condition, event or circumstance that might prevent or impede, after the Closing Date, the conduct of the Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets.

(c)      There has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the Business or the Purchased Assets, and Sellers have not received an Environmental Notice that any of the Business or the Purchased Assets  has been contaminated with any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, Sellers.

(d)      Sellers are not aware of or reasonably anticipate, as of the Closing Date, any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, prevent, impede or materially increase the costs associated with the ownership, lease, operation, performance or use of the Business or the Purchased Assets as currently carried out.

**Section 4.14    Employees; Seller Plans.**

(a)      Sellers have provided Buyer with a true, complete and correct list of the Employees, specifying their (i) name; (ii) title or position (including whether full-time or part-time); (iii) hire or retention date; (iv) resignation or termination date; (v) annual base compensation rate or contract fee; (vi) commission, bonus or other incentive-based compensation; and (vii) a description of the fringe benefits provided to each such individual. All compensation, including wages, commissions, bonuses, fees and other compensation, payable to all Employees for services performed on or prior to the date hereof have been paid in full, except with respect to certain paid time off obligations in an approximate amount of $230,000 and potential severance obligations to certain employees pursuant to their employment agreements with the Sellers. There are no outstanding agreements, understandings or commitments of Sellers with respect to any compensation, commissions, bonuses or fees. Sellers are in compliance in all material respects with all Laws related to the employment, classification, and termination of employment or services of the Employees. There are no material Actions pending or, to the Knowledge of Sellers, threatened, against any Seller by any current or former Employee.

(b)      Section 4.14(b) of the Disclosure Schedules lists all written agreements between Sellers and the Employees. Sellers have provided Buyer with complete and correct copies of the agreements listed on Section 4.14(b) of the Disclosure Schedules, together with all amendments thereto.

(c)     Section 4.14(c) of the Disclosure Schedules is a true and complete list of each Seller Plan. Sellers have provided Buyer with a complete and correct copy of each Seller Plan. Each Seller Plan has been maintained, operated and administered in compliance in all material respects with its terms and any related documents or agreements and the applicable provisions of ERISA, the Code and all other Laws.

(d)     Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor or consultant of the Business to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation (including stock-based compensation) due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Seller Plan; (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

## Section 4.15   Taxes.

(a)     All Tax Returns with respect to the Business required to be filed by Sellers for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. No Governmental Authority has made a claim in writing that the Business or the Purchased Assets may be subject to Taxes, or that a Tax Return related to the Business or the Purchased Assets may be required to be filed, in a jurisdiction where no such Tax Returns have been filed.

(b)     Subject to any obligation of Sellers under the Bankruptcy Code, all Taxes related to the Business or the Purchased Assets (whether or not shown on any Tax Return) have been paid.

(c)     All Taxes related to the Business or the Purchased Assets required to be withheld and paid, including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or third party, have been duly and timely withheld and remitted to the appropriate Governmental Authority.

(d)     No waiver, extension, or comparable consent regarding the application of the statute of limitations with respect to any Taxes or Tax Returns related to the Business or the Purchased Assets is outstanding, nor is there pending any request for such a waiver, extension, or comparable consent.

(e)     No Seller is a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority related to the Purchased Assets or the Business.

(f)      There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(g)      None of the Purchased Assets is (i) required to be treated as being owned by another person pursuant to the so-called "safe harbor lease" provisions of former Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, (ii) subject to Section 168(g)(1)(A) of the Code, or (iii) subject to a disqualified leaseback or long-term agreement as defined in Section 467 of the Code.

**Section 4.16   Brokers.** Except for Objective Capital Partners, LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Sellers.

**Section 4.17   No Other Representations and Warranties.** Except for the representations, warranties and covenants of Sellers expressly contained herein, neither any Seller nor its representatives, nor any other Person, makes any other express or implied warranty (including any implied warranty of merchantability or fitness for a particular purpose) on behalf of any Seller, including (a) the probable success or profitability of ownership, use or operation of the Purchased Assets by Buyer after the Closing, (b) the probable success or results in connection with the Bankruptcy Case and the Sale Order, and (c) the value, use or condition of the Purchased Assets, which are being conveyed hereby on an "As Is", "Where Is" condition at the Closing Date, without any warranty whatsoever (including any implied warranty of merchantability or fitness for a particular purpose).

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE V are true and correct as of the date hereof.

**Section 5.01   Organization of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

**Section 5.02   Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery

by Sellers) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 5.03   No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except for the entry of the Sale Order.

**Section 5.04   Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05   Sufficiency of Funds.** Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make the DIP Loan, make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.06   Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 5.07   Investigation by Buyer**. Buyer has conducted its own independent review and analysis of the Purchased Assets, the Assumed Liabilities, and the Business and acknowledges that Sellers have provided Buyer with reasonable access to the personnel, properties, premises, and records of the Business for this purpose. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer acknowledges that neither of the Sellers nor any of their Affiliates makes or have made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or to be provided to Buyer or its Affiliates, except for the representations and warranties contained in this Agreement and the Ancillary Documents, as applicable. Further, and notwithstanding anything to the contrary herein, Buyer expressly acknowledges and agrees that, as of the Closing, it will acquire and accept the Purchased Assets on "As Is", "Where Is" basis.

**ARTICLE VI**
**BANKRUPTCY COURT MATTERS**

**Section 6.01    Competing Transactions.** Sellers shall promptly notify Buyer of any proposals or offers from any third party to acquire, directly or indirectly, all or any substantial portion of the assets, properties, rights and interests of Sellers (a "**Competing Transaction**") received by Sellers after the date hereof until the Bankruptcy Court shall have entered the Bidding Procedures Order, and Sellers shall promptly communicate to Buyer the material terms of such offer or bid. From and after the date of this Agreement, Sellers shall provide Buyer with the names of Persons who enter into a confidentiality agreement with Sellers with respect to a potential transaction involving the assets of Sellers or their Affiliates as provided for in the Bidding Procedures within two Business Days of entry into the same. Sellers will not agree to any Competing Transaction other than as expressly permitted by and in accordance with the Bidding Procedures.

**Section 6.02    Bankruptcy Court Filings.**

(a)    Within one Business Day of the date hereof, Sellers shall file or cause to be filed a petition for relief under Chapter 11 of the Bankruptcy Code on behalf of Sellers with the Bankruptcy Court (the date of such petition being the "**Petition Date**"). On the Petition Date, Sellers shall file (and, within one Business Day, serve) a motion or motions (the "**Sale Motion**"), in form and substance reasonably satisfactory to Buyer, in the Bankruptcy Case requesting that the Bankruptcy Court (i) approve the Bidding Procedures and enter the Bidding Procedures Order and (ii) schedule a hearing on the Sale Motion for entry of the Sale Order. Thereafter, Buyer and Sellers shall take all actions as may be reasonably necessary to cause the Bidding Procedures Order and the Sale Order to be issued, entered and become Final Orders, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    Sellers shall provide appropriate notice of the hearings on the Sale Motion, as is required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, to all Persons entitled to notice, including all Persons that have expressed interest in buying the Purchased Assets, all Persons that have asserted liens, claims or other interests in the Purchased Assets, all parties to the Purchased Contracts, all applicable state and local tax authorities, including the Internal Revenue Service, each Governmental Authority that is an interested party with respect to the Purchased Assets and the Bidding Procedures Order and all tax and environmental authorities in jurisdictions applicable to Sellers. Sellers shall be responsible for making all appropriate filings relating thereto with the Bankruptcy

Court, which filings shall be submitted to Buyer within a reasonable time prior to their filing with the Bankruptcy Court to allow for Buyer's prior review and comments.

(c)     On or before the date that is no later than one day after (i) the Auction, or (ii) the Bid Deadline (as such term is defined in the Bidding Procedures), if no Auction is held, Sellers shall file with the Bankruptcy Court and serve a cure notice (the "**Cure Notice**") by first class mail on all non-debtor counterparties to all Contracts and provide a copy of the same to Buyer. The Cure Notice shall inform each recipient that its respective Contract may be designated by Buyer as assumed, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the Contract, (ii) the name of the counterparty to the Contract, (iii) Sellers' good faith estimates of the Cure Costs required in connection with such Contract, (iv) the identity of Buyer and (v) the deadline by which any such Contract counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto.

(d)     Sellers shall use their best efforts to (i) file and have entered the Bidding Procedures Order on or before April 12, 2019, (ii) hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures, on or before May 6, 2019 and (iii) file and have entered the Sale Order on or before May 15, 2019.

(e)     The Sellers shall consult with the Buyer regarding pleadings that they intend to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Bidding Procedures Order and the Sale Order, including, sharing in advance any drafts thereof for Buyer's review and comment. Each Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Sale Motion, or any other order related to any of the transactions contemplated in this Agreement. No Seller shall seek any modification to the Bidding Procedures Order and the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without the prior written consent of Buyer.

(f)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated in this Agreement are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order and the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use their best efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(g)     Notwithstanding anything expressed or implied herein to the contrary, other than in the ordinary course of business, Sellers shall not consent or agree to the allowance of any claim to the extent it would constitute an Assumed Liability without the prior written

consent of Buyer. Each Seller shall use its best efforts to cause the Sale Order to provide that Buyer will have standing in the Bankruptcy Case to object to the amount of any claim to the extent it would constitute an Assumed Liability and that the Bankruptcy Court will retain the right to hear and determine such objections.

## ARTICLE VII
## COVENANTS

**Section 7.01    Conduct of Business Prior to the Closing.**

(a)      From the date hereof until the Closing, except as otherwise required, authorized or restricted pursuant to this Agreement, the Bankruptcy Code, an order of the Bankruptcy Court or the DIP Loan Agreement or consented to in writing by Buyer, Sellers shall conduct the Business in the ordinary course of business consistent with past practice.

(b)      Without limiting the generality of Section 7.01(a), from the date hereof until the Closing Date, Sellers shall not enter into, amend, terminate or renew (other than terminations in connection with (i) an expiration or (ii) a renewal that becomes automatically effective unless a party thereto provides prior notice of an intention not to renew) any Contract or arrangement relating to the Business or the Purchased Assets in a manner adverse to Sellers, except as otherwise required, authorized or restricted pursuant to this Agreement, the Bankruptcy Code, an order of the Bankruptcy Court or the DIP Loan Agreement or consented to in writing by Buyer.

(c)      Without limiting the generality of Section 7.01(a), from the date hereof until the Closing Date, Sellers shall:

(i)      preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets and all applications for Permits relating to the Business or any Purchased Asset;

(ii)      pay the debts, Taxes and other obligations of the Business when due, subject to the filing of the Bankruptcy Case;

(iii)      continue to collect Accounts Receivable in a manner consistent with past practice, without discounting such Accounts Receivable;

(iv)      maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(v)     continue in full force and effect without modification all their insurance policies, except as required by applicable Law;

(vi)     defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(vii)     perform all of their obligations under all Assigned Contracts;

(viii)     maintain the Books and Records in accordance with past practice; and

(ix)     comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets.

except if otherwise required, authorized or restricted pursuant to this Agreement, the Bankruptcy Code, an order of the Bankruptcy Court or the DIP Loan Agreement.

**Section 7.02    Access to Information.** From the date hereof until the Closing, Sellers shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Leased Real Property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Sellers to cooperate with Buyer in its investigation of the Business. Any investigation pursuant to this Section 7.02 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Sellers. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement.

**Section 7.03    Notice of Certain Events.**

(a)     From the date hereof until the Closing, Sellers shall promptly notify Buyer in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Sellers hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 8.02 to be satisfied;

(ii)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement or the entry of the approval of any order by the Bankruptcy Court;

(iii)     any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)     any Actions commenced or, to Sellers' Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.12 or that relate to the consummation of the transactions contemplated by this Agreement.

(b)     Buyer's receipt of information pursuant to this Section 7.03 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

## Section 7.04   Employees and Employee Benefits.

(a)     Commencing on the Closing Date, Sellers shall terminate all Employees, and, at Buyer's sole discretion, Buyer may offer employment to any or all of such Employees subject to appropriate background checks and, if necessary, negotiation of employment arrangements. Sellers shall bear any and all obligations and liability under the WARN Act resulting from employment losses pursuant to this section.

(b)     Sellers shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Sellers at any time on or prior to the Closing Date and Sellers shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(c)     Sellers shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Sellers also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date. Sellers shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

**Section 7.05   Confidentiality.** Sellers shall, and shall cause their Affiliates to, hold, and shall use their best efforts to cause their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Sellers can show that such information (a) is generally available to and known by the public through no fault of Sellers, any of their Affiliates or their respective Representatives or (b) is lawfully acquired by Sellers, any of their Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. Notwithstanding the foregoing, Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Case, and other Persons bidding on assets of Sellers, and (ii) any information required to be disclosed by Sellers pursuant to any applicable Law (including the Bankruptcy Code), legal proceeding or Governmental Authority, provided that in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required. Notwithstanding anything in to the contrary, unless disclosure is required by applicable Law, the confidentiality of any trade secrets of the Business shall be maintained for so long as such trade secrets continue to be entitled to protection as trade secrets of the Business.

**Section 7.06   Consents.** Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents and approvals contemplated by this Agreement.

**Section 7.07   Books and Records.** Each of the Sellers (or any subsequently appointed bankruptcy estate representative, including a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it related to the pre-Closing Business for a period commencing on the date hereof and ending at such date on which an orderly wind-down of Sellers' operations has occurred in the reasonable judgment of Buyer and Sellers (or any subsequently appointed bankruptcy estate representative, including a trustee, a creditor trustee or a plan administrator) and shall make such books and records available to the other parties hereto (and permit any such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such other party in connection with, among other things, any insurance claims by, legal proceedings or tax proceedings against or governmental investigations of Sellers or Buyer or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records, the relevant party shall first give twenty days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given within that twenty day period, to take possession of the records within thirty days after the date of such notice.

**Section 7.08   Public Announcements.** Neither Sellers nor Buyer shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto, unless, in the sole judgment of Buyer or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the party intending to make such release shall use its best efforts

consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof.

**Section 7.09    Further Assurances.** Subject to the other provisions of this Agreement, each of Buyer and each Seller shall (a) take all actions reasonably necessary or appropriate to consummate the transactions contemplated by this Agreement, (b) provide the other parties hereto with reasonable cooperation and take such actions as such other parties may be reasonably request in connection with the consummation of the transactions contemplated herein, and (c) use commercially reasonable efforts to cause the fulfilment at the earliest practicable date of all of the conditions to its obligations to consummate the transactions contemplated herein. If requested by Buyer, Sellers will transfer to Buyer the personnel records of any Employees who accept an offer of post-Closing employment with Buyer.

**Section 7.10    Wrong Pockets.** If following the Closing either Buyer or any Seller becomes aware that any of the Purchased Assets have not been transferred to Buyer or that any of the Excluded Assets have been transferred to Buyer, it shall promptly notify the other and the parties hereto shall, as soon as reasonably practicable thereafter, ensure that such property is transferred, at the expense of the party that is seeking the assets to be transferred to it, to (i) Buyer, in the case of any Purchased Assets which were not transferred to Buyer at or in connection with the Closing, or (b) any Seller, in the case of any Excluded Assets which were transferred to Buyer at the Closing.

**Section 7.11    DIP Financing**.

(a)    Simultaneously with commencement of the Bankruptcy Case and pursuant to the DIP Loan Agreement, Buyer will, subject to Section 7.11(b) below, provide debtor-in-possession financing to Sellers up to a maximum amount of $500,000, which may not be increased on a priming basis without the consent of Oxford Finance LLC in its sole and absolute discretion (the "DIP Loan"), in order to permit Sellers to continue operating the Business and pay the reasonable and documented out-of-pocket third party fees and expenses actually incurred in connection with the transactions contemplated herein and the Bankruptcy Case.

(b)    The DIP Loan Agreement will become effective upon (i) approval by the Bankruptcy Court and (ii) satisfaction of the conditions as set forth herein and in the DIP Loan Agreement. If the Closing occurs, all amounts then outstanding under the DIP Loan Agreement shall be credited towards the Purchase Price payable by Buyer.  The Bidding Procedures Order shall expressly authorize and approve such credit bidding of amounts outstanding under the DIP Loan Agreement pursuant to Section 363(k) of the Bankruptcy Code.

(c)    The obligations of Sellers under the DIP Loan Agreement will be secured by a first lien on substantially all of the assets of Sellers, including, without limitation, the Purchased Assets. In addition, the obligations of Sellers under the DIP Loan Agreement

will be entitled to super-priority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code.

(d)    The Bidding Procedures Order shall provide that if the Bankruptcy Court enters an order approving a Competing Transaction, then on the first Business Day following entry of the sale order relating to such Competing Transaction, Sellers shall pay to Buyer, in accordance with wire transfer instructions provided by Buyer, from the overbidder's deposit of the Successful Bidder, an amount equal to all obligations of Sellers then outstanding under the DIP Loan, which payment shall be irrevocable and free and clear of all Encumbrances. No qualified bid may contain any provision that purports to alter or restrict the foregoing. The Sellers shall not reduce or otherwise alter the overbidder's deposit required of any qualified bidder under the Bidding Procedures or the Bidding Procedures Order without the prior written consent of Buyer. For the avoidance of doubt, in the event the overbidder's deposit of the Successful Bidder is insufficient to satisfy in full all obligations owing under the DIP Loan Agreement, Sellers will pay the remainder in full as promptly as possible from the proceeds of any substitute DIP Loan facility provided by the Successful Bidder or from any other source, including the proceeds of the sale to the Successful Bidder.

**Section 7.12   No Successor Liability**. The parties hereto intend that, except where expressly prohibited under applicable Law, upon the Closing, the Buyer shall not be deemed to: (i) be the successor of any Seller, (ii) have, de facto, or otherwise, merged with or into any Seller, (iii) be a mere continuation or substantial continuation of any Seller or the enterprise(s) of any Seller, or (iv) be liable for any acts or omissions of any Seller in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties hereto intend that Buyer shall not be liable for any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against any Seller or any of such Seller's predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of any Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this section shall be reflected in the Sale Order.

## ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.01   Conditions to Obligations of All Parties.** The obligations of each party hereto to consummate the transactions contemplated by this Agreement shall be subject to the fulfilment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making

the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)      The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order and each of such orders shall be a Final Order providing for a sale of the Purchased Assets free and clear of any Encumbrances and in form and substance reasonably satisfactory to Sellers and Buyer, which orders shall not have been reversed, modified, amended or stayed.

(c)      Sellers shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 4.03 and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 5.03, in each case, in form and substance reasonably satisfactory to Buyer and Sellers, and no such consent, authorization, order and approval shall have been revoked.

**Section 8.02  Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfilment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)      Sellers shall have complied with the sale process deadlines set forth in the Bidding Procedures Order and any order amending such Bidding Procedures Order.

(b)      Sellers shall have delivered to Buyer a certified copy of the Sale Order and copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Sellers.

(c)      The representations and warranties made by Sellers in this Agreement or in any Ancillary Document, other than those set forth in Section 4.05, shall be true and correct in all respects, in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect, and the representations and warranties made by Sellers set forth in Section 4.05, shall be true and correct in all material respects, in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date.

(d)      Sellers shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the

Ancillary Documents to be performed or complied with by them prior to or on the Closing Date.

(e)      No Action shall have been commenced against Buyer or Sellers, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(f)      All approvals, consents and waivers that are listed on Section 4.03 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(g)      From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(h)      Each of David Hansen, Greg Hanson and Paul Maffuid shall have entered into an employment or consultancy agreement with Buyer or an Affiliate of Buyer on terms mutually acceptable to Buyer and such individuals.

(i)      Buyer shall have received all Permits that are necessary for it to conduct the Business as conducted by Sellers as of the Closing Date and all pending applications for Permits related to the Business shall have been transferred to Buyer.

(j)      All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances, and Sellers shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(k)      Buyer shall have received a certificate from each Seller, dated the Closing Date and signed by a duly authorized officer of each Seller, that each of the conditions set forth in Section 8.02(c) and Section 8.02(d) have been satisfied (the "**Seller Closing Certificates**").

(l)      Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of each Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of such Seller authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(m)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of each Seller certifying the names and signatures of the officers of such Seller authorized to sign this Agreement, the Ancillary Documents and the other documents to be delivered hereunder and thereunder.

(n)     Buyer shall have received duly executed certificates pursuant to Treasury Regulations Section 1.1445-2(b) (the "**FIRPTA Certificates**") stating that Sellers are not foreign persons within the meaning of Section 1445 of the Code.

(o)     Sellers shall have delivered to Buyer such other documents and deliveries as set forth in Section 3.02(a).

(p)     the "SK13624 License MABs 2008 04 07", "MSKCC Amendment No.1 to Research and License Agreement of April 7 2008" and "SK2011-1138 Lic Unimolecular mAbs 2011 10 13" agreements described in Section 4.06(b) of the Disclosure Schedules shall have been amended in a manner satisfactory to Buyer and shall constitute Assigned Contracts.

**Section 8.03    Conditions to Obligations of Sellers.** The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties made by Buyer in this Agreement or in any Ancillary Document shall be true and correct in all respects, in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)     All approvals, consents and waivers that are listed on Section 5.03 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Sellers at or prior to the Closing.

(e)     Sellers shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied (the "**Buyer Closing Certificate**").

(f)     Sellers shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(g)     Sellers shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Ancillary Documents and the other documents to be delivered hereunder and thereunder.

(h)     Buyer shall have delivered such other documents and deliveries set forth in Section 3.02(b).

(i)     Buyer shall use good faith efforts to close no later than May 16, 2019.

## ARTICLE IX
## TERMINATION

**Section 9.01   Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Sellers and Buyer;

(b)     by Buyer by written notice to Sellers if:

(i)     Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by any Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VIII and such breach, inaccuracy or failure has not been cured by a Seller within ten days of such Seller's receipt of written notice of such breach from Buyer (and in any event prior to the Outside Closing Date); or

(ii)    the Closing has not occurred on or before May 16, 2019 (the "**Outside Closing Date**"), unless the failure to close by such date shall be due to

the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by Buyer prior to the Closing;

(c)    by any Seller by written notice to Buyer if:

(i)    such Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VIII and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from such Seller (and in any event prior to the Outside Closing Date); or

(ii)    the Closing has not occurred on or before the Outside Closing Date, unless such failure shall be due to the failure of such Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(d)    by Buyer or any Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable;

(e)    by Buyer, if (i) any Seller or any Affiliate of Seller seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting it to a petition for relief under Chapter 7 of the Bankruptcy Code, (ii) any Seller or any Affiliate of Sellers seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, the entry of an order by the Bankruptcy Court appointing a trustee in the Bankruptcy Case or an examiner with enlarged powers relating to the operation of the Business, (iii) the Bankruptcy Court orders, for any reason, an order of a type identified in clauses (i) or (ii) above, or (iv) the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material Purchased Assets;

(f)    by Buyer, if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (A) amended, modified or supplemented without Buyer's prior written consent or (B) voided, reversed or vacated or is subject to a stay such that the Bidding Procedures Order is not in full force and effect as of the date set forth in Section 9.01(g) below or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (A) amended, modified or supplemented in any way without Buyer's prior written consent or (B) voided, reversed or vacated or is subject to a stay such that the Sale Order is not in full force and effect as of the date set forth in Section 9.01(g) below;

(g)      by Buyer, if the Bankruptcy Court shall not have entered the Bidding Procedures Order on or before April 12, 2019; provided that Buyer shall not be able to terminate this Agreement pursuant to this section if, prior to such termination, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(h)      by Buyer, if the Bankruptcy Court shall not have entered the Sale Order on or before May 15, 2019 or following entry thereof such order shall have been voided, reversed, vacated or made subject to a stay; provided that Buyer shall not be able to terminate this Agreement pursuant to this section if, prior to such termination, the Bankruptcy Court shall have entered the Sale Order or the Sale Order is a Final Order, as applicable;

(i)      by Buyer, if the Bidding Procedures Order is entered by the Bankruptcy Court and (i) the Auction is not held on or before May 6, 2019, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures or (ii) the Sale Hearing is not held on or before May 15, 2019; provided that Buyer shall not be able to terminate this Agreement pursuant to this section if, prior to such termination, the Auction or Sale Hearing shall have been held, as applicable;

(j)      by Buyer, if Buyer is not selected as a Successful Bidder at the conclusion of the Auction, and Buyer does not choose to serve as Backup Bidder;

(k)      by Buyer, following Buyer's decision to serve as Backup Bidder, if Sellers fail to provide notice to Buyer, on or before the Backup Bid Outside Date, that Sellers have terminated any Competing Transaction and that the Sellers have elected to complete the transactions contemplated by this Agreement;

(l)      automatically, upon the consummation of a Competing Transaction; or

(m)      by Buyer (solely in the event any portion of the DIP Loan has been advanced and is outstanding), if the DIP Loan Agreement has been terminated or the outstanding loans thereunder have been accelerated in accordance with the terms thereof, except if (i) payment in full of all obligations thereunder has been made, or (ii) such termination of the DIP Loan Agreement is due to Buyer's material breach of its obligations thereunder.

**Section 9.02  Backup Bidder**.  If an Auction is conducted, and Buyer is not the Successful Bidder, Buyer shall, if its bid is determined to be the next highest bid, have the opportunity to serve, in Buyer's sole and absolute discretion, as Backup Bidder.  If Buyer elects to serve as Backup Bidder, Buyer agrees to serve as Backup Bidder until May 16, 2019 (as such date may be extended in accordance with this Section 9.02, the "**Backup Bid Outside Date**"); *provided*, *however* that the Backup Bidder may, in its sole and absolute discretion, extend the Backup Bid Outside Date by giving written notice to Sellers at least two (2) Business Days before the Backup Bid Outside Date (or before the end of any applicable extension thereof) of the new

Backup Bid Outside Date. Subject to the terms of the Sale Order, following the Sale Hearing and prior to the Backup Bidder Outside Date, if the Successful Bidder fails to consummate the applicable Competing Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Buyer as Backup Bidder will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, but subject to the Sale Order, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement.

**Section 9.03    Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)    as set forth in Section 2.09, this ARTICLE IX and ARTICLE X hereof;

(b)    that nothing herein shall relieve any party hereto from liability for any breach of any provision hereof.

**Section 9.04    Termination Fee; Expense Reimbursement.**

(a)    If (i) this Agreement is terminated for any reason other than by a Seller pursuant to Section 9.01(c)(i), then, in any such case, Sellers shall, jointly and severally, without the requirement of any notice or demand from Buyer or any application to or order of the Bankruptcy Court, promptly, but in no event later than three Business Days after the date of such termination, pay or cause to be paid to Buyer all reasonable out-of-pocket and documented fees and expenses (including reasonable attorneys' fees and expenses) incurred by Buyer in connection with or related to Buyer's evaluation, consideration, analysis, negotiation, and documentation of this Agreement or the transactions contemplated herein, in an amount not to exceed $250,000 in the aggregate (the "**Expense Reimbursement**"), (ii) this Agreement is terminated by Buyer or automatically pursuant to Section 9.01(l) then, in any such case, Sellers shall, jointly and severally, without the requirement of any notice or demand from Buyer or any application to or order of the Bankruptcy Court, pay or cause to be paid to Buyer a fee in an amount equal to 5% of the Purchase Price (the "**Termination Fee**") in addition to the Expense Reimbursement upon Sellers consummating a Competing Transaction by wire transfer of immediately available funds to such account or accounts as may be specified in a written notice by Buyer given to Sellers. The Expense Reimbursement and the Termination Fee shall, pursuant to the Bidding Procedures Order, constitute allowed administrative expenses of Sellers' estates under Section 503(b) of the Bankruptcy Code; provided, however, that notwithstanding any provision of this Agreement to the contrary, the Expense Reimbursement and Termination Fee shall be payable only from the proceeds of a Competing Transaction. The Bidding Procedures Order shall provide for the payment by Sellers of the Termination Fee and Expense Reimbursement (prior to the repayment of the obligations owed on account of any prepetition secured financing) as and when such amounts are due and payable hereunder.

(b)    Each of the parties to this Agreement acknowledges and agrees that the agreements contained in this Section 9.04 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the other parties would not enter into this Agreement. Each of the parties further acknowledges that the payment by Sellers of the Termination Fee and the Expense Reimbursement is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Buyer, together with any additional damages to which Buyer may be entitled hereunder, in the circumstances in which such Termination Fee and Expense Reimbursement is payable for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated herein, which amount would otherwise be impossible to calculate with precision. Without limiting in any way Buyer's rights set forth in the DIP Loan Agreement, Buyer's receipt in full of the Termination Fee and the Expense Reimbursement, together with interest or collection expenses, if any, due and payable as provided herein, shall be the sole and exclusive monetary remedy of Buyer against Sellers, and Sellers shall have no further liability or obligation, under this Agreement or relating to or arising out of any such breach of this Agreement or failure to consummate the transactions contemplated herein. The obligations to return the Deposit Amount and pay the Termination Fee and Expense Reimbursement in accordance with the provisions of this Section 9.04 will (i) be binding upon and enforceable against each Seller immediately upon the Bankruptcy Court's entering the Bidding Procedures Order, (ii) not be terminable or dischargeable thereafter for any reason, (iii) survive any subsequent conversion or dismissal or consolidation of the Bankruptcy Case, any plan of reorganization or liquidation in such case, and (iv) survive the subsequent termination of this Agreement by any means. The obligations to return the Deposit Amount and pay Buyer the Termination Fee and Expense Reimbursement, as and when required under this Agreement, are intended to be, and upon entry of the Bidding Procedures Order are, binding upon (A) each Seller, (B) any successors or assigns of any Seller, (C) any trustee, examiner or other representative of a Seller's estate, (D) the reorganized Sellers and (E) any other entity vested or revested with any right, title or interest in or to a Seller, or any other Person claiming any rights in or control (direct or indirect) over any Seller (each of (A) through (E), a "**Successor**") as if such Successor were a Seller hereunder. The obligations of Sellers to return the Deposit Amount and the obligations to pay Buyer the Termination Fee and Expense Reimbursement, as and when required under this Agreement, may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

(c)    For the avoidance of doubt, while Buyer may pursue (i) a grant of specific performance prior to the termination of this Agreement to cause the Closing and performance of this Agreement and (ii) concurrently pursue the payment of the Termination Fee and the Expense Reimbursement, under no circumstances shall Buyer be permitted or entitled to receive both (A) the remedy of specific performance to cause the Closing and (B) the payment of the Termination Fee and/or the Expense Reimbursement.

# ARTICLE X
# MISCELLANEOUS

**Section 10.01 No Survival of Representations and Warranties**. The Sellers and Buyer agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and none of the Sellers or Buyer will have any liability to each other after the Closing for any breach thereof. The Sellers and Buyer agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each party to this Agreement will be liable to the other parties after the Closing for any breach thereof.

**Section 10.02 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 10.03 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.03):

| | |
|---|---|
| If to MabVax Holdings: | 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121, USA |
| | E-mail: dhansen@mabvax.com |
| | Attention:     David Hansen |
| with a copy to: | The Rosner Law Group LLC, 824 N. Market Street, Suite 810, Wilmington, DE 19801, USA |
| | E-mail: rosner@teamrosner.com |
| | Attention:     Frederick B. Rosner |
| If to MabVax Therapeutics: | 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121, USA |
| | E-mail: dhansen@mabvax.com |
| | Attention:     David Hansen |

| with a copy to: | The Rosner Law Group LLC, 824 N. Market Street, Suite 810, Wilmington, DE 19801, USA |
| | E-mail: rosner@teamrosner.com |
| | Attention:    Frederick B. Rosner |
| If to Buyer: | BioNTech SE, An der Goldgrube 12, 55131 Mainz, Germany |
| | E-mail: james.ryan@biontech.de |
| | Attention:    James Ryan, Vice President IP & Legal |
| with a copy to: | Covington & Burling LLP, 265 Strand, London WC2R 1BH, United Kingdom |
| | E-mail: kwiggert@cov.com |
| | Attention:    Kristian Wiggert |
| | and |
| | Covington & Burling LLP, 620 8th Ave, New York, NY 10018, USA |
| | E-mail: dcoffino@cov.com, mbeeler@cov.com |
| | Attention:    Dianne Coffino and Martin Beeler |

**Section 10.04 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.05 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.06 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or

{00025297. }

provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.07 Entire Agreement.** This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.08 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers or Buyer (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents will be void; provided, however, that (a) Buyer may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates, (b) Buyer may assign some or all of its rights to receive assignment of any Purchased Assets hereunder to any third party and (c) Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, in the case of each clause (a) to (c) without any other party's consent. No assignment of any obligations hereunder will relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Sellers or Buyer will also apply to any such assignee unless the context otherwise requires.

**Section 10.09 No Third-party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.10 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.11 Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE INTERNAL LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT REGARD TO THE LAWS OF ANY OTHER JURISDICTION THAT MIGHT BE APPLIED BECAUSE OF CONFLICTS OF LAWS PRINCIPLES OF THE STATE OF DELAWARE.

(b)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(c)    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 10.12 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.13 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

MABVAX THERAPEUTICS HOLDINGS, INC.

By_____

Name:

Title:


MABVAX THERAPEUTICS, INC.

By_____

Name:

Title:


BIONTECH    RESEARCH    AND DEVELOPMENT, INC.

By_____

Name: Sierk Poetting

Title: CFO, COO