> ***THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE FOLLOWING COMBINED CHAPTER 11 DISCLOSURE STATEMENT AND PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PROVISIONALLY APPROVED BY THE BANKRUPTCY COURT.***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MABVAX THERAPEUTICS HOLDINGS, INC., *et al.*,[1] | ) Case No. 19-10603 (JTD) |
|  | ) |
|  | ) Jointly Administered |
| Debtors. | ) |
|  | ) |

## SECOND AMENDED COMBINED DISCLOSURE
## STATEMENT AND JOINT PLAN OF LIQUIDATION FOR DEBTORS

**THE ROSNER LAW GROUP LLC**

Frederick B. Rosner (DE #3995)
Scott J. Leonhardt (DE #4885)
Jason A. Gibson (DE #6091)
Zhao (Ruby) Liu (DE #6436)
824 N Market Street, Suite 810
Wilmington, Delaware 19801
Tel.:    (302) 777-1111
Email: rosner@teamrosner.com
        leonhardt@teamrosner.com
        gibson@teamrosner.com
        liu@teamrosner.com

*Counsel to the Debtors and Debtors in Possession*

Dated: January 8, 2020
        Wilmington, Delaware

---

[1]     The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) MabVax Therapeutics Holdings, Inc. (7903) and (ii) MabVax Therapeutics, Inc. (1765). The Debtors' mailing address is 11535 Sorrento Valley Road, Suite 400, San Diego, CA 92121.

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME
      AND GOVERNING LAW ........................................................................ 1
      A.    Defined Terms .................................................................................. 2
      B.    Rules of Interpretation ................................................................... 13
      C.    Computation of Time ...................................................................... 13
      D.    Governing Law ................................................................................ 13
      E.    References to Monetary Figures ..................................................... 14
      F.    References to the Debtors or the Post-Effective Date Debtors ..... 14

III.  SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND
      ESTIMATED RECOVERIES ................................................................ 14

IV.   BACKGROUND; KEY EVENTS LEADING UP TO AND DURING THE
      CHAPTER 11 CASES ........................................................................... 15
      A.    The Debtors ..................................................................................... 15
      B.    The Debtors' Prepetition Debt Capitalization ................................ 16
      C.    The Debtors' Prepetition Equity Capitalization ............................. 16
      D.    Events Leading to these Chapter 11 Cases. ................................... 17
      E.    Alleged Bad Actors' Pump and Dump Scheme .............................. 17
      F.    The SEC Action Against the Alleged Bad Actors ......................... 18
      G.    Derivative Actions .......................................................................... 19
      H.    The Debtors Incurred Substantial Legal Fees to Obtain Declaratory
            Relief Regarding Whether Shares Were Validly Issued ................ 20
      I.    Litigation by MabVax Holdings Against Sichenzia and the Alleged Bad
            Actors .............................................................................................. 21
      J.    NASDAQ Delisting ........................................................................ 22
      K.    Prepetition Sales and Sales Efforts. .............................................. 22
      L.    The Y-mAbs Sublicense .................................................................. 23
      M.    The BII License ............................................................................... 23
      N.    Significant Events in the Chapter 11 Cases ................................... 23
            1.    "First-Day" Relief ................................................................ 24
            2.    Retention of Professionals and Advisors ........................... 25
            3.    Schedules; 341 Meeting ...................................................... 25
            4.    Sale of Substantially all of the Debtors' Assets and Related
                  Settlements ......................................................................... 25
            5.    Contributions by the Directors and Officers to the Chapter 11
                  Cases. .................................................................................. 27
      O.    The Debtors have paid and fully satisfied the Pre-Petition Loan Amount
            Owed to Oxford. .............................................................................. 28
      P.    Other Significant Post-Petition Activity ........................................ 28
      Q.    Bar Dates ......................................................................................... 28
      R.    Purpose of the Plan ......................................................................... 29
      S.    Federal Income Tax Consequences ................................................ 29

      T.     Feasibility Test................................................................................... 29
      U.     Best Interests Test and Liquidation Analysis.................................. 29
      V.     Cramdown Test ................................................................................ 31
      W.    Alternatives to the Plan .................................................................. 31
      X.     Risk Factors ..................................................................................... 32
      Y.     Releases by the Debtors and Third Parties ..................................... 33

V.     TREATMENT OF UNCLASSIFIED, ADMINISTRATIVE AND PRIORITY CLAIMS ....................................................................................................... 33
      A.     Administrative Expense Claims....................................................... 33
      B.     Professional Compensation Claims ................................................. 34
      C.     Priority Tax Claims.......................................................................... 34
      D.     Payment of Statutory Fees ............................................................... 34
      E.     Post-Confirmation Fees and Expenses............................................ 35

VI.    CONFIRMATION AND VOTING PROCEDURES ...................................... 35
      A.     Confirmation Procedure ................................................................... 35
             1.     Confirmation Hearing ......................................................... 35
             2.     Procedure for Objections .................................................... 35
             3.     Requirements for Confirmation .......................................... 36
             4.     Classification of Claims and Equity Interests................... 37
             5.     Impaired Claims or Equity Interests .................................. 37
             6.     Eligibility to Vote on the Combined Disclosure Statement and Joint Plan of Liquidation.................................................. 37
             7.     Solicitation Notice .............................................................. 38
             8.     Procedure/Voting Deadlines ............................................... 38
             9.     Acceptance of the Combined Disclosure Statement and Joint Plan of Liquidation ................................................... 38
      B.     Bar Dates for Administrative Claims First Arising After August 10, 2019................................................................................................ 39
      C.     Elimination of Vacant Classes ........................................................ 39
      D.     Special Provision Governing Unimpaired Claims .......................... 39
      E.     Subordinated Claims........................................................................ 39
      F.     Controversy Concerning Impairment .............................................. 40

VII.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS; ESTIMATED RECOVERIES ................................................. 40
      A.     Classification of Claims and Equity Interests ................................ 40
      B.     Treatment of Claims and Equity Interests ...................................... 40
             1.     DIP Claims (Class 1) .......................................................... 40
             2.     Other Secured Claims (Class 2)......................................... 41
             3.     Priority Non-Tax Claims (Class 3) .................................... 41
             4.     General Unsecured Claims (Class 4) ................................. 42
             5.     510(a) and 510(b) Subordinated Claims (Class 5)............ 42
             6.     510(c) Subordinated Claims (Class 6) .............................. 43
             7.     Intercompany Claims (Class 7).......................................... 43
             8.     Equity Interests (Class 8) ................................................... 44

VIII.   MEANS FOR IMPLEMENTATION OF THE PLAN.................................................... 44
    A.    Vesting of Assets ................................................................................. 44
    B.    General Settlement of Claims and Interests.......................................... 44
    C.    Sources of Consideration for Plan Distributions and Priority Waterfall ....... 45
    D.    Directors/Officers/Managers and Other Authorized Persons of the Debtors ................................................................................................ 45
    E.    Post-Effective Date Debtors ................................................................ 45
    F.    Preservation of Privileges of the Estates and Debtors ................................. 45
    G.    Plan Administrator .............................................................................. 46
    H.    Priority Claims Reserve ...................................................................... 47
    I.    Dissolution of the Post-Effective Date Debtors............................................ 48
    J.    Necessary Transactions....................................................................... 48
    K.    Cancellation of Securities and Agreements ................................................ 48
    L.    No Action Required ............................................................................ 48
    M.    Preservation of Retained Causes of Action ................................................ 48
    N.    Substantive Consolidation of the Debtors.................................................... 49
    O.    Further Distributions ........................................................................... 49

IX.   PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 49
    A.    Record Dates ...................................................................................... 49
    B.    Distributions Under the Plan................................................................ 50
    C.    Equity Interests are Deemed Canceled and Non-transferable After the Effective Date ................................................................................... 50
    D.    Plan Administrator as Disbursing Agent ................................................... 50
    E.    Form W-9 .......................................................................................... 50
    F.    Delivery of Distributions; Undeliverable Distributions............................... 50
    G.    Failure to Negotiate Checks ................................................................ 51

X.   PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ............................................................................... 51
    A.    Allowance of Claims .......................................................................... 51
    B.    Claims Administration Responsibilities ..................................................... 51
    C.    Estimation of Claims........................................................................... 51
    D.    Adjustment to Claims Without Objection.................................................... 52
    E.    Objection to Claims ........................................................................... 52
    F.    Contingent Claims .............................................................................. 52
    G.    Disallowance of Claims ...................................................................... 52
    H.    Amendments to Claims ....................................................................... 53
    I.    Distributions After Allowance ................................................................... 53
    J.    Disputed Claims Reserve .................................................................... 53

XI.   TREATMENT OF EXECUTORY CONTRACTS ............................................ 53
    A.    Executory Contracts Deemed Rejected ...................................................... 54
    B.    Claims Based on Rejection of Executory Contracts ..................................... 54
    C.    Indemnification Obligations ................................................................ 54
    D.    Reservation of Rights.......................................................................... 55

XII.   AVOIDANCE ACTIONS, LITIGATION CLAIMS ...................................................... 55
    A.   Retention and Reservation .......................................................................... 55
    B.   Prosecution................................................................................................. 55

XIII.  CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................................ 55
    A.   Conditions to Confirmation ........................................................................ 55
    B.   Conditions to Occurrence of Effective Date ................................................ 56
    C.   Waiver of Conditions .................................................................................. 56

XIV.  RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS ........... 56
    A.   General........................................................................................................ 56
    B.   Releases by the Debtors .............................................................................. 57
    C.   Consensual Third-Party Releases by Holders of Claims and Equity
        Interests ...................................................................................................... 58
    D.   Non-Discharge of the Debtors; Injunction.................................................. 58
    E.   Exculpation ................................................................................................. 59
    F.   Binding Nature of Plan ............................................................................... 60
    G.   Preservation of Insurance ........................................................................... 60

XV.   RETENTION OF JURISDICTION ........................................................................... 60

XVI.  AMENDMENT AND WITHDRAWAL OF PLAN ..................................................... 61
    A.   Amendment of Plan .................................................................................... 61
    B.   Withdrawal of Plan. .................................................................................... 62

XVII. MISCELLANEOUS ................................................................................................. 62
    A.   Binding Effect............................................................................................. 62
    B.   Governing Law ........................................................................................... 62
    C.   Setoffs and Recoupment ............................................................................. 62
    D.   Notices ........................................................................................................ 62
    E.   Severability ................................................................................................. 63
    F.   Substantial Consummation ......................................................................... 63
    G.   Withholding and Reporting Requirements .................................................. 63
    H.   Post-Effective Date Fees; Final Decree ...................................................... 63

## **DISCLAIMER**

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION. THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION AND THE TRANSACTIONS CONTEMPLATED HEREBY.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION, EACH HOLDER OF A CLAIM OR EQUITY INTEREST THAT IS ENTITLED TO VOTE SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THE COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

## I.    INTRODUCTION

The Debtors hereby propose the Debtors' Amended Combined Disclosure Statement and Joint Plan of Liquidation and pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Plan constitutes a joint liquidating chapter 11 plan for the Debtors and provides for the Distribution of the Debtors' assets already liquidated or to be liquidated over time to the Holders of Allowed Claims in accordance with the terms of the Plan and the priority of claims provisions of the Bankruptcy Code. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter.

This amended combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations and Chapter 11 Cases, risk factors, summary and analysis of the Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN BANKRUPTCY CODE SECTION 1127, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

On the Effective Date, pursuant to the Plan, all Equity Interests in the Debtors shall be cancelled. Each Holder of an Intercompany and Subordinated Claim or Equity Interest shall neither receive nor retain any property or interest in property on account of such Claims or Equity Interests; provided, however, in the event that prior to the closing of the Chapter 11 Cases, the Plan Administrator determines that there is sufficient Available Cash to make a Distribution to such Holders of Claims or Equity Interests, then, upon reasonable notice to the Holders of record of Equity Interests as of the Effective Date, Subordinated Claims, and the U.S. Trustee, the Plan Administrator shall file a motion with the Bankruptcy Court requesting approval of procedures for making such Distribution. It cannot be predicted with any degree of certainty at this time that any such Distribution will be made to holders of Subordinated Claims and/or Equity Interests. The rights of Holders in Class 8 Equity Interests shall be nontransferable from and after the Effective Date.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth herein, the Debtors expressly reserve the right to alter, amend or modify the Amended Combined Disclosure Statement and Joint Plan of Liquidation, including the Plan Supplement, one or more times, before substantial consummation thereof, including as disclosed more fully in Article XVI of the Amended Combined Disclosure Statement and Joint Plan of Liquidation.

## II.    DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

*A.     Defined Terms*

Unless otherwise defined herein, capitalized terms used in this Combined Disclosure Statement and Joint Plan of Liquidation shall have the meanings ascribed to them below.

**1.1.    "*Administrative Claim*"** means a Claim against the Debtors for the costs and expenses of administration of the Chapter 11 Cases arising from and after the Petition Date to the Effective Date pursuant to §§ 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, for the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' business.

**1.2.    "*Administrative Claim Bar Date*"** means, for Administrative Claims first arising on or after August 10, 2019 through the Effective Date, the first Business Day thirty (30) days after the Confirmation Date; provided, however, the following Administrative Claims are not subject to the Administrative Claim Bar Date:  (i) Professional Fee Claims, (ii) Statutory Fees and (iii) Administrative Claims asserted by J. David Hansen, as Sole Director, and only to the extent they are asserted for reasonable fees and reimbursement of actual necessary expenses incurred post-petition for services rendered as Sole Director.

**1.3.    "*Administrative Claim Objection Bar Date*"** means the deadline for Filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the later of sixty (60) days after the Effective Date and sixty (60) days after the Filing of the applicable request for payment of the Administrative Claims; provided that the Administrative Claim Objection Bar Date may be extended by order of the Bankruptcy Court.

**1.4.    "*Administrative/Priority/Tax Claims Reserve*"** means a segregated Cash reserve to be established by the Plan Administrator on the Effective Date, to the extent necessary, maintained and controlled by the Plan Administrator to be used to fund (i) Distributions made by the Plan Administrator to holders of Allowed Administrative Claims, Priority Tax Claims and Other Priority Claims, on account of such Allowed Claims, and (ii) payments of any other valid tax obligations of the Debtors made by the Plan Administrator as part of the Plan Administrator functions.  This reserve shall be funded to be sufficient to cover all Administrative Claims, Priority Tax Claims, and Other Priority Claims that have been Allowed and all such Claims that have been Disputed.

**1.5.    "*Affiliate*"** has the meaning set forth in section 101(2) of the Bankruptcy Code.

**1.6.    "*Alleged Bad Actors*"** means the Persons or Entities named as defendants in the Alleged Bad Actor Litigation as may be amended from time to time.

**1.7.    "*Alleged Bad Actor Litigation*"** means the action styled *MabVax Therapeutics Holdings, Inc. v. Honig, et al.*, Case No. 19-cv-981-WQH-MSB filed by the Debtors on May 24, 2019, against certain of the Debtors' outside investors and vendors in the United States District Court for the Southern District of California, as may be amended including the addition of additional defendants.

**1.8.** "*Allowed*" means with respect to any Claim against, or Interest in, the Debtors, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim or a request for payment of an Administrative Claim, as applicable, that is Filed on or before the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim or request for payment of an Administrative Claim is not required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim or Interest allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been allowed by a Final Order. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed and no Final Order entered allowing such Claim, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors or the Post-Effective Date Debtors, as applicable; for the avoidance of doubt, that includes the Holder of a Claim or Equity Interest, or an Affiliate thereof, that is a defendant in the Alleged Bad Actor Litigation or Sichenzia Litigation. In addition, (x) a Proof of Claim Filed after the Bar Date or the Initial Administrative Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

**1.9.** "*Asset Purchase Agreement*" means that certain asset purchase agreement by and among the Debtors and BioNTech, dated as of March 20, 2019, as amended (including ancillary documents).

**1.10.** "*Available Cash*" means, collectively, all Cash on hand held by the Debtors and Post-Effective Date Debtors on and after the Effective Date, including any Sale Proceeds, any proceeds from the resolution of Retained Causes of Action, and Milestone Payments net of Administrative Claims, Professional Fee Claims, the reasonable fees and actual and necessary expenses of the Sole Director, Statutory Fees, the Administrative/Priority/Tax Claim Reserve, the Disputed Claims Reserve Account, Non-Tax Priority and Priority Tax Claims, and any other amounts required to be paid or payable under the Plan or any other Order of the Bankruptcy Court.

**1.11.** "*Avoidance Actions*" means the statutory causes of action preserved for the Estates under Bankruptcy Code §§ 502, 510, 542, 543, 544, 545, 547-553 and 724(a), or under similar or related state or federal statutes and common law, including fraudulent transfer laws. All

Avoidance Actions are Retained Causes of Action. The failure to list an Avoidance Action in the Plan does not waive or release that Avoidance Action.

**1.12.** "*Ballot*" means the ballot on which each holder of a Claim or Equity Interest entitled to vote on the acceptance or rejection of the Combined Disclosure Statement and Joint Plan of Liquidation casts such vote.

**1.13.** "*Balloting Agent*" means The Rosner Law Group LLC, in its capacity as the noticing, balloting and claims agent in these Chapter 11 Cases for the Debtors and Plan Administrator.

**1.14.** "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

**1.15.** "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

**1.16.** "*Bankruptcy Rules*" means, collectively, the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075 and any Local Rules of the Bankruptcy Court applicable to these Chapter 11 Cases.

**1.17.** "*Bar Date*" means, collectively, the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed pursuant to the Bar Date Order or the Plan.

**1.18.** "*Bar Date Order*" means the *Order Granting Motion of the Debtor for Entry of an Order (A) Establishing Bar Dates for Filing Proofs of Claim; (B) Approving the Form and Manner for Filing Proofs of Claim; and (C) Approving Notice Thereof* [entered: 08/27/2019; D.I. 214].

**1.19.** "*BII*" means Boehringer Ingelheim International GmbH.

**1.20.** "*BII Receivable*" means any amount(s) that may become due and owing to the Debtors or Post-Effective Date Debtors or their designees pursuant to the *Assumption of MSK License Agreement and BII Agreements* [D.I. 138] by and between the Debtors, BioNTech and MSK.

**1.21.** "*BII Settlement Agreement*" means the *Assumption of MSK License Agreement and BII Agreements* [D.I. 138, 143] by and between the Debtors, MSK, and BioNTech.

**1.22.** "*BII Sublicense*" means the pre-petition sale of the Debtors' assets relating to a specific human antibody research and development program to identify and characterize antibodies that bind to an undisclosed glycan antigen and grant of a sublicense of the Debtors' intellectual property licenses related thereto pursuant to certain *Asset Purchase and License Agreement* dated July 4, 2018 by and between BII and the Debtors.

**1.23.** "*BioNTech*" or "*DIP Lender*" means BioNTech Research and Development, Inc.

**1.24.** "*Business Day*" means any day other than a Saturday, Sunday, or legal holiday (as defined in Bankruptcy Rule 9006).

**1.25.** "***Cash***" means cash and cash equivalents, checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks, money orders, negotiable instruments, and wire transfers of immediately-available funds.

**1.26.** "***Chapter 11 Cases***" means the cases under chapter 11 of the Bankruptcy Code for the Debtors pending before the Bankruptcy Court under Case No. 19-10603 (JTD) and 19-10604 (JTD).

**1.27.** "***Claim***" means a claim against the Debtors or their property as defined in Bankruptcy Code § 101(5).

**1.28.** "***Class***" means the category consisting of holders of Claims or Equity Interests substantially similar in nature to the Claims or Equity Interests of other holders placed in that category, as sdesignated in the Plan.

**1.29.** "***Class 4 Satisfaction***" shall have the meaning ascribed to it in Article VII of the Plan.

**1.30.** "***Clerk***" means the clerk of the Bankruptcy Court.

**1.31.** "***Combined Disclosure Statement and Joint Plan of Liquidation***" (or, where appropriate, the "***Plan***" or "***Disclosure Statement***") means the Debtors' combined disclosure statement and joint plan of liquidation, including, without limitation, all exhibits hereto, either in its present form or it may be amended from time to time through the Confirmation Date.

**1.32.** "***Confirmation Date***" means the date the Bankruptcy Court enters the Confirmation Order.

**1.33.** "***Confirmation Hearing***" means the evidentiary hearing at which the Bankruptcy Court considers confirmation of the Plan.

**1.34.** "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan under the Bankruptcy Code.

**1.35.** "***Contingent Claim***" means any Claim for which a proof of claim has been filed with the Bankruptcy Court that: (a) was not Filed in a fixed amount, or has not accrued and depends on a future event that has not occurred and may never occur; and (b) has not been Allowed on or before the Confirmation Date.

**1.36.** "***D&O Policy***" means any directors and officers' liability insurance policy or any applicable errors and omissions policy applicable to the Debtors' directors, officers, and managers.

**1.37.** "***Debtors***" or "***Company***" means MabVax Therapeutics Holdings, Inc. and/or MabVax Therapeutics, Inc., each a Delaware corporation.

**1.38.** "***Derivative Claims***" means any claim belonging to the Debtors whether asserted by a shareholder or as part of a derivative lawsuit. For the avoidance of doubt, the following actions assert Derivative Claims: (i) *In re MabVax Therapeutics Securities Litigation,* Case No.

18-cv-1160-BAS-NLS, filed in the United States District Court for the Southern District of California; (ii) *Liesman v. Hansen*, Case No. 18-cv-2237-BAS-MSB, filed in the United States District Court for the Southern District of California; and (iii) *Jackson v. Hansen et al.*, Case No. 18-cv-2302-BAS-MSB, filed in the United States District Court for the Southern District of California.

**1.39.**    "***DIP Claim***" means any claim existing under the DIP Facility.

**1.40.**    "***DIP Facility***" means the senior secured debtor in possession financing provided by BioNTech AG to the Debtors in accordance with the Bankruptcy Court's *Final Order (A) Authorizing and Approving Debtor-In-Possession Financing and Granting First Priority and Priming Security Interests and a Superpriority Administrative Claim In Connection Therewith, (B) Approving the Terms and Conditions of That Certain Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement and Related Documents, (C) Modifying the Automatic Stay to the Extent Necessary to Enter into the Debtor-In-Possession Financing and Effectuate the Terms Thereof and (D) Granting Related Relief*, dated April 4, 2019 [D.I. 68].

**1.41.**    "***DIP Lender***" or "***BioNTech***" means BioNTech Research and Development, Inc.

**1.42.**    "***DIP Motion***" means the *Motion of Debtors for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of the Bankruptcy Code (I) Authorizing Debtors to (A) Obtain Post-Petition Secured Financing From BioNTech Research and Development, Inc.; (B) Utilize Cash Collateral; and (C) Pay Certain Related Fees and Charges; and (II) Scheduling a Final Hearing, dated March 21, 2019* [D.I. 9].

**1.43.**    "***Disallowed***" means in reference to a Claim, a Claim or any portion of a Claim that: (a) has been disallowed or withdrawn by Final Order or (b) with respect to a Claim other than an Administrative Claim, a Professional Fee Claim, or a Rejection Claim, was listed as disputed, unliquidated, or contingent in the Schedules and no proof of which was filed before the applicable Bar Date.

**1.44.**    "***Disputed***" means with respect to a Claim or Equity Interest, or any portion thereof, (a) that is not Allowed' and (b) that is disallowed under the Plan, the Bankruptcy Code or a Final Order.

**1.45.**    "***Disputed Claims Reserve***" shall have the meaning ascribed to it in Article X of the Plan.

**1.46.**    "***Distribution***" means any payment of Cash, property, or other value to a holder of an Allowed Claim or Interest under the Plan.

**1.47.**    "***Effective Date***" means the first Business Day fifteen (15) days after the Confirmation Date on which (a) the Confirmation Order is a Final Order, (b) no stay of the Confirmation Order is in effect and (c) all conditions to the Effective Date set forth in  Article XIII of the Combined Disclosure Statement and Joint Plan of Liquidation have been satisfied or waived in accordance with the Plan.

**1.48.**    "***Entity***" has the meaning set forth in Section 101(15) of the Bankruptcy Code.

**1.49.** "*Estate*" means the estate created on the Petition Date for each of the Debtors in their respective Chapter 11 Cases pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

**1.50.** "*Equity Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtors including but not limited to all issued, unissued, certificated or uncertificated, authorized or outstanding common or preferred stock in the Debtors, together with any warrant, options or contract rights to purchase or acquire such stock that existed before the Effective Date.

**1.51.** "*Executory Contract*" means a contract to which the Debtors are a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

**1.52.** "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

**1.53.** "*File*" or "*Filed*" means, with respect to any pleading, entered on the docket of the Chapter 11 Cases and properly served in accordance with the Bankruptcy Rules.

**1.54.** "*Final DIP Loan Amount*" means the amount borrowed by the Debtors pursuant to the DIP Facility and fully re-paid to the DIP Lender as part of closing on Sale.

**1.55.** "*Final Order*" means an order or judgment of the Bankruptcy Court: (a) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors; and (b) if an appeal, writ of certiorari, or reargument or rehearing has been sought, as to which the highest court to which the order was appealed, or certiorari, reargument or rehearing was sought, has determined or denied the appeal, writ of certiorari, reargument, or rehearing, and the time to take any further appeal, petition for writ of certiorari, or move for reargument or rehearing has expired; but the filing of a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, with respect to the order does not prevent the order from being a Final Order.

**1.56.** "*First Day Declaration*" means the *Declaration of J. David Hansen in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 10].

**1.57.** "*General Bar Date*" means the date by which any Person asserting any Claim against the Debtors or an Administrative Claim that first arose after the Petition Date but before August 10, 2019 (except Administrative Claims asserted by the Sole Director, Professional Fee Claims, and Rejection Damages Claims; provided, however, notwithstanding the foregoing, Claims under Bankruptcy Code section 503(b)(9) are included in the Bar Date) is required to file a proof of claim or be forever barred from asserting a Claim against the Debtors or their property and from sharing in Distributions. Except as provided above, the General Bar Date for all Claims, including those of any governmental unit, and the Initial Administrative Bar Date, is October 17, 2019 at 4:00 p.m. (prevailing Eastern time).

**1.58.** "*General Unsecured Claim*" means any Claim against the Debtors existing as of the Petition Date including Rejection Claims and Bankruptcy Code § 503(b)(9) claims, but excluding an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, or an Equity Interest.

**1.59.** "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

**1.60.** "*Governmental Unit Bar Date*" means October 17, 2019 at 4:00 p.m. (ET), which is the deadline for Governmental Units to file Proofs of Claim on account of pre-petition Claims against the Debtors, as set forth in the Bar Date Order.

**1.61.** "*Holder*" means a Person holding an Interest or a Claim.

**1.62.** "*Impaired*" means with respect to a Claim or Equity Interest, impaired within the meaning of §1124 of the Bankruptcy Code.

**1.63.** "*Independent Director*" means Ted Gavin of Gavin/Solmonese LLC.

**1.64.** "*Initial Administrative Bar Date*" means October 17, 2019, the Bar Date to submit Administrative Claims for period from and after the Petition Date through, to and including August 10, 2019.

**1.65.** "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

**1.66.** "*License Agreements*" means the Y-mAbs Settlement Agreement and BII Receivable.

**1.67.** "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

**1.68.** "*MabVax Holdings*" means MabVax Therapeutics Holdings, Inc.

**1.69.** "*MabVax*" means MabVax Therapeutics, Inc.

**1.70.** "*Maximum Amount*" means with respect to any Claim that is not an Allowed Claim: (a) the amount to which the Debtors and the holder of the Claim agree; or (b) any amount the Bankruptcy Court estimates or determines under Bankruptcy Code § 502(c); or (c) absent any agreement, estimation, or determination, the amount set forth in the proof of claim or application for payment filed by the holder of the Claim or, if none, the amount set forth in the Schedules for the Claim, or, if none, the amount the Debtors estimate in its good faith discretion.

**1.71.** "*Milestone Payments*" means the BII Receivable and the Y-mAbs Receivable as defined herein.

**1.72.** "*MSK*" means Memorial Sloan Kettering Cancer Center and Sloan Kettering Institute for Cancer Research.

**1.73.** "*Oxford*" or "*Pre-Petition Lender*" means Oxford Finance LLC.

**1.74.** "*Other Secured Claim*" means other Secured Claims including the Pre-Petition Loan Amount but excluding the DIP Claims.

**1.75.** "*Petition Date*" means March 21, 2019.

**1.76.** "*Plan Administrator*" means J. David Hansen, the Person appointed pursuant to the Combined Disclosure Statement and Joint Plan of Liquidation to be the sole officer and/or responsible Person for the Post-Effective Date Debtors to carry out the duties and responsibilities set forth herein on behalf of the Estate and the Post-Effective Date Debtors.

**1.77.** "*Plan Administrator Expenses*" means the overhead and other business expenses of the Post-Effective Date Debtors including, but not limited to, the reasonable fees and reimbursement of actual necessary expenses of the Plan Administrator.

**1.78.** "*Plan Administrator Operational Reserve*" means the reserve established by the Plan Administrator to hold the amount of Cash deemed necessary to satisfy the anticipated future Plan Administrator Expenses.

**1.79.** "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be filed by the Debtors no later than fourteen days before the deadline to object to confirmation of the Plan on notice to parties in interest, including the following, as applicable: (a) the identity and terms of compensation of the Plan Administrator; (b) any other necessary documentation related to the Plan, and (c) a list of rejected Executory Contracts.

**1.80.** "*Post-Effective Date Assets*" means all assets of the Debtors or of their Estates on or after the Effective Date including, without limitation: (a) all Cash on hand, (b) all Sale proceeds, (c) proceeds from the resolution of Retained Causes of Action, (d) all Milestone Payments, (e) all tax refunds, (f) any assets not sold pursuant to the Asset Purchase Agreement and (g) all proceeds of any of the foregoing.

**1.81.** "*Pre-Petition Lender*" or "*Oxford*" means Oxford Finance LLC.

**1.82.** "*Pre-Petition Loan Amount*" means the $3,220,000 re-paid to Oxford in full on or about June 19, 2019.

**1.83.** "*Priority Claim*" means any Claim (or portion of a Claim) entitled to priority under Bankruptcy Code § 507(a) other than Priority Tax Claims and Administrative Claims.

**1.84.** "*Privilege*" means any attorney-client privilege, work product protection, or other privilege or protection of immunity (i) held by any or all of the Debtors, their Estates, or the Plan Administrator, (ii) held by the Board of Directors or any special committee of the board of directors of any of the Debtors, and (iii) attaching to any documents, communications, or thing (whether written or oral) including, but not limited to, all electronic information relating to any Retained Causes of Action.

**1.85.**    "*Priority Tax Claim*" means any Claim of a Governmental Unit entitled to priority under Bankruptcy Code § 507(a)(8) including, for purposes of the Plan, any Secured Claim which would otherwise meet the description of an unsecured Claim of a Governmental Unit under Bankruptcy Code § 507(a)(8) but for the Secured status of that Claim.

**1.86.**    "*Professional*" means a Person: (a) employed in these Chapter 11 Cases by a Final Order under Bankruptcy Code §§ 327, 328, 363, or 1103 and compensated for services under Bankruptcy Code §§ 327, 328, 329, 330, and 331 or by a Final Order; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Bankruptcy Code § 503(b).

**1.87.**    "*Professional Fee Bar Date*" means the first Business Day thirty (30) days after the Effective Date except that Baker Botts and Block and Leviton are not required to file final fee applications at this time.

**1.88.**    "*Professional Fee Claim*" means an Administrative Claim for compensation and reimbursement of expenses of a Professional incurred before the Effective Date submitted in accordance with Bankruptcy Code §§ 328, 330, 331, or 503(b).

**1.89.**    "*Pro Rata*" means a proportionate share, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of that Allowed Claim is the same as the ratio of all consideration distributed on account of all Allowed Claims in that Class to the amount of all Allowed Claims in that Class.

**1.90.**    "*Record Date for General Unsecured Claims*" means the date the Solicitation Procedures Order is entered.

**1.91.**    "*Record Date for Equity Interests*" means the Effective Date.

**1.92.**    "*Rejection Claim*" means a Claim arising from the Debtors' rejection of an Executory Contract or unexpired lease either during these Chapter 11 Cases or under the Plan other than a Claim for unpaid rent or contract payments arising under a rejected Executory Contract or unexpired lease after the Petition Date and before the effective date of the rejection of that contract or lease.

**1.93.**    "*Rejection Claims Bar Date*" means the first Business Day 30 days after the Confirmation Date.

**1.94.**    "*Release Opt-Out Election*" shall mean the timely election to "opt out" of being a Releasing Party by (a) selecting the option set forth on the Ballot to not grant the releases set forth in Article XIV of this Plan or (b) Filing a written objection to the releases set forth in Article XIV of this Plan by the objection deadline established by the Solicitation Procedures Order.

**1.95.**    "*Retained Causes of Action*" means any actions, claims, any victim recovery from the SEC, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter

arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertible directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. Retained Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Action; and (f) Derivative Actions. For the avoidance of doubt, the Alleged Bad Actor Litigation and Sichenzia Litigation as each may be amended are Retained Causes of Action.

**1.96.** "*Sale*" means (i) the Debtors' sale of substantially all its assets, including certain equipment and laboratory furnishings, to BioNTech and assignment of certain contracts and leases to BioNTech in accordance with the Sale Order; (ii) the sale of miscellaneous lab equipment to BioNTech AG pursuant to an order dated June 26, 2019 [DI 186] and (iii) any other sales of assets by the Debtors.

**1.97.** "*Sale Order*" means the *Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 365, Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9014 and Local Rule 6004-1 (I) Approving the Sale of Substantially all of The Debtors' Assets;(II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Authorizing Consummation of Sale Transaction; and (IV) Granting Related Relief [D.I. 141], entered by the Bankruptcy Court in these Chapter 11 Cases on May 7, 2019 and Order Authorizing (A) Rejection of Proposed Transaction with SequenX Biolgoics LLC and (B) Sale of Equipment to BioNTech AG* [D.I. 186] entered on June 26, 2019.

**1.98.** "*Sale Proceeds*" means the amount of Cash deposited by the Debtors into their bank account resulting from Sales.

**1.99.** "*Schedules*" means the schedules of assets and liabilities, the list of holders of interests, and the statements of financial affairs filed by the Debtors under Bankruptcy Code § 521 and Bankruptcy Rule 1007, as the schedules, list, and statements may have been or may be supplemented or amended from time to time.

**1.100.** "*SEC*" means the United States Securities and Exchange Commission.

**1.101.** "*SEC Complaint*" means the action the SEC commenced on September 7, 2018, against certain stockholders of the Debtors styled *SEC v. Honig, et al.*, Case No. 1:18-v-08175 in the United States District Court Southern District of New York.

**1.102.** "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as

determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

**1.103.** "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

**1.104.** "*Securities Act*" means the Securities Act of 1933, 1.5 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

**1.105.** "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

**1.106.** "*Sichenzia Litigation*" means the lawsuit filed by Debtor MabVax Holdings on or about October 30, 2018 against, inter alios, its former counsel, Sichenzia Ross Ference LLP (f/k/a Sichenzia Ross Ference Kesner LLP; f/k/a Sichenzia Ross Friedman Ference LLP), Harvey Kesner, in the United States District Court for the Southern District of California, styled *MabVax Therapeutics Holdings, Inc. v. Sichenzia Ross Ference LLP, et al.*, Case No. 3:18-cv-02494-WQH-MSB.

**1.107.** "*Sole Director*" means J. David Hansen, in his capacity as the sole remaining director of the Debtors.  Pursuant to the Combined Disclosure Statement and Joint Plan of Liquidation, the Sole Director shall succeed to the role of Plan Administrator.

**1.108.** "*Solicitation Procedures Order*" means the *Order (A) Conditionally Approving the Combined Disclosure Statement and Plan for Solicitation Purposes Only, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Combined Disclosure Statement and Plan, (C) Approving the Forms of Ballot and Solicitation Materials, (D) Establishing Voting Record Date, (E) Fixing the Date, Time and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto, and (F) Approving Related Notice Procedures* [D.I. __].

**1.109.** "*Statutory Fees*" means any and all fees payable to the UST pursuant to section 1930 of title 28 of the United States Code and any interest thereon.

**1.110.** "*Subordinated Claim*" means any Claim that is subject to subordination under section 510 of the Bankruptcy Code.  For the avoidance of doubt, "Subordinated Claim" includes any 510(a) and 510(b) Subordinated Claim and any 510(c) Subordinated Claim.

**1.111.** "*UST*" means the Office of the United States Trustee for the District of Delaware.

**1.112.** "*Unclaimed Distribution Deadline*" means sixty (60) days from the date the Plan Administrator makes a Distribution of Cash or other property under the Combined Disclosure Statement and Joint Plan of Liquidation to a Holder of an Allowed Claim.

**1.113.** "*Unclaimed Distribution*" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

**1.114.** "***Unimpaired***" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of Sections 1123(a)(4) and 1124 of the Bankruptcy Code.

**1.115.** "***Vote, Voting***" means to timely complete and submit, in accordance with the Bankruptcy Court's order approving the Combined Disclosure Statement and Joint Plan of Liquidation, a ballot substantially in the form of Official Bankruptcy Form 314 indicating an acceptance or rejection of the Plan.

**1.116.** "***Voting Deadline***" means [*], 2020, at 4:00 p.m. (prevailing Eastern Time), the date and time by which Ballots to accept or reject the Plan must be received.

**1.117.** "***Y-mAbs***" means Y-mAbs Therapeutics, Inc.

**1.118.** "***Y-mAbs Receivable***" means the amount that may become due and owing to the Debtors pursuant to the Y-mAbs Settlement Agreement.

**1.119.** "***Y-mAbs Settlement Agreement***" means the *Settlement and Assumption and Assignment of MSK License Agreement and Y-mAbs Sublicense Agreement* [D.I. 262] by and between the Debtors, MSK and Y-mAbs.

*B.    Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings of Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

*C.    Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

*D.    Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), provided that corporate or limited liability company governance matters relating to the Debtors.

E.      *References to Monetary Figures*

All references in the Plan to monetary figures refers to currency of the United States of America, unless otherwise expressly provided.

F.      *References to the Debtors or the Post-Effective Date Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or Post-Effective Date Debtors mean the Debtors and the Post-Effective Date Debtors, as applicable, to the extent the context requires.

### III.    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Claims and Priority Tax Claims which are not classified in accordance with §1123(a)(1)) and an estimate of the recoveries of each Class.[1]  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by the full contents of the Combined Disclosure Statement and Joint Plan of Liquidation.

The information in the table below is provided in summary from for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by creditors.  The Projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimate as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Joint Plan of Liquidation, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the

---

[1]      The amounts represent estimated Allowed Claims and do not represent amounts actually asserted by the creditors in proofs of claim or otherwise. The Debtors have not completed their analysis of Claims in these Chapter 11 Cases and objections to such Claims have not been fully litigated.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be more or less than estimated.

date hereof on any basis (including new or different information received and/or errors discovered).

| Class Type of Claim or Interest | Estimated Allowed Claims and Equity Interests | Treatment / Voting Status | Estimated Recovery to Holders |
|---|---|---|---|
| Class 1 – DIP Claims | $0 | Unimpaired/Deemed to Accept | 100% |
| Class 2 – Other Secured Claims | $0 | Unimpaired/Deemed to Accept | 100% |
| Class 3 – Priority Non-Tax Claims | $74,994.44 | Unimpaired/ Deemed to Accept | 100% |
| Class 4 – General Unsecured Claims | $15,885,419.94 | Impaired/Entitled to Vote | 3% |
| Class 5 – 510(a) and 510(b) Subordinated Claims | N/A | Impaired/Deemed to Reject | 0% |
| Class 6 – 510(c) Subordinated Claims | N/A | Impaired/Deemed to Reject | 0% |
| Class 7 – Intercompany Claims | N/A | Impaired/Deemed to Reject *** Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims* | 0% |
| Class 8 – Equity Interests | N/A | Impaired/ Deemed to Reject *** On the Effective Date, all Equity Interests shall be extinguished, and owners thereof shall receive no Distribution on account of such Equity Interests. Equity Interest shall be non-transferable from and after the Effective Date; provided, however, if the Plan Administrator receives over time sufficient Available Cash to achieve the class 4 Satisfaction, a procedure motion will be filed to make Distributions to junior classes.* | 0% |

## IV.    BACKGROUND; KEY EVENTS LEADING UP TO AND DURING THE CHAPTER 11 CASES

*A.    The Debtors*

MabVax Holdings was a public company originally incorporated in 1988 under the name "Terrapin Diagnostics, Inc." in the state of Delaware.  In 1998, it changed its name to "Telik, Inc." In 2014, Telik, Inc. merged with MabVax Holdings.  Debtor MabVax Holdings was a clinical-stage biotechnology company involved with developing treatments for certain cancers, including pancreatic cancer, soft tissue cancer, and ovarian cancer.  MabVax Holdings was founded in San Diego more than a decade ago by leading pharmaceutical researchers, clinicians, and

entrepreneurs, including the head of the Laboratory of Tumor Vaccinology at the renowned Memorial Sloan Kettering Cancer Center in New York. Since then, the MabVax Holdings' team developed promising therapies leading to early-stage clinical trials and collaborated with others here and abroad—including Memorial Sloan Kettering—in the fight to find effective treatments for these diseases. Along the way, MabVax Holdings matured from a local start-up financed by a few generous patrons into a public company with its stock traded on the Nasdaq Stock Market.[2]

B.      *The Debtors' Prepetition Debt Capitalization.*

As of the Petition Date, the Debtors' aggregate funded and matured secured debt obligations were approximately $2,800,000 (the "Pre-Petition Loan"). This amount was owed to the Debtors' sole pre-petition secured lender, Oxford Finance LLC, pursuant to that certain Loan and Security Agreement that Oxford and the Debtors entered into in January 2016 (as amended, the "Pre-Petition Loan Agreement").

To secure repayment of the Pre-Petition Loan, the Debtors granted Oxford a first lien upon and security interest in, *inter alia,* goods, accounts receivable, inventory, equipment, deposit accounts, general intangibles (excluding intellectual property), and investment property (the "Pre-Petition Security Agreement"). In the Second Amendment to the Pre-Petition Loan Agreement, MabVax Holdings granted Oxford a security interest in its intellectual property pursuant to a separate Intellectual Property Security Agreement (the "IP Security Agreement" and, together with the Pre-Petition Security Agreement and the collateral described by each, the "Pre-Petition Collateral") in exchange for Oxford's consent to the Debtors entering into an asset purchase and license agreement with Boehringer Ingelheim International GmbH ("BII").[3]

C.      *The Debtors' Prepetition Equity Capitalization*

Debtor MabVax Holdings is the sole stockholder of Debtor MabVax Therapeutics. Debtor MabVax Holdings is a publicly traded company and has the following series of stock issued and outstanding:[4]

| Series | Registered Holders | Approximate Beneficial Owners | Shares Issued and Outstanding |
|---|---|---|---|
| Common | 99 | 3700 | 4,714,791 |
| Preferred A-1 | 1 | 0 | 13,419 |
| Preferred D | 1 | 0 | 44,104 |
| Preferred E | 1 | 0 | 33,333 |
| Preferred I | 2 | 0 | 645,640 |

---

[2] MabVax Holdings is now de-listed from NASDAQ as described *supra.*

[3] BII is Europe's largest privately held biopharmaceutical company pioneering the development of individualized therapies for cancer and other diseases.

[4] The foregoing is based upon the current information available to the Debtors but is not an admission as to the validity or nature of any Equity Interest. The Debtors reserve all rights to update this information and/or to challenge any Equity Interest.

| | | | |
|---|---|---|---|
| Preferred J | 4 | 0 | 772.73 |
| Preferred K | 14 | 0 | 62,050 |
| Preferred L | 7 | 0 | 45,500 |
| Preferred M | 3 | 0 | 5,000 |
| Preferred N | 8 | 0 | 5,363.64 |
| Preferred O | 10 | 0 | 10,065 |

Debtor MabVax Holdings also has the following outstanding warrants:[5]

| Issuance | Amount of Common Stock Eligible to Be Purchased | Eligible Purchase Price | Expiration Date |
|---|---|---|---|
| January 2016 Oxford Finance LLC Secured Financing | 75,075 | $16.65 | January 15, 2021 |
| 2018 Private Placement | 855,561 | $2.70 | February 2021 |

D.      *Events Leading to these Chapter 11 Cases.*

Like other clinical-stage biotechnology companies, MabVax Holdings could not earn product revenue until it (or its collaborative partners) completed clinical trials, obtained regulatory approval, and successfully commercialized one or more of its products.  Consequently, it relied on outside financing, and sales and licensing of certain intellectual property to fund its operations.  As described more fully below, from and after January 2018, the month MabVax announced to the Public Markets that it was under SEC investigation, the Debtors' ability to raise debt/equity financing was seriously impaired.  As of the Petition Date, the Debtors had not yet brought any products to market and have incurred net losses since inception.

E.      *Alleged Bad Actors' Pump and Dump Scheme*

A group of MabVax Holdings' outside investors and vendors (the "Alleged Bad Actors") allegedly acquired financial control of MabVax Holdings through fraudulent and deceptive means, concealing from MabVax Holdings the extent of their inter-relationships—both with each other, and other collaborators.  The Alleged Bad Actors were able to obtain a consent right ("Consent Right") pursuant to which MabVax Holdings was required to obtain the Alleged Bad Actors' permission before it could raise any additional money (such as equity or debt financing).  This Consent Right allowed the Alleged Bad Actors to block, for any reason or no reason at all, financing MabVax Holdings desperately needed to continue its work.  Through the Consent Right, the Alleged Bad Actors were able to impose any manner of conditions when granting consent to MabVax Holdings to seek additional financing.

---

[5] Debtor MabVax Holdings also issued warrants as follows: (a) to purchase 56,303 shares of common stock at a price of $29.31 in connection with its October 2015 public financing; those warrants expired on September 30, 2018 and (b) to purchase 291, 304 shares of common stock at a price range between $16.65 and $18.87 per share in connection with the August 2016 public offering.  Those warrants expired August 22, 2019.

The Alleged Bad Actors were able to exert financial control over MabVax Holdings' ability to raise needed capital by, among other things, requiring, as a condition to extending financing to MabVax Holdings, that MabVax Holdings hire a number of vendors who, unbeknownst to MabVax Holdings, allegedly were collaborating with the Alleged Bad Actors on their pump and dump scheme. For example, MabVax Holdings was required to hire multiple investor relations vendors at great expense. In hindsight, it appears MabVax Holdings unknowingly was required to finance through those vendors some fraudulently bullish "research" reports that facilitated the pump-and-dump scheme described below. Also, critically, MabVax allegedly was compelled to retain the Alleged Bad Actors' favored counsel, Harvey Kesner, Esq. ("Kesner") of what was then Sichenzia Ross Ference Kesner LLP ("Sichenzia"), as counsel for securities reporting matters.[6] By allegedly providing MabVax Holdings with false legal advice, Sichenzia/Kesner allegedly concealed that the Alleged Bad Actors were acting as an illicit control group.

The Alleged Bad Actors' alleged intention in gaining financial control of MabVax was to profit through illegal "pump and dump" schemes with MabVax Holdings' stock. This illegal scheme was publicly exposed by the SEC Complaint filed September 7, 2018. The Alleged Bad Actors did so by, among other things, allegedly writing, or causing to be written, fraudulent promotional articles about MabVax Holdings that were intended to drive up MabVax Holdings' stock price. Then—allegedly acting pursuant to their illicit agreement to acquire, hold, vote and/or dispose of their MabVax Holdings shares in concert—the Alleged Bad Actors sold their shares of MabVax Holdings into the market possibly through private off market transactions.

Additionally, the Alleged Bad Actors fraudulently induced the MabVax Holdings to issue millions of shares of stock—worth over $30 million—to the Alleged Bad Actors and their affiliates. One way in which the Alleged Bad Actors allegedly did this was through shares of preferred stock many Alleged Bad Actors held. Each share of preferred stock, upon the request of the investor holding that share, was to be converted by MabVax Holdings into shares of common stock. This preferred stock was also subject to "beneficial ownership blockers" that forbade the conversion of preferred shares into common stock if, as a result, the converting shareholder would beneficially own more than a certain percentage of MabVax Holdings (most often, 4.99%). The Alleged Bad Actors and their affiliates misrepresented their beneficial ownership of MabVax Holdings when seeking conversions of preferred stock, leading MabVax Holdings allegedly to issue at least $22 million in common stock to which Alleged Bad Actors and their affiliates were not entitled to. MabVax Holdings was also required to issue "inducement shares" to the Alleged Bad Actors and their affiliates to secure consent for financings, equal to roughly $9.6 million.

F.      *The SEC Action Against the Alleged Bad Actors*

On January 26, 2018, MabVax Holdings received notice from the SEC of an investigation into potential violations of securities laws involving MabVax Holdings and certain of its stockholders.

As MabVax Holdings publicly has disclosed, the subject matter of the SEC Investigation includes (i) the circumstances under which certain stockholders invested in MabVax Holdings and

---

[6] The statements made herein regarding the Alleged Bad Actors are based entirely on the allegations in the Alleged Bad Actor Litigation and Sichenzia Litigation. As such, they remain only allegations.

whether they acted as an undisclosed group under Section 13(d)(3) of the Exchange Act in connection with their investment; (ii) the manner in which those stockholders may have sought to control or influence MabVax Holdings and its leadership from and after their respective investments; and (iii) MabVax Holdings' prior disclosures regarding the control of it and the beneficial ownership of its common and preferred stock included in its registration statements filed in 2017 and 2018 and in its Exchange Act reports.

On September 7, 2018, the SEC filed a complaint in the U.S. District Court for the Southern District of New York against certain investors in MabVax Holdings; *SEC v. Honig, et al.*, No. 1:18-cv-01875 (S.D.N.Y. 2018), as later amended and expanded in the First Amended Complaint filed March 8, 2019 (the "SEC Complaint"). The SEC Complaint alleges a variety of misconduct with respect to the investors' transactions; *e.g.,* some of the investor defendants: (i) manipulated the price of MabVax Holdings' securities by writing, or causing to be written, false or misleading promotional articles, and a variety of other manipulative trading practices in connection therewith and (ii) filed false reports of their beneficial ownership or failed to file reports of their beneficial ownership when required to do so. The SEC claims that, by engaging in this and other alleged actions, the investor defendants and other defendants violated the anti-fraud and many other provisions of the Exchange Act, the Securities Act and SEC Rules promulgated thereunder. Specifically, the SEC claims that certain investors violated provisions of federal securities laws that require individuals and groups to file accurate 13D and 13G reports describing the extent of their ownership with the SEC and investing public and that the investor group acted as a group to manipulate the company's stock.

The SEC Complaint does *not* assert any claims against the Debtors or any of their directors or officers, nor otherwise alleges that they were culpable participants in the misconduct allegedly undertaken by the investor defendants. The Debtors have cooperated with the SEC and consider themselves victims. The SEC has never brought or threatened any claims against MabVax.

Unfortunately, the Debtors incurred substantial legal fees as a result of the SEC investigation and are the subject of two derivative lawsuits.

G.    *Derivative Actions*

***In re MabVax Therapeutics Securities Litigation, Case No. 18-cv-1160-BAS-NLS.***

On June 4, 2018, and August 3, 2018, purported stockholders of MabVax Holdings filed two securities class action complaints against it and certain of its officers and directors in the United States District Court for the Southern District of California. On September 6, 2018, the Court consolidated the cases and appointed lead plaintiffs. On October 10, 2018, lead plaintiffs (and two additional plaintiffs) filed a consolidated complaint that alleged certain investors in Debtor MabVax Holdings, with the cooperation of Debtor MabVax Holdings and its management, engaged in a pump-and-dump scheme at the expense of other MabVax Holdings' investors. On November 13, 2018, the plaintiffs voluntarily dismissed the consolidated action without prejudice. On December 6, 2018, the Court entered an Order terminating the cases.

***Liesman v. Hansen et al., Case No. 18-cv-2237-BAS-MSB and Jackson v. Hansen et al., Case No. 18-cv-2302-BAS-MSB.***

On September 26, 2018 and October 4, 2018, purported stockholders of MabVax Holdings, filed two derivative complaints in the United States District Court for the Southern District of California. The lawsuits arise out of the same underlying facts as *In re MabVax Therapeutics Securities Litigation* but the complaint in *Liesman* asserts a state law breach of fiduciary duty claim against certain of the Debtor MabVax Holdings' current and former directors and officers, and the complaint in *Jackson* asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement and waste of corporate assets. David Hansen, the Debtors' former chief executive officer and director, is named as a defendant. The plaintiffs seek, on behalf of Debtor MabVax Holdings, damages, fees, costs, and equitable relief. On January 23, 2019, the Court consolidated the actions. On February 22, 2019, the plaintiffs filed a joint motion for appointment of lead counsel.

On March 27, 2019 the Court entered an Order Staying Case and directing that counsel for Defendants and MabVax shall file a status report no later than 7 days after the date of the resolution of the bankruptcy proceeding which addresses what impact the bankruptcy proceeding has on the consolidated derivative action.

H.    *The Debtors Incurred Substantial Legal Fees to Obtain Declaratory Relief Regarding Whether Shares Were Validly Issued*

Historically, Debtor MabVax Holdings had calculated and reported beneficial ownership in reliance upon the accuracy of the beneficial ownership reporting of its stockholders, including reports filed on Schedules 13D and 13G and information provided directly by these stockholders. MabVax Holdings similarly relied on the accuracy of stockholder-reported beneficial ownership when effecting conversions of shares of preferred stock. The SEC investigation and the Debtors' review of the matters under investigation raised questions about the accuracy of the reports by those holders, including their past disclaimers of having not acted as a group with respect to their investment in MabVax Holdings. If certain stockholders acted as a group, their respective beneficial ownership interests should have been aggregated and reported in the aggregate in MabVax Holdings' prior beneficial ownership disclosures. If their holdings should have been aggregated, then, due to the provisions of MabVax Holdings' organizational documents regarding the conversion limitations applicable to certain holders of MabVax Holdings' preferred stock, shares of its common stock may have been issued in violation of its organizational documents. If shares of its common stock were issued in violation of its organizational documents, then the number of shares of its outstanding common stock previously reported in its financial statements, registration statements and Exchange Act Reports may be inaccurate. Further, figures reported and included in its financial statements, registration statements and Exchange Act Reports in reliance on the number of its outstanding shares of common stock, including, but not limited to, its loss per share figures, may also have been inaccurate.

Due to the uncertainty regarding the valid issuance of certain shares common stock as a result of the Alleged Bad Actors' alleged fraudulent activities, and until such time as MabVax Holdings could obtain the ratification of the Delaware Court of Chancery, on May 20, 2018, MabVax Holdings' Board of Directors, upon the recommendation of management, concluded MabVax Holdings prior annual and interim period financial statements for the years 2014, 2015, 2016 and 2017 included in their Reports on Form 10-K and Form 10-Q for such years, and MabVax Holdings' registration statements filed during the years 2014, 2015, 2016, 2017 and 2018 with

respect to the number of shares of common stock outstanding, and the weighted average number of shares used in calculating earnings per share and related per share figures should not be relied upon.  Accordingly, on May 20, 2018, the Debtors engaged the independent registered public accounting firm, CohnReznick LLP, and withdrew their audit reports included in MabVax Holdings' Annual Reports on Form 10-K for the years 2014, 2015, 2016 and 2017.  Given the cloud of uncertainty over the number of shares outstanding and the dramatic impact on past and current financial statements of the Company as well as allegations brought by the SEC against the Alleged Bad Actors, MabVax Holdings was unable to raise capital to continue clinical development of its programs.

On July 27, 2018, MabVax Holdings filed a *Verified Petition for Relief Under 8 Del. C. § 205* (the "Delaware Petition") in the Court of Chancery of the State of Delaware (the "Delaware Chancery Court") captioned *In re: MabVax Therapeutics Holdings, Inc.*  The Delaware Petition sought a declaration that shares of common stock were validly issued upon conversion of preferred stock and that all stockholder resolutions be ratified.

On September 20, 2018, the Delaware Chancery Court entered an order granting the Delaware Petition validating (i) issuances of common stock upon conversions of MabVax Holdings' preferred stock occurring between June 30, 2014 and February 12, 2018, and (ii) stockholder approval of corporate actions presented to MabVax Holdings' stockholders from June 30, 2014 to February 12, 2018.  On October 15, 2018, MabVax Holdings' auditor re-instated their audit report and MabVax Holdings filed an amended annual report for 2017 and two quarterly reports, bringing the company's filings current with the SEC.

While MabVax Holdings was not charged by the SEC and also prevailed in the class action litigation, the legal fees were substantial and a further drain on MabVax Holdings' limited liquidity.

I.      *Litigation by MabVax Holdings Against Sichenzia and the Alleged Bad Actors*

On October 30, 2018, MabVax Holdings filed an action styled *MabVax Therapeutics Holdings, Inc. v. Sichenzia Ross Ference LLP, et al.*, Case No. 3:18-cv-02494-WQH-MSB (the "Sichenzia Litigation") against, *inter alios*, Sichenzia and Kesner, in the United States District Court for the Southern District of California.  In the *Sichenzia Litigation*, the Debtors asserts, *inter alia*, negligent professional practice, breach of fiduciary duty and fraud.  By Order of this Court [D.I. 102], the Debtors retained Block & Leviton post-petition to continue to prosecute the Sichenzia Litigation.  On May 9, 2019, the United States District Court for the Southern District of California entered an order denying defendants Sichenzia and Kesner's motion to dismiss and motion to transfer venue and granting motion to dismiss filed by other defendants.  The parties currently are in discovery.

On May 24, 2019, MabVax Holdings filed an action styled *MabVax Therapeutics Holdings, Inc. v. Honig, et al.*, Case No. 19-cv-981-WQH-MSB (the "Alleged Bad Actor Litigation") against the Alleged Bad Actors in the United States District Court for the Southern District of California.  In the Alleged Bad Actor Litigation, the Debtors assert, among other things, market manipulation, unlawful business practices, fraud and fraudulent concealment.  By Order of

this Court [D.I. 101], the Debtors retained Baker Botts LLP post-petition to continue to prosecute the Alleged Bad Actor Litigation.

*J.*      *NASDAQ Delisting*

As a consequence of uncertainty regarding the valid issuance of certain shares of common stock, on May 21, 2018, MabVax Holdings notified the Listing Qualifications Department of the Nasdaq Stock Market that it would not be filing its Form 10-Q, as required for continued listing on the Nasdaq Capital Market per Nasdaq listing rule 5250(c)(1). MabVax Holdings received notice from the Listing Qualifications Department of The Nasdaq Stock Market LLC indicating that it was not in compliance with Nasdaq Listing Rule 5250(c)(1), which requires the timely filing of periodic reports with the U.S. Securities and Exchange Commission.

In accordance with the Nasdaq Listing Rules, MabVax Holdings was provided a period of 60 days from the date of the notice to either file the Form 10-Q or to submit a plan to regain compliance with the Rule for the Staff's review. If a plan was submitted and accepted, MabVax Holdings could be granted up to 180 days from the Form 10-Q's due date, or until November 12, 2018, to regain compliance.

On June 29, 2018, MabVax Holdings' board of directors voted not to submit a plan to the Listing Qualifications Department of The Nasdaq Stock Market to regain compliance with Nasdaq Listing Rule 5250(c)(1) regarding filing its Form 10-Q with the SEC for the period ended March 31, 2018.  As a result of MabVax Holdings' decision not to submit a plan to regain compliance with Nasdaq's filing requirement, which decision was announced by MabVax Holdings' in a press release on July 2, 2018, the Listing Qualifications Staff of The Nasdaq Stock Market LLC notified MabVax Holdings of its determination to delist its securities from Nasdaq. The Staff indicated that the determination was based upon MabVax Holdings' non-compliance with the filing requirement as well as its non-compliance with the $2.5 million stockholders' equity requirement for continued listing on The Nasdaq Capital Market and, as a result, on July 2, 2018, MabVax Holdings received a letter from the Staff that the trading of its common stock would be suspended on Nasdaq at the open of business on Wednesday, July 11, 2018.  On July 11, 2018, MabVax Holdings common stock began trading on the OTC Pink, continuing under the symbol MBVX.

Delisting the common stock effectively results in the common stock being designated a "penny stock" that broker-dealers cannot recommend.  Additionally, subsequent transfers of the shares of common stock by U.S. holders may not be exempt from state securities laws.  Under such circumstances, the common stock is substantially less attractive to prospective purchasers.

As a result of the various matters of the SEC's investigation and lawsuit against the Alleged Bad Actors and delisting from the NASDAQ Stock Market, MabVax Holdings was unable to generate funds through additional equity issuances.

*K.*      *Prepetition Sales and Sales Efforts.*

Between February 2 and February 10, 2018, MabVax Holdings entered into separate purchase agreements with investors pursuant to which it sold (i) shares of common stock, (ii) shares of their convertible preferred stock, and (iii) warrants to purchase shares of common stock

(the "February 2018 Private Placements").    The net proceeds of the February 2018 Private Placements were $2,700,000 after transaction costs of $50,000.

From April 30 to May 2, 2018, MabVax Holdings entered into separate purchase agreements with investors pursuant to which it agreed to sell shares of its common stock and convertible preferred stock (the "May 2018 Private Placements").    The May 2018 Private Placements closed on May 15, 2018, with the MabVax Holdings receiving gross proceeds totaling $830,000.

L.    The Y-mAbs Sublicense

On June 27, 2018, MabVax Holdings entered into a Sublicense Agreement granting Y-mAbs Therapeutics, Inc., a publicly held clinical stage biopharmaceutical company, an exclusive sublicense for a bi-valent ganglioside-based vaccine intended to treat neuroblastoma, a rare pediatric cancer (the "Y-mAbs Sublicense").    The underlying license was issued by MSK, as licensor to the Debtors.    Upon entering into the Y-mAbs Sublicense, MabVax Holdings received a non-refundable upfront payment of $700,000.

If Y-mAbs successfully develops and receives FDA approval for the neuroblastoma vaccine, it will be required to file a Priority Review Voucher with the FDA.    The FDA may then grant that Priority Review Voucher.    By way of background, Priority Review Vouchers entitle an applicant to expedited regulatory review of a new product.    This can be extremely valuable in the biotechnology industry and rights to the Vouchers are sold for substantial fees.    If a Priority Review Voucher is granted to Y-mAbs and subsequently sold, MabVax Holdings is entitled to a 20% of the net sale proceeds (the "Y-mAbs Receivable") before taking into account royalty payments due and owing from the Debtors to MSK on account of the Y-mAbs Receivable.

M.    The BII License

On July 4, 2018, the Debtors entered into certain asset purchase and license agreement with BII (the "BII Sublicense") pursuant to which BII purchased all the Debtors' assets relating to a specific human antibody research and development program to identify and characterize antibodies that bind to an undisclosed glycan antigen.    The transaction closed on July 6, 2018.    The BII Sublicense is derived from certain rights pursuant to licenses issued by MSK, as licensor to the Debtors.

Pursuant to the BII Sublicense, MabVax Holdings received $4 million with the right to receive up to an additional $8.25 million upon the achievement by BII of various specified milestone events, plus further earn-out payments through the later of the expiration of the last to expire valid claim of the licensed program patent covering a BII product, or ten (10) years from the date of first commercial sale of such BII product on a country-by-country and product-by-product basis (the "BII Receivable").    The Debtors are required to pay certain royalties to MSK arising from the BII Receivable.

N.    Significant Events in the Chapter 11 Cases

Unable to raise equity or debt to continue operations, or otherwise re-finance or restructure the Pre-Petition Loan Agreement, the Debtors defaulted to Oxford. The Debtor engaged

investment bankers to market and sell their business, as described *infra* in the Bidding Procedures Motion. After a prolonged marketing period, the Debtors identified BioNTech[7] as the best and most likely candidate to acquire their business and assets. On February 28, 2019, BioNTech made an unsecured loan to the Debtors in the amount of $258,000. The BioNTech pre-petition loan was fully funded on March 11, 2019 and used to provide necessary liquidity to bridge the Debtors to the filing date for these Chapter 11 Cases. The BioNTech loan remains an unsecured obligation of the Debtors.

The Debtors filed their voluntary petitions for relief on March 21, 2019, the Petition Date. Since that time, a number of key events have occurred in these Chapter 11 Cases, including (i) the Bankruptcy Court's entry of orders providing the Debtors with certain "first day" relief, including the provision of post-petition financing to the Debtors; (ii) the Debtors' retention of Professionals; (iii) the Debtors' treatment of Executory Contracts and unexpired leases, and the settling of certain contested matters with respect thereto; (iv) the auction and sale of substantially all of the Debtors' assets to BioNTech; and (v) the sale of other lab equipment to BioNTech.

## 1. "First-Day" Relief

On March 21, 2019, the Debtors filed the following emergency "first-day" motions and applications seeking relief intended to facilitate the Debtors' transition into these Chapter 11 Cases and to minimize disruptions to the Debtors' business operations:

- **Bank Accounts Motion.** The Debtors filed the Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363, 1107 and 1108 Authorizing: (A) Continued Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms and (C) Waiver of Section 345(b) Deposit and Investment Requirements and Certain United States Trustee Guidelines [D.I. 5], which sought an order permitting the Debtors to designate its existing bank accounts as debtor in possession accounts for use in these Chapter 11 Cases.

- **Taxes Motion.** Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Pre-Petition Taxes and (II) Authorizing the Banks to Honor and Process the Payment of Such Amounts [D.I. 6]

- **Wages Motion.** The Debtors filed the Motion for Interim and Final Orders Pursuant to Sections 105(a), 363(b), 363(c), 507(a), 541(b)(7), 541(d), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing the Debtors to (A) Pay Certain Prepetition Severance, Variable Commissions, Wages, Compensation, and Employee Benefits, (B) Continue Payment of Severance, Variable Commissions, Wages, Compensation, and Employee Benefits in the Ordinary Course of Business and (C) Continue Payment of Employment, Unemployment, Social Security and Other Taxes Incident to the Employee Obligations; and (II) Authorizing and Directing the Debtors' Third-Party Payroll Administrator and Debtors' Bank to Receive, Process,

---

[7] BioNTech is a researched-based pharmaceutical biotech company that develops tailored treatments for cancer and other diseases with high unmet medical need through its disruptive research platforms. Post-petition, BioNTech purchased substantially all of the Debtors' assets.

Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing [D.I. 7], which sought an order authorizing the Debtors to meet its current obligations to its employees in the ordinary course of business.

- **Insurance Motion.** Motion for Entry of an Order Authorizing the Debtors to Continue and Renew Their General Business Insurance Policies and Honor All Obligations and Financing Agreements in Respect Thereof [D.I. 8].

- **DIP Financing Motion.** The Debtors filed the a Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of the Bankruptcy Code (I) Authorizing Debtors to (A) Obtain Post-Petition Secured Financing From BioNTech Research And Development, Inc.; (B) Utilize Cash Collateral; and (C) Pay Certain Related Fees and Charges; and (II) Scheduling a Final Hearing [D.I. 9], which sought interim and, ultimately, final approval of the DIP Financing.

The Bankruptcy Court entered orders granting these "first-day" motions, among others, on March 22, 2019.

### 2. Retention of Professionals and Advisors

On April 23, 2019, the Bankruptcy Court granted the Debtors' application to employ The Rosner Law Group LLC as its general bankruptcy counsel for all purposes of these Chapter 11 Cases [D.I. 100].

On April 23, 2019, the Court also entered orders approving the retention of the law firms Baker Botts L.L.P [D.I. 101] and Block & Leviton LLP [D.I. 102] as special litigation counsel to the Debtors to prosecute, respectively, the Alleged Bad Actor Litigation and the Sichenzia Litigation.

As noted, David Hansen, the Debtors' Sole Director, is named as a defendant in the Derivative Actions.  In Article XIV of the Plan, the Debtors propose to release the Derivative Actions.  On December 6, 2019, the Debtors moved to retain Edward T. Gavin of Gavin/Salmonese LLC as an Independent Director for the sole and limited purpose of rendering an independent opinion on the value, if any, of the Derivative Actions in connection with the Plan's proposed release of such actions.

### 3. Schedules; 341 Meeting

On April 12, 2019, the Debtors filed their (i) Schedules of Assets and Liabilities [D.I. 86 & 88] and (ii) Statement of Financial Affairs (collectively, the "<u>Schedules</u>") [D.I. 87 & 89].  On April 24, 2019, the Debtors filed their amended Schedules [D.I. 103-05].

On April 24, 2019, the U.S. Trustee conducted and concluded a meeting of creditors in these Chapter 11 Cases pursuant to section 341(a) of the Bankruptcy Code.

### 4. Sale of Substantially all of the Debtors' Assets and Related Settlements

On the Petition Date, the Debtors filed the *Motion of Debtors and Debtors-in-Possession with Respect to Sale of Assets for (I) an Order (A) Establishing Bidding Procedures Including, Without Limitation, Break-Up Fee Provisions and Other Bid Protections, (B) Approving Form of Asset Purchase Agreement, (C) Approving Form and Manner of Notice of Sale and Treatment of Executory Contracts and Unexpired Leases and (D) Scheduling Sale Hearing Date to Consider Final Approval of Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases; (II) an Order Approving (A) the Sale, Free and Clear of Liens, Claims and Encumbrances and (B) Treatment of Executory Contracts and Unexpired Leases; and (III) Related Relief* [D.I. 11](the "Bidding Procedures Motion"). On dated April 8, 2019, the Court approved the Bid Procedures Motion [D.I. 78] (the "Bid Procedures Order"). As described more fully in the Bid Procedures Motion, the Debtors' assets were extensively marketed pre-petition by two investment banks and management and were largely derived from the Debtors' rights under licenses issued by MSK.

Pursuant to the Bid Procedures Order, the Debtors continued to market their business and assets to potential purchasers. On May 1, 2019, the Debtors conducted an auction of their assets between two bidders: (1) BioNTech AG and (2) Scale Therapeutics Inc. At the conclusion of spirited bidding, the Debtors determined that the bid submitted by BioNTech (the "BioNTech Bid") was the highest and best bid submitted for the Debtors' assets. The BioNTech Bid provided the following consideration to the Debtors' estate: (i) $3,915,000 in cash plus (ii) BioNTEch assumed all cure costs with respect to certain assumed executory contracts and an unexpired lease. On May 7, 2019, the Court entered the Sale Order which resolved certain objections of MSK and approved the sale of substantially all of the Debtors' assets to BioNTech. The sale to BioNTech closed on May 7, 2019.

On May 7, 2019, the Debtors, MSK and BioNTech entered into that certain *Assumption of MSK License Agreement and BII Agreements* [D.I. 138, 143] (the "BII Settlement Agreement").[8] Pursuant to the BII Settlement Agreement, the Debtors preserved and retained the right to collect and receive the BII Receivable. The parties agreed that the Debtors' rights to the BII Receivable will not be affected by these chapter 11 cases, a conversion of these chapter 11 cases to cases under chapter 7 or by any plan that transfers the Debtors' assets to a trust, and the Debtors' successor(s) will be entitled to the BII Receivable. Further, the Debtors are authorized to transfer their rights to the BII Receivable to any Plan Administrator pursuant to the Plan. In addition, the BII Settlement Agreement requires the Debtors or their successors, as applicable, to comply with certain obligations to MSK as licensee, including the payment of royalties from the proceeds of the BII Receivable. As of the date of the BII Settlement Agreement, a royalty payment in the amount of $400,000 (the "BII Cure Amount") was due and owing by the Debtors to MSK on account of the BII Sublicense. Pursuant to the BII Settlement Agreement, MSK agrees to defer the Debtors' obligation to pay the BII Cure Amount, which shall be paid from the BII Receivable, if any. Furthermore, the Debtors (including their successors or designees) shall be obligated to pay the BII Cure Amount to MSK in full before paying any other third party with, or retaining, any future income or other payments on account of the BII Sublicense. The BII Settlement Agreement further provides that if the Debtors or their successors can no longer receive or are unable or unwilling to enforce the right to any portion of the BII Receivable then the BII

---

[8] To the extent there is any inconsistency between the terms of the BII Settlement Agreement and this Amended Combined Disclosure and Joint Plan of Liquidation, the BII Settlement Agreement governs.

Receivable shall be paid directly to MSK; provided, however, before any payments to MSK in such circumstance, Debtors' counsel must be given thirty (30) days' notice and the opportunity to object.

Additionally, post-petition, on or about July 1, 2019, MabVax received an additional $600,000 upon the one-year anniversary of entering into the Y-mAbs Sublicense.

On July 10, 2019, the Debtors filed a motion to assume the Y-mAbs Sublicense Agreement [D.I. 190]. MSK objected to the motion on August 2, 2019 [D.I. 202], asserting a cure amount of $328,351.00 (the "Y-mAbs Cure Amount"). Subsequently, the Debtors, MSK and Y-mAbs entered into a *Settlement and Assumption and Assignment of MSK License Agreement and Y-mAbs Sublicense Agreement* (the "Y-mAbs Settlement Agreement"). [9] On December 3, 2019, the Debtors filed a *Motion Pursuant to Bankruptcy Rule 9019 for Entry of an Order Approving the Settlement Agreement Between the Debtors, Sloan Kettering Institute for Cancer Research and Y-mAbs Therapeutics Inc.* [D.I. 262] (the "9019 Motion"). On December 13, 2019, the Court entered an order [D.I. 270] granting the 9019 Motion and approved the Y-mAbs Settlement. Pursuant to the Y-mAbs Settlement Agreement, the Debtors retained the right to collect and receive the Y-mAbs Receivable, provided however, that the portion due and payable to MSK would be paid directly by Y-mAbs to MSK, instead of passing through the Debtors or their successors. For the avoidance of doubt, the purpose of the Y-mAbs Settlement Agreement is to enable Y-mAbs to pay MSK directly its share of the Priority Review Voucher, and not in any way prejudice, alter, lower or affect the Debtors or Plan Administrator's right to receive the Y-mAbs Receivable.

### 5. Contributions by the Directors and Officers to the Chapter 11 Cases.

The success that the Debtors had in the marketing and competitive auction sale of substantially all of their assets and securing and preserving the recovery of Milestone payments sufficient to make the Distributions contemplated by this Plan may be largely attributed to the active involvement of David Hansen, Chief Executive Officer and Chairman of the MabVax Board, Gregory Hanson, acting as Chief Financial Officer, and Paul Maffuid, acting as Executive Vice President of Research and Development (collectively, the "D&Os"). Since the Petition Date and through the closing date on the Sale, the D&Os were the key persons managing the Debtors' estates, maximizing the cash received and ensuring the Sale closed without issue. The D&Os acted and remained employed by the Debtors at a substantial discount from the compensation they otherwise enjoyed pre-petition, all for the benefit of creditors and the Estates. Hansen, as Sole Director, now provides as needed service as Sole Director for the Estates at $300/hour.

Pre-petition, Messrs. Hansen and Hanson were directly involved in all business transactions either completed or contemplated by the Debtors. Specifically, David Hansen was the essential decision maker regarding the structuring and financial details of all agreements entered into by the Debtors. Post-Sale, David Hansen has continued to manage the Debtors acting as their Sole Director. No one is as familiar as David Hansen regarding the financial obligations and timing of payments related to the Boehringer Ingelheim Asset Sale and License Agreement, the Y-mAbs license Agreement, or the MSK license agreements. David Hansen has a professional

---

[9] To the extent there is any inconsistency between the terms of the Y-mAbs Settlement Agreement and this Amended Combined Disclosure and Joint Plan of Liquidation, the Y-mAbs Settlement Agreement governs.

and personal relationship with each of the principals that are counterparties to the Debtors' agreements and licenses and no one is better positioned to monitor and protect creditors' interests in receiving the Milestone payments over the next several years as these Milestone events come to critical decision and payment time points.

The Sole Director is also critical to the successful prosecution of the Sichenzia Litigation and the Alleged Bad Actor Litigation. On behalf of the Debtors, David Hansen has been at the center of the SEC and Department of Justice investigations into the investor group. He has intimate knowledge of the alleged misdeeds of these defendants and knows where all of the documents that are essential to the lawsuits are available. Hansen is the only person with knowledge and authority to direct the two different law firms prosecuting these two cases because of his unique knowledge and personal and professional relationship with the principal attorneys representing the Debtors. Both lawsuits will potentially require Hansen's testimony to successfully prosecute the cases.

O.    *The Debtors have paid and fully satisfied the Pre-Petition Loan Amount Owed to Oxford.*

From the sale proceeds received, the Debtors paid $3,220,000 to Oxford, its fully secured pre-petition lender, in full satisfaction of all amounts owed. Oxford thereafter filed UCC-3 termination statements and released all security interests in and liens upon the Debtors' assets.

P.    *Other Significant Post-Petition Activity*

On June 4, 2019, the Debtors filed the Motion for Entry of Order Authorizing: (A) Rejection of Proposed Transaction with SequenX Biologics LLC and (B) Sale of Equipment to BioNTech AG, Subject to Higher and Better Offers Filed by MabVax Therapeutics Holdings, Inc. [D.I. 158]. On June 26, 2019, the Court entered its Order Authorizing (A) Rejection of Proposed Transaction with SequenX Biologics LLC and (B) Sale of Equipment to BioNTech AG [D.I. 186] approving the sale of certain of the Debtors' remaining assets to BioNTech. The sale of miscellaneous lab equipment to BioNTech resulted in $200,000 to the Debtors and their estates.

On July 10, 2019, the Debtors filed a Motion for Entry of an Order (A) Authorizing the Debtors to Assume Executory Contracts and Pay Related Cure Costs and (B) Granting Related Relief [D.I. 190]. The Debtors sought to assume, among others, the Y-mAbs Sublicense and retain its right to receive and collect the Y-mAbs Receivable. MSK filed an Objection and the Debtors filed a Reply. The dispute with MSK regarding the assumption of the licenses and sublicense related thereof was resolved consensually by Y-mAbs Settlement Agreement. Pursuant to the Y-mAbs Settlement Agreement, the Debtors retained the right to collect and receive the Y-mAbs Receivable. For the avoidance of doubt, the purpose of the Y-mAbs Settlement Agreement is to enable Y-mAbs to pay MSK directly its share of the Priority Review Voucher, and not in any way prejudice, alter, lower or affect the Debtors or Plan Administrator's right to receive the Y-mAbs Receivable.

Q.    *Bar Dates*

Pursuant to the Bar Date Order, the Bankruptcy Court established (i) October 17, 2019 at 4:00 p.m. (ET) (the "Bar Date") as the deadline for creditors, including Governmental Units, to file proofs of claim for General Unsecured Claims, and Administrative Claims accrued during the period from the Petition Date through August 10, 2019 in these Chapter 11 Cases. Notice of the

Bar Dates was served on all potential creditors of the Debtors' Estates and holders of Equity Interests in the event they wished to assert a claim against the Estates, not a proof of Interest.

R.      *Purpose of the Plan*

Following the Sale, the BII Settlement and Y-mAbs Settlement, the Debtors' financial and business affairs essentially have been reduced to reviewing and, if appropriate, objecting to filed proofs of claim, preparing and filing monthly operating reports and state and federal tax filings, prosecuting and/or mediating the Retained Causes of Action, collecting the Milestone Payments, and administering the Available Cash for payment to creditors in accordance with the priorities of the Bankruptcy Code.  The Debtors' major remaining assets generally are the Sale Proceeds, proceeds of the Retained Causes of Actions, and the right to receive the Milestone Payments, if any milestones are achieved.

The Plan constitutes what the Debtors believe is the most straightforward, simple, and cost-effective means available under the circumstances of ascertaining and fixing all Claims against the Debtors and making Distributions to holders of Allowed Claims and, subject to Available Cash, Equity Interests.  The Plan permits the Plan Administrator to receive and review submitted Claims for any possible objection, seek whatever rulings from the Bankruptcy Court pertaining to any Disputed Claims as necessary, and make Distributions to holders of Allowed Claims from the Post-Effective Date Assets, after which the administration of the Estates will be complete and the Plan Administrator will be discharged.  The Plan's provisions are set forth in Article V through Article XVII immediately below.

S.      *Federal Income Tax Consequences*

The confirmation and execution of the Combined Disclosure Statement and Joint Plan of Liquidation may have tax consequences to Holders of Claims and Equity Interests.  The Debtors do not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan.  All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan.  The Disclosure Statement and Plan are not intended, and should not be construed, as legal or tax advice to any Holder of a Claim, Equity Interest or other party in interest.

T.      *Feasibility Test*

The Debtors believe the Plan satisfies the Feasibility Test because it provides for the satisfaction of all Administrative Claims and Priority Claims on the Effective Date from Cash on hand and because the Plan Administrator will retain and receive sufficient Cash to make Distributions to holders of Allowed General Unsecured Claims and wind down the Chapter 11 Case. Thus, no additional liquidation or financial reorganization of the Debtors will be necessary following Confirmation.

U.      *Best Interests Test and Liquidation Analysis*

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a

value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Because substantially all of the Debtors' assets already have been liquidated to Cash, the value of any Distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Combined Disclosure Statement and Joint Plan of Liquidation. This is because conversion of the Chapter 11 Cases to chapter 7 cases would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new Professionals.  The "learning curve" that the trustee and new Professionals would be faced with comes with substantial additional costs to the Estates and with a delay compared to the time of Distributions under the Combined Disclosure Statement and Joint Plan of Liquidation. Furthermore, a chapter 7 trustee would be entitled to statutory fees relating to the Distributions of the already monetized assets, which the Plan Administrator is not charging.  Accordingly, a portion of the Cash currently available for Distribution to Holders of Claims, including unsecured creditors, would instead be paid to the chapter 7 trustee and new professionals.

As a result, the Debtors believe that the Estates would have fewer funds to be distributed in a hypothetical chapter 7 liquidation than it would if the Plan is confirmed, and therefore Holders of Claims in all Impaired Classes will recover less than in the hypothetical chapter 7 cases. Accordingly, the Debtors believe that the "best interest" test of Bankruptcy Code section 1129 is satisfied.

A liquidation analysis is attached hereto as **Exhibit A**.

**Calculation of Liquidation Value.**  To calculate the probable distribution to members of each impaired class of holders of claims if the Debtors were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtors' assets by a Chapter 7 trustee. Here, the liquidation value of the Debtors' assets is easy to ascertain since those assets are composed mostly of Cash. However, the Milestone Payments still have to be monitored and collected and the Retained Causes of Action have to be prosecuted.  A chapter 7 trustee and his or her counsel might struggle with this task, not knowing the Debtors' business, the counter-parties to certain licenses, the history of dealings between the parties and the deals struck with respect to the licenses. There is some risk to creditors that a chapter 7 trustee might not be able to recover as fully as the Plan Administrator.

**Reductions.**  The amount of liquidation value available to unsecured creditors would be reduced by: (1) the claims of any secured creditors to the extent of the value of their collateral; and (2) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 cases and the Chapter 11 cases. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as counsel and other professionals retained by the Chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors or the Chapter 11 Trustee in the bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants, if any) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the Debtors during the pendency of the bankruptcy case. Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general

unsecured creditors from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors under the plan, then the plan is not in the best interests of creditors and equity security holders.

**Application.** A liquidation analysis prepared with respect to the Debtors is attached to this Combined Disclosure Statement and Joint Plan of Liquidation as **Exhibit A**. As demonstrated by the liquidation analysis, holders of Allowed General Unsecured Claims will receive substantially better recoveries under the Plan than under a hypothetical Chapter 7 liquidation. Accordingly, the Plan easily satisfies the Best Interests Test with respect to any holder of an Allowed General Unsecured Claim that may Vote to reject the Plan.

**Provisos.** The Debtors believe that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the liquidation analysis, the Debtors have projected the amount of Allowed Claims based on a review of the Schedules, the Debtors' books and records, and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Distribution.

V.       *Cramdown Test*

The Plan can be Confirmed despite that Classes 5, 6, 7 and 8 (Intercompany, Subordinated Claims, and Equity Interests) are deemed to reject the Plan without Voting under Bankruptcy Code § 1126(g) if the Cramdown Test is satisfied with respect to these Classes—that is, if the Plan does not "discriminate unfairly" against, and is "fair and equitable" with respect to Classes 6, 7 and 8. The Plan does not discriminate unfairly against Subordinated Claims, Intercompany Claims and Equity Interests because applicable non-bankruptcy law does not permit Holders or these types of Claims and Equity Interests to recover any value if a debtor does not pay creditor claims in full and because the Plan does not alter that result in the context of these Chapter 11 Cases. And because Classes 6, 7 and 8 comprise Subordinated Claims, Intercompany Claims and Equity Interests, the Plan is "fair and equitable" with respect to these Classes because, under Bankruptcy Code § 1129(b)(2)(C)(ii), there is no holder of any Claim junior to Subordinated Claims that will receive or retain any property under the Plan.

W.       *Alternatives to the Plan*

The Debtors believe that the Plan affords holders of Claims the greatest possible recovery under the circumstances and, therefore, is in their best interests. But if the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan; (c) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code; or (d) dismissal of the Chapter 11 Cases.

**Continuation of the Chapter 11 Cases.** The Debtors have sold substantially all of their assets, although the License Agreements remain in place as Debtor assets, ceased all operations, and no longer even maintain a physical business location. They have set a bar date. The Debtors

have Available Cash and may monetize certain remaining assets over time. Creditors are entitled to a Distribution. Nothing is accomplished by continuing the Chapter 11 Cases without a Plan which is the means by which creditors achieve a recovery on their Allowed Claims.

**Alternative Plan.** It is perhaps theoretically possible to formulate an alternative to the Plan but the present Plan provides for distributing Available Cash in accordance with the priorities of the Bankruptcy Code. An alternative to that may draw objections and not be legally confirmable or largely constitute cosmetic differences. This may come with additional and unnecessary administrative expenses.

**Liquidation Under Chapter 7.** If the Plan is not confirmed, the Chapter 11 Cases may be converted to Chapter 7 of the Bankruptcy Code. As demonstrated by the liquidation analysis attached to this Combined Disclosure Statement and Joint Plan of Liquidation and discussed above, recoveries to holders of Allowed Claims under a Chapter 7 liquidation would be materially lower than recoveries under the Plan. Such a liquidation would be disadvantageous to holders of Allowed Claims compared with the Plan.

**Dismissal.** The Chapter 11 Cases could be dismissed if the Plan was not confirmed. Among other things, dismissal would result in the termination of the automatic stay, permitting individual creditors to assert state law collection rights against the Debtors' Cash at the likely disadvantage to other less aggressive or speedy, yet similarly-situated, creditors. Given a chaotic race to assets that could result from a dismissal of the Chapter 11 Cases, the likelihood that all holders of Allowed Claims would receive a ratable distribution would be exceedingly low. Accordingly, the vast majority of creditors could expect to receive far less than they would under the Plan, if they received anything at all.

X.    *Risk Factors*

Members of Class 4—the holders of Allowed General Unsecured Claims—should read the following risk factors carefully, as well as all the information contained in and attached to this Combined Disclosure Statement and Joint Plan of Liquidation, before deciding whether and how to Vote. The following risk factors should not, however, be regarded as the only risks associated with the Plan and its implementation.

- **Non-Confirmation of the Plan.** Although the Debtors believe that the Plan satisfies all legal and factual requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will agree. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that modifications would not adversely affect holders of Allowed Claims, or that modifications would not necessitate another solicitation of Votes.

- Parties May Object to the Classification of Claims and Equity Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Equity Interest in a particular class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class. As is described in greater detail *infra*, the Debtors believe that the classification of Claims and Equity Interests under the Combined Disclosure Statement and Joint Plan of Liquidation

complies with the requirements set forth in the Bankruptcy Code.  Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

- **Estimate Inaccuracies.**  It is possible that one or more of the estimated dollar amounts set forth above or one or more of the factual assumptions used in the analyses above will prove materially incorrect.  If so, estimated recoveries for holders of Allowed Claims could differ materially from those described in this Combined Disclosure Statement and Joint Plan of Liquidation.  In addition, the outcome of the Debtors' pending prosecution of certain Retained Causes of Action and the receipt of the Milestone Payments may impact the estimated recoveries to Holders of Allowed Claims.

- Delays or Non-Occurrence of Confirmation or of the Effective Date**.**  Although the Debtors believe that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  Any delay in confirmation and effectiveness of the Combined Disclosure Statement and Joint Plan of Liquidation could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.  In addition, in order for the Effective Date to occur, the Debtors are required to have sufficient Cash on hand to fund the initial Distributions.  While the Debtors believe, based on their estimates of Claims that must be paid or reserved for, that the Debtors will have sufficient Cash on hand to fund the initial Distributions, there can no guarantee that the Debtors' estimates are correct.  In addition, subsequent Distributions are contingent on receipt of the Milestone Payments and successful prosecution of the Retained Causes of Action.

- **Conditions.**  The Plan contains certain conditions to the Effective Date.  It is possible that circumstances arise that make those conditions impossible to satisfy and improvident to waive.  If that occurs, the Plan could be confirmed but may not become effective, at least not when the Debtors anticipate it to become effective.

*Y.     Releases by the Debtors and Third Parties*

The release provisions set forth in Article XIV of the Combined Disclosure Statement and Joint Plan of Liquidation are an integral part of the Combined Disclosure Statement and Joint Plan of Liquidation.  The Debtors intend to seek a consensual release of all claims against the current and former directors and officers from Holders of General Unsecured Claims, including the claims asserted in the Derivative Actions.

## V.     TREATMENT OF UNCLASSIFIED, ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article VII.

*A.     Administrative Expense Claims*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during these Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in Cash in the amount of its Allowed Administrative Claim.

MSK asserted two Administrative Claims: (i) the Y-mAbs Cure Amount in connection with the Y-mAbs Sublicense in the amount of $328,351; and (ii) the BII Cure Amount in connection with the BII Sublicense in the amount of $400,000, plus any additional amounts that may arise from the BII Receivable in accordance with the BII Settlement Agreement. The Debtors intend to pay the Y-mAbs Cure Amount in full upon approval of the Y-mAbs Settlement Agreement. Pursuant to the BII Settlement Agreement, the Debtors are obligated to pay MSK in full the BII Cure Amount when and if the Debtors receive the initial portion of the BII Receivable (to the extent the BII Receivable is large enough to pay such amounts) before paying any other third party with, or retaining, any future income or other payments on account of the BII Receivable. As set forth in the BII Settlement Agreement, the Debtors and MSK have agreed that the BII Cure Amount will be paid solely from the proceeds of the BII Receivable, and MSK has agreed to defer to payment of such amounts until and if the Debtors receive the BII Receivable.

B.      *Professional Compensation Claims*

The Bankruptcy Court shall fix in the Confirmation Order a date for filing all Professional Compensation Claims, the deadline for which shall be thirty (30) days after the Effective Date pursuant to Article II hereof unless such deadline is extended by agreement of the Plan Administrator (the "<u>Professional Fee Claims Bar Date</u>"). Any Professional Fee Claim not Filed by the Professional Fee Claims Bar Date (or such later date as may be agreed upon by the Plan Administrator) shall be deemed disallowed under this Plan and shall be forever barred against the Estates, the Plan Administrator, or any of the Post-Effective Date Assets, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim. Subject to the provisions of Sections 328, 330(a), and 331 of the Bankruptcy Code, the Plan Administrator shall pay each holder of an Allowed Professional Fee Claim the full unpaid amount of such Allowed Professional Fee Claim in Cash no later than five (5) Business Days after the date that such Claim is Allowed by order entered by the Bankruptcy Court. For the avoidance of doubt, the Professional Fee Bar Date does not apply either to Baker Botts or Block and Leviton.

C.      *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim against a Debtor agrees to a different treatment, the Debtors or the Plan Administrator, as applicable, shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

D.      *Payment of Statutory Fees*

All Statutory Fees prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Plan Administrator shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the UST. The Debtors shall remain obligated to pay quarterly fees to the UST. Trustee until the earliest of the Debtors' cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

E.    *Post-Confirmation Fees and Expenses*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Plan Administrator shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, Plan Administrator, or other fees and expenses related to the consummation and implementation of the Plan. The Plan Administrator shall pay, within ten (10) business days after submission of a detailed invoice, such reasonable claims for compensation or reimbursement of expenses incurred by the retained professionals of the Plan Administrator. If the Plan Administrator disputes the reasonableness of any such invoice, the Plan Administrator or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Administrator may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## VI.    CONFIRMATION AND VOTING PROCEDURES

A.    *Confirmation Procedure*

### 1.    Disclosure Statement Hearing

On [\_\_\_\_], 2019, the Bankruptcy Court entered the Solicitation Procedures Order. The Solicitation Procedures Order approved the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and authorized the Debtors to solicit acceptances of the Plan.

### 2.    Confirmation Hearing

Pursuant to the Solicitation Procedures Order, a hearing before the Honorable John T. Dorsey has been scheduled for [\_\_\_], 2020 at \_\_\_ (ET), at the Bankruptcy Court, 824 North Market Street, \_\_ Floor, Courtroom No. \_\_, Wilmington, Delaware 19801 to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

### 3.    Procedure for Objections

Any objection to confirmation of the Combined Disclosure Statement and Joint Plan of Liquidation must: (i) be in writing, (ii) conform to the Bankruptcy Rules and Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and (iii) be Filed with the Bankruptcy Court and served so as to be actually received on or before [____], 2020 at [____] (ET), by (i) counsel for the Debtors, The Rosner Law Group LLC, 824 N. Market St., Suite 810, Wilmington, DE 19801 (Attention: Frederick B. Rosner and Scott Leonhardt and (ii) the UST, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane Leamy, Esq.).

**Unless an objection is timely Filed and served by the Confirmation Objection Deadline, such objection may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

### 4.    Requirements for Confirmation

The Bankruptcy Court may only confirm the Plan if it determines at and as a result of the Confirmation Hearing that the requirements for Confirmation set forth in Bankruptcy Code § 1129 have been satisfied, which include, among others:

(a)    The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    The Debtor as Plan proponent has complied with the applicable provisions of the Bankruptcy Code;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    At least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in that class;

    (i).    Only Class 4 under the Plan is impaired;

    (ii).    Classes 1-3 under the Plan are unimpaired and are deemed to accept the Plan without Voting under Bankruptcy Code § 1126(f);

    (iii).    Accordingly, the Plan may not be able to be Confirmed unless Class 4 accepts the Plan. To accept the Plan, creditors holding at least two-thirds in amount of Allowed Claims in Class 4 and more than one-half of creditors with Allowed Claims in Class 4 that actually Vote, ignoring any Vote of insiders, must Vote to accept the Plan.

(e)    The Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor other than the liquidation provided for in the Plan (frequently referred to as the "Feasibility Test");

(f)    Each holder of a Claim or Equity Interest that is Impaired by the Plan either has accepted the Plan or will receive or retain on account of that Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain if the Debtor were liquidated on the Effective

Date under Chapter 7 of the Bankruptcy Code (typically referred to as the "Best Interests Test");

(g)     The Plan does not discriminate unfairly against, and is fair and equitable with respect to, non-accepting classes of Claims or Equity Interests (also known as the "Cramdown Test").

The Debtors will demonstrate to the Bankruptcy Court at the Confirmation Hearing that all requirements for Confirmation of the Plan under Bankruptcy Code § 1129 have been meet, including the Feasibility Test, the Best Interests Test, and the Cramdown Test all discussed more extensively below. Accordingly, if Class 4 accepts the Plan, the Plan will be eligible for Confirmation at the Confirmation Hearing.

### 5.     Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Combined Disclosure Statement and Joint Plan of Liquidation to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Combined Disclosure Statement and Joint Plan of Liquidation creates separate Classes to deal respectively with DIP Claims, Other Secured Claims, Priority Non-Tax Claims, General Unsecured Claims, Intercompany Claims, Subordinated Claims, and Equity Interests. The Debtors believe that the Combined Disclosure Statement and Joint Plan of Liquidation's classifications place substantially similar Claims or Equity Interests in the same Class and thus meet the requirements of section 1122 of the Bankruptcy Code.

### 6.     Impaired Claims or Equity Interests

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes Impaired by the Plan and receiving a payment or Distribution under the Combined Disclosure Statement and Joint Plan of Liquidation may vote on the Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class. The Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The Holders of Claims or Interests in any Class that will not receive any payment or Distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote. Finally, the Holders of Claims or Equity Interests whose Claims or Equity interests are not classified under the Plan are not entitled to vote on the Plan.

### 7.     Eligibility to Vote on the Combined Disclosure Statement and Joint Plan of Liquidation

Unless otherwise Ordered by the Bankruptcy Court, only Holders of Allowed Claims in Class 4 – General Unsecured Claims may vote on the Plan. Further, subject to the tabulation procedures that were approved by the Solicitation Procedures Order, in order to vote on the Plan, you must hold an Allowed Claim in Class 4 – General Unsecured Claims, or be the Holder of a General Unsecured Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

### 8.     Solicitation Notice

All Holders of Allowed Claims in Class 4 – General Unsecured Claims will receive (i) the Confirmation Notice, (ii) a form of Ballot, and (iii) a copy of the Combined Disclosure Statement and Joint Plan of Liquidation.  All other Creditors, Holders of Equity Interests and parties in interest not entitled to vote on the Combined Disclosure Statement and Joint Plan of Liquidation will only receive a copy of the Confirmation Notice.

### 9.     Procedure/Voting Deadlines

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Balloting Agent by mailing the Ballot to the Balloting Agent at the following address: The Rosner Law Group LLC, 824 N. Market Street, Suite 810, Wilmington, Delaware 19801, Attn: Jason Gibson, Esq.

The Balloting Agent must RECEIVE physically original ballots by mail or overnight delivery, on or before [_____], 2020, at 4:00 p.m.  (ET) (the "Voting Deadline").  Subject to the tabulation procedures approved by the Solicitation Procedures Order, you may not change your vote once the Balloting Agent receives your original paper ballot.

Subject to the tabulation procedures approved by the Solicitation Procedures Order, any Ballot that is timely and properly received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Disclosure Statement and Joint Plan of Liquidation.

### 10.    Acceptance of the Combined Disclosure Statement and Joint Plan of Liquidation

As a Creditor, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (i.e., more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan.  The Debtors urges that you vote to accept the Plan.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE BALLOT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND, IF NECESSARY, LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

**HOLDERS OF CLAIMS IN CLASS 4 WHO DO NOT WISH TO PROVIDE THE RELEASES SET FORTH IN ARTICLE XIV HEREIN MUST AFFIRMATIVELY INDICATE SO BY CHECKING "OPT-OUT" BOX ON THEIR BALLOT.**

**PLEASE BE ADVISED THAT ALL HOLDERS OF CLAIMS IN CLASS 4 THAT (I) VOTE TO ACCEPT THE PLAN; OR (II) WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLITICTED BUT DO NOT VOTE EITHER TO ACCEPT OR REJECT THE PLAN AND DO NOT AFFIRMATIVELY MAKE THE OPT-OUT ELECTION; OR (III) VOTE TO REJECT THE PLAN, BUT DO NOT AFFIRMATIVELY MAKE THE OPT-OUT ELECTION ON THEIR BALLOT SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE XIV HEREIN.**

B.      *Bar Dates for Administrative Claims First Arising After August 10, 2019*

Except for Professional Fee Claims and, unless previously Filed, requests for payment of Administrative Claims that first arose on or after August 10, 2019, must file and serve a request or motion on the Debtors no later than the Administrative Claim Bar Date. Objections to such requests must be Filed and served on counsel to the Plan Administrator and the requesting party by the Administrative Claim Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of such Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request or motion for payment of such Administrative Claims that do not file and serve such a request or motion by the applicable Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and the Post-Effective Date Debtors or the Post-Effective Date Assets, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Plan Administrator or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim that is Allowed by Final Order.

C.      *Elimination of Vacant Classes*

Any Class of Claims that does not contain, as of the date the Solicitation Procedures Order is entered, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan except as expressly provided herein, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

D.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

E.      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Plan Administrator reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

*F.    Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## VII.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS; ESTIMATED RECOVERIES

*A.    Classification of Claims and Equity Interests*

Claims and Equity Interests, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes, including voting, confirmation and Distribution pursuant to the Plan, as follows:

| Class | Type | Status Under Plan | Voting Status |
|---|---|---|---|
| 1 | DIP Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | 510(a) and 510(b) Subordinated Claims | Impaired | Deemed to Reject |
| 6 | 510(c) Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |

*B.    Treatment of Claims and Equity Interests*

Each Holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement and release of an in exchange for, such Holders' Allowed Claim or Allowed Equity Interest, except to the extent different treatment is agreed to by the Debtor and the Holder of such Allowed Claim or Equity Interest, as applicable.

### 1.    DIP Claims (Class 1)

#### a.    **Classification**

Class 1 consists of DIP Claims.

### b.    **Impairment and Voting**

Class 1 is Unimpaired by the Plan.  Holders of DIP Claims are deemed to have accepted the Plan and therefore, are not entitled to vote to accept or reject the Plan.

### c.    **Treatment**

On the Effective Date or as soon thereafter as is reasonably practical, or on the date such Claim becomes an Allowed DIP Claim or as soon thereafter as is reasonably practical, each Holder of an Allowed DIP Claim shall receive either (a) such treatment as such Holder agrees, or (b) at the Debtors' option (i) payment in full in Cash of the Allowed Amount of such DIP Claim (as determined by settlement or Final Order of the Bankruptcy Court), or (ii) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## 2.  **Other Secured Claims (Class 2)**

### a.    **Classification**

Class 2 consists of Other Secured Claims.

### b.    **Impairment and Voting**

Class 2 is Unimpaired by the Plan.  Holders of Other Secured Claims are deemed to have accepted the Plan and therefore, are not entitled to vote to accept or reject the Plan.

### c.    **Treatment**

Unless otherwise mutually agreed upon by the holder of an Allowed Other Secured Claim and the Debtors or Plan Administrator, as applicable, on the later of the Effective Date and the date such Allowed Secured Claim becomes Allowed, or as soon thereafter as is practicable, the Plan Administrator shall pay each holder of an Allowed Secured Claim, at the Plan Administrator's sole and exclusive election, in full and final satisfaction of such Allowed Secured Claim, one of the following:

   (i).    The collateral securing such Allowed Secured Claim;

   (ii).    Cash in an amount equal to the value of such collateral; or

   (iii).    Such other treatment that renders such Allowed Secured Claim Unimpaired.

## 3.  **Priority Non-Tax Claims (Class 3)**

a.    **<u>Classification</u>**

Class 3 consists of Priority Non-Tax Claims.

b.    **<u>Impairment and Voting</u>**

Class 3 is Unimpaired, and each Holder of a Priority Non-Tax Claim is conclusively deemed to have accepted the Plan and, therefore, is not entitled to vote on the Plan.

c.    **<u>Treatment</u>**

Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Debtors or Plan Administrator, as applicable, on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes Allowed, or as soon thereafter as is practicable, the Plan Administrator shall pay to each holder of an Allowed Priority Non-Tax Claim the full amount of such Allowed Priority Non-Tax Claim in Cash in full and final satisfaction of such Allowed Priority Non-Tax Claim.

**4.  General Unsecured Claims (Class 4)**

a.    **<u>Classification</u>**

Class 4 consists of General Unsecured Claims.

b.    **<u>Impairment and Voting</u>**

Class 4 is Impaired, and holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

c.    **<u>Treatment</u>**

On or as soon as practicable after the Effective Date, the Plan Administrator shall pay each holder of an Allowed General Unsecured Claim, in full and final satisfaction, settlement and release, and in exchange for, such General Unsecured Claim, its Pro Rata share of the Available Cash. Subsequent Distributions shall be made if additional Available Cash is received. Each Holder of a Class 4 Allowed Claim shall receive subsequent Distributions in Cash from the Plan Administrator up to the Allowed amount of such Holders Class 4 Allowed Claim plus post-petition interest at the Federal Judgment Rate. At that point, the Class 4 Satisfaction shall be deemed to have occurred.

**5.  510(a) and 510(b) Subordinated Claims (Class 5)**

a.      **<u>Classification</u>**

Class 5 consists of Subordinated Claims.

b.      **<u>Impairment and Voting</u>**

Class 5 is Impaired.  Holders of Subordinated Claims in Class 5 will not receive any Distribution under Plan.  Class 5 shall be deemed to have voted to reject the Plan.

c.      **<u>Treatment</u>**

Section 510(b) Subordinated Claims are subordinated pursuant to this Plan and section 510(b) of the Bankruptcy Code.  Section 510(b) Subordinated Claims shall be deemed expunged, discharged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

## 6.  510(c) Subordinated Claims (Class 6)

a.      **<u>Treatment</u>**

510(c) Subordinated Claims are subordinated pursuant to this Plan and section 510(c) of the Bankruptcy Code.  510(c) Subordinated Claims shall be deemed expunged, discharged, released and extinguished without further action by or order of the Court, and shall be of no further force or effect.

b.      **<u>Impairment and Voting</u>**

510(c) Subordinated Claims are Impaired.  Holders of Subordinated Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of section 510(c) Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of Holders of 510(c) Subordinated Claims will not be solicited with respect to such Subordinated Claims.

## 7.  Intercompany Claims (Class 7)

a.      **<u>Treatment</u>**

Holders of Intercompany Claims shall not receive or retain any property under this Plan on account of such Claims.  Intercompany Claims shall be deemed expunged, discharged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

### b. **Impairment and Voting**

Intercompany Claims are Impaired.  Holders of Intercompany Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

## 8. **Equity Interests (Class 8)**

### a. **Classification**

Class 8 consists of Equity Interests.

### b. **Impairment and Voting**

Class 8 is Impaired.   Holders of Equity Interests in Class 8 will not receive any Distribution under the Plan.  Class 8 shall be deemed to have voted to reject the Plan.

### c. **Treatment**

On the Effective Date, all Equity Interests shall be cancelled, and of no further force or effect.  Each Holder of an Equity Interest shall neither receive nor retain any property or interest in property on account of such Equity Interests.  Equity Interests shall be canceled and non-transferable from and after the Effective Date.

## VIII.   **MEANS FOR IMPLEMENTATION OF THE PLAN**

### A.   *Vesting of Assets*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, all property of the Debtors, any property acquired by the Debtors pursuant to the Plan, the Retained Causes of Action, and the Milestone Payments, shall vest in the Post-Effective Date Debtors free and clear of all Liens, Claims against, charges or other encumbrances.

### B.   *General Settlement of Claims and Interests*

As discussed herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123

of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. All distributions made to holders of Allowed Claims and Allowed Equity Interests (as applicable) in any Class are intended to be and shall be final.

C.    *Sources of Consideration for Plan Distributions and Priority Waterfall*

Distributions under the Plan will be funded by (i) Available Cash held on the Effective Date by or for the benefit of the Debtors or Post-Effective Date Debtors, and (ii) Available Cash held after the Effective Date by or for the benefit of the Debtors or Post-Effective Date Debtors, sourced from, among other things, Sales proceeds, the prosecution/settlement of Retained Causes of Acton, the receipt of Milestone Payments and the liquidation of any remaining assets of the Post-Effective Date Debtors.

After the payment of Professional Fee Claims, Administrative Claims, the reasonable fees and reimbursement of actual, necessary expenses of the Sole Director and Plan Administrator, Priority Tax Claims, Other Priority Claims, any remaining Available Cash shall be available for Distributions to holders of Allowed General Unsecured Claims on a Pro Rata basis.

D.    *Directors/Officers/Managers and Other Authorized Persons of the Debtors*

On the Effective Date, except for the Plan Administrator, the authority, power and incumbency of the persons then acting as directors, officers, managers and other authorized persons of the Debtors shall be terminated and such persons shall be deemed to have resigned.

E.    *Post-Effective Date Debtors*

The Debtors shall continue in existence after the Effective Date as the Post-Effective Date Debtors solely for the purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating all assets, if any, held by the Post-Effective Date Debtors and distributing Available Cash, (2) resolving any Disputed Claims, (3) paying Allowed Claims, (4) enforcing and prosecuting claims, interests, rights, and privileges under any Retained Causes of Action in an efficient manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (5) filing appropriate tax returns, and (6) administering the Plan in an efficient manner. The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, including, for the avoidance of doubt, the Sichenzia and Alleged Bad Actor Litigations, in each case, without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

F.    *Preservation of Privileges of the Estates and Debtors*

The Plan Administrator shall be the successor to all of the privileges of the Estates and the Debtors including, but not limited to, the attorney/client privilege and common interest doctrine. The Plan Administrator may rely upon written information previously created or generated by the Debtors.

*G.*     *Plan Administrator*

On the Effective Date, the Plan Administrator is appointed for the purposes of: (a) liquidating the Post-Effective Date Debtors' assets in accordance with the Plan including receiving the Milestone payments; (b) reconciling and objecting to Claims to the extent necessary; and (c) making Distributions. The Plan Administrator may not continue or engage in any other trade or business on the Debtors' behalf. The Plan Administrator is the sole representative of the Post-Effective Date Debtors under Bankruptcy Code § 1123(b)(3)(B) and stands in the Debtors' place for purposes of contesting, settling, or compromising objections to Claims and Retained Causes of Action and is vested with all the Debtors' rights and defenses to all Claims and Retained Causes of Action.

In furtherance of the Plan, the Plan Administrator has the following rights, powers, and duties, which the Plan Administrator must exercise and perform in accordance with his reasonable business judgment for the benefit of all parties entitled to Distributions:

1.     Hold and manage Cash, convert Post-Effective Date Assets to Cash and make Distributions;

2.     Investigate and prosecute, settle, liquidate, or abandon any Retained Causes of Actions;

3.     Implement and enforce the Plan;

4.     If necessary or appropriate, reconcile and object to Claims and prosecute or settle any objections to Claims;

5.     Sign any document on the Post-Effective Date Debtors' behalf consistent with the purposes of the Plan and the Plan Administrator's duties and authority;

6.     Dispose of the Debtors' books and records transferred to the Plan Administrator, in a manner the Plan Administrator deems appropriate in his discretion, except that the Plan Administrator may not dispose of any books and records reasonably likely to pertain to pending litigation in which the Debtors or their former officers or directors are a party or that may pertain to Claims without further order of the Bankruptcy Court;

7.     Obtain a final decree closing one or both of the Chapter 11 Cases;

8.     Enter into any contracts and exercise the Debtors' rights under any existing contracts necessary or desirable to implement the Plan and make Distributions,

9.     Establish, maintain, and terminate bank accounts as the Plan Administrator deems appropriate in his discretion;

10.     Without prior Bankruptcy Court order or approval, engage and reasonably compensate professionals to assist the Plan Administrator regarding his responsibilities under the Plan;

11.     Pay in the ordinary course and without prior Bankruptcy Court order or approval any reasonable expenses of Plan administration incurred by the Plan Administrator from and after the Effective Date, including compensation to the Plan Administrator under the Plan; and

12.     Take any other action not materially inconsistent with the Plan.

The Plan Administrator is to be compensated for his services from Available Cash on hand at the rate of $300 per hour plus reimbursement of any reasonable, actually-incurred out-of-pocket expenses. The Plan Administrator must provide a summary invoice of his services to The Rosner Law Group LLC no less frequently than monthly. If The Rosner Law Group LLC does not object in writing to the compensation to be paid under that invoice within seven days of its receipt of the statement, the Plan Administrator may satisfy the invoice from Cash. The Bankruptcy Court will hear and resolve any dispute regarding any such invoice if, after good faith effort, the Plan Administrator and The Rosner Law Group LLC cannot consensually resolve such a dispute.

The Plan Administrator and all Professionals retained by the Plan Administrator, each in his capacity as such, shall be deemed exculpated and indemnified, and shall not incur any liability to any entity for any act or omission in connection with or related to the administration of the Post-Effective Date Debtors or the Plan except if the Bankruptcy Court determines by Final Order that the act or omission constitutes a crime, fraud, willful misconduct, or gross negligence. To the fullest extent permitted under applicable law, the Post-Effective Date Debtors indemnify the Plan Administrator against any liabilities arising directly or indirectly from acts or omissions related to the administration of the Post-Effective Date Debtors or the Plan other than an act or omission found by Final Order of the Bankruptcy Court to constitute a crime, willful misconduct, or gross negligence.  Any indemnity owing to the Plan Administrator is to be paid as an expense of Plan administration from Available Cash.

The Plan Administrator may resign by giving not less than 60 days' prior written notice to The Rosner Law Group LLC. The resignation is not effective until a successor Plan Administrator is appointed.  If the Plan Administrator resigns, subject to a final accounting, he is entitled to be paid all accrued but unpaid fees arising from or relating to events occurring before the resignation, and to be reimbursed for any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Plan Administrator.

*H.      Priority Claims Reserve*

On the Effective Date, the Plan Administrator, to the extent necessary, shall establish the Administrative/Priority/Tax Claims Reserve by depositing Cash in the amount necessary to fund, in his conservative estimate, the Administrative/Priority/Tax Claims Reserve.

The Administrative/Priority/Tax Claims Reserve shall be used to pay holders of all Allowed Priority Claims, Allowed Priority Tax Claims and Allowed Administrative Claims, to the extent that such Priority Claims, Priority Tax Claims and Administrative Claims have not been paid in full on or before the Effective Date.  If all or any portion of a Priority Claims or Priority Tax Claims or Administrative Claim shall become a Disallowed Claim, then the amount on deposit in the Administrative/Priority/Tax Claims Reserve attributable to such surplus or such Disallowed

Claim, shall remain in the Administrative/Priority/Tax Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Administrative/Priority/Tax Claims Reserve is sufficient to ensure that all Allowed Administrative Claims will be paid in accordance with the Plan, and shall otherwise be deemed Available Cash to be distributed according to Article X without any further action or order of the Court.

I.      *Dissolution of the Post-Effective Date Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which the Post-Effective Date Debtors were formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable states.

J.      *Necessary Transactions*

The Post-Effective Date Debtors and the Plan Administrator may take any action and sign any instrument, agreement, or other document reasonably necessary or appropriate in their discretion to effect or facilitate any transaction contemplated in the Plan.

K.      *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under any certificate, Security, share, note, purchase right, warrant, option or other instrument or document directly or indirectly evidencing or relating to Equity Interests, including the Equity Interests themselves, are canceled solely as to the Debtors, and the Post-Effective Date Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, certificates, bylaws or certificates of articles of incorporation or similar documents governing the shares, certificates, purchase rights, options, warrants, or similar instruments or documents evidencing the Equity Interests shall be released.  All rights arising under any such agreements, instruments, or documents are extinguished except for those expressly provided for in the Plan.

L.      *No Action Required*

As of the Effective Date, (a) the adoption, execution, delivery, and implementation of all documents or agreements related to or contemplated by the Plan, and (b) the other matters provided for under, or in furtherance of, the Plan involving action required of the Debtors, are deemed to have occurred, are effective, binding, and enforceable in accordance with their respective terms, and are deemed authorized and approved in all respects without further order of the Bankruptcy Court or any further action by the Debtors' officers or directors.

M.      *Preservation of Retained Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Post-Effective Date Debtors shall retain and enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date and the Post-Effective Date Debtors' right to commence, prosecute and/or settle Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

### N.    Substantive Consolidation of the Debtors

The Plan shall be implemented through a deemed substantive consolidation of the assets and liabilities of the Debtors with one another. The Confirmation Order shall contain findings supporting the conclusions providing for substantive consolidation for purposes of distribution on the terms set forth in the Plan. The substantive consolidation of the assets and liabilities and properties of the Debtors shall have the effects set forth in the Plan.

1. The Chapter 11 Cases of the Debtors shall be consolidated into the case of Mabvax Therapeutics Holdings, Inc. as a single consolidated case with respect to Claims against the Debtors. All property of the estate of each Debtor shall be deemed to be property of the consolidated estates with respect to the payment of Claims against the Debtors.

2. All Claims against each Debtors' Estates shall be deemed to be Claims against the consolidated estates, all proofs of claim filed against one or more of the Debtors shall be deemed to be a single Claim filed against the consolidated estates, and all duplicate proofs of claim for the same Claim filed against more than one Debtor shall be deemed expunged.

3. No Distributions under the Plan shall be made on account of Intercompany Claims among the Debtors.

4. For purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one consolidated entity so that, subject to the other provisions of section 553, debts due to any of the Debtors may be set off against the debts of any other of the Debtors.

### O.    Further Distributions

In the event that prior to the closing of the Chapter 11 Cases the Plan Administrator determines that Available Cash is available for Distribution to Holders of Subordinated Claims and Equity Interests then, upon reasonable notice to (i) Holders of Subordinated Claims, (ii) Holders of Equity Interests as of the Effective Date, and (iii) the Office of the United States Trustee, the Plan Administrator shall file a motion with the Bankruptcy Court requesting approval of procedures for making Distributions to the Holders of (i) Subordinated Claims and (ii) Equity Interests as of the Effective Date. The rights of Holders in Class 8 shall be nontransferable from and after the Effective Date.

## IX.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Record Dates

The Record Date for holders of Claims shall be the date of the Solicitation Procedures Order.

The Record Date for holders of Equity Interests is the Effective Date.

The respective Record Dates shall be for all purposes under the Plan, including Distributions, and are fixed such that no future changes in the record holders of Claims and Equity Interests are valid or will be acknowledged.  Neither the Debtors nor the Plan Administrator has any obligation to recognize any ownership transfer of any Claim or Equity Interest occurring after the respective Record Dates.

B.    *Distributions Under the Plan*

The Plan Administrator and Post-Effective Date Debtors shall administer Claims subject to the Plan Administrator functions.  The Plan Administrator shall make Distributions to holders of Allowed Administrative Claims, Priority Tax Claims and Other Priority Claims, out of the Administrative/Priority/Tax Clams Reserve.  The Plan Administrator shall make Distributions in respect of all other Allowed Claims and, if applicable, Allowed Subordinated Claims and Equity Interests.

C.    *Equity Interests are Deemed Canceled and Non-transferable After the Effective Date*

As of the close of business on the Effective Date, the various transfer registers for the Class of Equity Interests as maintained by the Debtors, or their agent, including Computershare Limited, shall be deemed closed, and there shall be no further changes in the record holders of any of the Equity Interests.  The Debtors, the Post Effective Date Debtors, and the Plan Administrator, shall have no obligation to recognize any transfer of Equity Interests occurring on or after the Effective Date. The Debtors, the Post Effective Date Debtors, and the Plan Administrator shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Effective Date for Holders of Equity Interests.

D.    *Plan Administrator as Disbursing Agent*

All Distributions and other payments made under the Plan are to be made by the Plan Administrator.  The Plan Administrator need not provide any bond, surety, or other security for the performance of his duties unless the Bankruptcy Court orders otherwise.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Post-Effective Date Debtors.

E.    *Form W-9*

As a condition to receiving any Distribution under the Plan, each holder of an Allowed Claim entitled to a Distribution must, if the Plan Administrator requests it, provide the Plan Administrator with an executed IRS Form W-9.

F.    *Delivery of Distributions; Undeliverable Distributions*

Distributions will be made: (a) to the address set forth on the holder's timely filed proof of claim, the Schedules, or, if no proof of claim is filed and the holder does not appear on the Schedules, the holder's last known address; or (b) to the address set forth in any written notice of address change delivered to the Debtors or the Plan Administrator. If any holder's Distribution is returned as undeliverable, no further Distributions to that holder will be made unless and until the Plan Administrator is notified of the holder's then-current address. Claims held by a holder whose Distributions are returned as undeliverable and who fails to notify the Plan Administrator of its correct address within 90 days after the Distributions are returned to the Plan Administrator as undeliverable will be expunged, after which all unclaimed property reverts to the Estates for Pro Rata distribution to all other eligible holders of Allowed Claims. Neither the Post-Effective Date Debtors nor the Plan Administrator is required to attempt to locate any holder of an Allowed Claim or Equity Interest.

G.    *Failure to Negotiate Checks*

Checks issued in respect of Distributions are void if not negotiated within 90 days after issuance. Requests for reissuance of any such check must be made in writing directly to the Plan Administrator by the holder of the Allowed Claim with respect to which such check originally was issued. All amounts represented by any voided check will be held until 90 days after the voided check was issued. After that time, all such amounts vest in in the Estates for Pro Rata Distribution to all other eligible holders of Allowed Claims. Claims in respect of void checks and the underlying distributions are forever barred against the Post-Effective Date Debtors and the Plan Administrator, and their respective property, notwithstanding any federal or state escheat laws to the contrary.

## X.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.    *Allowance of Claims*

After the Effective Date, the Post-Effective Date Debtors or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest immediately before the Effective Date.

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Administrator shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Equity Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason,

regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation of such Claim for all purposes under the Plan (including for purposes of Distributions), and the Post-Effective Date Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

D.     *Adjustment to Claims Without Objection*

Any Claim or Equity Interest that has been paid or satisfied, or any Claim or Equity Interest that has been amended to superseded, cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Post-Effective Date Debtors without an objection to such Claim or Equity Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.     *Objection to Claims*

Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed before the Effective Date, the Plan Administrator may object to the allowance or seek estimation of any Claim against the Debtor on any ground permitted by the Bankruptcy Code. Nothing in this section affects any party-in-interest's right to object to the allowance of any Claims or to seek the subordination of any Claim on any grounds permitted by the Bankruptcy Code.

Any objections to Claims shall be Filed on or before the later of (1) one hundred eighty (180) days after the Effective Date and (2) such other period of limitation as may specifically fixed by the Debtors or the Post-Effective Date Debtors, as applicable, by the Plan Administrator's motion filed (but not necessarily heard) before the first Business Day that is one day after the Effective Date.

F.     *Contingent Claims*

Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim is treated as a Disputed Claim for all purposes under the Plan. The holder of a Contingent Claim is entitled to a Distribution only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement or contribution held by a Person that may be liable with the Debtor on a Claim is Disallowed as of the Effective Date if: (a) that Claim is Disallowed; (b) the Claim for reimbursement or contribution is contingent as of the Effective Date; or (c) that Person asserts a right of subrogation under Bankruptcy Code § 509.

G.     *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, to that is a transferee of a transfer avoidable

under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, or (iii) is a defendant in the Alleged Bad Actor Litigation or Sichenzia Litigation, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Equity Interests may not receive any Distributions on account of such Claims until such time as such Retained Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Post-Effective Date Debtors.

*H.    Amendments to Claims*

On or after the applicable Bar Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Post-Effective Date Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without further action.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL HOLDERS OF PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL NOT BE TREATED AS CREDITORS FOR PURPOSES OF VOTING AND DISTRIBUTION PURSUANT TO BANKRUPTCY RULE 3003(c)(2) AND PURSUANT TO THE GENERAL BAR DATE ORDER, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

*I.    Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the Distribution (if any) to which such holder is entitled under the Plan as of the Effective Date.

*J.    Disputed Claims Reserve*

On and after the Effective date, the Plan Administrator shall maintain in reserve such Cash as the Plan Administrator estimates to be reasonably necessary to satisfy the Distributions that could be required to be made by the Plan Administrator under the Plan (the "Disputed Claims Reserve").  The Disputed Claims Reserve is separate from the Administrative/Priority/Tax Claims Reserve to be maintained by the Plan Administrator as set forth in Articles VIII of the Plan.

For the avoidance of doubt, Distributions to any Person holding a Disputed Claim that becomes an Allowed Claim (including, without limitation, Administrative Claims, Priority Tax Claims, Other Priority Claims and General Unsecured Claims) after the Effective Date shall be made together with any payments or other distributions that would have been made to such Person had its Disputed Claim become an Allowed Claim on or prior to the Effective Date.

## XI.    TREATMENT OF EXECUTORY CONTRACTS

A.    *Executory Contracts Deemed Rejected*

On the Effective Date, all Executory Contracts shall be deemed automatically rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent: (l) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract; (2) prior to the Effective Date, the Debtors have filed a motion to assume, or assume and assign an Executory Contract on which the Bankruptcy Court has not rule; (3) the agreements are the Debtors' amended and restated bylaws and all insurance policies available and covering the Derivative Actions including, without limitation, AIG D&O Policy # 01-615-25-78 and Side A XS Policy # 01-615-32-99, Sompo D&O XS Policy # DOX10007405902 and Liberty IU Policy # DOSFABH4QV001, all of which are preserved and will ride through these Bankruptcy Cases. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and Bankruptcy Code sections 365(a) and 1123.

B.    *Claims Based on Rejection of Executory Contracts*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts, if any, must be Filed with the Bankruptcy Court within twenty-one (21) days after the earlier of (a) service of Notice of the Effective Date, or (b) service of notice of entry of an order of the Bankruptcy Court (other than the Confirmation Order) approving the rejection of a particular Executory Contract on the counterparty thereto. The Notice of Effective Date shall also set forth the deadline for filing Proofs of Claim with respect to the same. Absent order of the Court to the contrary, any Claims arising from the rejection of an Executory Contract not Filed by the applicable deadline will not be considered Allowed and such person or entity shall not be treated as a creditor for purposes of distributions under the Plan. Claims arising from the rejection of the Debtors' Executory Contracts shall be classified as General Unsecured Claims and shall be treated in accordance with Class 4 of the Plan, which information shall be included in the Notice of the Effective Date.

**Rejection Claims for which a Proof of Claim is not timely Filed may be forever barred from assertion against the Debtors, the Post-Effective Date Debtors, the Estate and its property or the Plan Administrator unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.**

C.    *Indemnification Obligations*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date, to indemnify, defend, reimburse, or limit the liability of the Sole Director, and only the Sole Director against any Claims or causes of action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors and assigned to the Post-Effective Date Debtors which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; provided that, notwithstanding anything herein to the contrary, the Post-Effective Date Debtors' obligation to fund such indemnification obligations shall be limited to the extent of Available Cash.

*D.     Reservation of Rights*

Nothing contained in the Plan, shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or that any of the Post-Effective Date Debtors have any liability thereunder. If there is a dispute regarding whether a contract is executory at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract under the Plan.

## XII.     AVOIDANCE ACTIONS, LITIGATION CLAIMS

*A.     Retention and Reservation*

All Retained Causes of Action are retained and reserved for the Plan Administrator, who is designated as the Estates' representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Retained Causes of Actions.

*B.     Prosecution*

The Plan Administrator has the exclusive authority and discretion, to prosecute, defend, compromise, settle, and otherwise deal with any Retained Causes of Action, and does so in his capacity as a representative of the Estates under Bankruptcy Code § 1123(b)(3)(B). The Plan Administrator shall pay the fees and costs associated with litigating the Retained Causes of Action from the Estates' Available Cash as an expense of Plan administration.

## XIII.     CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

*A.     Conditions to Confirmation*

The Plan may not be confirmed unless and until each of the following occurs:

1.     **Approval of Disclosure Statement**. The Bankruptcy Court enters a Final Order approving this Amended Combined Disclosure Statement and Joint Plan of Liquidation as an adequate disclosure statement under Bankruptcy Code § 1125.

2.     **Form of Confirmation Order.** The Bankruptcy Court enters the Confirmation Order in form and substance reasonably acceptable to the Debtors. If any party is unable to reach an agreement with any other party regarding the form and substance of the Confirmation Order, the Bankruptcy Court will resolve all such disputes.

3.     **Substance of Confirmation Order.** The Confirmation Order contains the following:

   a.     The provisions of the Confirmation Order are non-severable and mutually dependent;

   b.     The Plan's rejection of all remaining Executory Contracts is approved;

c.      In accordance with Bankruptcy Code § 1123(b)(3)(B), the Plan Administrator is appointed as the Estates' representative to prosecute, compromise, or abandon any Retained Causes of Action in accordance with the Plan; and

d.      The Bankruptcy Court retains jurisdiction to the fullest extent permissible by applicable law and at least to the extent contemplated by Article XV of the Plan.

*B.      Conditions to Occurrence of Effective Date*

The Effective Date does not occur unless and until:

1.      The Confirmation Date occurs;

2.      No request for revocation of the Confirmation Order under Bankruptcy Code § 1144 is pending;

3.      Sufficient Available Cash exists to make all payments required under the Plan to be made to Administrative, other Priority and Priority Tax Claims on the Effective Date; and

4.      All instruments and agreements to be issued, entered into, delivered, or filed under the Plan are issued, entered into, delivered, or filed and are effective.

*C.      Waiver of Conditions*

The Debtors may waive any condition to confirmation or the Effective Date, in whole or in part, at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to confirmation and consummation of the Plan.

## XIV.    RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS

*A.    **General***

**Except as otherwise provided for in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.**

**In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date the Post-Effective Date Debtors may (1) compromise and settle Claims against them and (2) compromise and settle Retained Causes of Action against other Entities.**

For purposes of the following release and exculpation provisions the following defined terms below shall have the meanings set forth:

"**Causes of Actions**" means all Claims, actions, causes of action, choses in action, suits, debts, dues, damages, defenses, judgements, set-off claims, third-party claims, counterclaims, and cross claims that are or may be pending or existing on the Effective Date against any Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, known or unknown, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, and including the unknown Causes of Action that have not been released by the Plan or any order of the Bankruptcy Court.

"**Exculpated Parties**" means, collectively, each in their individual capacities as such, (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the Debtors' Directors and Officers that served in such capacity from and after the Petition Date and (d) Professionals retained under section 327 of the Bankruptcy Code.

"**Related Persons**" means, with respect to any Person, such Person's current and former officers, directors, employees, in each case, acting in such a capacity.  For the avoidance of doubt, the named defendants in the Alleged Bad Actor Litigation and Sichenzia Litigation are not Related Persons.

"**Released Parties**" means (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Plan Administrator; and (d) the Debtors' present and former directors and officers.

"**Releasing Parties**" means, collectively, each in its capacity as such: (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Plan Administrator; (d) all Holders of Claims that vote to accept the Plan; (e) all Holders of Claims whose vote to accept or reject the Plan is solicited but do not vote to accept or reject the Plan and that do not indicate that they opt out of granting the releases set forth in Article XIV of the Plan; (f) all Holders of Claims that vote to reject the Plan do but not indicate that they opt out of granting the releases set forth in Article XIV of the Plan; and (g) the Related Persons of each of the foregoing (a)-(f); provided, however, the Releasing Parties shall exclude any of the foregoing parties that make a Release Opt-Out Election.

*B.*    ***Releases by the Debtors***

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, including the Retained Causes of Action, except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged by the Debtors, the Post-Effective Date Debtors and the Plan Administrator from any and all Claims, or Causes of Action whatsoever, including any Derivative Claims asserted or that could have been asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities,

operations or business of the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Parties, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Orders, this Combined Disclosure Statement and Joint Plan of Liquidation, or any related agreements, instruments, or other documents, or  the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided that nothing in the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

C.    *Consensual Third-Party Releases by Holders of Claims*

As of the Effective Date, for good and valuable consideration, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or their Estates, any Claims or Causes of Action that any Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Chapter 11 Cases, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Parties, the negotiation, formulation, or preparation of the DIP Orders, the Plan, or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, provided that nothing in the Plan shall be construed to release the Released Parties from (i) any claims based upon willful misconduct or intentional fraud as determined by a Final Order; or (ii) any claims of MSK arising from either the BII Settlement Agreement or the Y-mAbs Settlement Agreement.

D.    *Non-Discharge of the Debtors; Injunction*

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than asserts required to be distributed to that Entity under the Plan.  All parties are precluded from asserting against any property to be distributed under the Plan, any Claims,

rights, Cause of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest, from:

1.    Commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors, the Post-Effective Date Debtors, the Plan Administrator, their successors and assigns, and any of their assets and properties;

2.    Enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any of the Debtors, the Post-Effective Date Debtors, the Plan Administrator, their successors and assigns, and any of their assets and properties;

3.    Creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors, the Post-Effective Date Debtors, the Plan Administrator, their successors and assigns, and any of their assets and properties;

4.    Asserting any right of setoff or subrogation of any kind against any obligation due from any of the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of Claim; or

5.    Commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XIV of the Plan.

E.    *Exculpation*

Except as otherwise provided in the Plan or the Confirmation Order, to the maximum extent permitted by applicable law, the Exculpated Parties shall not have or incur, and the Exculpated Parties are hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any Claim in connection with or arising out of the filing or administration of the Chapter 11 Cases, the negotiation and pursuit of the Amended Combined Disclosure Statement and Joint Plan of Liquidation, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

F.      *Binding Nature of Plan*

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

G.      *Preservation of Insurance*

The satisfaction of Claims as provided in the Plan, except as necessary to be consistent with the Plan, does not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Debtors' present and former directors and officers, or any other Person.

## XV.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court retains as much jurisdiction over the Chapter 11 Case after the Effective Date as legally permissible, including jurisdiction to:

A.      Allow, disallow, determine, liquidate, classify, estimate, or establish the amount, priority, or secured or unsecured status of any Claim, and resolve any request for payment of any Administrative Claim and any objection to the Allowance or priority of any Claim;

B.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

C.      Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which the Debtors are a party and to hear, determine and, if necessary, liquidate any Claims arising from such rejection;

D.      Ensure that Distributions required under the Plan are accomplished in accordance with the Plan;

E.      Decide or resolve any motions, adversary proceedings, contested matters, and any other matters and grant or deny any applications or motions involving the Debtors that may be pending on or after the Effective Date;

F.      Enter any necessary or appropriate orders to implement or consummate the Plan's provisions and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

G.      Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Person's obligations incurred in connection with the Plan;

H.      Hear and determine any motion or application to modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan; or hear or determine any motion or application to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, or any contract, instrument, release, or other agreement or document issued, entered into, filed or delivered in connection with the Plan, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

I.      Issue injunctions, enter and implement other orders, or take any other necessary or appropriate actions to restrain any entity's interference with consummation or enforcement of the Plan;

J.      Enter and implement any necessary or appropriate orders if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

K.      Determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Confirmation Order;

L.      Issue a final decree and enter an order closing the Chapter 11 Case; and

M.      Adjudicate the Disputed Claims, the Avoidance Actions, and the Retained Causes of Action or claims of the Estates or any dispute under the Y-mAbs or BII Settlement Agreements.

## XVI.      AMENDMENT AND WITHDRAWAL OF PLAN

*A.*     *Amendment of Plan*

At any time before the Confirmation Date, the Debtor may amend the Plan under Bankruptcy Code § 1127(a) as long as doing so does not materially and adversely affect the treatment and rights of the holders of Claims and Equity Interests under the Plan. After the Confirmation Date but before substantial consummation of the Plan as defined in Bankruptcy Code § 1101(2), the Post-Effective Date Debtors or the Plan Administrator may, under Bankruptcy Code § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Disclosure Statement and Joint Plan of Liquidation or the Confirmation Order, and any matters necessary to carry out the Plan's purposes as long as those proceedings do not materially and adversely affect the treatment of holders of Claims or Equity Interests under the Plan. The Post-Effective Date Debtors or the Plan Administrator must serve prior notice of those proceedings in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

B.    *Withdrawal of Plan.*

The Debtors may withdraw the Plan at any time before the Confirmation Date. If withdrawn, the Plan is void and nothing contained in the Plan waives or affects any Claims by or against the Debtors or any other Person in any further proceedings involving the Debtors or an admission of any sort, and the Plan and any transaction contemplated by the Plan may not be admitted into evidence in any proceeding.

## XVII.    MISCELLANEOUS

A.    *Binding Effect*

The Plan is binding on, and inures to the benefit of, the Post-Effective Date Debtors and the holders of all Claims and Equity Interests.

B.    *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any document entered into in connection with the Plan, the rights, duties and obligations of any Person arising under the Plan are governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware, without regard for Delaware's choice of law provisions.

C.    *Setoffs and Recoupment*

The Debtors and the Plan Administrator may but are not required to set off or recoup against any Claim (and the payments or other distributions to be made under the Plan in respect of such Claim) claims of any nature that arose before the Petition Date that the Estates may have against the holder of such Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the fact of any Claim under the Plan becoming Allowed constitutes a waiver or release by the Estates of any such claim that it may have against such holder.

D.    *Notices*

Any notice required or permitted to be provided under the Plan must be in writing and served by certified return-receipt-requested U.S. mail, hand delivery, overnight courier, or read-receipt-enabled email.  Any such notices to the Debtor or to the Plan Administrator should be addressed thus:

> David Hansen
> MabVax Therapeutics Holdings, Inc.
> 11535 Sorrento Valley Road, Ste. 400
> San Diego, CA 92121
>
> With a copy to:
>
> Frederick B. Rosner

Scott J. Leonhardt
Jason A. Gibson
Zhao (Ruby) Liu
The Rosner Law Group LLC
824 N. Market Street
Suite 810
Wilmington, DE 19801

If personally delivered or sent by overnight courier in accordance with the Plan, notice is deemed delivered on actual receipt. If emailed in accordance with the Plan, notice is deemed delivered on the noticing party's receipt of the read-receipt. If sent by U.S. mail in accordance with the Plan, notice is deemed delivered as of the date of delivery indicated on the receipt issued by the postal service or, if the addressee fails or refuses to accept delivery, as of the date of that failure or refusal.  Any party to the Plan may change its address for the purposes of the Plan by giving notice of the change to the Plan Administrator.

E.      *Severability*

If the Bankruptcy Court or any appellate court finds the Plan or any provision of the Plan to be invalid, illegal, or unenforceable, or if the Bankruptcy Court cannot confirm the Plan under Bankruptcy Code § 1129, the Bankruptcy Court, at the Post-Effective Date Debtors' or the Plan Administrator's request, may retain the power to alter and interpret the Plan or any such provision to make it valid or enforceable to the maximum extent feasible, consistent with the original purpose of the provision held to be invalid or unenforceable, and such provision then becomes applicable as altered or interpreted. The Confirmation Order constitutes a judicial determination and provides that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

F.      *Substantial Consummation*

Once the Effective Date has occurred and any payments under the Plan to any holder of a Claim have commenced, the Plan is substantially consummated within the meaning of Bankruptcy Code §§ 1101 and 1127(b).

G.      *Withholding and Reporting Requirements*

The Post-Effective Date Debtors and the Plan Administrator, as applicable, must comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority with respect to all Distributions. The Post Effective Date Debtors and the Plan Administrator, as applicable, may take all actions necessary to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim and, if applicable, any Equity Interest that receives a Distribution has sole responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such Distribution.

H.      *Post-Effective Date Fees; Final Decree*

The Estates through the Plan Administrator must pay any post-Effective Date fees under 28 U.S.C. § 1930(a)(6) and file post-confirmation reports until the Bankruptcy Court enters a final decree, which the Plan Administrator may seek and obtain from the Bankruptcy Court as soon as feasible after any payments under the Plan have commenced. Notice of application for a final decree need be given only to those parties that, after the Effective Date, specifically request such notice in writing.

**THE ROSNER LAW GROUP LLC**

Dated: January 9, 2020
    Wilmington, DE

*/s/ Frederick Rosner*
Frederick B. Rosner (DE #3995)
Scott J. Leonhardt (DE #4885)
Jason A. Gibson (DE #6091)
Zhao (Ruby) Liu (DE #6436)
824 N Market Street
Suite 810
Wilmington DE 19801
(302) 777-1111
Email: rosner@teamrosner.com
        leonhardt@teamrosner.com
        gibson@teamrosner.com
        liu@teamrosner.com

**<u>Exhibit A</u>**

**Liquidation Analysis**

**Liquidation Analysis[1]**

| | Chapter 11 | Chapter 7 |
|---|---|---|
| *Assets* [1] | | |
| Cash [2] | $ 303,000.00[2] | $ 303,000.00 |
| Alleged Bad Actor Litigation proceeds [3] | - | - |
| Sichenzia Litigation proceeds [4] | - | - |
| Milestone Payments, include: | - | - |
| Y-mAbs Receivable [5] | - | - |
| Y-mAbs Settlement Payment [6] | Up to $50,000.00 | Up to $50,000.00 |
| BII Receivable [7] | - | |
| **Gross Assets** | **$ 353,000.00** | **$ 353,000.00** |
| *Secured Claims* [8] | $          0.00 | $          0.00 |
| **Net Proceeds After Secured Claims** | **$ 353,000.00** | **$ 353,000.00** |
| *Estimated Allowed Administrative Claims* [9] | | |
| Chapter 7 Trustee Fees [10] | - | $       39,690.28 |
| Chapter 7 Trustee Professional Fees [11] | - | $     250,000.00 |
| Chapter 11 Plan Administrator Fees [12] | $       45,000.00 | - |
| Chapter 11 Professional Fees and | | |
| Independent Director Fees [13] | $     100,000.00 | - |
| **TOTAL** | $     473,351.00 | $     618,041.28 |
| *Estimated Recovery Rate* | *(100%)* | *(100%)* |
| **Net Proceeds After Administrative Claims** | **$     225,173.33** | **$       80,483.05** |
| Priority Claims [14] | $       74,994.44 | $       74,994.44 |
| *Estimated Recovery Rate* | *(100%)* | *(100%)* |
| **Net Proceeds After Priority Claims** | **$     150,178.89** | **$         5,488.61** |
| Priority Tax Claims [15] | $         - | $         - |
| *Estimated Recovery Rate* | *(100%)* | *(100%)* |
| **Net Proceeds After Priority Tax Claims** | **$     150,178.89** | **$         5,488.61** |
| General Non-Priority Unsecured Claims | $ 15,885,412.94 | $ 15,885,412.94 |
| *Estimated Recovery Rate* | *(0.95%)* | *(0.03%)* |

---

[1]     This Liquidation Analysis should be read in conjunction with the accompanying Introduction, Scope, Intent, and Purposes, Assumption and Notes.

[2]     The reduction in Cash from the previous version of the Liquidation Analysis is due to payment of the MSK/Y-mAbs Cure Amount.

{00027250. }

## A.  Introduction

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of liquidation unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis (the "Notes").  Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement. The Liquidation Analysis estimates potential Cash distributions to holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtors' assets. Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement.

## B.  Scope, Intent, and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.  No independent appraisals were conducted in preparing the Liquidation Analysis.

THE DEBTORS MAKES NO REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules and proofs of claim filed to date.  In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Case, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, trustee fees and trustee counsel fees.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis.  For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims contained in the Liquidation Analysis references specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to holders of Allowed Claims are based on ranges of Allowed Claims.  Therefore, the Debtors' estimate of Allowed

Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## C. **Assumptions and Notes**

**(1) Assets.** The Liquidation Analysis assumes a liquidation of all of the Debtors' assets. The Debtors' primary assets are all Cash on hand held by the Debtors and Post-Effective Date Debtors on and after the Effective Date, including any Sale Proceeds, any proceeds from the resolution of the Alleged Bad Actor Litigation, the Sichenzia Litigation, and Milestone Payments (*i.e.*, the BII Receivable and the Y-mAbs Receivable).

**(2) Cash.** This represents remaining cash as of December 17, 2019.

**(3) Alleged Bad Actor Litigation proceeds**. As of the date hereof, the Debtors cannot predict with certainty of the magnitude of recovery, if any, upon resolution of the Alleged Bad Actor Litigation.

**(4) Sichenzia Litigation proceeds**. As of the date hereof, the Debtors cannot predict with certainty of the magnitude of recovery, if any, upon resolution of the Sichenzia Litigation.

**(5) Y-mAbs Receivable.** This represents any amount that may become due and owing to the Debtors pursuant to the Y-mAbs Settlement Agreement. By way of background, the Debtors retained its right to receive 20% of the net sale proceeds of a Priority Review Voucher, if approved and sold, pursuant to that Y-mAbs Settlement Agreement. As of the date hereof, the Debtors cannot predict with certainty the value of such Priority Review Voucher.

**(6) Y-mAbs Settlement Payment**. This represents the cap on reimbursement of the Debtors' fees and expenses due and owing to the Debtors pursuant to the *Order Approving Settlement between the Debtors, Sloan Kettering Institute for Cancer Research and Y-mAbs Therapeutics Inc.* [D.I. 270].

**(7) BII Receivable**. This represents any amount(s) that may become due and owing to the Debtors or Post-Effective Date Debtors or their designees pursuant to the *Assumption of MSK License Agreement and BII Agreements* [D.I. 138] by and between the Debtors, BioNTech and MSK. As of the date hereof, the Debtors cannot predict with certainty the magnitude of recovery, if any.

**(8) Secured Claims**. As of the date hereof, the Debtors' has no Secured Claims.

**(9) Estimated Allowed Administrative Claims**. This represents what the Debtors anticipate to be the final amount of allowed Administrative Claims excluding future amounts that may become due and owing to MSK on account of the BII Receivable and the BII Settlement Agreement. For disclosure purposes, certain Equity Holders of the Debtors filed Administrative Proofs of Claim

in the amount of $523,907.35. The Debtors will be filing an objection to these Administrative Proofs of Claim pursuant to Local Rule 3007-1(d)(v) to disallow the claims entirely.

**(10) & (11) <u>Chapter 7 Trustee and Professional Fees</u>**. As described *supra* and in the Combined Disclosure Statement and Joint Plan of Liquidation, the Debtors' primary Assets include expected proceeds from the resolution of lawsuits against the Alleged Bad Actors and the Sichenzia Litigation, plus receivables related to the Debtors' major intellectual property licenses and/or sublicenses. If the Debtors enter chapter 7 proceedings, the amount of Administrative Claims would increase substantially because the chapter 7 trustee and his/her counsel, who has no institutional knowledge of the above-mentioned litigations and licenses, will have to incur substantial costs to bring themselves and their counsel up to speed. Additionally, in the event the Debtors receive proceeds from the Alleged Bad Actors and the Sichenzia Litigation, the Chapter 7 Trustee Fees will be significantly higher due to the increased amount of distributions made by the chapter 7 trustee.

The hourly rate of the prospective chapter 7 trustee and counsel is likely to be higher than that of the proposed chapter 11 Plan Administrator ($300/hr) and the Debtors' Chapter 11 Counsel (blended rate of $350/hr).

**(12) & (13) <u>Chapter 11 Plan Administrator Fees and Professional Fees</u>**. The proposed Plan Administrator is Mr. J. David Hansen, the Debtors' former Chief Executive Officer and Chairman of the Board of Directors. Pre-petition, Mr. Hansen was directly involved in all business transactions completed by the Debtors, including the transactions giving rise to the Milestone Payments. He also is familiar with the Alleged Bad Actor and Sichenzia Litigation.

On October 2, 2019, the Court entered the *Order Authorizing the Retention and Employment of Gatto, Pope & Walwick LLP as Accountants to the Debtors, Nunc Pro Tunc to the Petition Date* [D.I. 230].

On December 6, 2019, the Debtors filed the *Debtors' Application for an Order, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, Appointing Ted Gavin of Gavin/Solmonese as an Independent Director of the Debtors Nunc Pro Tunc* (the "<u>Application</u>") [D.I. 263]. As set forth in greater detail in the Application, the Debtors seek to appoint Edward T. Gavin as an independent director of the Debtors for the sole and limited purpose of investigating certain Derivative Actions and determining whether such actions have merit and value to the Debtors' estates and should be pursued by the Debtors and the estates as part of the Plan or, alternatively, whether considered independently and objectively by Mr. Gavin it is appropriate to release Derivative Actions as having no value.

**<u>(14) Priority Claims</u>**. This represents the amount the Debtors believe will be the final amount of Priority Claims allowed in these Chapter 11 Cases. For disclosure purposes, the total amount of priority claims asserted pursuant to Section 507(a)(4) of the Bankruptcy Code was $88,194.44. Four of the Debtors' former employees, however, asserted Section 507(a)(4) claims greater than the allowed priority amount of $12,850.00. The Debtors are working with these former employees to consensually reduce the amount of their Section 507(a)(4) claims. If the Debtors are unable to reach an agreement with the former employees, the Debtors will file an objection to reduce the amount of claims to the appropriate cap.

**(15) Priority Tax Claims**.  The Internal Revenue Service filed a claim against Debtor MabVax Therapeutics Holdings, Inc. in the amount of $97,691.15 allegedly stemming from failing to file certain quarterly tax returns and paying associated taxes.  The Debtors have reviewed its Books and Records and have confirmed that the quarterly tax filings at issue were filed by the Debtors' payroll servicer, Paychex, Inc. under the EIN of Debtor MabVax Therapeutics, Inc.  Additionally, the amount asserted by the IRS has been paid.  The Debtors have been in contact with the IRS, and are working with Paychex, Inc. to have to the correct tax forms filed and payments transferred to the correct EIN.  Accordingly, the Debtors' anticipate that the IRS's claim will be expunged in its entirety.

The San Diego County Treasurer – Tax Collector filed a claim against Debtor MabVax Therapeutics, Inc. in an amount of $9,430.53 related to post-petition taxes allegedly owed for "Personal Property/Fixtures" in connection with the Debtors former property lease.  Pursuant to the Sale, the Debtors' lease was assumed and assigned to BioNTech.  Accordingly, the amounts asserted by the San Diego County Treasurer should be properly asserted against and paid by BioNTech.  The Debtors are working with BioNTech in order to satisfy the San Diego County Treasurer's claim, and anticipate the claim being withdrawn.